**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FINANCIAL SERVICES INSTITUTE, INC., FINANCIAL SERVICES ROUNDTABLE, GREATER IRVING-LAS COLINAS CHAMBER OF COMMERCE, HUMBLE AREA CHAMBER OF COMMERCE DBA LAKE HOUSTON AREA CHAMBER OF COMMERCE, INSURED RETIREMENT INSTITUTE, LUBBOCK CHAMBER OF COMMERCE, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, and TEXAS ASSOCIATION OF BUSINESS,<br><br>            Plaintiffs,<br><br>    v.<br><br>THOMAS E. PEREZ, SECRETARY OF LABOR, and UNITED STATES DEPARTMENT OF LABOR,<br><br>            Defendants. | Civil Action No. 16-cv-1476 |

**COMPLAINT**

Plaintiffs CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

FINANCIAL SERVICES INSTITUTE, INC., FINANCIAL SERVICES ROUNDTABLE,

GREATER IRVING-LAS COLINAS CHAMBER OF COMMERCE, HUMBLE AREA

CHAMBER OF COMMERCE DBA LAKE HOUSTON AREA CHAMBER OF COMMERCE,

INSURED RETIREMENT INSTITUTE, LUBBOCK CHAMBER OF COMMERCE,

SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, and TEXAS

ASSOCIATION OF BUSINESS, for their Complaint against Defendants THOMAS E. PEREZ,

SECRETARY OF LABOR, and UNITED STATES DEPARTMENT OF LABOR allege, by and through their attorneys, on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit asserts claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, and the First Amendment to the United States Constitution, challenging a rule ("Fiduciary Rule" or "Rule") and related "prohibited transaction exemptions" ("PTEs") recently promulgated by the U.S. Department of Labor ("DOL" or "Department").[1]  The Rule and PTEs overstep the Department's authority, create unwarranted burdens and liabilities, undermine the interests of retirement savers, and are contrary to law.

2.      Dating back to the 1930s and the enactment of the federal securities laws, the financial services and insurance industries have been rigorously regulated by the U.S. Securities and Exchange Commission ("SEC").  The financial services and insurance industries are also regulated by self-regulatory organizations overseen by the SEC and authorized by Congress, including the Financial Industry Regulatory Authority ("FINRA"), and by state insurance departments and state securities departments in all 50 states and the District of Columbia.  Time

---

[1]   *See* Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20,946 (Apr. 8, 2016); Best Interest Contract Exemption, 81 Fed. Reg. 21,002 (Apr. 8, 2016); Class Exemption for Principal Transactions in Certain Assets Between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs, 81 Fed. Reg. 21,089 (Apr. 8, 2016); Amendment to Prohibited Transaction Exemption (PTE) 75-1, Part V, Exemptions from Prohibitions Respecting Certain Classes of Transactions Involving Employee Benefit Plans and Certain Broker-Dealers, Reporting Dealers and Banks, 81 Fed. Reg. 21,139 (Apr. 8, 2016); Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters, 81 Fed. Reg. 21,147 (Apr. 8, 2016); Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 86-128 for Securities Transactions Involving Employee Benefit Plans and Broker-Dealers; Amendment to and Partial Revocation of PTE 75-1, Exemptions from Prohibitions Respecting Certain Classes of Transactions Involving Employee Benefits Plans and Certain Broker-Dealers, Reporting Dealers and Banks, 81 Fed. Reg. 21,181 (Apr. 8, 2016); Amendments to Class Exemptions 75-1, 77-4, 80-83, and 83-1, 81 Fed. Reg. 21,208 (Apr. 8, 2016).

and again, Congress has affirmed that the SEC is, and should be, the primary federal regulator of the financial services industry, including recently in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 913(g), 124 Stat. 1376, 1828 (2010) ("Dodd-Frank Act").  The Dodd-Frank Act directs the SEC to evaluate whether to apply a uniform "best interest" standard of care to broker-dealers (who do not owe fiduciary duties to their customers under the securities laws currently) and registered investment advisers (who do) when they provide personalized investment advice to consumers.  Plaintiffs and their members support adoption and implementation of such a uniform standard of care by the SEC.

3.     Congress has also affirmed the primary role of state regulators over the business of insurance through various legislative acts, including the Dodd-Frank Act, which precludes the SEC from regulating certain annuities (a type of insurance product) that satisfy specified criteria developed by the National Association of Insurance Commissioners, and satisfy certain state law nonforfeiture requirements.

4.     Under this long-standing legislative and regulatory structure, tens of millions of Americans are able to enjoy a secure retirement because they can receive quality retirement assistance, products, and services from financial professionals.  Americans who receive assistance from financial professionals save more throughout their working years, make better use of available retirement planning products and strategies, commonly experience better returns on their investments, and, as a consequence, are better prepared for retirement than those who do not have access to retirement planning services and advice.  Retirement savers have been able to obtain these services through a variety of arrangements that are tailored to their needs, income levels, and preferences, and have the option to enter a relationship that is fiduciary, which may entail higher costs, or non-fiduciary, which may have lower costs.

5.       In providing both fiduciary and non-fiduciary services, financial professionals and their firms abide by exacting standards of care established by the SEC, FINRA, state insurance departments, and state securities departments.  Serving the best interest of customers has been and remains a paramount commitment of the industry, which has long supported the SEC's development of a uniform standard requiring professionals to act as fiduciaries when providing personalized investment advice about securities to retail customers.[2]

6.       The Rule the U.S. Department of Labor has promulgated in this case would upend this well-developed regulatory framework, with harmful consequences for retirement savers, small businesses, and tens of thousands of businesses—including many operating in North Texas and the Dallas-Fort Worth metroplex—that provide retirement advice, products, and services.

7.       The Department's Rule redefines "fiduciary" under section 3(21) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(21), and the identical definition under section 4975(e) of the Internal Revenue Code ("Code"), 26 U.S.C. § 4975(e)(3). Supplanting a regulation that has been in place since 1975, shortly after ERISA was enacted, the Rule dictates when a person becomes a fiduciary under ERISA and the Code by virtue of providing "investment advice" to ERISA-covered employee benefit plans and plans covered under the Code, including Individual Retirement Accounts ("IRAs").  Under the Fiduciary Rule, a person who makes any of various "recommendations" to a retirement saver, and who receives a fee or other compensation in connection with that recommendation, becomes a "fiduciary" under ERISA and/or the Code.  The recommendations covered by the Rule include many that have never been understood to entail fiduciary duties, such as whether to purchase an investment

---

[2]  "Retail customer," as defined by Congress, is "a natural person, or the legal representative of such natural person, who (A) receives personalized investment advice about securities from a broker, dealer or investment adviser; and (B) uses such advice primarily for personal, family, or household purposes."  15 U.S.C. § 80b–11(g)(2).

product, or offering a simple comparison between a firm's own proprietary products.  Indeed, the Rule makes it impossible to sell most individual retirement investment products without being deemed a fiduciary.  It also bars non-fiduciaries from engaging in a range of ordinary and customary communications with clients, including communications that explain their products and services.

8.      This Rule will limit consumer choice by forcing those who need retirement investment assistance to obtain it only by entering a fiduciary relationship, and bearing the accompanying costs, or to forgo it entirely.  Studies show that a similar regulation adopted in the United Kingdom has had a real and negative impact on lower-income individuals' ability to obtain much-needed retirement assistance—resulting in what one of the principal U.K. financial regulators has called an "advice gap" for the less affluent.  *See, e.g.*, Financial Conduct Authority, *Financial Advice Market Review Final Report* at 5-8 (March 2016), *available at* https://www.fca.org.uk/static/fca/documents/famr-final-report.pdf.

9.      Under the Department's Rule, small businesses in the United States will be hampered in their ability to maintain retirement plans for their workers.

10.     The SEC has more than eighty years' experience regulating financial markets and services, including the provision of investment advice, and has been specifically charged by Congress with studying the propriety of adopting a uniform fiduciary standard.  The Department of Labor's authority, by contrast, is more narrowly prescribed and is generally restricted to employee benefit plans.  It possesses neither the expertise nor the authority to regulate financial services in a manner that properly balances the needs of retirement savers and small businesses.

11.     Because the Department lacks *affirmative* authority to regulate financial services outside the context of employee benefit plans, it has sought to promulgate this new regulatory

regime through its *exemptive* authority under ERISA.  That is, the Department seeks to convert its authority to *lift* regulatory burdens into a means to *impose* them, resulting in the most sweeping change in retirement planning since the adoption of ERISA itself.  By doing so, the Department has disregarded the regulatory framework established by Congress, exceeded its authority, and assumed for itself regulatory power that is vested in the SEC in ways that will harm retirement savers.

12.     The Department has pursued this improper expansion of its authority in two steps. First, through its redefinition of "fiduciary," the Department expands who is covered by the term in a manner that is inconsistent with the statutory text and the ordinary and historical understanding of what constitutes a fiduciary relationship.  In doing so, the Department bans common and long-accepted forms of compensation for financial services and insurance professionals, such as commissions and sales loads (a mutual fund sales charge).  The Department's broad redefinition has this effect because fiduciaries under ERISA and the Code are prohibited from receiving compensation that varies based on the investment "advice" provided or transaction engaged in.  *See* 81 Fed. Reg. 20,946-21,002.  The Department is well aware that these methods of compensation are essential for firms and professionals to continue to offer many of the valued services and products they provide.  Second, the Department then offers an exemption from this far-reaching prohibition—known as the Best Interest Contract Exemption (or "BIC" exemption)—but conditions it on financial services firms and insurance institutions agreeing to subject themselves to fiduciary standards of conduct in contracts that they must enter into with their customers, as well as a range of other restrictions and requirements. *See* 81 Fed. Reg. 21,002-21,089.

13.     And, because the Department itself lacks authority to enforce these new fiduciary standards of conduct, it requires that the new contracts expose financial services firms and insurance institutions to liability in class action lawsuits.  Another newly promulgated exemption, the Principal Transactions exemption, requires these same contractual obligations and liabilities.  *See* 81 Fed. Reg. 21,089-21,139.

14.     The Department has acknowledged that financial services firms and insurance institutions will have no choice but to submit to the terms of its exemptions.  That was the Department's objective, since, as it stated in the release accompanying the BIC exemption, "banning all commissions, transaction-based payments, and other forms of conflicted payments" (which would otherwise occur under the Rule) "could have serious adverse unintended consequences."  81 Fed. Reg. at 21,062/3.

15.     The Department has also made clear that it intends to subcontract to the class action bar enforcement of the new regulatory scheme that it lacks the power to enforce itself.  In the words of the Labor Department official responsible for the Rule:  "Back in the day, when people wanted to make changes, they passed legislation," but "what we've done" with the new DOL regulations "is we've shifted from the way that social change and legal change and financial change is accomplished through congressional action to two different avenues for making changes:  The main one being regulation and the second one being litigation."[3]  The Labor Department lacked direct statutory authority over IRAs, the official later explained, and therefore "we had to be creative to try to find a way to" create enforceable rights under the Rule;

---

[3]   Kristen Ricuarte Knebel, *Borzi Highlights Changes to ERISA as She, Other Speakers Look Back at Law's 40 Years*, Bloomberg BNA (Sept. 9, 2014), http://benefits.bna.com/bprc/2229/split_display.adp? fedfid=56270592&vname=pennotallissues&split=0.

"that's how we came up with the best interest contract exemption," which "deputiz[es]" consumers to bring "state contract actions."[4]

16.     In short, the Department is instituting a deliberately unworkable fiduciary definition, with full knowledge that financial services firms and insurance institutions will have no choice but to seek an exemption from it.  The Department is conditioning that exemption on an agreement to adhere to practices that the Department has no authority to require or enforce, and that will therefore be administered instead by the class action bar.

17.     As illustrated below, the consequences—for savers, for small U.S. businesses, for financial professionals, and for the financial services firms and insurance institutions—will be extensive and severe.

18.     This Fiduciary Rule, the BIC exemption, and the other related PTEs are arbitrary, capricious, and violate the APA and First Amendment.  They should be vacated, and the Department should be enjoined from implementing or enforcing them in any manner.

## PARTIES

19.     Plaintiff Chamber of Commerce of the United States of America ("Chamber") is the world's largest federation of businesses and associations.  It directly represents 300,000 members and indirectly represents the interests of more than three million businesses and trade associations of every size, in every industry sector, and from every region of the country.  More than 96% of the Chamber's members are small businesses with 100 or fewer employees.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly brings

---

4   *DOL Will Rely on Consumers, Advisors to Help Enforce Fiduciary Rule: Borzi*, ThinkAdvisor (May 25, 2016), http://www.thinkadvisor.com/2016/05/25/dol-will-rely-on-consumers-advisors-to-help-enforc?&slreturn=1464294809.

litigation challenging the legality of rulemaking by federal agencies, including the U.S. Department of Labor, in order to protect the legal rights of American businesses with respect to subjects such as financial regulation, retirement benefits, class actions, and arbitration.  Chamber members and their subsidiaries run the entire gamut of businesses directly subject to the Fiduciary Rule, including registered investment advisers and other financial professionals, as well as broker-dealers, banks, insurers, and other large and small financial institutions and financial services firms.  Many of the Chamber's members, especially small businesses, sponsor 401(k) and other retirement plans that will be directly affected by the Rule.  The Chamber's members will incur significant compliance and other costs as a result of the Rule's expansion of fiduciary status.  As a result, its members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some individuals and employees may no longer be able to obtain their investment assistance.  The Chamber brings this action on behalf of its members and in order to advance the interests of its members and, more broadly, the entire business community.

20.     Plaintiff Financial Services Institute, Inc. ("FSI") is an advocacy association comprised of members from the independent financial services industry and is the only organization advocating solely on behalf of independent financial advisers and independent financial services firms.  Approximately 100 independent financial services firms and 39,000 independent financial advisers are members of FSI.  Since 2004, through advocacy, education, and public awareness, FSI has been working to create a healthier regulatory environment for these members so they can provide affordable, objective financial advice to hard-working Americans.  FSI's mission is to ensure that all Americans have access to competent and affordable financial advice, products, and services, delivered by a growing network of

independent financial advisers and independent financial services firms. The Rule at issue here will impede these efforts by restricting the advice, products, and services that FSI members may provide, thereby harming their ability to serve their customers and making it harder for their customers to obtain investment assistance and achieve a dignified retirement. The Rule will also impose unnecessary, burdensome, and direct compliance costs on FSI members. FSI brings this action on behalf of its members.

21.    Plaintiff Financial Services Roundtable ("FSR") is an advocacy organization for the financial services industry, representing the interests of the largest integrated financial services companies serving American consumers. FSR works to ensure that its members' interests are represented at every level of the U.S. government and, in turn, helps its members understand the policies and regulations shaping the financial services industry. FSR member companies participate through the Chief Executive Officer ("CEO") and other senior executives nominated by the CEO. FSR member companies provide American consumers with a variety of essential services, including banking, insurance, credit cards and payment products, mortgages, loans, and investment advice and products. As a result of the Rule and the restrictions it imposes on FSR members, those members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance. The Rule will also impose unjustified compliance costs on FSR members. FSR brings this action on behalf of its members.

22.    Plaintiff Greater Irving-Las Colinas Chamber of Commerce ("Irving Chamber") is a membership organization accredited by the Chamber that represents the interests of the business community in the Greater Irving and Las Colinas, Texas areas. The Irving Chamber works to promote the growth and development of the business community in Greater Irving and

Las Colinas by, among other things, providing businesses with the resources and connections to thrive in the region, hosting networking and informational events, and advocating for policies favorable to business development and advantageous to consumers.  A number of the Irving Chamber's members are financial services providers and insurance companies who will incur significant compliance and other costs as a result of the Rule's expansion of fiduciary status.  As a result, the Irving Chamber's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance.  Many other members are businesses that sponsor retirement plans for their employees, and that will be negatively affected by the Rule.  The Irving Chamber brings this action on behalf of its members.

  23. Plaintiff Humble Area Chamber of Commerce DBA Lake Houston Area Chamber of Commerce ("Lake Houston Chamber") is a membership organization accredited by the Chamber that promotes the economy and quality of life in the Lake Houston area by attracting new businesses, supporting the expansion of existing ones, and representing the area's business interests at the local, state, and national levels, activities which also redound to consumers' benefit.  A number of the Lake Houston Chamber's members are financial services providers and insurance companies who face significant compliance and other costs as a result of the Rule's expansion of fiduciary status.  As a result, the Lake Houston Chamber's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance.  Many other members sponsor retirement plans for their employees that will be negatively affected by the implementation of the Rule.  The Lake Houston Chamber brings this action on behalf of its members.

24.     Plaintiff Insured Retirement Institute ("IRI") is the leading association for the retirement income industry and is the only association that represents every segment of the insured retirement income industry.  IRI members are major life insurers, broker-dealers/distributors, and asset managers, and IRI provides member services to over 150,000 financial professionals.  IRI's members provide lifetime income products to over 30 million American families, with more than $2.6 trillion of assets under management.  As a not-for-profit organization, IRI provides an objective forum for communication and education, and advocates for the sustainable retirement solutions Americans need to help achieve a secure and dignified retirement.  IRI also leads a national consumer coalition, comprised of 40 organizations, who work to promote the importance of retirement planning.  IRI's members will be affected by the Rule's expansion of fiduciary status, including through the negative impacts on the families they serve and those needing their services and products, as well as the financial professionals who serve these families on their behalf.  The Rule will also impose significant compliance costs.  As a result, IRI's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients will no longer be able to obtain this investment assistance.  IRI brings this action on behalf of its members.

25.     Plaintiff Lubbock Chamber of Commerce ("Lubbock Chamber") is a membership organization accredited by the Chamber that represents over 2,000 member businesses, who in turn employ over 79,000 workers, in Lubbock, Texas, and West Texas.  The Lubbock Chamber advocates on behalf of its members on the local, state, and federal levels to promote policies favorable to businesses and advantageous to consumers in the Lubbock and West Texas areas.  It also hosts business development, community relations, and marketing events oriented toward providing member businesses with valuable networking opportunities and learning experiences

to further support their growth and development.  Many of the Lubbock Chamber's members sponsor 401(k)s and other retirement plans for their employees and will be negatively affected by the Rule.  A number of the Lubbock Chamber's members are financial services providers and insurance companies who will incur significant compliance and other costs as a result of the Rule's expansion of fiduciary status.  As a result, the Lubbock Chamber's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance.  The Lubbock Chamber brings this action on behalf of its members.

26.     Plaintiff Securities Industry and Financial Markets Association ("SIFMA") is the voice of the U.S. securities industry.  SIFMA represents the broker-dealers, banks, and asset managers whose nearly 1 million employees provide access to the capital markets, raising over $2.5 trillion for businesses and municipalities in the United States, serving clients with over $20 trillion in assets and managing more than $67 trillion in assets for individual and institutional clients including mutual funds and retirement plans.  SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association. SIFMA's members will be affected by the Rule's expansion of fiduciary status, including through the significant compliance costs imposed by the Rule.  As a result, SIFMA's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance. SIFMA brings this action on behalf of its members.

27.     Plaintiff Texas Association of Business ("TAB") is the state chamber of commerce for Texas, advocating for policies favorable to businesses on behalf of Texas employers and businesses of all sizes and representing more than 4,000 business members and

their over 600,000 employees at the state and federal levels.  On the federal level, TAB works to promote a national affairs agenda aimed at improving the climate for employers, so their employees may thrive.  The final Rule is directly contrary to TAB's goal of minimizing the regulatory burdens faced by Texas employers.  A significant portion of TAB's members are financial services providers and insurance companies who will be directly impacted by the Department's expansion of the definition of "fiduciary," and will face substantial compliance costs when the Rule takes effect.  TAB members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance.  Many other members sponsor retirement plans for their employees that will be directly affected by the implementation of the Rule.  TAB brings this action on behalf of its members.

28.     Defendant Thomas E. Perez is the U.S. Secretary of Labor and is subject to the APA.  *See* 5 U.S.C. § 551(1).  The Secretary is sued in his official capacity as head of DOL.

29.     Defendant DOL is an agency of the United States government subject to the APA. *See* 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

30.     This action arises under the U.S. Constitution, the APA, 5 U.S.C. § 500 *et seq.*, ERISA, 29 U.S.C. § 1001 *et seq.*, and the Code, 26 U.S.C. § 1 *et seq.*  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

31.     Plaintiffs have associational standing to bring this suit on behalf of their various members because those members will be directly and adversely affected by the Rule and exemptions and thus would have standing to sue in their own right; because the interests plaintiffs seek to protect are germane to their organizations' purposes; and because neither the claims asserted nor the relief requested requires an individual member to participate in this suit.

*See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citations omitted).

32.     Hundreds of companies that are members of the Plaintiff associations are directly subject to the Rule, are the objects of it, and will be adversely affected by the Rule, both in their ability to continue to offer valued products and services to their customers and clients, and as a consequence of the restrictions, burdens, and costs that the Rule imposes directly on those member companies.

33.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against an officer and an agency of the United States, and the Irving Chamber and the Lubbock Chamber reside in this judicial district and no real property is involved in this action.  Venue is also proper in the Dallas Division of this Court because the Irving Chamber resides in this division.  *See* N.D. Tex. Civ. R. 5.1(a).

## BACKGROUND

I.     **The Firms, Individuals, And Small Businesses That Serve Americans Seeking To Save For Retirement**

34.     Hundreds of thousands of financial professionals, small businesses, and other institutions provide valuable services to Americans seeking to save for retirement, including by providing products that help build financial security, assisting them in selecting among different investment options and guaranteed lifetime income alternatives, and rebalancing their investments to achieve a desired risk level.  Studies have shown that individuals who receive retirement help from financial professionals save more than those who do not.[5]  For example,

---

[5]  *E.g.*, Frances M. Kinniry Jr. et al., *Putting a Value on Your Value: Quantifying Vanguard Advisor's Alpha*, Vanguard Research, 4 (March 2014), http://www.vanguard.com/pdf/ISGQVAA.pdf; *The role of financial advisors in the US retirement market*, Oliver Wyman, 5 (July 10, 2015), http://fsroundtable.org/wp-content/uploads/2015/07/The-role-of-financial-advisors-in-the-US-retirement-market-Oliver-Wyman.pdf.

financial professionals help consumers achieve more retirement income, earning 1.59% in additional returns, which over time leads to 22.6% more income in retirement.[6]  And, while 88% of Hispanic Americans contribute to a retirement plan when working with a financial professional, only 54% do so working on their own.[7]

35.     By the Labor Department's own reckoning, "over 90 percent of broker-dealers, registered investment advisers, insurance companies, agents, and consultants" who provide these services are small businesses.  81 Fed. Reg. at 20,993/3.  Many financial professionals also serve small businesses, which make up 99% of all U.S. employers.

36.     To ensure that this assistance continues to be offered through a system that is fair, efficient, and effective, the industry has long supported regulatory measures at the state and federal levels to protect consumers and ensure that financial professionals act in their clients' best interests.  For example, since before the passage of the Dodd-Frank Act and to the present day, FSI, FSR, and SIFMA have called for the creation by the SEC of a uniform fiduciary standard of conduct for broker-dealers and investment advisers when providing personalized investment advice to consumers.  Others, such as IRI, have also supported a "best interest" standard of care.

37.     Among the financial professionals providing investment services to American consumers are brokers (or registered representatives), registered investment advisers, registered investment adviser representatives, and insurance agents.

---

[6]   David Blanchett & Paul Kaplan, *Alpha, Beta, and Now… Gamma*, Morningstar Investment Management, 3 (Aug. 28, 2013), http://corporate.morningstar.com/ib/documents/PublishedResearch/ AlphaBetaandNowGamma.pdf.

[7]   *Hispanic Americans On the Road to Retirement*, Prudential, 13 (March 2008), http://www.prudential.com/media/managed/Hispanic_Retirement_FINAL_3-19-08.pdf.

38.     Brokers are professionals who buy and sell investment products, such as stocks, bonds, and mutual funds, for their customers.  These individuals typically work for broker-dealer firms, which buy and sell securities both on behalf of their customers (the broker-side) and on their own account (the dealer-side).  Broker-dealers can follow the traditional "wirehouse" model, in which the firm's employees often offer the firm's proprietary products and services to customers (and, in some cases, non-proprietary products as well), or the "independent" model, in which the financial professionals have an independent contractor relationship with a broker-dealer and/or investment adviser, and also offer non-proprietary products and services.

39.     Registered investment advisers are individuals or firms who provide advice about investment products to their clients, and are specifically paid for doing so.  They are registered as investment advisers with the SEC or a state securities regulator.

40.     Investment adviser representatives are individuals who offer the registered investment adviser's investment advice to their clients, and are specifically paid for doing so.  They are registered as investment adviser representatives with state securities regulators.

41.     Insurance agents offer insurance products like life insurance policies or annuities to their customers.  Annuities and other products can provide retirement savers with needed guaranteed lifetime income streams and other protections during retirement.  Annuities operate by having the customer make payments to the insurer, who reciprocates by making a series of payments either immediately or at a later day.  There are two main types of annuities, called fixed (a subcategory of which is fixed-indexed) and variable, which differ, among other ways, in how they accumulate value and in whether they are regulated as securities (variable) or generally as non-securities (fixed and fixed-indexed).  Insurance agents can be "captive," which means they contract with one insurance company and offer that company's policies and products, along

with products from other companies in most cases, or "independent," which means they may

offer products and policies from several companies.

42.     Financial professionals can, and most do, hold licenses to conduct their business

activities, including multiple licenses to act in more than one capacity.  For example, to offer a

variable annuity, licensure as a state insurance agent and as a FINRA registered representative

are both required.

43.     In general, retirement savers can choose to pay investment professionals through

one of two compensation models, either a "transaction-based" or "fee-based" model.  Under the

commonly used transaction-based model, customers "pay as they go," with the professional

receiving commissions, mark-ups, sales loads, or similar fees in connection with the transactions

they execute.  Other customers prefer the fee-based model, under which a fee is assessed based

on a percentage of the assets in the customer's accounts, a flat fee, or an hourly charge.  The

transaction-based model can be a better value for consumers who trade infrequently or buy a

product for which there may be no need for ongoing advice; it is also often the best option for

consumers who lack the account minimums generally required under the fee-based model to

make account management services cost-effective.  The financial services industry and small

businesses have evolved to meet consumer preferences, and most investment professionals now

offer their clients a choice between paying commissions and asset-based fees.

44.     Significant overlap and integration exists among brokers, who typically use the

transaction-based model, and investment advisers, who typically use the fee-based model.  Of the

approximately 375,000 registered representatives who advise consumers, more than half also act

as registered investment advisers who operate under a fiduciary standard.  Similarly, more than

49% of FINRA's registered broker-dealer firms are either dually registered as a registered

investment adviser or have an affiliate that engages in investment advisory activities for some portion of their clients.  This is true for the vast majority of FSI and SIFMA members who serve consumers, and many of their clients have both types of accounts (transaction- and fee-based).  The same is true of many financial professionals associated with FSR's and IRI's members and their clients.

## II.   Federal And State Regulation Of Financial Services And The Business Of Insurance

45.    Registered investment advisers, investment adviser representatives, registered broker-dealers, registered representatives, insurance companies, insurance agents, and other financial professionals are governed by an extensive network of federal and state laws and regulators, and by "self-regulatory organizations" or "SROs."

46.    The federal securities laws, which the SEC has administered and enforced for more than eighty years, regulate a wide range of products sold by broker-dealers, registered investment advisers, registered representatives, and insurers, and broadly protect consumers of these products.

47.    FINRA, a self-regulatory organization registered with and overseen by the SEC under section 15A of the Securities Exchange Act of 1934 ("Exchange Act"), regulates through its own rules and enforcement framework its member broker-dealers and registered representatives, including insurance agents who are also registered representatives.  Under the Exchange Act, the SEC must approve FINRA's rules after finding that, among other things, they are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors and the public interest."  15 U.S.C. § 78o-3(b)(6).  FINRA is led by a Board of Governors, a majority of whom are "public," meaning they do not have any "material business relationship" with a broker, a dealer, or another

self-regulatory organization. *By-Laws of the Corporation*, FINRA, Article I, ¶ tt, Article VII,

http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4598.

48.     The securities laws do not apply fiduciary duties to all financial professionals.

Registered investment advisers owe fiduciary duties under the Advisers Act of 1940, 15 U.S.C.

§ 80b-1 *et seq.* ("Advisers Act"), consistent with the ongoing and continuous investment

discretion that they generally exercise over their client's assets. *See SEC v. Capital Gains*

*Research Bureau, Inc.*, 375 U.S. 180, 190-92 (1963).  However, it has long been recognized by

Congress that broker-dealers who sell products, even if they provide some advice incidental to

that sale, have no fiduciary obligation to their customers under current law.  Rather, the SEC and

FINRA require regulated entities and professionals to abide by strict, non-fiduciary standards of

conduct, such as the requirement that recommended securities transactions or strategies be

"suitable" for customers, taking into account the customer's investment profile, which includes

age, investment experience, financial situation and needs, and other information the customer

discloses to the firm or broker in connection with the recommendation.  *See* Rule 2111(a),

FINRA, http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=9859

&print=.  These comprehensive requirements result in close regulation of broker-dealers, even in

the absence of fiduciary duties.  For instance, FINRA requires that brokers' recommendations be

consistent with their clients' "best interests."  As FINRA has explained, "The suitability

requirement that a broker make only those recommendations that are consistent with the

customer's best interests prohibits a broker from placing his or her interests ahead of the

customer's interests." *Regulatory Notice 12-25*, FINRA, 3 (July 9, 2012),

http://www.finra.org/sites/default/files/NoticeDocument/p126431.pdf.

49.     A broad network of state regulation also governs broker-dealer and registered investment adviser activities, as well as the insurance industry and insurance products, including annuities.  All states have laws regulating the sale of securities and insurance products and the provision of investment advice, and most states require that annuity transactions be "suitable" for the customer.  Forty-nine states and jurisdictions have adopted the National Association of Insurance Commissioners Suitability in Annuity Transactions Model Regulation (the "NAIC Model"), applicable to all types of annuity transactions.  The NAIC Model requires that insurance producers have reasonable grounds for believing that the consumer would benefit from the features of the annuity and that the recommendation is suitable for the consumer based on information provided by the consumer.  The NAIC Model also requires insurance companies to establish a system to supervise annuity recommendations, including procedures to detect unsuitable recommendations.  FINRA also regulates variable annuities as securities products, and FINRA Rule 2330 imposes similar requirements on broker-dealers and registered representatives, who are also licensed insurance agents, with respect to deferred variable annuity transactions.  *See* Rule 2330(a), FINRA, http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=8824.  The requirements of the NAIC Model and FINRA Rule 2330 are far more stringent than FINRA's general suitability rule (FINRA Rule 2111).  Insurance agents, however, have not historically been held to a fiduciary standard.

50.     It has thus long been recognized that individuals may offer a wide range of financial services and products without becoming fiduciaries, even where they provide advice incidental to the sale.

**III.    The Definition Of "Fiduciary" In ERISA And The Code, And The Prohibited Transaction Provisions**

51.    The U.S. Department of Labor—which is responsible for enforcing federal occupational safety and health laws, wage and overtime requirements, and a range of other employment laws—also is responsible for administering the Employee Retirement Income Security Act, or ERISA, which was enacted in 1974 to protect participants and beneficiaries of employee benefit plans.  ERISA defines who is a "fiduciary" to those plans and imposes standards of conduct, responsibility, and obligation on plan fiduciaries, in addition to establishing civil enforcement remedies and sanctions against them.  29 U.S.C. § 1001(b); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Nachman Corp. v. PBGC*, 446 U.S. 359, 361 n.1 (1980).

52.    Under ERISA, "[a] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of [an ERISA-covered employee benefit] plan or exercises any authority or control respecting management or disposition of its assets, (ii) *he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so*, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A) (emphases added).

53.    Congress adopted this definition of "fiduciary" in light of well-established legal principles developed through trust law and codified in the Investment Advisers Act of 1940.  Under these principles, a fiduciary relationship is established only where a heightened relationship of trust and confidence exists between the parties as reflected, among other things, through ongoing, personalized contact.  Brokers and others may sell financial products to plans

and plan participants without being fiduciaries, even if investment recommendations are made incidental to the transaction.

54.     Under ERISA, a fiduciary to an employee benefit plan is prohibited from engaging in a broad range of transactions involving the plan, specifically:  (1) transactions involving self-dealing; (2) transactions in which the fiduciary represents someone whose interests are adverse to the interests of the plan; or (3) transactions in which the fiduciary receives compensation from a third party with respect to a plan transaction.  29 U.S.C. § 1106(b).

55.     ERISA nonetheless provides that the Department may grant "exemptions" from the prohibited transaction provisions if it "finds" that an exemption is "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." 29 U.S.C. § 1108(a). (The statute itself also contains certain prohibited transaction exemptions. *Id.* § 1108(b).)

56.     At the same time that it enacted ERISA, Congress included in the Internal Revenue Code a parallel "fiduciary" definition applicable to non-ERISA tax-favored plans like IRAs. *See* 26 U.S.C. § 4975(e)(3)(B). Congress did not, however, impose the same standards of conduct on fiduciaries under the Code that apply to ERISA fiduciaries, nor did it establish the private rights of action that are available against fiduciaries under ERISA. Instead, the limitations in the Code are enforced solely through excise taxes administered by the Department of the Treasury. 26 U.S.C. § 4975(a), (f)(8)(E).

57.     The Department of Labor was given the authority through presidential Executive Order to interpret the definition of "fiduciary" and to issue prohibited transaction exemptions under section 4975 of the Code, *see* Reorganization Plan No. 4 of 1978, § 102, 43 Fed. Reg. 47,713 (Aug. 10, 1978), *reprinted in* 5 U.S.C. app. 1 (2016), *and in* 92 Stat. 3790 (1978)

("Reorganization Plan No. 4"), but the Department lacks any enforcement authority with respect to IRAs.

58.     The Department also has authority under ERISA to issue regulations "necessary or appropriate to carry out" the provisions of ERISA and the corresponding provisions of the Code, with certain exceptions not relevant here. 29 U.S.C. § 1135. In doing so, the Department "may define accounting, technical and trade terms used in such provisions," among other things. *Id.*

## IV.     The Department's 1975 Regulation Implementing The "Investment Advice" Prong Of ERISA's Fiduciary Definition

59.     In 1975, one year after ERISA's enactment, the Department issued a regulation interpreting the "investment advice" prong of ERISA's fiduciary definition. 29 C.F.R. § 2510.3-21(c). This regulation established a five-part test for determining when a person is an ERISA fiduciary by reason of rendering investment advice for a fee, consistent with the principles of trust law and from the Advisers Act that are incorporated in the statutory text.

60.     Under the regulation, to be deemed an investment-advice fiduciary, an adviser who is not a fiduciary under another provision of the statute must—(1) "render[] advice as to the value of securities or other property, or make recommendations as to the advisability of investing in, purchasing, or selling securities or other property" (2) on a regular basis (3) "pursuant to a mutual agreement, arrangement or understanding," with the plan or a plan fiduciary that (4) the advice "will serve as a primary basis for investment decisions with respect to plan assets," and that (5) the advice will be individualized "based on the particular needs of the plan" or IRA. 29 C.F.R. § 2510.3-21(c).

61.     The Department's 1975 regulation thus recognized that individuals may sell a range of financial services and products to retirement savers without being deemed a fiduciary.

24

For instance, selling an investment product in circumstances where advice was incidental to the sale, or was not what was being paid for in the transaction, did not make one a fiduciary—on the contrary, a fiduciary generally was *barred* from selling a financial product to a plan.  Nor was marketing activity, such as promoting a company's own proprietary products, considered fiduciary activity.  Instead, the regulation—consistent with well-established trust law and the Advisers Act—recognized fiduciary status to involve a mutually agreed-upon, ongoing, individualized relationship of heightened trust and confidence, of the type that characterized fiduciaries' special relationship with a trust.

62.     Under the Department's 1975 regulation, broker-dealers, registered representatives, insurance agents, and other financial professionals could thus engage in many different types of interactions with people seeking to save for retirement without being considered "fiduciaries" under ERISA or the Code.  The hallmarks of investment advice memorialized in the 1975 regulation have continued to govern the determination of an ERISA or Code fiduciary relationship for more than four decades.  In 2005, for example, the Department issued guidance stating that a recommendation regarding a "rollover" of plan assets to an IRA was not fiduciary advice, and confirming that to be fiduciary advice, recommendations must be provided on a "regular basis," among other things.  *See* Advisory Opinion 2005-23A, ERISA Sec. 3(21), Dep't of Labor (Dec. 7, 2005).

## V.     The Department's Proposed Fiduciary Rule And The Public Comment Period

63.     In October 2010, the Department published in the Federal Register a proposed rule to amend its 1975 fiduciary regulation.  Definition of the Term "Fiduciary," 75 Fed. Reg. 65,263 (proposed Oct. 22, 2010).  The Department indicated that this amendment was intended, in part, to "improve the Department's ability" to win enforcement actions.  *Id.* at 65,273/2; *see also id.* at 65,265/2, 65,275/3.  After a contentious comment period, the Department announced

in September 2011 that it was withdrawing the proposed regulation and would re-propose it at a later date.

64.     On April 20, 2015, the Department published in the Federal Register its revised proposed fiduciary rule, as well as several proposed new or amended PTEs for financial professionals, their firms, and others falling within this new fiduciary definition. *See generally* Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 80 Fed. Reg. 21,928 (proposed Apr. 20, 2015).

65.     The proposed rule provided that "a person renders investment advice with respect to moneys or other property of a plan or IRA" within the meaning of ERISA and the Code if certain "recommendation[s]," such as "the advisability of acquiring . . . securities or other property," were provided "in exchange for a fee or other compensation."  80 Fed. Reg. at 21,956/3-21,957/1.  Under the proposal, "investment advice" existed when the person making the recommendation "specifically directed" the advice to a "recipient" pursuant to an "agreement, arrangement or understanding," or otherwise acknowledged he was acting as a fiduciary.  *Id.* at 21,957/1.

66.     The proposed rule prohibited financial professionals and firms from receiving certain forms of compensation they traditionally received—such as commissions in connection with the purchase, sale, and holding of certain investment products by plan participants and beneficiaries, IRA owners, or certain small plans—unless they qualified for exemptive relief under the new or amended PTEs.

67.     The proposed rule also included six "carve-outs" from the scope of its fiduciary coverage ranging from employees of an employee benefit plan sponsor to investment education. 80 Fed. Reg. at 21,957/1-59/2.  One of those carve-outs, the so-called "seller's carve-out,"

excluded incidental advice provided in connection with arms' length sales to plans, but only for plans that managed at least $100 million in assets or had at least 100 participants. *Id.* at 21,957/1-3.

68.     Simultaneous with the proposed new fiduciary definition, the Department proposed two new PTEs, as well as amendments to six existing exemptions (PTEs 75-1, 77-4, 80-83, 83-1, 84-24, and 86-128).[8]

69.     One of the new proposed PTEs, the BIC exemption, would have permitted financial professionals and financial institutions who were deemed investment-advice fiduciaries under the proposed rule to receive common forms of compensation that would otherwise be prohibited, such as commissions.  80 Fed. Reg. at 21,983/3-21,984/1.  However, this exemption was contingent on satisfying numerous conditions and incorporating them into a written contract enforceable by the plan participant, IRA owner, or plan, against the institutions and professionals.

70.     The Department also proposed amendments to an existing exemptive rule, PTE 84-24, which for decades has provided exemptive relief for various insurance and annuity products and mutual fund shares.  *See generally* 80 Fed. Reg. 22,010.  Under the proposed

---

[8]   Proposed Best Interest Contract Exemption, 80 Fed. Reg. 21,960 (proposed April 20, 2015); Proposed Class Exemption for Principal Transactions in Certain Debt Securities between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs, 80 Fed. Reg. 21,989 (proposed April 20, 2015); Proposed Amendment to Prohibited Transaction Exemption (PTE) 75-1, Part V, Exemptions From Prohibitions Respecting Certain Classes of Transaction Involving Employee Benefit Plans and Certain Broker-Dealers, Reporting Dealers and Banks, 80 Fed. Reg. 22,004 (proposed April 20, 2015); Proposed Amendment to and Proposed Partial Revocation of Prohibited Transaction Exemption (PTE) 86-128 for Securities Transactions Involving Employee Benefit Plans and Broker-Dealers; Proposed Amendment to and Proposed Partial Revocation of PTE 75-1, Exemptions From Prohibitions Respecting Certain Classes of Transactions Involving Employee Benefits Plans and Certain Broker-Dealers, Reporting Dealers and Banks, 80 Fed. Reg. 22,021 (proposed April 20, 2015); Proposed Amendments to Class Exemptions 75-1, 77-4, 80-83 and 83-1, 80 Fed. Reg. 22,035 (proposed April 20, 2015); Proposed Amendment to and Proposed Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies and Insurance Company Principal Underwriters, 80 Fed. Reg. 22,010 (proposed April 20, 2015).

amendments, variable annuities sold to IRAs would no longer be covered by PTE 84-24, while other insurance and annuity products, including fixed and fixed-indexed annuities, could still be sold under this exemption.  *Id.* at 22,012/1.  The conditions of this exemption were less restrictive and burdensome than the BIC exemption and did not include, among other things, a written, enforceable contract requirement.  *Id.*

71.     The Department received more than 3,000 comments on its proposal, 81 Fed. Reg. at 20,958/3, with many of them expressing profound concerns with the Department's sweeping proposed changes.

**VI.     The Final Rule And Prohibited Transaction Exemptions**

72.     On April 8, 2016, the final Fiduciary Rule and prohibited transaction exemptions were published in the Federal Register.  Between the end of the comment period and issuance of DOL's final Rule and PTEs, DOL allowed itself only approximately 200 days to review and respond to the thousands of comments it had received.  By contrast, in other recent rulemakings under ERISA, the DOL has often taken a year or two to review comments—even when those comments ranged in number between 50 and 100.

73.     The final Rule's definition of an investment-advice fiduciary under ERISA and the Code generally track the proposal's, covering any person who "provides to a plan, plan fiduciary, plan participant or beneficiary, IRA, or IRA owner" specified types of "investment advice" "for a fee or other compensation."  81 Fed. Reg. at 20,997/2.

74.     The final Rule broadly defines "investment advice" to include "recommendations" regarding:

- "the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property";

- "rollovers, transfers, or distributions from a plan or IRA, including whether, in what amount, in what form, and to what destination such a rollover, transfer, or distribution should be made";

- "how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or distributed from the plan or IRA"; and

- "the management of securities or other investment property, including, among other things, recommendations on investment policies or strategies, portfolio composition, selection of other persons to provide investment advice or investment management services, [or] selection of investment account arrangements (*e.g.*, brokerage versus advisory)."

*Id.*

75.     "Recommendation," in turn, is defined as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." 81 Fed. Reg. at 20,997/3.  Moreover, "a series of actions . . . that may not constitute a recommendation when viewed individually may amount to a recommendation when considered in the aggregate." *Id.*

76.     If the person providing the recommendation "[d]irects the advice to a specific advice recipient or recipients regarding the advisability of a particular investment or management decision with respect to securities or other investment property of the plan or IRA," then that person becomes an "investment advice" fiduciary under the final Rule.  *Id.*  The person can also become a fiduciary by either "[r]epresent[ing] or acknowledg[ing] that it is acting as a fiduciary within the meaning of [ERISA] or the Code," or "[r]ender[ing] the advice pursuant to a written or verbal agreement, arrangement, or understanding that the advice is based on the particular investment needs of the advice recipient."  *Id.*

77.     The final Rule asserts that certain activities associated with 401(k)-type "platform providers," "selection and monitoring assistance," and "investment education," are not "recommendations," so long as they are performed within certain specified parameters.  *Id.* at

29

20,997/3-20,998/2.  "General communications," which the Rule defines to include, among other things, "commentary in publicly broadcast talk shows" and "news reports prepared for general distribution," are also not covered.  *Id*. at 20,998/1-2.

78.     Separately, the final Rule includes three exceptions from its definition of persons deemed fiduciaries, including when the person engages in sales activity involving "independent fiduciaries with financial expertise."  *Id.* at 20,999/2-21,000/2.  To qualify for this exception, the transaction must be between independent fiduciaries and either licensed, regulated financial service providers (like registered broker-dealers) or large plan fiduciaries with at least $50 million in assets under management.  *Id.* at 20,999/3.  The Department rejected commenters' request for a more general "seller's exception," under which the financial professional would disclose to the retirement saver that he was acting in the capacity of a salesperson, because it could "creat[e] a loophole" and disclosure alone would not be "sufficient to address investor confusion about financial conflicts of interest."  *Id.* at 20,981/2-3.

79.     The DOL's new fiduciary definition, standing alone, would preclude a range of valuable activities that have long been routine in the financial services sector and not considered fiduciary activity.  Activities that are now deemed fiduciary under the Rule and cannot be offered as they historically have been include:

- General sales activity, such as a sales presentation in which the financial professional identifies investment options that she can provide;

- Client referrals or solicitations to other investment professionals;

- Communications in which a financial professional makes comparisons between products offered by the professional's firm;

- A one-time discussion between an individual and a financial professional regarding whether to "rollover" that individual's assets from an employer plan to an IRA; and

- Responding to a request for proposal for retirement plan services by providing a sample 401(k) investment option menu, unless the sample menu is based only on the

existing menu or on the plan's size, and the response includes, among other things, a written notification to the plan fiduciary that the responder is not providing fiduciary advice.

80.    With respect to rollovers, for example, the DOL cast aside the long-established understanding that discussions regarding the disposition of assets that have been removed from a 401(k) plan, or assets that are not yet in a plan, do not involve fiduciary advice.  The final Rule even overturned the DOL's own 2005 guidance that a recommendation to rollover plan assets to an IRA was not fiduciary advice.  *See* Advisory Opinion 2005-23A.  In reversing its 2005 position in the final Rule, the DOL cited the "importance" of rollovers to individuals' financial decisions, but disregarded whether rollovers reflected the elements of a fiduciary relationship, and the fact that many other important financial decisions—from home ownership to financing a college education—are made without advice that is deemed to be fiduciary in nature.  *See* 81 Fed. Reg. at 20,964/3.

81.    Persons who become fiduciaries under this broadly sweeping definition cannot— without incurring significant burdens and liability risk—receive brokerage or insurance commissions, 12b-1 fees (which are charges used to pay the company or agent that sold the mutual fund shares for ongoing support and services provided to the customer), or any other type of transaction-based payments.  Such payments are now considered "prohibited transactions" forbidden to fiduciaries under ERISA and the Code absent exemptive relief.

82.    This prohibition marks an extreme departure from the regulatory framework developed over decades by Congress, the SEC, and the SROs, and from widely accepted financial industry practices.  For example, broker-dealers and insurance companies have charged a commission on transactions since at least the 1930s, and the practice is expressly contemplated by the securities laws and state insurance regulation, as well as by section 913 of the Dodd-Frank Act.

83.     These transaction-based payments have been instrumental to the development of the U.S. financial system, enabling individual Americans to achieve trillions in investment income and retirement savings and delivering other valuable benefits.  Retirement savers pursuing a "buy and hold" or other long-term strategies, for instance, have benefited from the opportunity to make longer-term investments and purchase guaranteed lifetime income products (annuities) at the cost of a one-time transaction fee.

84.     Without exemptive relief, however, the new fiduciary definition would force countless financial professionals and financial firms, as well as insurance institutions, to shift from the transaction-based compensation model to the fee-based model.

85.     Such a wholesale shift would have serious adverse effects on consumers and the financial services and insurance industries.  Fee arrangements based on the amount of assets under management have generally been available only to consumers with sizable portfolios because of the high cost to a firm of managing an individualized portfolio.  Many consumers lack the financial means to open such a fee-based investment account and will suffer from a loss of investment options and advice under the Rule.  Moreover, consumers with "low trading activity and no need for ongoing monitoring or advice," 81 Fed. Reg. at 21,011/3-21,012/1 n.18, fare better with a transaction-based model rather than a fee-based model because the latter is more costly and results in recurring charges.  The Department in fact deemed it "abusive conduct" for a financial professional to recommend a fee-based account for such customers, *id*., even though the new fiduciary definition, standing alone, prohibits financial institutions and professionals from offering the retirement saver a transaction-based account.

86.     The fee-based model is not feasible or appropriate at all for certain financial investment products.  For example, an insurance agent who offers a fixed annuity does not

manage the assets used to purchase the annuity; rather, a fixed-annuity sale is a one-time transaction.

87.     Moreover, even if financial professionals offer services through a fee-based model in accordance with the fiduciary requirements of the Advisers Act, the final Rule imposes additional "fiduciary" standards, mandates new disclosures, and prohibits certain forms of compensation absent exemptive relief.

88.     The final Rule, like the proposal, is subject to exemptive relief pursuant to regulatory changes adopted by the Department simultaneously with the new Rule:  two new prohibited transaction exemptions—including the BIC exemption—and amendments to six existing prohibited transaction exemptions.

89.     Most persons who become fiduciaries under the Rule's broad new definition cannot receive brokerage or insurance commissions, 12b-1 fees, or any other type of transaction-based payments without complying with the onerous requirements of the BIC exemption.

90.     Although the Department made some changes to the BIC exemption in response to rulemaking comments, it retained many of the proposal's most onerous requirements:

a.      Financial institutions and representatives serving IRAs and other Code-covered plans must submit to a legally enforceable written contract.  81 Fed. Reg. at 21,020/2.

b.      Proprietary products—such as an annuity developed by a particular insurance company—may be offered consistent with the requirements of the BIC exemption, but the final BIC exemption does not make clear whether an insurer can offer only its own products without violating the exemption.  *Id.* at 21,053/1-54/1.  Firms that sell only proprietary products may now face the choice of either exiting the market, or being required to justify, *ex post facto*, how their limited product options meet the best interest standard.  As a consequence, they will

confront substantial legal risk, uncertainty, and difficulty in profitably selling proprietary products under the BIC exemption.

c.      The contract requires a variety of disclosures in different contexts and formats that the Department itself conceded would cost billions of dollars to implement.  For example, it must contain a description of the compensation received from third parties in connection with recommended investments; disclose the costs, fees, and compensation relating to a recommended transaction; contain a schedule of typical fees and service charges; and disclose the financial institution's compensation and incentive arrangements with its representatives.  *Id.* at 21,078/1-2, 21,079/3-21,080/1.

d.      The BIC exemption requires that the contract include, among other terms, a statement that the financial institution and its representatives are acting as "fiduciaries," and specific representations and warranties that are ill-defined and unfamiliar to the courts and regulated community (*e.g.*, differential compensation must be justified by "neutral factors"). Financial institutions and their representatives cannot be certain of the meaning of these requirements in advance, and instead will have their obligations determined in hindsight in litigation initiated by the plaintiffs' bar.

91.     The final BIC exemption retains the written, enforceable contract requirement for IRAs and other Code plans, along with a broad prohibition on class action waivers that extends to arbitration agreements.  *Id.* at 21,076/2-3, 21,078/3-21,079/1.  While the BIC exemption removes the requirement of a written, enforceable contract for ERISA plans, it still prohibits class waivers from being included "in any contract, instrument, or communication" with respect to those plan participants and beneficiaries.  *Id.* at 21,079/1.

92.     In the Principal Transactions exemption, the Department also requires a written, enforceable contract, and prohibits arbitration agreements with class-action waivers for Code-covered plans.  That exemption is necessary for financial institutions to engage in principal transactions and receive payment in connection with the transactions when the buyer or seller of certain investments specified in the exemption—including debt securities and certificates of deposit—is an ERISA or Code plan, participant, or beneficiary.  *Id*. at 21,133/2-3, 21,135/3-21,136/1, 21,137/3, 21,138/2.

93.     The final amendments to PTE 84-24 narrow the scope of eligible products to include only fixed-rate annuities, thereby removing individual and group variable annuities and fixed-indexed annuities from this long-standing exemption.  *Id*. at 21,147/2-21,148/1.  This change went far beyond the proposed amendments, which would have removed from the scope of PTE 84-24 individual variable annuities sold to IRAs.

## VII.   The Numerous Flaws In The Department's Rule And Prohibited Transaction Exemptions

94.     Under the Administrative Procedure Act, the DOL was required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted).  In doing so, it was to "consider [all] important aspect[s] of the problem," and could not "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  The DOL also had an "obligation to consider" alternatives that were "neither frivolous nor out of bounds," *Chamber of Commerce v. SEC*, 412 F.3d 133, 144-45 (D.C. Cir. 2005), and had to respond to key comments that "if true, . . . would require a change in [the]

proposed rule," *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080

(D.C. Cir. 2003) (internal quotation marks and citations omitted).

95.     Because the Rule will require expenditures greater than $100 million in a year by

private entities, *see* Regulating Advice Markets, Definition of the Term "Fiduciary" Conflicts of

Interest – Retirement Investment Advice, Regulatory Impact Analysis for Final Rule and

Exemptions, Dep't of Labor, 10 (April 2016) ("Regulatory Impact Analysis"), the DOL also had

responsibility under the Unfunded Mandates Reform Act to provide a written statement

containing, among other things, a "qualitative and quantitative" cost-benefit analysis.  2 U.S.C.

§ 1532.  It was obligated to consider "a reasonable number of regulatory alternatives and from

those alternatives select the least costly, most cost-effective or least burdensome alternative that

achieves the objectives of the rule," unless "the head of the affected agency publishe[d] with the

final rule an explanation of why the least costly, most cost-effective or least burdensome method

of achieving the objectives of the rule was not adopted."  *Id.* § 1535(a) & (b).  In addition, under

Executive Orders 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993), and 13,563, 76 Fed. Reg. 3,821

(Jan. 21, 2011), the Department was required, among other things, to "assess all costs and

benefits of available regulatory alternatives, including the alternative of not regulating," "design

its regulations in the most cost-effective manner to achieve the regulatory objective," "tailor its

regulations to impose the least burden on society," 58 Fed. Reg. at 51,735-51,736, and

coordinate regulatory efforts across agencies to reduce the burdens on sectors and industries that

"face a significant number of regulatory requirements," 76 Fed. Reg. at 3,822.

96.     Far from satisfying these obligations, the Department failed to consider important

record evidence, ignored the public's comments (and those of an SEC commissioner), and

adopted a Rule that will impose unjustifiable costs on customers, small businesses, financial

professionals, financial firms, and insurance institutions. The Rule exceeds the Department's

statutory authority and is arbitrary, capricious, and contrary to law.

### A. The Department Rejected Legal Principles Established By Congress, Claiming For Itself A Role That Congress Has Assigned To The SEC, Including Through The Dodd-Frank Act

97.     The DOL's vast expansion of fiduciary status and duties rejects legal principles

laid down by Congress in the securities laws and the long-standing and widely accepted business

practices built around those laws. It also encroaches on responsibilities Congress gave to the

SEC.

98.     In the securities laws, Congress recognized that a broker-dealer and customer may

have a sales relationship in which advice is provided incidentally, and in which the broker-

dealer, therefore, is not a fiduciary. The Department nonetheless stated that "[n]one of the

commenters pointed to any provision in the federal securities laws containing a 'seller's' carve-

out or similar concept used to draw distinctions between advice relationships that are fiduciary

from non-fiduciary under the federal securities laws." 81 Fed. Reg. at 20,982/1. Elsewhere, the

Department referred disparagingly to the "fine legal distinction"—a distinction created by

Congress—between broker-dealers and registered investment advisers, *id.* at 20,955/3, and it

forthrightly proclaimed its "reject[ion] of the purported dichotomy between a mere 'sales'

recommendation . . . and advice . . . in the context of the retail market for investment products,"

*id.* at 20,981/2. This "dichotomy" is not "purported"—it is established by Congress as a matter

of federal law.

99.     Similarly, the principle that financial representatives be required to offer products

that are "suitable" for their customers is firmly established in the federal securities laws and state

insurance regulation, but the Department considered those existing requirements as insufficient.

100.    One of the most basic and familiar models for any business is to create a product and then market it for sale to customers; in the financial services industry these are called "proprietary products" and are well recognized under the securities laws and state insurance laws, including in the Dodd-Frank Act, § 913(g).  But the Department—whose expertise is not in the financial services industry—expressed its "deep and continuing concern" with the very notion of proprietary financial products.  *Id.* at 21,052/3.

101.    Further, in section 913 of Dodd-Frank, Congress directed the SEC to analyze whether "the standards of care for brokers, dealers, [and] investment advisers" are adequate.  As the DOL acknowledged, Congress "authorize[d], but [did] not require, the SEC to issue rules addressing [those] standards of care."  81 Fed. Reg. at 20,990/3.  Despite this clear allocation of responsibility to the SEC, the Department declared that "[n]othing in the Dodd-Frank Act indicates that Congress meant to preclude the Department's regulation of fiduciary investment advice under ERISA or its application of such a regulation to securities brokers or dealers."  *Id.*

102.    Commenters had objected that Congress expressly authorized the SEC, not the DOL, to decide whether to extend fiduciary responsibilities to broker-dealers and create a uniform standard of care, and only after considering various factors including "the potential impact on access of retail customers to the range of products and services offered by brokers and dealers."[9]  As alternatives to the Department's proposal, commenters advocated—among other things—that the Department defer to the SEC's adoption of a best interest standard, or allow a "seller's exemption," under which no fiduciary relationship would exist when a financial

---

[9]    *See, e.g.*, Comment of Gibson, Dunn & Crutcher LLP at 11-13 (July 20, 2015) (citing Dodd-Frank Act, § 913); Comment of SEC Commissioner Daniel M. Gallagher at 1-2 (July 21, 2015) ("Section 913 makes clear that commission-based fees must be permissible under any SEC rules," but the DOL "grounded" its proposal "in the misguided notion that charging fees based on the amount of assets under management is superior in every respect and for every investor to charging commission-based fees.").

representative told her client that she was a "salesperson, interested in selling you financial products," not a "fiduciary," and that she had "a conflict of interest because I will receive compensation if you agree to purchase the products we are discussing, and I may receive more compensation from some of those products than from others."[10]

103.    The Department dismissed these comments and the role that Congress had assigned to another agency, and leapt ahead of the SEC to establish its own new standard of care toward customers.

104.    The Department also disregarded the parameters Congress had imposed on the regulation of broker-dealers by the SEC.  For example, the Dodd-Frank Act requires that any fiduciary standard that the SEC establishes for broker-dealers must provide that "receipt of compensation based on commission or other standard compensation for the sale of securities shall not, in and of itself, be considered a violation of such standard," and that "[t]he sale of only proprietary or other limited range of products by a broker or dealer shall not, in and of itself, be considered a violation" of the fiduciary standard.  Dodd-Frank Act, § 913(g).  Yet the DOL's definition of "fiduciary" ignores this congressional directive and instead deems brokers' and dealers' receipt of this "standard compensation" in connection with securities transactions with plans a violation of ERISA's and the Code's fiduciary duties.  Moreover, in granting the SEC authority to issue regulations governing product-specific disclosures for investors, Congress required the SEC to "consider whether the rules will promote investor protection, efficiency, competition, and capital formation."  15 U.S.C. § 78o(n)(2).  Yet the DOL did not consider these

---

[10]  *See, e.g.*, Comment of PFS Investments Inc. of Primerica Inc. at 3 (Sept. 24, 2015); Comment of SIFMA at 2-3 (July 20, 2015); *see also* Comment of IRI at 20 (July 21, 2015) (proposing alternative where no fiduciary relationship would exist for a person who "provides advice or recommendations . . . under facts and circumstances where there can be no reasonable expectation on the part of the advice recipient that the advice provider is undertaking to provide unbiased and impartial advice").

factors in promulgating the Fiduciary Rule, which imposes extensive, complex, and confusing disclosure requirements.

105.    Further, the pressure the Rule creates to move customers to fee-based accounts directly conflicts with the securities laws and places financial institutions and professionals in the intolerable position of having to choose which regulator to obey.  Specifically, FINRA and the SEC have each imposed upon firms a duty to ensure that fee-based accounts are only recommended to those customers for which they are suitable, as these accounts tend to be more expensive for consumers who engage in little to no trading activity.  FINRA and the SEC regularly police for "reverse churning" (the improper recommendations of fee-based accounts) through their examinations of firms and branch offices.  Among other things, they have brought actions against firms for placing customers in fee-based accounts when commission-based accounts were more appropriate.  *See, e.g.*, *Geman v. SEC*, 334 F.3d 1183, 1187-88 (10th Cir. 2003).

106.    Experts in financial markets at the SEC objected to DOL's flawed proposal and analysis, but their concerns were ignored.  A committee of the U.S. Senate—after an investigation that included review of communications between the DOL and other agencies— determined in a special report that the Department disregarded many of the concerns about its proposal raised by "career, non-partisan professional staff" at the SEC, "regulatory experts at the Office of Information and Regulatory Affairs . . . within the Office of Management and Budget," and officials from the Treasury Department, and "declined to implement [their] recommendations."  *The Labor Department's Fiduciary Rule: How a Flawed Process Could Hurt Retirement Savers*, Comm. on Homeland Sec. & Governmental Affairs, Majority Staff

Rep., 1 (Feb. 24, 2016).  "The Administration was predetermined to regulate the industry and sought evidence to justify its preferred action," the Committee concluded.  *Id.* at 2.

107.    Recently, FINRA's chief legal officer also voiced criticism of the DOL's Rule and BIC exemption.  The BIC exemption could "act as a throttle" for affected businesses—even if the Department did not intend it to—and was "problematic" in numerous respects.[11]

### B.    The Department's Definition Of Investment-Advice Fiduciary Conflicts With The Statutory Text

108.    The Department indicated that any regulatory definition of "fiduciary" should be consistent with ERISA and must "honor[]" the statutory text.  81 Fed. Reg. at 20,990/1.  The final Rule does not do so.  Instead, the regulatory definition is overbroad, sweeping in a wide range of activities that have never been understood to be fiduciary activities under the law of trusts, the Advisers Act, ERISA, or otherwise.  As the Department itself admitted in the Rule release, its "broad test could sweep in some relationships that are not appropriately regarded as fiduciary in nature and that the Department [did] not believe Congress intended to cover as fiduciary relationships," although it purported to excise those relationships from the Rule.  *Id.* at 20,948/3.

109.    Many commenters had warned the Department that its re-definition of "fiduciary" was overbroad and deemed "fiduciary" relationships to exist in a far broader range of circumstances than under the law of trusts or the securities laws, on which ERISA was in part based.[12]  They pointed out, for example, the Department improperly treats sales activity as

---

[11]    Bruce Love, *Finra Flags Problems with DOL's Fiduciary Rule*, Financial Advisor IQ (May 27, 2016), http://financialadvisoriq.com/c/1370293/150793/finra_flags_problems_with_fiduciary_rule?referrer_module=to picBox&module_order=7.

[12]    *See, e.g.*, Comment of FSR at 15-16 (July 21, 2015) ("The Department is essentially attempting to amend ERISA to encompass IRAs without Congressional action.  Amending ERISA requires an act of Congress, not an informal rulemaking under the Administrative Procedure Act."); Comment of IRI at 14 (July 21, 2015) ("the

*(Cont'd on next page)*

fiduciary investment advice.  Comment of Chamber at 18 (July 17, 2015) ("[T]he Proposal goes too far and encompasses circumstances where there is no reasonable expectation of fiduciary trust and confidence," such as "the sale of proprietary products.").  Indeed, the proposal's drastic deviation from the 1975 regulation's fiduciary definition was prohibited by Congress's ratification of the 1975 definition through numerous amendments to ERISA over the past 40 years.  *See, e.g.*, *id.* at 12 ("Congress has amended ERISA numerous times over the past 40 years, and in so doing implicitly ratif[ied] its original decision to leave financial regulation to financial regulators, rather than the Department.").

110.    In response, the Department stated, among other things, that "ERISA's statutory definition of fiduciary status broadly covers any person that renders investment advice to a plan or IRA for a fee."  81 Fed. Reg. at 20,990/1.  The regulatory definition could go beyond trust law, the Department argued, because the statute does not require "an express trust," but encompasses functional fiduciaries also.  *Id.*  Elsewhere in the release, however, the Department repeatedly invoked trust law to justify the Rule, asserting, for example, that the Rule "avoid[ed] burdening activities that do not implicate relationships of trust."  *Id.* at 20,949/1.

111.    In rewriting the settled definition of "fiduciary," the Department similarly disregarded and effectively nullified the Advisers Act's definition of "investment adviser" for a wide swath of the market.  *See id.* at 20,990/1-2.  The Advisers Act explicitly recognizes that one is not an investment adviser—a position that is understood to be fiduciary—when providing

---

*(Cont'd from previous page)*

   Proposed Regulation inappropriately characterizes as fiduciary in nature a broad spectrum of financial
   marketing and sales activities where no reasonable expectation can exist that an financial professional has been
   engaged by a consumer to act as an unbiased and impartial source of recommendations"); Comment of Gibson,
   Dunn & Crutcher LLP at 2 (July 20, 2015) ("In enacting ERISA's fiduciary definition, Congress drew upon
   principles of trust law . . . [under which], a fiduciary relationship arises in the context of a relationship of special
   'trust and confidence' between the parties.  The [Fiduciary Rule], however, would deem persons to be
   fiduciaries where those hallmarks of a fiduciary relationship are absent . . . ." (internal citations omitted)).

investment advice that is merely "incidental" to a sale. ERISA was enacted against that backdrop and defined investment advice in terms strikingly similar to the Advisers Act. Yet the Department refused to use the Advisers Act as a guide to interpreting the statutory language in ERISA.

112.    The Department's re-interpretation of fiduciary conflicts with the statutory text and imposes a fiduciary relationship in circumstances that lack the heightened "trust and confidence" that are hallmarks of fiduciary status. The Department imposes fiduciary status even where two consenting parties wish to have a sales or broker-dealer relationship rather than a fiduciary relationship and the increased duties and costs that come with it. It has long been the law, however, that a difference exists between sales activity and fiduciary activity—which occurs only under certain circumstances arising out of a special relationship marked by trust and confidence between the parties. In the securities laws, for instance, Congress recognized that one can engage in sales speech without becoming a fiduciary, and that such non-fiduciary communications can in fact be valuable to customers. The Department, however, rejected that dichotomy and deemed every person offering investment products to be providing fiduciary advice. That is an impermissible departure from the historical understanding of "fiduciary" incorporated into ERISA's and the Code's statutory text.

### C.    The Department Misused Its Exemptive Authority To Create A Private Right Of Action And Regulate IRAs And The Broker-Dealers Who Offer Them

113.    "Unlike participants and beneficiaries in plans covered by Title I of ERISA, IRA owners and participants and beneficiaries in non-ERISA plans do not have an independent statutory right to bring suit against fiduciaries for violation of the prohibited transaction rules." 81 Fed. Reg. at 21,021/1. What is more, the Department has admitted, "the Secretary of Labor [cannot] bring suit to enforce the prohibited transactions rules on their behalf." *Id.* Enforcement

of the prohibited transaction rules as to IRAs is left to the Treasury Department, through the imposition of excise taxes. *Supra* ¶ 56.

114.    Apparently dissatisfied with this framework established by Congress, the Department overstepped the statutory constraints on its authority by combining its overbroad definition of fiduciary with exemptions conditioned on submitting to requirements that the Department cannot impose directly.  It thereby regulated IRAs through the back-door.

115.    Through the BIC exemption, the Department stated, it was creating a "mechanism for investors [in IRAs and non-ERISA plans] to enforce their rights," by requiring the financial professionals who serve them to agree to a written, enforceable contract in order to avail themselves of the exemption.  81 Fed. Reg. at 21,020/2-21,021/1; *see also id.* at 21,008/1 ("in the case of IRAs and non-ERISA plans, the exemption generally requires the Financial Institution to commit to the Impartial Conduct Standards in an enforceable contract with Retirement Investor customers"), 21,021/3 (noting "IRA owners' lack of a statutory right to enforce prohibited transaction provisions").  The Department deemed the "imposition of an excise tax"—the only remedy provided by Congress—to be "inadequate." *Id.* at 21,022/1.

116.    The Department similarly included a written, enforceable contract requirement in the Principal Transactions exemption for financial institutions who engage in certain transactions in assets out of their own inventory. *Id.* at 21,133/2-3.  Again, this contract served to provide "IRA owners and participants and beneficiaries in non-ERISA plans" with enforcement rights they lacked under the Code. *Id.* at 21,100/2.

117.    The Department knew and intended that banning all transaction-based compensation would force financial services providers to accept the terms of the BIC exemption and to agree, among other things, to be sued in class action litigation under the vague new

standards devised by the Department.  A Labor Department official recently said of the Rule's vague and expansive requirements, "When in doubt, assume you are under [the BIC] exemption."[13]

118.    The DOL's creation of a private right of action is an impermissible end-run around the remedial scheme enacted by Congress, as commenters in the rulemaking explained. *See, e.g.*, Comment of FSI at 35-37 (July 21, 2015); Comment of FSR at 27 (July 21, 2015); Comment of Chamber at 4, 13-15 (July 17, 2015).  An agency cannot create a cause of action that Congress did not.  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

### D.    The Department Banned Class Action Waivers In Arbitration Agreements In Disregard Of Congress's Direction In The Federal Arbitration Act

119.    In the BIC exemption, the Department provided that exemptive relief will not be available if a financial firm or representative has an arbitration agreement with a customer that included a class action waiver.  *See* 81 Fed. Reg. at 21,021/2-3.  Because the broad sweep of the Rule would prohibit many common forms of compensation, and because the fee-based compensation model that is permissible under the Rule is incompatible with certain investment products like fixed annuities, the Rule forces financial and insurance firms and professionals into relying on the BIC exemption—and thus effectively prohibits the enforcement of arbitration agreements containing class action waivers.  Similarly, firms relying on the Principal Transactions exemption would be prohibited from enforcing class action waivers.

120.    This result cannot be reconciled with the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, which establishes a strong federal policy favoring arbitration, mandates that arbitration agreements be enforced according to their terms, and prohibits laws conditioning these

---

[13]    *DOL Will Rely on Consumers, Advisors to Help Enforce Fiduciary Rule: Borzi*, ThinkAdvisor (May 25, 2016), http://www.thinkadvisor.com/2016/05/25/dol-will-rely-on-consumers-advisors-to-help-enforc?&slreturn=1464294809.

agreements' enforceability on whether they include certain terms.  Indeed, the Supreme Court has specifically held that conditioning the enforceability of an arbitration contract on the availability of class procedures—precisely what the BIC exemption and Principal Transactions exemptions purport to do—is prohibited by the FAA.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011) ("[T]he FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements.").

121.    Even setting aside the effect of forcing financial and insurance institutions and financial professionals into relying on the BIC and Principal Transactions exemptions, the prohibition on arbitration agreements with class waivers independently violates the FAA.

122.    Commenters voiced this objection to the Department.  *See, e.g.*, Comment of Chamber at 11-15 (July 20, 2015).  The Department nonetheless included a class waiver prohibition in the BIC exemption, on which nearly all firms and representatives have no choice but to rely (or exit the business), and in the Principal Transactions exemption, which is necessary for firms to engage in certain common transactions for the benefit of plans, participants, and beneficiaries.  By doing so, the Department once again overstepped its authority.

### E.    The Department Regulated Fixed-Indexed Annuities In A Manner Contrary To Congress's Intent In The Dodd-Frank Act

123.    In its Fiduciary Rule, the Department not only regulates the "advice" that may be provided to retirement savers, but also subjects different financial products to heightened regulatory obligations based on its own views about the nature of the products.  The Department has little experience with those products, however, and for some of the products, Congress already had determined that federal oversight was not warranted.

124.    The Department's regulation of annuities is illustrative.  Insurance products, including annuities, are heavily regulated and have a long history of congressional and state involvement in their sale and marketing.  As the law has developed, certain insurance products, like variable annuities, have been treated as securities.  Others have been treated as private contracts.  Congress in the Dodd-Frank Act specifically precluded the SEC from regulating fixed-indexed annuities if the products satisfied certain state regulatory requirements, as commenters noted in the rulemaking.  *See, e.g.*, Comment of National Ass'n of Fixed Annuities at 4-5 (Sept. 24, 2015).

125.    The Department acknowledged this existing regulatory structure in its Regulatory Impact Analysis, including that annuities are regulated under state insurance laws and—to an extent—under the federal securities laws, as in the case of variable annuities.  Regulatory Impact Analysis at 40-43.  The Department nonetheless assumed, without basis or any meaningful analysis, that these state regulations were inadequate, and proceeded to regulate all annuity products through the Rule, treating fixed-indexed annuities as if they are variable annuities regulated by the SEC.

126.    This was an unanticipated change from the proposed rulemaking.  Under the proposal, all annuities were to remain subject to PTE 84-24, except for individual variable annuities.  That PTE does not impose, among other things, the written, enforceable contract requirement of the BIC, but does impose a best interest standard of care and reasonable compensation requirement.  As amended in the final rule, however, PTE 84-24 is now limited to fixed-rate annuities, meaning that fixed-indexed annuities, as well as individual and group variable annuities, unexpectedly must qualify for other exemptions, such as the BIC.

127.    By regulating these insurance products in this manner, the Department once again disregarded Congress's instructions and the Dodd-Frank Act, assuming for itself regulatory power that had been denied the SEC, and substituting its own judgment about the effectiveness of existing state regulation.

128.    In suddenly reversing its proposal to make fixed-indexed annuities and group variable annuities subject to PTE 84-24, the DOL also failed to provide adequate notice of this change and an opportunity for affected firms to explain why it would be impractical to offer these products under the BIC exemption.  Had the Department properly consulted and heeded industry participants, it would have recognized that this unexpected change cannot feasibly be implemented.  The BIC exemption requires that a "Financial Institution" supervise the sale, purchase, or holding of fixed-indexed annuities to ensure that the transaction is in the best interest of the retirement saver.  81 Fed. Reg. at 21,077/3.  "Financial Institution," in turn, is generally defined as a registered investment adviser under the Advisers Act or state law, a bank or similar financial institution, an insurance company, or a broker-dealer.  *Id.* at 21,083/2-3. Fixed-indexed annuities, however, often are sold through independent insurance agents who are not employed by any of the "Financial Institutions" defined in the BIC, but instead are part of an independent marketing organization ("IMO").  Those agents will therefore be unable to satisfy the BIC and will be forced to exit the fixed-indexed annuity market, unless an insurer is willing to bear responsibility for the conduct of agents it does not control, or the agents join a broker-dealer or other "Financial Institution" willing to assume the associated fiduciary liability.  Those options are not viable for most insurance-only licensed agents working through an IMO who offer fixed-indexed annuities because they are not registered representatives licensed to sell securities, and only a limited number of positions are available with insurers that use a captive

48

agent system. Moreover, both alternatives would disrupt existing distribution channels, with adverse effects on the cost and availability of these products for consumers. The Department's definition of "insurance company" in the BIC exemption is also flawed, and could effectively preclude insurance companies from ever meeting that definition. *See* 81 Fed. Reg. at 21,083/3.

129. In excluding fixed-indexed annuities from PTE 84-24, the Department failed to account for any of these consequences. Indeed, the Department did not even mention independent agents in the preamble to its Rule. As a result, the Department created an exemption that is not "administratively feasible" as required under ERISA and the Code, and seriously understated the costs associated with its Rule and related exemptions.

**F. The Department Overstated The Benefits Of The Rule, Failed To Consider Substantial And Obvious Costs, And Relied Upon Contradictory Claims And Assertions In Justifying The Rule**

130. In proposing and adopting the Rule and accompanying PTEs, the Department claimed that they would save IRA investors between $33 billion and $36 billion over ten years, or about $4 billion a year. Regulatory Impact Analysis at 10; Fiduciary Investment Advice, Regulatory Impact Analysis, Dep't of Labor, 8 (April 14, 2015). This projection, which purportedly was based on a handful of studies that themselves contained no such estimate, is patently erroneous. The Department concluded that the average mutual fund sold by brokers underperformed its benchmark by at least 50 to 100 basis points (Regulatory Impact Analysis at 9); in doing so, the Department improperly extrapolated from performance data for certain unrepresentative funds to draw conclusions about the entire mutual fund market. *See* Comment of Investment Company Institute (Regulatory Impact Analysis) at 30-32 (July 21, 2015). The Department also based its underperformance estimate on the year in which funds were purchased, rather than studying the funds' performance over time. *See* Comment of Economists Incorporated (Robert Litan & Hal Singer) at 22 (July 20, 2015). Compounding this error, the

Department failed to discount its estimate for savings that consumers would realize from the time value of money—a discount the Department *did* include when making its cost estimates. Further, the Department ignored public comments that provided empirical performance data that conflicted with its flawed estimates. *See, e.g.*, Comment of Investment Company Institute (Regulatory Impact Analysis) at 16-30 (July 21, 2015). The Department also erroneously estimated the performance of certain mutual funds by discounting their returns by the amount of fees attributable to the provision of financial advice, while not taking into account that financial advice is a valuable service, and not considering that other investments—that do not have built-in advice fees—would incur fees for financial advice in other forms.

131. The Department's assessment of the Rule's benefits also improperly relied on unsupported speculation that conflicted with record evidence. For instance, the Department predicated the Rule's supposed benefits in part on a projected increase in consumers' reliance on computer-based "robo-advisers" to make investment decisions, even though the Department conceded that robo-advisers currently serve only about .1% of the market, are generally used only by young people, and "have never been tested in a bear market." Regulatory Impact Analysis at 320-21. "Relying on a computer algorithm only may be inadequate to avoid panic selling" in a bear market, the Department conceded (*id.* at 321), without acknowledging the record evidence and empirical literature demonstrating that preventing retirees from divesting in a down-market is among the most notable contributions of financial professionals. The Department provided no evidence that small savers—whom it claimed are not sufficiently sophisticated to understand even simple disclosures—can and would sign up in sufficient numbers, and with sufficient assets, for robo-advised accounts to bring down investment costs relative to the cost of current transaction-based accounts. And, the Department failed to heed

investor alerts issued by the SEC and FINRA warning consumers about relying on robo-advisers because, among other things, "an automated tool may rely on assumptions that could be incorrect or do not apply to your individual situation," and therefore could "suggest investments . . . that may not be right for you." *Joint Investor Alert: Automated Investment Tools*, SEC Office of Investor Educ. & Advocacy and FINRA (May 8, 2015), https://www.sec.gov/oiea/investor-alerts-bulletins/autolistingtoolshtm.html.

132. The Department also sought to justify the Rule and PTEs through conflicting and contradictory assertions. For instance, it based adoption of the Rule in part on the projection that under the Rule, whether a financial professional offered a customer a commission or fee-based account would be determined by what served the customer best. But in the Regulatory Impact Analysis, when trying to minimize the Rule's potentially disruptive effects, the Department asserted instead that financial professionals will use the payment approach that "will be most cost effective for their business models." Regulatory Impact Analysis at 258. Similarly, the Department repeatedly questioned the effectiveness of disclosures to customers, but its Rule will impose billions of dollars in costs through new disclosure requirements, for which the Department claims immense benefits.

133. In the final Regulatory Impact Analysis, moreover, the Department repeatedly relied on studies and data that had never been made available for public comment. These studies attempted to, among other things, rehabilitate other studies cited in the proposed rulemaking that had been deeply undermined by commenters. For example, one study sought to "independently replicat[e] the results obtained by DOL and highlight[] potential data issues that influence the results." Karthik Padmanabhan et al., *Rates of Return for Broker-Sold and Direct-Sold Mutual*

*Funds*, Advanced Analytical Consulting Group, 1 (Mar. 15, 2016),

https://www.dol.gov/ebsa/pdf/rates-of-return-of-broker-sold-and-direct-sold-mutual-funds.pdf.

134.    While overstating the Rule's and PTEs' purported benefits, the Department

grossly understated the direct and indirect costs they will impose on retirement savers, small

businesses, financial institutions, insurance agents, and other financial professionals.  It did this

in part through conjecture that disputed some of the most basic truths about responsible

retirement saving.  It is widely accepted, for example, that it is beneficial to save for retirement,

and to receive financial advice when doing so.  But the Department refused to fully accept either

proposition in justifying its Rule.  "The use of a financial adviser does not appear to increase

savings," the Department stated when trying to downplay the Rule's potential adverse effects,

adding:  "There is little evidence that financial advisers improve retirement savings."  Regulatory

Impact Analysis at 315-16.  These statements are erroneous and flatly inconsistent with the

Department's own statement five years earlier that investment mistakes cost investors

approximately $114 billion per year, that access to financial assistance reduced the cost of those

mistakes by $15 billion per year, and that increased access to such assistance would enable them

to save billions more.  *Investment Advice-Participants and Beneficiaries*, 76 Fed. Reg. 66,139,

66,152/2-3 (Oct. 25, 2011).  In seeking to minimize the Rule's costs, the Department likewise

questioned the value of retirement saving.  "Many . . . comments" submitted in the rulemaking

"incorrectly characterized any decrease in retirement savings as a cost," the Department stated.

Regulatory Impact Analysis at 316.  In fact, the Department argued, it might be better for

individuals to pay off their debt than to save for retirement.  *Id*. at 316, 370.

135.    In this and other respects, the Department understated the costs the Rule will

impose by depriving retirement savers of advice.  Some savers will no longer have access to a

transaction-based account, for example, and will not have assets sufficient to meet the minimum account balance required to open a traditional fee-based account. (In emphasizing claims that some robo-advisers recently have lowered the minimum account balances they require, the Department overlooked the many other obstacles that will prevent savers from switching to these new services in significant numbers.) The Department also nowhere considered the downstream impact that the Rule's costs for the industry will have on consumers in the form of increased prices for services and products, which will prevent some consumers from being able to afford valuable retirement savings help.

136. The Department is especially unfamiliar with annuities and other insurance products, and as a consequence these were scarcely an afterthought in its Regulatory Impact Analysis. While acknowledging that "31 percent of IRAs include investments in annuities," Regulatory Impact Analysis at 100, and that "insurance companies [will] be significantly affected by the proposal," *id.* at 103, the Analysis contained no assessment of the Rule's impact on the value of guaranteed lifetime income products to those who rely on these products for retirement security, the impact on the availability of guaranteed lifetime income products to consumers, or the impact on insurers who provide these products. The Department also calculated the benefits and costs of its Rule for all industry sectors, products, and consumers on the basis of data about mutual funds (which are not life insurance products), despite commenters' objections that conclusions about annuities could not properly be based on such different products.

137. The Department also ignored the costs to retirement savers who will be moved from a transaction-based account to a fee-based account that incurs costs based on the amount of assets under management. *See* Comment of Economists Incorporated (Robert Litan & Hal

Singer) at 16-22 (July 20, 2015); Comment of Investment Company Institute (Regulatory Impact

Analysis) at 6-8 (July 21, 2015).  For many savers who would be best served by a "buy and

hold" strategy, the recurring fees associated with a fee-based account would far exceed the one-

time cost of a transaction-based commission.  Morningstar calculated that this shift could result

in up to $13 billion in additional costs to savers.  Michael M. Wong et al., *Financial Services

Observer: The U.S. Department of Labor's Fiduciary Rule for Advisors Could Reshape the

Financial Sector*, Morningstar, 2 (Oct. 30 2015), http://www.advisor.ca/wp-

content/uploads/2015/11/FinancialServicesObserver_DOL-Oct2015.pdf.  Further, the pressure

the Rule puts on financial professionals to move to a fee-based model rather than a transaction-

based model would deprive savers of valuable financial assistance, as some savers would be

unable to afford the fees charged or would not qualify for the minimum account balances under a

fee-based account, and thus would be unable to keep their financial professionals.  Commenters

estimated that the costs associated with such a loss of services could be as high as $80 billion in

the event of a future major stock market correction.  Comment of Economists Incorporated at 4

(July 20, 2015).

138.    While the Department claimed that the U.K.'s recent experience with similar

regulation showed that retirement savers would not lose access to their financial professionals

under the Fiduciary Rule, it made no attempt to evaluate whether savers in the U.K. who retained

their professionals, but with a fee-based rather than transaction-based account, were worse off as

a result of increased fees.  The Department acknowledged a commenter who pointed to higher

"ongoing charges" paid by U.K. savers after the introduction of the U.K.'s regulatory changes,

Regulatory Impact Analysis at 82, but attempted to minimize the possibility that many savers

could pay more as a result of switching from transaction-based to fee-based accounts by claiming

that these savers will turn to lower-cost "robo-adviser" or hybrid robo-personal accounts, *id.* at

87.  The Department cited no evidence, however, that robo-advice had become widespread in the

U.K. in response to the advice gap recognized by a U.K. regulatory authority.

139.    Other costs of the Rule were also understated or ignored.  The Department did not

meaningfully consider the costs of class action lawsuits asserting breaches of the BIC exemption

requirements, some of which may be borne by consumers in the form of higher costs for services

and products.  For example, it did not provide any data or test findings to support its claim that

disclosure alone was insufficient to resolve investor confusion about a person's fiduciary status.

Comment of Investment Company Institute (Regulatory Impact Analysis) at 30-32 (July 21,

2015).  It failed to properly assess the costs of the new supervisory systems that firms will need

to develop and operate to monitor compliance with the BIC exemption's various standards and

warranties.  (Although brokerage firms already have established supervisory systems to comply

with the SEC, FINRA, and state securities law requirements, the Fiduciary Rule imposes new

and different requirements that will increase supervisory burdens and costs.)

140.    The Department also did not consider the costs on non-bank IRA custodians and

trustees, who as a result of the Rule may be required to maintain a higher net worth to satisfy the

Treasury Department's "net-worth" test.  This test allows a "passive" nonbank custodian or

trustee to maintain a lower net worth than is required for a "non-passive" custodian or trustee.

However, the IRS Non-Bank Trustee Investigation Procedures define "passive" in part as not

providing "any investment advice," and the Department's expansion of the meaning of

"investment advice" could result in non-bank custodians and trustees who are currently

considered passive being deemed non-passive, thereby incurring higher costs.

141.    The Department admitted that the Rule's costs will fall disproportionately on U.S. small businesses.  "Most firms affected by this rule are small firms," the Department acknowledged in describing the Rule's billions of dollars in projected costs.  Regulatory Impact Analysis at 258.  Indeed, the Department acknowledged, "over 90 percent of broker-dealers, registered investment advisers, insurance companies, agents, and consultants are small businesses," 81 Fed. Reg. at 20,993/3, and the "number of small entities" affected by the Rule exceeds 20,000, *id.*

142.    Even with so many of the Rule's costs ignored or severely understated, the Department's own estimates suggest that the Rule's supposed benefits might barely exceed costs. The Department estimated a 10-year compliance cost of as much as $31.5 billion, while the low-end of the 10-year benefits was $33 billion.  Regulatory Impact Analysis at 10.  The possible net benefit even with the flawed cost estimates is thus potentially only $1.5 billion, an amount that could easily be overwhelmed by the loss of even a small fraction of the potential broker benefits associated with portfolio rebalancing and discouragement of investor market disruption, as estimated in the study and comment of Economists Incorporated.

143.    The Senate Committee that reviewed the many flaws in the Department's Regulatory Impact Analysis concluded that the analysis was not a genuine attempt to appraise whether the Rule would benefit consumers.  Instead, "[t]he Administration was predetermined" to issue its Fiduciary Rule, the Committee concluded.  *The Labor Department's Fiduciary Rule: How a Flawed Process Could Hurt Retirement Savers* at 2.  In an email discovered by the Committee, a Labor Department official had lamented to White House advisers of the "'challenges in completing the [regulatory impact analysis]' and of the need to find literature and data that 'can be woven together to demonstrate that there is a market failure and to monetize the

potential benefits of fixing it.'" *Id.* at 2-3.  But the Department hastily "wove together" justifications for its sweeping regulatory changes in record time nonetheless, producing a Rule that will reshape industries and markets for which the U.S. Department of Labor is not even the primary regulator.

### G.  The Fiduciary Rule And The BIC Exemption Violate The First Amendment

144.    The First Amendment's right to "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (internal quotation marks and citations omitted).  This right extends to commercial speech.  *United States v. United Foods, Inc.*, 533 U.S. 405, 409-10 (2001); *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 765 (5th Cir. 2008).

145.    Under the First Amendment, financial institutions and financial professionals have a constitutional right to engage in truthful, non-misleading speech about products and services without the government imposing unreasonable or excessive burdens on that speech. Any governmental curtailment of speech must be narrowly tailored to serve the asserted policy purpose.

146.    In the Fiduciary Rule, the Department forbids certain speech unless it occurs in a context that the Department defines to be a fiduciary relationship, subject to limitations and burdens created by the Department.  *See supra* ¶¶ 73-93.

147.    Further, in the BIC exemption, the Department compels financial institutions and their representatives to satisfy numerous burdensome conditions to qualify for exemptive relief, including costly, unwarranted contractual commitments and excessive disclosure requirements. The required disclosures include the compensation expected from third parties in connection with recommended investments; the costs, fees, and compensation associated with recommended investments; whether the client's investments will be monitored, and with what frequency; and

compensation and incentive arrangements the financial institution has with its representatives. These conditions unduly restrict financial institutions' and professionals' ability to engage in truthful, commercial speech.

148.    The burdensome, excessive disclosures and conditions required by the Rule are not necessary to an informed and effective commercial transaction, and are not properly tailored to the Department's stated purpose of protecting consumers.  Indeed, the Department has admitted that its disclosure requirements are intended in part to "promote comparison shopping" and provide information to the "general public."  81 Fed. Reg. at 21,046/1, 21,052/2; *see also id.* at 21,051/1, 21,051/3.  The burdens and costs of the disclosure requirements will, in fact, impede commercial transactions without benefiting consumers.  Any benefit to consumers could have been achieved through less burdensome disclosures as suggested by commenters, including a clear and simple disclosure when a financial representative is not acting as a fiduciary.

149.    Because the Rule and the BIC exemption unreasonably and unnecessarily restrict and burden the speech of financial institutions and financial professionals, they violate the First Amendment.

## **COUNT ONE:**

### **THE DEPARTMENT HAS IMPROPERLY EXCEEDED ITS AUTHORITY IN VIOLATION OF ERISA, THE INTERNAL REVENUE CODE, AND THE ADMINISTRATIVE PROCEDURE ACT**

150.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-149 above.

151.    ERISA grants the Department regulatory authority over covered employee benefit plans, but not over IRAs when sold to individual savers.  *See* 29 U.S.C. § 1002(1) & (2).

152. Congress granted the Department the authority to interpret the definition of "fiduciary" under both ERISA and the Code, and expressly limited the Department's enforcement authority to ERISA. *See* Reorganization Plan No. 4 §§ 102, 105.

153. Authority to enforce section 4975 of the Code is given only to the Treasury Department, and even that authority is restricted to imposing excise taxes and conducting audits. *Id.* § 105; 26 U.S.C. § 4975(a), (f)(8)(E).

154. In adopting the Rule and related PTEs, the Department disregarded the balance struck by Congress between the Department's interpretive authority and enforcement authority. The Department bootstrapped its way into regulating matters outside its jurisdiction by first defining the term "fiduciary" in an impermissibly broad manner, and then exploiting its exemptive authority to obligate financial services professionals to accept special duties and liabilities that have no basis in ERISA and the Code.

155. The DOL also exceeded its authority under ERISA and the Code by seeking to regulate institutions and products in ways that conflict with the regulatory mandates and judgments of the SEC and FINRA, in areas where those entities have primary regulatory responsibility. The DOL, for example, has purported to establish standards of conduct for broker-dealers and registered investment advisers, despite the fact that Congress confirmed in the Dodd-Frank Act that the SEC, not the DOL, has the authority to adopt a uniform fiduciary standard applicable to broker-dealers and investment advisers. *See supra* ¶¶ 2, 97-107; Dodd-Frank Act, § 913.

156. The DOL also failed to consider all the factors that Congress indicated must be considered before adoption of a uniform fiduciary standard, including "the potential impact on access of retail customers to the range of products and services offered by brokers and dealers."

Dodd-Frank Act, § 913(c)(9)-(10).  Further, the DOL ignored Congress's intent that any regulations requiring product-specific disclosures by broker-dealers be adopted after consideration of their effect on "efficiency, competition, and capital formation," 15 U.S.C. § 78o(n)(2), an important statutory safeguard on rulemaking affecting broker-dealers, registered investment advisers, and their customers.

157.    The Department further overstepped its bounds by regulating certain insurance products (fixed-indexed annuities) that the Dodd-Frank Act expressly left to oversight by state regulators.  15 U.S.C. § 77c(a)(8).

158.    The Department's regulation of broker-dealers and expansion of its regulatory and enforcement authority improperly upsets the considered statutory determinations of Congress; impermissibly intrudes on the province of the SEC; and exceeds the Department's statutory authority.

159.    The Department's promulgation of the Rule was arbitrary, capricious, and otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706.  The entire Rule, BIC exemption, and other related PTEs should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner.  These PTEs are integral and non-severable from the Rule, and their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT TWO:

**THE FIDUCIARY RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT BECAUSE IT IS ARBITRARY, CAPRICIOUS, AND IRRECONCILABLE WITH THE LANGUAGE OF ERISA AND THE INTERNAL REVENUE CODE**

160.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-159 above.

161.    In enacting the definition of "fiduciary" in ERISA and the Code, Congress incorporated the traditional and historical meaning of that term as reflected in the law of trusts and the Advisers Act.  Under these principles, a fiduciary relationship is not present in all financial relationships, but only those formed for the purpose of providing advice in the context of a heightened degree of trust and confidence between the parties.  Further, the advice must be what is paid for, not the product being purchased or sold.  As the text states, an investment-advice fiduciary is one who "renders investment advice for a fee or other compensation."  29 U.S.C. § 1002(21)(A).

162.    The interpretation of "fiduciary" expressed in the Rule is not a permissible construction of ERISA or the Code.  The Rule sweeps so broadly that it encompasses activity that has long been understood to be sales-related and not fiduciary, not to mention relationships that even the Department admits are "not appropriately regarded as fiduciary in nature" and require exclusion from the Rule.  81 Fed. Reg. at 20,948/3.  Further, this sweeping change in the definition of fiduciary is barred by Congress's ratification of the 1975 definition through subsequent amendments to ERISA.  *See Lorillard v. Pons*, 434 U.S. 575, 584-85 (1978).

163.    The Department's promulgation of the Rule was arbitrary, capricious, and otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706.  The entire Rule, BIC exemption, and other related PTEs should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner.  These PTEs are integral and non-severable from the Rule, and their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT THREE:

## THE DEPARTMENT UNLAWFULLY CREATED A PRIVATE RIGHT OF ACTION

164.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-163 above.

165.    Section 4975 of the Code provides that the remedies for violating the provision's prohibited transaction requirements are limited to excise taxes and audits.  26 U.S.C. § 4975(a), (f)(8)(E).  Participants in IRAs and other non-ERISA plans have no statutory right to enforce the prohibited transaction provisions.

166.    The BIC exemption and the Principal Transactions exemption violate section 4975 and the APA by purporting to create a private right of action through a written, enforceable contract requirement that would enable participants in IRAs and other non-ERISA plans to sue financial institutions and their representatives for breach of standards of conduct fashioned by the Department that Congress nowhere imposed on IRAs, other non-ERISA plans, or on the financial professionals and firms who offer them.

167.    The Department did not properly determine that these two exemptions, which create enormous liability and exposure, and include the requirement that "reasonable compensation" must be paid, are "administratively feasible."  29 U.S.C. § 1108(a); *see also* 26 U.S.C. § 4975(c)(2).

168.    In adopting the BIC exemption and the Principal Transactions exemption, the Department acted in a manner that is arbitrary, capricious, and that violates section 4975 and the well-established principle that only Congress may create a private right of action, *Alexander*, 532 U.S. at 286.

169.    The Department's promulgation of the Rule was arbitrary, capricious, and otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to

5 U.S.C. §§ 702, 706.  The entire Rule, BIC exemption, Principal Transactions exemption, and

other related PTEs should be declared unlawful, set aside, and enjoined from enforcement,

implementation, and being given effect in any manner.  These PTEs are integral and non-

severable from the Rule, and their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT FOUR:

### THE DEPARTMENT FAILED TO PROVIDE ADEQUATE NOTICE AND TO SUFFICIENTLY CONSIDER AND RESPOND TO COMMENTS

170.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-169

above.

171.    The APA provides that before an agency promulgates a rule, it must provide

notice of the proposed rule and give "interested persons an opportunity to participate in the rule-

making through submission of written data, views, or arguments."  5 U.S.C. § 553(b)-(c).

172.    In that notice-and-comment process, the agency must respond to "relevant" and

"significant" public comments, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir.

1977), and to those comments "which, if true, . . . would require a change in [the] proposed

rule," *La. Fed. Land Bank Ass'n, FLCA*, 336 F.3d at 1080 (internal quotation marks and citations

omitted).  "[A]n agency has a duty to consider responsible alternatives to its chosen policy and to

give a reasoned explanation for its rejection of such alternatives."  *Farmers Union Cent.*

*Exchange, Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984).

173.    The Department failed to provide the opportunity to comment on studies and data

relied upon in the final Rule.  It also failed to adequately consider and respond to important

comments and proposed alternatives relating to the scope of the Fiduciary Rule.  For example,

commenters requested a broad seller's exception that would apply to all sellers and customers,

effectuated by a clear and simple disclosure that the seller is not a fiduciary.  Multiple

commenters also informed the Department that its Regulatory Impact Analysis had critical defects, including that the Department provided no data or test findings to support its conclusion that disclosure alone is insufficient to dispel investor uncertainty about whether a person is acting as a fiduciary; and that while the Department identified receipt of 12b-1 fees or other practices as a cost to investors, it did not provide any data about the benefits that investors experienced from those purported "conflicted" services provided by financial institutions and their representatives.

174.     The Department did not address these comments in any meaningful way.  With the seller's disclosure, for example, the Department disparaged "[d]isclosure alone" as wholly "ineffective," 81 Fed. Reg. at 20,950/3, 20,981/3, and even contended that it was harmful, *id.* at 20,981/3.  No commenters proposed that a seller's exclusion be based on "disclosure alone," however.  Rather, they proposed that the exclusion be based on disclosure in the context of a relationship that was indeed a seller's relationship according to the traditional definition, and that was also subject to a range of state and federal requirements, including regulations requiring sellers to recommend suitable investments consistent with just and equitable principles of trade. The Department also drew inconsistent and conflicting conclusions by stating on the one hand that disclosure by financial representatives was often "harmful" and could incentivize representatives to engage in improper conduct, while on the other hand imposing costly new disclosure obligations on representatives and claiming these burdensome disclosure requirements would yield significant benefits.  The Department also did not explain how its rejection of the efficacy of disclosure could be squared with Congress's reliance for over 80 years on disclosure as a cornerstone of the federal securities laws.

175.     By adopting a Rule that will have severe and disruptive effects on the financial services and insurance industries, small businesses, and retirement savers without fairly

addressing comments relating to the legality and effectiveness of the Rule, the Department

"failed to consider an important aspect of the problem" purportedly addressed by the Rule, in

violation of the APA. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118

(D.C. Cir. 2010).

176.    The Department's promulgation of the Rule was arbitrary, capricious, and

otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to

5 U.S.C. §§ 702, 706.  The entire Rule, BIC exemption, and other related PTEs should be

declared unlawful, set aside, and enjoined from enforcement, implementation, and being given

effect in any manner.  These PTEs are integral and non-severable from the Rule, and their

vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT FIVE:

### THE FEDERAL ARBITRATION ACT PROHIBITS THE BIC AND PRINCIPAL TRANSACTIONS EXEMPTIONS' REGULATION OF CLASS ACTION WAIVERS IN ARBITRATION AGREEMENTS

177.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-176

above.

178.    The FAA establishes a federal policy favoring arbitration and requires arbitration

agreements to be enforced according to their terms. *CompuCredit Corp. v. Greenwood*, 132 S.

Ct. 665, 669 (2012).  A federal agency lacks authority to override the FAA's protections of the

enforceability of arbitration agreements unless Congress has conferred such authority through a

clear "contrary congressional command." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 358 (5th

Cir. 2013).  Nothing in ERISA or the Code contains such an override.

179.    Nonetheless, the Department's Rule turns long-standing federal pro-arbitration

policy on its head and forbids financial institutions and representatives from relying on the BIC

exemption and Principal Transactions exemption if they include an arbitration agreement with a

class action waiver in their contract with customers.  Reliance on the BIC exemption is now

essential to receiving common forms of compensation for a range of financial services, because

the Department prohibits this compensation outright through the Fiduciary Rule, allowing it only

if financial institutions and representatives submit themselves to the BIC and its contractual

requirements.  Further, reliance on the Principal Transactions exemption is also necessary for

any transactions of certain investments out of the financial institution's own inventory.  Thus,

financial institutions and representatives have no choice but to comply with the ban on class

action waivers in the exemptions.

180.    This prohibition violates the FAA and is arbitrary, capricious, and not in

accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706.

The entire Rule, BIC exemption, Principal Transactions exemption, and other related PTEs

should be declared unlawful, set aside, and enjoined from enforcement, implementation, and

being given effect in any manner.  These PTEs are integral and non-severable from the Rule, and

their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT SIX:

### THE DEPARTMENT'S REGULATION OF FIXED-INDEXED ANNUITIES AND GROUP VARIABLE ANNUITIES THROUGH THE BIC EXEMPTION IS ARBITRARY, CAPRICIOUS, BARRED BY THE DODD-FRANK ACT, AND WAS NOT SUBJECT TO PROPER NOTICE AND COMMENT

181.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-180

above.

182.    In the Dodd-Frank Act, Congress prohibited the SEC from regulating fixed-

indexed annuities if the annuities met certain state standards.  15 U.S.C. § 77c(a)(8).

183.     With its Rule and series of exemptions, however, the Department undertook to regulate all fixed-indexed annuities, regardless of Congress's intent in the Dodd-Frank Act that only certain annuities like variable annuities be federally regulated.

184.     The Department's effort to regulate products that Congress specifically withdrew from the scope of federal regulation except in carefully-defined circumstances contradicts congressional intent, exceeds the Department's statutory authority, and is arbitrary, capricious, and not in accordance with law.

185.     Under the APA, an agency must provide notice and an opportunity to comment on its proposed rules.  5 U.S.C. § 553(c).  In regulating fixed-indexed annuities and group variable annuities, the Department failed to fairly apprise the public of its intention to entirely exclude those products from PTE 84-24, and to limit exemptive relief for those products to the BIC exemption.  As a result, the Department also failed to assess the effect this change would have on the benefits and costs projected for in the Rule.  By failing to give fair notice of and an adequate opportunity to comment on an important aspect of the final PTEs, the Department acted arbitrarily and capriciously and in violation of the notice and comment requirements of the APA.

186.     The Department also acted arbitrarily and capriciously by creating an exemption that is not "administratively feasible" for fixed-indexed annuities—as required by ERISA and the Code—products that are sold predominantly by independent insurance agents through IMOs that do not meet the definition of "Financial Institution" under the BIC exemption.  Further, insurance companies are not likely to step into the void left by IMOs, because the Department created an unworkable definition of qualifying insurance companies in the BIC that no insurance company may be able to satisfy.

187.     Plaintiffs and their members suffered prejudice because proper notice would have permitted them to show the obstacles the BIC exemption poses for the sale of fixed-indexed annuities, and the higher costs the Rule and exemptions will impose as a result.

188.     The Department's promulgation of the BIC exemption was arbitrary, capricious, and otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706.  The entire Rule, BIC exemption, and other related PTEs should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner.  These PTEs are integral and non-severable from the Rule, and their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT SEVEN:

## THE DEPARTMENT ARBITRARILY AND CAPRICIOUSLY ASSESSED THE RULE'S BENEFITS, CONSEQUENCES, AND COSTS

189.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-188.

190.     In rulemaking under the APA, an agency may not ignore significant evidence in the record, draw conclusions that conflict with the record evidence, rely on contradictory assumptions or conclusions, or fail to consider an important aspect of the problem it purports to be remedying.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015).

191.     The DOL predicated its adoption of the Fiduciary Rule on the claim that it would offer significant financial benefits to retirement savers.  The DOL estimated these benefits at $4 billion a year, an amount that it claimed outweighed the Rule's costs.

192.     The Department's analysis of the Rule's benefits was thoroughly flawed.  It improperly extrapolated the underperformance of outlier mutual funds to all mutual funds, and speculated without basis that "robo-advisers" would become a major and effective source of

investment assistance in the near future. It ignored and underestimated the Rule's direct and indirect costs to the financial services industry and savers, including costs from class action lawsuits arising from the BIC exemption, and costs to savers from lost access to retirement assistance or lost access to the transaction-based fee model. The Department gave no meaningful consideration at all to the Rule's impact on access to assistance with products providing guaranteed lifetime income (annuities), or on non-bank IRA custodians and trustees who may need to have a higher net worth because of the Rule's expansion of the meaning of "investment advice." When all those costs—which the record shows will total tens of billions of dollars—are properly considered, the Rule fails to give savers the financial benefits that were the DOL's stated purpose for adopting the Rule.

193. By adopting the Rule for its purported economic benefits, while simultaneously exaggerating those benefits and minimizing the Rule's direct and indirect costs, the Department adopted the Rule in a manner that was arbitrary, capricious, and otherwise not in accordance with law. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706. The entire Rule, BIC exemption, and other related PTEs should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner. These PTEs are integral and non-severable from the Rule, and their vacatur necessarily requires vacatur of the Rule as a whole.

## COUNT EIGHT:

### THE DEPARTMENT'S BEST INTEREST CONTRACT EXEMPTION IMPERMISSIBLY BURDENS SPEECH IN VIOLATION OF THE FIRST AMENDMENT

194. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-193.

195. "The First Amendment protects [against] compelled speech as well as compelled silence." *Hersh*, 553 F.3d at 765. "For corporations as for individuals, the choice to speak

includes within it the choice of what not to say." *Pacific Gas & Elec. Co. v. Public Utils.*

*Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality op.).

196.    Financial institutions and financial professionals have a First Amendment right to engage in truthful, non-misleading speech related to their products and services, including in their communications with customers and potential customers. *See supra* ¶¶ 144-45.

197.    The Fiduciary Rule improperly abridges this speech by prohibiting it unless it occurs in the confines of a fiduciary relationship subject to definitions, limitations, and burdens created by the Department.  Further, the numerous conditions that financial institutions and their representatives must satisfy to qualify for relief under the Department's BIC exemption impose unjustified burdens on protected speech, and impermissibly regulate speech on the basis of its content, because they unduly restrict financial institutions' and professionals' ability to engage in sales communications; compel costly, unwanted contractual commitments; and force disclosure of sensitive, competitive information about the financial institutions' and professionals' compensation and revenues.

198.    These burdens and restrictions are broader and more costly than justified by any legitimate governmental interest, and impose limitations on speech that are no more effective than other less restrictive requirements, including a clear and simple disclosure when a financial representative is not acting as a fiduciary.  As a result, no fit exists between any legitimate ends the Department seeks to achieve and the means the Department has chosen to accomplish them.

199.    The BIC exemption's disclosure requirements and other burdens cannot survive any level of constitutional scrutiny.  They violate the First Amendment and should be vacated and declared null and void.

200.   Plaintiffs are therefore entitled to relief for the deprivation of their First Amendment rights under 5 U.S.C. §§ 702, 706(2)(B).  Without the BIC exemption, which is integral and non-severable from the Rule, the entire Rule collapses.  Therefore, the Rule, BIC exemption, and other related PTEs should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner.

**PRAYER FOR RELIEF**

201.   WHEREFORE, Plaintiffs pray for an order and judgment:

a.   Declaring that the Rule and exemptions were promulgated by the DOL in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C); were not promulgated by observance of procedures required by law within the meaning of 5 U.S.C. § 706(2)(D); are arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A); and are contrary to constitutional right, power, privilege, or immunity within the meaning of 5 U.S.C. § 706(2)(B);

b.   Vacating and setting aside the Rule and exemptions;

c.   Enjoining the DOL and all its officers, employees, and agents from implementing, applying, or taking any action whatsoever under the Rule and exemptions, and anywhere within the DOL's jurisdiction.  Without an injunction, the Rule and exemptions will impose myriad compliance costs on the financial services industry—costs which according to the DOL's own flawed estimate are $5 billion in the first year—and lead some financial professionals and their companies to forgo or cease serving certain clients, and even to leave the business altogether.  An injunction would also serve the public interest by averting harm to the operation and viability of financial

services companies that are an important part of the U.S. economy; to individual financial professionals who could lose income, their businesses, or even their jobs because of the costs, liability, and exposure posed by the Rule and the exemptions; and to hard-working Americans who could no longer afford investment assistance in reaching their retirement goals and who could be prevented from meeting in those goals as a result;

d.  Issuing all process necessary and appropriate to postpone the effective date of the Rule and exemptions and to maintain the status quo pending the conclusion of this case;

e.  Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

f.  Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  June 1, 2016                s/ James C. Ho

Eugene Scalia*
Jason J. Mendro*
Paul Blankenstein*
Rachel E. Mondl*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
escalia@gibsondunn.com
jmendro@gibsondunn.com
pblankenstein@gibsondunn.com
rmondl@gibsondunn.com

James C. Ho, Texas Bar No. 24052766
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 110
Dallas, TX  75291
Telephone:  (214) 698-3264
Facsimile:  (214) 571-2917
jho@gibsondunn.com

*Counsel for Plaintiffs Chamber of Commerce of the United States of America, Financial Services Institute, Inc., Financial Services Roundtable, Greater Irving-Las Colinas Chamber of Commerce, Humble Area Chamber of Commerce DBA Lake Houston Area Chamber of Commerce, Insured Retirement Institute, Lubbock Chamber of Commerce, Securities Industry and Financial Markets Association, and Texas Association of Business*

* Application for admission *pro hac vice* to be submitted

(*continued on next page*)

Steven P. Lehotsky*
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone:  (202) 463-5337
Facsimile:  (202) 463-5346
slehotsky@uschamber.com

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

J. Lee Covington II*
INSURED RETIREMENT INSTITUTE
1100 Vermont Avenue, N.W.
Washington, DC 20005
Telephone:  (202) 469-3000
Facsimile:  (202) 469-3030
lcovington@irionline.org

*Counsel for Plaintiff Insured Retirement Institute*

David T. Bellaire*
Robin Traxler*
FINANCIAL SERVICES INSTITUTE, INC.
607 14th Street, N.W.
Suite 750
Washington, DC 20005
Telephone:  (888) 373-1840
Facsimile:  (770) 980-8481
david.bellaire@financialservices.org
robin.traxler@financialservices.org

*Counsel for Plaintiff Financial Services Institute, Inc.*

Kevin Carroll*
Ira D. Hammerman*
SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION
1101 New York Avenue, N.W.
8th Floor
Washington, DC 20005
Telephone:  (202) 962-7300
Facsimile:  (202) 962-7305
kcarroll@sifma.org
ihammerman@sifma.org

*Counsel for Plaintiff Securities Industry and Financial Markets Association*

Kevin Richard Foster*
Felicia Smith*
FINANCIAL SERVICES ROUNDTABLE
600 13th Street, N.W.
Suite 400
Washington, DC 20005
Telephone:  (202) 289-4322
Facsimile:  (202) 589-2526
richard.foster@fsroundtable.org
felicia.smith@fsrroundtable.org

*Counsel for Plaintiff Financial Services Roundtable*

* Application for admission *pro hac vice* to be submitted