**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FINANCIAL SERVICES INSTITUTE, INC., FINANCIAL SERVICES ROUNDTABLE, GREATER IRVING-LAS COLINAS CHAMBER OF COMMERCE, HUMBLE AREA CHAMBER OF COMMERCE DBA LAKE HOUSTON AREA CHAMBER OF COMMERCE, INSURED RETIREMENT INSTITUTE, LUBBOCK CHAMBER OF COMMERCE, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, and TEXAS ASSOCIATION OF BUSINESS, | Civil Action No. 3:16-cv-1476-M  (Consolidated with Nos. 3:16-cv-1530-M and 3:16-cv-1537-M) |

                    Plaintiffs,

        v.

THOMAS E. PEREZ, SECRETARY OF
LABOR, and UNITED STATES
DEPARTMENT OF LABOR,

                    Defendants.

**AMERICAN COUNCIL OF LIFE INSURERS AND NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

    A.    The Significant Role Of Annuities In The Retirement Savings
        Marketplace.......................................................................................... 2

    B.    Existing Distribution Channels And Compensation Models For Annuities........... 4

    C.    Existing Regulation Of Annuity Sales.................................................. 6

    D.    The Rule................................................................................................ 7

STANDARD OF REVIEW .............................................................................................. 8

ARGUMENT .................................................................................................................... 9

I.     THE RULE'S IMPOSITION OF FIDUCIARY OBLIGATIONS ON NON-FIDUCIARY
      COMMERCIAL SPEECH EXCEEDS THE DEPARTMENT'S STATUTORY AUTHORITY................. 9

II.    THE RULE UNLAWFULLY CREATES A PRIVATE RIGHT OF ACTION ..................................... 9

III.   THE RULE VIOLATES THE FIRST AMENDMENT AS APPLIED TO TRUTHFUL
      COMMERCIAL SPEECH ....................................................................... 10

    A.    The Rule Is A Content-Based Regulation That Fails Strict Scrutiny .................. 10

    B.    The Rule Fails Intermediate Scrutiny ................................................. 15

        1.    The Rule does not advance a substantial government interest ................. 15

        2.    The Rule does not directly advance a substantial interest ........................ 17

        3.    The Rule is not narrowly tailored ............................................................ 20

IV.   IN DISCRIMINATING BETWEEN FAVORED AND DISFAVORED RETIREMENTS
      PRODUCTS, THE DEPARTMENT EXCEEDED ITS STATUTORY AUTHORITY........................... 23

    A.    The Rule Deliberately Disfavors Variable And Fixed Indexed Annuities
        While Seeking To Promote Other Retirement Products ....................................... 23

    B.    The Department Lacks Statutory Authority To Promote And Discriminate
        Against Particular Retirement Products................................................................. 24

V.     THE RULE'S TREATMENT OF VARIABLE AND FIXED INDEXED ANNUITIES IS
       ARBITRARY AND CAPRICIOUS ............................................................................................ 26

       A.     The BICE Is Not "Administratively Feasible" For Annuities ............................. 27

       B.     The Department Failed To Account For The Harm To Consumers From
              Decreased Access To Annuity Products............................................................... 29

       C.     The Department Unreasonably Disregarded Existing Annuity Regulation.......... 32

VI.    THE DEPARTMENT FAILED TO PROVIDE NOTICE AND AN OPPORTUNITY TO
       COMMENT ON ARBITRARY CHANGES THE RULE MADE TO DIFFERENT
       TYPES OF ANNUITIES....................................................................................................... 35

CONCLUSION..................................................................................................................................... 36

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007) ............................................................20

*Am. Bankers Ass'n v. SEC*, 804 F.2d 739 (D.C. Cir. 1986)...........................................................26

*Am. Equity v. SEC*, 613 F.3d 166 (D.C. Cir. 2010) ...............................................................32, 35

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................................22

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011) .......................................................10, 14

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)......................................................14

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)............................................................29

*Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990)..............................................................26

*Cent. Forwarding, Inc. v. ICC*, 698 F.2d 1266 (5th Cir. 1983).............................................24, 25

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 557 (1980).................................................................................15, 17, 20, 22

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ............................................20

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ..........................................32, 33

*Darden v. Peters*, 488 F.3d 277 (4th Cir. 2007) .............................................................................9

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015)...........................................23

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ............................................................25

*Edenfield v. Fane*, 507 U.S. 761 (1993) .................................................................................15, 17

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................................25

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................................24

*Gobeille v Liberty Mut. Ins. Co.*, 136 S. Ct. 936 (2016)...............................................................29

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977).........................................................31

*Illusions—Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 2007) .................................9

*In re Express-News Corp.*, 695 F.2d 807 (5th Cir. 1982)..............................................................20

*Judulang v. Holder*, 132 S. Ct. 476 (2011).....................................................................9

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ...................................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................30

*Nat'l Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121 (N.D. Tex. June 27, 2016) ....................11

*NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158 (D.C. Cir. 1998)......................................32

*Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979) ...........................................................9

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)...........................................11, 14

*Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015)................................11, 12, 13, 14

*Resolute Forest Products, Inc. v. Dep't of Agric.*, 2016 WL 2885869
    (D.D.C. May 17, 2016) .......................................................................................34

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)...........................................22

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................10, 12, 13, 14, 15, 16, 17

*Texas v. EPA*, 690 F.3d 670 (5th Cir. 2012) ...........................................................9, 32

*United Airlines, Inc. v. FERC*, 2016 WL 3568136 (D.C. Cir. July 1, 2016)..............................34

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) .........................................10, 14

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976).......................................................................10, 15, 17, 21

## STATUTES AND LEGISLATIVE AUTHORITIES

5 U.S.C. § 553.......................................................................................................35

5 U.S.C. § 706.........................................................................................................8

15 U.S.C. §§ 77f-h..................................................................................................6

15 U.S.C. § 77j........................................................................................................6

15 U.S.C. § 78a *et seq.*..........................................................................................26

15 U.S.C. § 80b-2(a)(11) .........................................................................................7

15 U.S.C. § 80b-11(g)(1) ...................................................................................22

15 U.S.C. §§ 1011-1015 ...................................................................................26

26 U.S.C. § 4975...................................................................................8, 27, 28

29 U.S.C. § 1002(21)(A)(ii)...............................................................................24

29 U.S.C. § 1106(b) ...........................................................................................24

29 U.S.C. § 1108...........................................................................................24, 27

29 U.S.C. § 1135.................................................................................................30

Conf. Rep. No. 93-1280, 93d Cong., 2d Sess. (1974) .....................................25

*Modernizing ERISA To Promote Retirement Security: Hearing Before the Subcomm. on
Emp'r-Emp. Relations of the H. Comm. on Educ. and the Workforce*, 106th
Cong. (2000) (statement of Leslie Kramerich, Acting Assistant Secretary of
Labor for Pension and Welfare Benefits, U.S. Department of Labor) .............25

Reorganization Plan No. 4 of 1978, § 102, 92 Stat. 3790
(Aug. 10, 1978, as amended Sept. 20, 1978) ....................................................27

S. Rep. No. 93-383 (1973)....................................................................................8

## RULES AND REGULATIONS

29 C.F.R. § 2510.3-21(b)(1) ...............................................................................12

29 C.F.R. § 2510-3.21(c) (2015)............................................................................7

29 C.F.R. § 2550.408c-2(b)(1)............................................................................28

Advisory Opinion Procedure, 41 Fed. Reg. 36,281 (1976) ..............................28

FINRA Regulatory Notice 07-53 (2007) ...........................................................34

FINRA Rule 2111 ...........................................................................................6, 33

FINRA Rule 2330...........................................................................................6, 33

FINRA Rule 2210-2..............................................................................................6

NAIC 2010 Suitability Model §§ 5(I), 6(A) ........................................................6

Proposed Information Collection Request, 81 Fed. Reg. 10,280 (Feb. 29, 2016)........................16

v

Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under
the "Prudence" Rule, 44 Fed. Reg. 37,221 (1979) ............................................................ 24


## OTHER AUTHORITIES

Brien, Michael J. & Constantijn W.A. Panis, *Annuities in the Context of Defined
Contribution Plans: A Study for the U.S. Department of Labor, Employee
Benefits Security Administration* (Nov. 2011) ................................................................ 3, 4

FCA, *Financial Advice Market Review Call for Input* (Oct. 2015),
https://www.fca.org.uk/your-fca/documents/famr-cfi ...................................................... 19

FINRA, *Variable Annuities: Beyond the Hard Sell* (Aug. 31, 2009),
http://www.finra.org/investors/alerts/variable-annuities-beyond-hard-sell ...................... 34

Mass. Sec. Div., *Policy Statement, Robo-Advisers and State Investment Adviser
Registration* (Apr. 1, 2016), http://www.sec. state.ma.us/sct/sctpdf/Policy-
Statement--Robo-Advisers-and-State-Investment-Adviser-Registration.pdf ................... 20

Restatement (Second) of Trusts § 227 cmt. b (1959) .................................................................. 25

Restatement (Third) of Trusts ch. 17 introductory note (2007) ................................................... 25

## INTRODUCTION

Plaintiffs—the American Council of Life Insurers ("ACLI"), the principal national association of companies that issue life insurance products, including annuities; the National Association of Insurance and Financial Advisors ("NAIFA"), the principal association of insurance agents who sell such products to retirement investors; and several North Texas associations of insurance agents affiliated with NAIFA[1]—bring this action to challenge the attempt by the Department of Labor (the "Department") to impose new rules on the way annuities are sold to retirement savers, rules that exceed the Department's statutory mandate; violate the First Amendment rights of consumers and sellers of such products to receive and provide truthful information about such products; and will do far more harm than good to Americans trying to plan for happy and prosperous retirement years.

Many retirement savers today must manage and balance various retirement risks without a pension, even as Americans' life expectancy improves.  Plaintiffs' members issue, market, and sell a variety of life insurance products, including  "annuities"—popular insurance products that enable American retirement savers to receive guaranteed income for life that protects them from the risk of outliving their assets.  The variety of annuity products in the marketplace today also empowers consumers to select and tailor their investment in annuities to meet their specific needs, income level, life situation, and risk preferences.

The regulation at issue here (the "Rule") is a misguided and unprecedented intervention in the retirement savings marketplace.  It will unnecessarily restrict consumers' access to annuity products and important information about those products.  Yet the rulemaking failed to examine meaningfully the effects of the Rule on the annuity marketplace.  As the record before the

---

[1] The associations are NAIFA-Texas, NAIFA-Amarillo, NAIFA-Dallas, NAIFA-Fort Worth, NAIFA-Great Southwest, and NAIFA-Wichita Falls.

Department demonstrated, the Rule will unnecessarily drive up the costs of guaranteed lifetime income products, distort the marketplace for retirement products generally, interfere with consumers' access to truthful information about those products, and worsen, not help resolve, the profound challenges facing retirement investors.

For reasons explained below, in Plaintiffs' complaint, and in the briefs of other plaintiffs in these consolidated actions, the Rule is contrary to law, arbitrary and capricious, and unconstitutional as applied.  The Court should vacate the Rule in its entirety.

## BACKGROUND

### A.    The Significant Role Of Annuities In The Retirement Savings Marketplace

American retirees today must balance numerous retirement risks.  They may save too little.  They may outlive their assets.  They may see the value of their assets effectively eroded by inflation.  Or they may invest in assets that ultimately decline in value and provide no safety net. The annuity products that Plaintiffs' members issue, market, and sell provide unique opportunities for retirement savers and retirees to address those risks.  An annuity is a contract between an insurance company and an individual in which the consumer invests a lump sum or series of payments and, in exchange, the insurer makes periodic payments over either a set period of time or the lifetime of an individual.  Compl. ¶ 30.  By offering a way to guarantee income for life or for a period of the investor's choosing, annuities protect against the risk of outliving retirement savings ("longevity" risk), a significant risk for many now that Americans are living longer and longer.  *Id.* ¶¶ 29, 38.

So-called "longevity risk" is not the only issue confronting retirement savers, and various types of annuities enable retirement savers to address an array of other risks:  the risk that rising prices will diminish purchasing power ("inflation" risk); the risk that assets will decline in value ("investment" risk); as well as the risk of outliving one's resources.  Compl. ¶ 31.  A "fixed

declared rate" annuity (or "fixed-rate annuity") prioritizes protection against investment risk over potentially greater returns by guaranteeing that interest credited to the contract will be based on a specified rate of return.  A "fixed indexed rate" annuity (or "fixed indexed annuity") likewise protects against investment risk by guaranteeing that interest credited will be no less than a specified minimum, while also providing protection against inflation risk by basing interest credited, in part, on a market index, such as the S&P 500.  A "variable" annuity unlocks the full potential of investment market growth (and thus maximizes protection against inflation risk) by tying interest credited to the performance of a portfolio of stocks, bonds, or other assets selected by a consumer and to the selection of a guaranteed benefit option.  Which type of annuity is most appealing to a consumer depends upon, among other things, a consumer's financial situation, objectives, risk tolerance, and other investments.

Consumers can readily customize annuities to meet their specific needs and preferences. Compl. ¶ 33.  For example, variable and fixed indexed annuities typically provide a guaranteed death benefit, which is paid to a surviving spouse or other dependent when the annuity owner passes away—a benefit of immense value to many consumers.  Optional riders are available to meet other objectives, such as providing enhanced death benefits or guaranteeing the annuity owner's account will not drop below the initial premium paid.

Annuities play a critical role in today's retirement savings marketplace, particularly as held within tax-advantaged Individual Retirement Accounts ("IRAs").  Widespread investment in annuities reflects the great value retirement savers obtain from them.  Indeed, a Department-commissioned study cited in the administrative record "found that beneficiaries of lifelong-guaranteed income," such as an annuity, "were more satisfied in retirement and suffered from fewer depression symptoms than those without such income."  Brien & Panis, *Annuities in the*

*Context of Defined Contribution Plans* 1 (Nov. 2011) (cited in App. 538-539).[2]  The "boost in well-being became stronger" the longer a person was retired—a finding "consistent with the notion that … recipients of lifelong-guaranteed income … are less concerned with outliving their resources."  *Id*.  Numerous other studies cited and discussed in the administrative record demonstrated annuities' singular value to consumers.  Compl. ¶¶ 40-41; App. 210, 252, 541-542, 653-655.

### B.    Existing Distribution Channels And Compensation Models For Annuities

Given the retirement risks and various options for addressing them, American consumers depend more than ever on truthful, timely information about retirement products.  Compl. ¶¶ 49-53; App. 210, 602.  Many retirement savers obtain that information the same way they learn about other important products:  through conversations with a salesperson.  For fixed annuities, including fixed-rate and fixed indexed annuities, that salesperson is most often an insurance agent; for variable annuities, it is a registered broker-dealer.  Compl. ¶ 54.  Insurance agents and broker-dealers may be affiliated with an insurer and devote substantially all of their sales efforts to that insurer's products (so-called "proprietary products").  *Id*. ¶ 55.  Or they may be independent.  Many independent agents—especially those who sell fixed indexed annuities—work with third-party independent marketing organizations ("IMOs"), from which they obtain sales support, product recommendations, and training.  *Id*. ¶ 55.

Informing consumers about annuities requires considerable time and expertise.  Annuities have wide-ranging features designed to accommodate varying risk tolerances and consumer preferences.  Compl. ¶¶ 50-51; App. 210.  Insurance agents and broker-dealers must comply with state and federal "suitability" requirements, discussed below, as they help consumers assess

---

[2] "App." refers to citations to Plaintiffs' Appendix, filed with their motion for summary judgment.  "AR" refers to citations to the Administrative Record jointly filed in this case.

whether an annuity is a good choice and, if so, which type of annuity and optional features suit consumers' financial circumstances.  Consumers often are unfamiliar with how annuities work and how different riders may address concerns they have about liquidity, inflation, or the financial effects of premature death.  Compl. ¶ 52; App. 210, 657.  Many purchasers find it difficult to consider how retaining a lump sum of savings will compare to a steady stream of wage-like payments received for life.  App. 925-969.  Effectively informing consumers about annuities thus often requires a more involved conversation than is required to sell other financial products.  For these reasons, life insurers rely on IMOs and affiliated agents and broker-dealers to maintain a highly trained, professional sales force to market and sell their annuity products.  Compl. ¶ 55; App. 843; AR 418-419.  And insurers typically pay a sales commission to compensate agents and broker-dealers for the significant effort involved in learning about, marketing, and selling annuities.  Compl. ¶ 56; App. 210.  These existing distribution and compensation systems ensure that a trained sales staff is available to meet consumer demand.

The alternative to commission-based compensation is a fee-for-advice model, in which consumers pay an adviser to manage their investments over time.  This model may work well for consumers who can afford to pay for ongoing advice—typically measured by a percentage of assets under management.  But it is more expensive and makes little sense for consumers making a one-time purchase of a "buy-and-hold" product like an annuity.  Fee-based advisers typically require investors to maintain a minimum balance of between $100,000 and $250,000—levels that are out of reach for most Americans.  Compl. ¶ 53; App. 830-831 (in 2013, 76% of traditional IRAs had less than $100,000).  A standard 2% annual fee may cost investors far more, over time, than one-time commission payments insurance companies typically pay agents or broker-dealers.  App. 851-852.  Switching from a commission-based model to annual fees thus

would increase costs for many annuity purchasers and threaten to deprive individuals with small balances of all access to personal financial assistance.  *See* App. 231-232, 604-605, 868-869.

### C.      Existing Regulation Of Annuity Sales

Annuities are already subject to comprehensive regulation that effectively protects consumers without unreasonably impeding the annuity market.  Compl. ¶¶ 59-80.  As insurance products, all annuities are subject to state insurance laws administered by state insurance regulators.  In addition, the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") regulate the sale of variable annuities.  This regulatory oversight—strengthened in recent years—ensures that consumers receive truthful, valuable information about investment options and suitable retirement recommendations.

*FINRA regulation of variable annuity sales*.  Anyone who sells variable annuities must register as a broker-dealer with FINRA and comply with both general suitability rules governing the sale of all securities (FINRA Rule 2111) and specific, and more stringent, suitability requirements imposed on the sale of variable annuities (FINRA Rule 2330).  The SEC requires that variable annuities be registered with the SEC, 15 U.S.C. §§ 77f-h, and that customers receive a prospectus filed with the SEC describing the annuity's features, *id.* § 77j.  All variable annuity advertising must comply with FINRA Rule 2210-2.

*State-law suitability and disclosure requirements*.  Comprehensive state regulations also govern annuities.  The National Association of Insurance Commissioners ("NAIC") has crafted a Model Suitability Rule that has been adopted in some form by 48 States and the District of Columbia.  The recently strengthened 2010 Model Rule prohibits an insurance agent from recommending an annuity until the agent determines that it is suitable for the consumer in light of, among other things, the consumer's age, annual income, financial objectives, liquidity needs, liquid net worth, risk tolerance, and tax status.  NAIC 2010 Suitability Model §§ 5(I), 6(A).

### D.     The Rule

The Department promulgated the Rule in April 2015.  *See* Compl. ¶¶ 92-155 (detailing rulemaking proceeding and final Rule).[3]  It combines a sweeping expansion of fiduciary status, which would prohibit those selling annuities from receiving a commission or selling only proprietary products, with the creation of a new "prohibited transaction exemption" ("PTE")— the Best Interest Contract Exemption ("BICE")—that purports to permit broker-dealers and insurance agents to continue those essential practices.  But in reality, the BICE is too onerous to be usable by most issuers and sellers of variable and fixed indexed annuities.

In three major ways, the Rule breaks sharply with past Department regulations and with federal law more generally.  *First*, the Rule discards a longstanding distinction between fiduciary investment advisers and non-fiduciary salespersons.  For more than 75 years, advisers hired to provide impartial investment advice have been required to comply with fiduciary obligations imposed by the Investment Advisers Act of 1940.  But salespersons who provide advice "solely incidental" to selling a product (that is, as part of a sales conversation) have had to comply with salesperson-specific regulations, most recently the suitability requirements discussed above.  15 U.S.C. § 80b-2(a)(11); Compl. ¶¶ 62-65.  The Department's previous interpretation of "investment advice"—which has stood for four decades prior to the Rule—respected this statutory distinction by conditioning fiduciary status on characteristics emblematic of a trusted fiduciary relationship.  29 C.F.R. § 2510-3.21(c) (2015).  The Rule discards this commonsense distinction, redefining "advice" as including all "recommendations" made by insurance agents or broker-dealers to IRA owners, ERISA plan participants, or the sponsors of an ERISA plan with less than $50 million in assets.  Salespersons now may speak as a fiduciary, or not at all.

---

[3] The Rule challenged here is a collection of related rules that the Department simultaneously proposed and adopted, along with a regulatory impact analysis, and subsequent technical corrections.  *See* AR1-698.

*Second*, the Rule replaces enforcement-by-expert-agency with a new regime of enforcement-by-private-lawsuit.  Congress designed the Employment Retirement Income Security Act of 1974 ("ERISA") so that the "primary" means of enforcing the statute's prohibited-transaction rules—and the sole means of enforcing those rules for IRAs—would be an excise tax administered by the Internal Revenue Service ("IRS").  26 U.S.C. § 4975; S. Rep. No. 93-383, at 33-34 (1973).  That statutory approach has been the law for decades.  But finding Congress's remedial scheme "inadequate" and wanting instead to provide a "mechanism for investors to enforce their rights" through litigation, AR77-78, the Department structured the BICE to require execution of an enforceable "best interest" contract for all IRA sales.  The Rule thus replaces enforcement by the IRS with class-action lawsuits under the BICE as the primary means for enforcing compliance with statutory obligations.

*Third*, for the first time, the Rule subjects different kinds of annuities to entirely different legal regimes.  Since 1977, the Department has regulated all annuities the same way—permitting annuities to be sold under an exemption now referred to as "PTE 84-24."  The Rule, however, establishes different regulatory requirements for the sale of different annuities, retaining the "streamlined" PTE 84-24 for products like fixed-rate annuities the Department wishes to "promote," but excluding from PTE 84-24 variable and fixed indexed annuities and requiring these products to be sold under the "more stringent" BICE.  AR232-233, 235.  The Rule thus erects a new hierarchy between annuity products favored and disfavored by the Department.

## STANDARD OF REVIEW

A rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations" must be vacated.  5 U.S.C. § 706(2)(A)-(C).  Agency action must be set aside as arbitrary and capricious if the agency failed to "examine[] the relevant data," to consider

"'relevant factors,'" or to "articulate[] a 'satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'"  *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012).  These standards accord some deference to agencies, but courts retain an important role in "ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 132 S. Ct. 476, 484 (2011).  "[J]udicial review of a claim that the agency's action violated [a party's] constitutional rights is conducted *de novo*."  *Darden v. Peters*, 488 F.3d 277, 284 (4th Cir. 2007); *see Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979).

Summary judgment on Plaintiffs' First Amendment claim is appropriate if "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Illusions—Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 304 (5th Cir. 2007).

## ARGUMENT

### I.   THE RULE'S IMPOSITION OF FIDUCIARY OBLIGATIONS ON NON-FIDUCIARY COMMERCIAL SPEECH EXCEEDS THE DEPARTMENT'S STATUTORY AUTHORITY

As set forth in the briefs of the Chamber of Commerce and IALC, the Rule is contrary to law and arbitrary and capricious because it imposes fiduciary duties on a wide range of communications and commercial relationships that are plainly not fiduciary in nature and because the Department failed to identify empirical evidence that parties to sales of annuities are actually in relationships of trust and confidence.  Chamber Mem. Part I; IALC Mem. Part I; *see also* Compl. ¶¶ 156-172.

### II.   THE RULE UNLAWFULLY CREATES A PRIVATE RIGHT OF ACTION

As set forth in the briefs of the Chamber of Commerce and others, the Rule is contrary to law because the BICE creates a private right of action in violation of congressional intent, creating massive potential liability for financial institutions that use the BICE.  Chamber Mem. Parts II & III; *see also* Compl. ¶¶ 175-180.

III.   **THE RULE VIOLATES THE FIRST AMENDMENT AS APPLIED TO TRUTHFUL COMMERCIAL SPEECH**

The Rule violates the First Amendment as applied to the truthful commercial speech of Plaintiffs' members.  It bans, regulates, and burdens speech—that is, "recommendations" regarding certain retirement products—yet fails both strict and intermediate scrutiny.  This violation is particularly damaging to Plaintiffs' members and their customers:  as the administrative record demonstrated, consumers need access to timely, truthful commercial information about the annuity products Plaintiffs' members issue and sell, but the Rule will seriously interfere with consumers' right and ability to receive such information.  This Court's review is "*de novo*."  *Darden*, 488 F.3d at 284.

A.   **The Rule Is A Content-Based Regulation That Fails Strict Scrutiny**

Where a rule "imposes a restriction on the content of protected speech, it is invalid unless [the government] can demonstrate that it passes strict scrutiny." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011).  That the Rule regulates written and oral communications "'propos[ing] a commercial transaction,'" *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 762 (1976), does not diminish the First Amendment's protection against content discrimination, *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 826 (2000) ("[A]ll content-based restrictions on speech must give us … pause.").

Indeed, content-based restrictions on commercial speech are no less noxious than content-based restrictions on other forms of expression, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("[c]ommercial speech is no exception" to the First Amendment's disfavor of content-based burdens), and thus "the First Amendment requires heightened scrutiny whenever the government" imposes content-based restrictions on commercial speech, whose vital importance to consumers the Supreme Court has long recognized, *id.*  With exceptions not

applicable here, therefore, content-based regulations trigger strict scrutiny and "may be justified

only if the government proves that they are narrowly tailored to serve compelling [government]

interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015); *see, e.g.*, *Nat'l Fed'n of*

*Indep. Bus. v. Perez,* 2016 WL 3766121, at *32-35 (N.D. Tex. June 27, 2016) (holding that a

DOL rule was a content-based regulation of speech that failed strict scrutiny).[4]

 As a threshold matter, there can be no debate that the Rule triggers First Amendment

scrutiny:  it directly regulates speech by insurance agents, broker-dealers, and others.  It prohibits

"recommendations" about retirement products communicated to consumers as a part of sales

conversations—conversations about retirement products and options that occur at consumers'

dinner tables and in the offices of insurance agents and broker-dealers day in and day out across

the Nation—unless its onerous terms and conditions are satisfied.  Indeed, the Rule all but

abolishes commercial speech in this marketplace by requiring that recommendations be

conveyed in a fiduciary capacity, or not at all.  Under the Rule, for example, a broker-dealer is

prohibited from saying "you should consider buying a variable annuity from my company,"

unless that broker-dealer assumes fiduciary status.  The terms and conditions themselves impose

---

[4] A content-based restriction of commercial speech may avoid strict scrutiny only "[w]hen the basis for the content discrimination consists entirely of the very reasons the entire class of speech is proscribable." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992).  Thus, for example, "a State may … regulate price advertising in one industry but not in others, because the risk of fraud … is in its view greater there." *Id.* at 388-389.  That proposition is wholly inapplicable here.  The Rule is not aimed at fraud or even misleading sales tactics recommending unsuitable retirement products—both of which extant regulation already prohibits.  Instead, the Rule is aimed at remedying purported conflicts of interest created by commissioned sales, even when all information provided to consumers in those interactions is truthful.  In fact, the Rule bars broker-dealers from recommending a variable annuity unless they assume a fiduciary status, not because of a risk of false or misleading information, but because of the Department's view that even fully disclosed, truthful commercial information will persuade consumers to make investment choices of which the Department disapproves.  *See* AR5-6.  This view that well-informed consumers cannot act in their own interest is at war with the First Amendment, as explained below.  Moreover, even if concerns about fraud could be cited as a reason to ban truthful commercial speech about suitable retirement products—which it cannot—the Rule nevertheless triggers strict scrutiny because, as explained below, of the myriad content-based lines the Rule draws between speakers (human v. robo-advisers), listeners (sophisticated v. unsophisticated), and subject matters (favored v. disfavored retirement products)—none of which can be justified primarily, much less "entirely," as antifraud measures.

heavy content-based burdens on the making of such recommendations, burdens that will certainly reduce the quantity of constitutionally protected speech in the annuity marketplace.

The Rule is also content-based under either of the two tests elaborated by the Supreme Court.  *Reed*, 135 S. Ct. at 2227.  The Rule draws "facial distinctions" based on subject matter, speaker, listener, and product.  *Id.*  Specifically, the Rule regulates speech with a particular subject matter:  "investment advice," or "recommendations" to purchase retirement products.  "Advice" and "recommendations" are broadly defined to encompass any "suggestion" to take or not take some action.  AR52.  The Rule regulates speech with this subject matter by imposing fiduciary obligations on the speaker solely by virtue of the content of her speech, thereby triggering statutory liability for violations of the prohibited-transaction rules, including for the receipt of commission-based compensation for such speech.  *Cf. Sorrell*, 564 U.S. at 564 ("The statute … disfavors marketing, that is, speech with a particular content.").  Indeed, whether any particular communication subjects a speaker to regulation depends entirely "on [the communication's] *content*."  AR52 (codified at 29 C.F.R. § 2510.3-21(b)(1)) (emphasis added).

The complex of exemptions built into the Rule further discriminates among "recommendations" according to content-based criteria, including the type of speaker and listener.  For example, while burdening human broker-dealers and agents, the Department declined to subject one speaker—so-called robo-advisers—to the BICE in order to avoid "adversely affect[ing] the incentives currently shaping the market for robo-advice."  AR114.[5] The Department thus intentionally chose to "adversely affect" incentives for some speakers but not others.  In addition, the Rule's exception for "transactions with independent fiduciaries with financial expertise" provides listener-based relief from fiduciary status based on the

---

[5] This speaker-based discrimination triggers strict scrutiny and is independently irrational given the serious questions regulators have raised about the utility of robo-advice.  *See infra* p. 20 n.5.

Department's judgment about which listeners are and are not sophisticated enough to distinguish between sales communications and fiduciary advice.  AR35-36 (declining to expand the "seller's exception" to include retail IRA investors or small business sponsors of ERISA plans); *see* AR54-55.  The Rule thus privileges customers the Department deems more sophisticated, who may gain access to truthful, commercial speech that the Department places out of bounds for ordinary consumers, for whom the Department restricts speech.

In addition to discrimination based on content, speaker, and listener, the Rule codifies the Department's disfavor of particular messages about retirement products.  For instance, agents "recommending" fixed-rate annuities need only comply with PTE 84-24 to be exempt from ERISA's blanket fiduciary obligations, whereas an agent or broker-dealer discussing variable or fixed indexed annuities with their customers must comply with the more onerous BICE.  Tying the level of regulation to the product discussed is obviously content-based.  *See Reed*, 135 S. Ct. at 2227.  And the BICE's already stringent conditions are more stringent still where the topics being discussed are an insurer's own proprietary products.  AR136-137.  Regulatory distinctions like these targeting communications by specific speakers to specific listeners about specific subject matters are "paradigmatic" content discrimination subject to strong presumptions of invalidity.  *Reed*, 135 S. Ct. at 2223; *see Sorrell*, 564 U.S. at 564.

The Rule is also content-based because its multiple facial distinctions "cannot be justified without reference to the content of the regulated speech" and were "adopted … because of disagreement with the message the speech conveys."  *Reed*, 135 S. Ct. at 2227 (internal quotation marks and alterations omitted).  Indeed, the Department's core justification for the Rule is inextricably tied to the content of messages consumers receive.  Citing the "dangers posed by conflicts of interest and by the asymmetries of information," AR5, the Department

treated "recommendations" communicated by non-fiduciary broker-dealers and insurance agents as a source of harm to consumers.  The Rule purports to solve this problem by imposing blanket fiduciary status for all retirement-related sales speech—banning "recommendations" made in ordinary sales conversations, for example—and then carving out limited conditional relief for those categories of speech the Department deemed acceptable.  The First Amendment proscribes such "regulat[ion] … based on hostility—or favoritism—towards the underlying message." *R.A.V.*, 505 U.S. at 386.

As a content-based regulation, the Rule is "presumptively unconstitutional" and subject to strict scrutiny.  *Reed*, 135 S. Ct. at 2226.  "It is rare that a regulation restricting speech because of its content will ever be permissible."  *Playboy*, 529 U.S. at 818; *see Sorrell*, 564 U.S. at 571; *Reed*, 135 S. Ct. at 2226.  To withstand strict scrutiny, the Department must show a "compelling government interest," and the regulation must be "narrowly drawn" to serve that interest. *Brown*, 564 U.S. at 799 (citations omitted).

The Department cannot come close to carrying that burden here because, as discussed below, the Rule clearly fails even intermediate scrutiny.  But one point specific to strict scrutiny is dispositive.  Under strict scrutiny, the availability of a "less restrictive alternative" is fatal. *Playboy*, 529 U.S. at 813.  That is so even when the alterative might require Congress, rather than the Department, to act.  *See Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751, 2759 (2014) (striking down, under "least restrictive means" prong of the Religious Freedom Restoration Act, agency regulations because of "other ways in which Congress or [agency] could equally" achieve compelling interest).  That principle invalidates the Rule here because there are numerous ways Congress could have addressed professed concerns about conflicts of interest without regulating, burdening, or banning speech.  As obvious examples, Congress could have

regulated commissions and compensation directly, in connection with commercial *transactions* rather than commercial *speech*; it could have regulated retirement products themselves; or it could have allowed consumers to receive commercial speech from a non-fiduciary following full disclosure, AR 5-6, and affirmative agreement to a non-fiduciary, sales relationship.

### B.     The Rule Fails Intermediate Scrutiny

The Rule is unconstitutional under intermediate scrutiny, and therefore fails even if strict scrutiny were not applied.  Recognizing the extraordinary value of commercial speech to consumers and society, the Supreme Court has "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate [it]."  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980); *Virginia State Board of Pharmacy*, 425 U.S. at 763-764.  Under intermediate scrutiny, the Department carries the burden of justifying the Rule's burdening of truthful, non-misleading commercial speech, *see Edenfield v. Fane*, 507 U.S. 761, 770 (1993), and the Rule may be upheld only if it "directly advances" "a substantial government interest" and "is not more extensive than is necessary to serve that interest," *Cent. Hudson*, 447 U.S. at 566; *see Sorrell*, 564 U.S. at 571-572.  The Rule fails at each step of the analysis.

### 1.     The Rule does not advance a substantial government interest

Protecting American retirement consumers is undoubtedly a substantial interest.  Nevertheless, the Rule does not advance that interest here in a manner consistent with the First Amendment because it proceeds from an unconstitutional premise—namely, that truthful, non-misleading commercial information about retirement products is harmful to consumers and the government therefore should shield them from it.  The Department casually dismissed concerns that the Rule would lead to decreased access to information from financial professionals by, among other things, asserting that access to such information actually harms consumers.  In the

Department's view, "conflicted advisers help investors overcome biases when it is in the

adviser's own best interest to do so, but they also reinforce investor biases when those biases are

beneficial to the adviser ... cost[ing] investors $114 billion annually." AR631. As the

Department sees it, government-enforced silence is better for consumers than so-called

"conflicted advice"—that is, truthful information provided by broker-dealers and insurance

agents other than in a fiduciary capacity.

The view that truthful information is harmful to consumers making retirement decisions

is belied by the record. App. 138, 247. For example, the record demonstrated that "Americans

accumulate more savings when working with a financial professional, saving twice the amount

over a seven- to 14-year period," and "earn[ing] 1.59 percent in additional returns." App. 542-

543. Furthermore, the Department's own prior finding was that "retirement investors who do not

receive investment advice are twice as likely to make poor investment choices as those who do

receive that advice." App. 829 (citing Investment Advice—Participants and Beneficiaries, 76

Fed. Reg. 66,136, 66,152 (Oct. 25, 2011)). The Department's counterintuitive belief that truthful

information is unhelpful to consumers making retirement decisions is also fatally undermined by

the Department's admission, elsewhere, that it lacks any data-based understanding about "how

people make planning and financial decisions before and during retirement." Proposed

Information Collection Request, 81 Fed. Reg. 10,280, 10,281 (Feb. 29, 2016).

Even more fundamentally, whatever the state of the record, the Department's premise

that government-enforced silence is preferable to truthful commercial information is at war with

the First Amendment. The foundation of the commercial speech doctrine is that "[a]

'consumer's concern for the free flow of commercial speech often may be far keener than his

concern for urgent political dialogue,'" *Sorrell*, 564 U.S. at 566—a proposition certainly true

where retirement options are at issue.  For that reason, "the First Amendment presumes that some accurate information is better than no information at all." *Cent. Hudson*, 447 U.S. at 562. That broker-dealers and insurance agents have economic interests does not change that analysis: "a great deal of vital expression" "results from an economic motive." *Sorrell*, 564 U.S. at 567.

The Department's denigration of consumers' capacity to understand information pervades the rulemaking.  For example, in rejecting clear and simple disclosures as an alternative, the Department explained "that even if disclosure about conflicts could be made simple and clear, it could be ineffective—or even harmful." AR6.  In addition, other aspects of the Rule simply assume that most consumers cannot make informed decisions for themselves about retirement options. *See, e.g.*, AR4-5 (asserting that consumers "have no idea how advisers are compensated" and consumers "are bewildered" by retirement options).

And even if the Department's assumptions regarding consumers' ability to process information, to understand disclosures, and to make retirement decisions had been reasonable and supported by record evidence—they were not—they are foreclosed by the First Amendment, which "assume[s] that [truthful] information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Virginia State Bd. of Pharmacy*, 425 U.S. at 770.  "The choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely available' is one that 'the First Amendment makes for us.'" *Sorrell*, 564 U.S. at 578.  The Department was not free to choose differently here.

## 2.    The Rule does not directly advance a substantial interest

To survive intermediate scrutiny, the Rule must serve the Department's posited interest in assisting consumers making retirement decisions "in a direct and material way." *Edenfield*, 507

U.S. at 767.  The Department also "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them[.]"  *Id.* at 770-771.

The Department cannot possibly make that showing here.  To the contrary:  the administrative record demonstrated that the Rule will harm, not help, the retirement savers it seeks to assist.  Compl. ¶¶ 203-210.  The record confirmed that the non-fiduciary sales conversations the Department effectively banned (and the recommendations it has directly burdened) are low-cost means through which many consumers obtain useful investment information about how particular products can meet their specific needs.  *See, e.g.*, App. 7, 21.  Particularly pertinent here, the record showed that consumers need truthful information and expert assistance to help them appreciate the value of annuities and make decisions about them.  Compl. ¶ 104 (collecting record evidence); App 210, 542-543, 924.

The record was equally clear that the Rule's imposition of fiduciary obligations and resulting litigation risk, as basic economics would predict, will raise the costs of and impede consumers' access to this flow of commercial information.  For example, increased compliance costs associated with fiduciary status, as well as the threat of class-action litigation under the BICE, will drive insurance agents and broker-dealers out of the market, lowering supply and increasing the price of investment information for retirement savers.  *E.g.*, App. 249 ("The price of financial advice is determined by supply and demand.  The time, resources and financial burdens of complying with the proposed rule will be greater than under current regulations.");  *see also* App. 829.  The Rule threatens to drive many independent insurance agents, in particular, from the marketplace because they are not eligible to sign the BICE.  AR80.  And insurers may discontinue distributing products through independent agents given the downstream liability risks under the BICE.  AR623-628.

18

These harmful effects are not merely theoretical.  The record showed that, following the United Kingdom's adoption of a similar regulation in 2012, the number of investment advisers dropped substantially.  App. 249-250.  Regulators in the United Kingdom have acknowledged that as supply dwindled and the cost of financial information rose, middle- and small-balance savers lost access to valuable retirement information.  FCA, *Financial Advice Market Review Call for Input* 15-16 (Oct. 2015).

Moreover, the record established that insurance agents and broker-dealers who remain in the market are likely to serve primarily wealthier customers or shift to fee-based accounts, which are typically more expensive than commission sales payments.  *E.g.*, App. 105 ("Individuals with small balance accounts are likely to lose access to retirement help and support with selecting appropriate products."); *see also* App. 249.  One economic analysis suggested that the cost to consumers from loss of consumer access to financial information and assistance could reach $19 billion per year within ten years.  App. 821.

In responding to criticisms that the Rule would result in higher prices and decreased access to information, the Department opined that "the price of advice should not be higher merely because an adviser charges direct fees and avoids prohibited transactions."  AR629.  But that ignores that providing advice as a fiduciary as opposed to providing information in a sales relationship will be costlier.  It also ignores that, even under the Department's flawed accounting, compliance costs will be between $10 billion and $31.5 billion over 10 years.  AR326.  And that analysis wholly failed to assess the litigation-related expenses under the BICE. Many of those costs will be paid by consumers:  "A basic principle of economics is that prices charged by firms in an industry will rise if firms face an increase in per-unit or per-client costs, such as … increased costs associated with compliance and litigation risks."  App. 7.

In addition, the Department pointed to robo-advisers—companies supplying interactive online tools to generate recommendations for consumers—as an option for small-balance investors who might face decreased access to assistance as a result of the Rule. AR635-636; Compl. ¶¶ 150-151, 207. But given the Department's concession that information conveyed through automated mechanisms does not offer the same benefits as information provided by human financial professionals, AR636-637; App. 251, the Department offered no reasoned explanation for how robo-advisers could effectively substitute for consumers' loss of access to truthful information under the Rule.[6]

In short, the Rule fails intermediate scrutiny because it will hinder, not help, retirement consumers in their access to truthful commercial information about retirement products. The Rule thus not only fails to advance the Department's stated interests but also violates consumers' First Amendment "right to receive information" that will help them make important life decisions. *In re Express-News Corp.*, 695 F.2d 807, 809 & n.2 (5th Cir. 1982).[7]

### 3.      The Rule is not narrowly tailored

The Rule also fails intermediate scrutiny because it is unnecessarily burdensome. Commercial-speech regulation must be "in proportion to [the government] interest," *Cent. Hudson*, 447 U.S. at 564, showing the Department "'carefully calculated' the costs and benefits associated with the burden on speech," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993). The Department carries the burden of proof on this point, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 168 (5th Cir. 2007), and the Department failed that constitutional

---

[6] Recent reports by FINRA and the SEC cited in the record express concerns that automated investment tools rely on incorrect assumptions and may be prone to conflicts of interest. *See* App. 1038, 1045-1047; *see also* Mass. Sec. Div., *Policy Statement, Robo-Advisers and State Investment Adviser Registration* 1 (Apr. 1, 2016).

[7] In addition to implicating the First Amendment, the Department's failure to assess adequately the grave risk that the Rule will deprive consumers of information about retirement options renders the Rule arbitrary and capricious under the APA. *See* Compl. ¶¶ 143-151, 203-210; Chamber Mem. 36-37.

requirement here, particularly with respect to insurance products.  *E.g.*, Compl. ¶¶ 131-155

(detailing myriad errors in the Department's cost-benefit analysis); *infra* pp. 29-32.

The Rule's lack of narrow tailoring is obvious.  To accomplish its radical intervention in

the marketplace, the Department classified vast swaths of communications as fiduciary

"advice"—had it not done so, it would have had no statutory basis to regulate them at all.  The

Department did so by adopting a sweeping definition of fiduciary advice unmoored from

historical understanding of a fiduciary relationship.  The Department itself recognized that its

definition covered "relationships that are *not* appropriately regarded as fiduciary in nature and

that the Department does not believe Congress intended to cover as fiduciary relationships."

AR3 (emphasis added).  It is no answer to say that the Department remedied that lack of narrow

tailoring through the Rule's bewildering array of exemptions and carve-outs.  Those purported

safety-valves are ill-defined, artificially narrow, and onerous to use—and uncertainty about when

they apply will inevitably chill protected First Amendment speech.  *See, e.g.*, AR36 (limiting

seller's exception to large plans); *infra* pp. 27-29 (detailing BICE's unworkability).

In addition, the Rule fails narrow-tailoring analysis because it all but bans commercial

speech in the retail retirement marketplace without warrant.  Categorizing speech as "fiduciary

advice, education, [or] sales activity directed at independent fiduciaries with financial expertise,"

AR6, the Rule permits speech "'propos[ing] a commercial transaction,'" *Virginia State Bd. of

Pharmacy*, 425 U.S. at 762, only for one "very narrow and stringent" class of listeners, AR35—

investors the Department conjectured "*should* have a high degree of financial sophistication"

based on "assets under management," AR37 (emphasis added).  Not only is this proxy for

sophistication unsupported by empirical evidence, but the Department unreasonably assumed

that only such listeners can distinguish sales speech from fiduciary advice and, on that basis,

proscribed commercial speech to all IRA owners, all plan participants and beneficiaries, and smaller plan fiduciaries.  In those contexts, sellers may communicate as a fiduciary, or not at all. Thus, far from being "designed carefully" to avoid plainly excessive burdens on commercial speech, *Cent. Hudson*, 447 U.S. at 564, the Rule is vastly overbroad by design.

More narrowly tailored approaches were clearly available.  For example, if the Department's concern was that some consumers are confused about when they are receiving impartial advice and when they are receiving sales information, the Department could have adopted straightforward prophylactics, such as clear and simple disclosures, to dispel that confusion.  App. 140-145, 1118-1120.  That approach would have been in keeping with Congress's statutory judgments that consumers can consent to *disclosed* conflicts of interest even in a fiduciary context.  *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 186 (1963); 15 U.S.C. § 80b-11(g)(1).

The Department paternalistically rejected even "simple and clear" disclosures based on conjecture that consumers could not understand them; strangely, the Department even asserted that truthful disclosures could, in fact, harm consumers.  AR5-6.  The studies on which the Department relied for these contentions were deeply flawed, inapplicable, or both.[8]  But more importantly, it is a cornerstone of the First Amendment that well-informed consumers can and will make appropriate judgments about their own self-interest.  Based on that insight, Congress has "time and again" relied on disclosures in federal securities law.  *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) ("Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress.").  Moreover, elsewhere in the Rule, the Department itself relied on the effectiveness of disclosures.  *E.g.*, AR29, 38, 102-105.  That

---

[8] For example, the Department relied primarily on a five-page, highly theoretical paper supported not by real-world empirical data from actual markets, but by limited "evidence" from a few stylized role-playing experiments involving, for example, dice games.  *See* App. 142-144, 1118-1120 (criticizing studies).

"unexplained inconsistenc[y]" alone renders its rejection of disclosure irrational.  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015).

IV.   **IN DISCRIMINATING BETWEEN FAVORED AND DISFAVORED RETIREMENTS PRODUCTS, THE DEPARTMENT EXCEEDED ITS STATUTORY AUTHORITY**

The Rule has the purpose and effect of granting special and preferential advantages to the Department's favored retirement products, while heaping disproportionate burdens on products the Department disfavors, namely, variable and fixed indexed annuities.  The Department has no authority to regulate retirement products themselves, and this discrimination therefore exceeded its statutory authority.  Compl. ¶¶ 185-188.

A.   **The Rule Deliberately Disfavors Variable And Fixed Indexed Annuities While Seeking To Promote Other Retirement Products**

The Rule imposes varying burdens on different types of investment products in a deliberate effort to steer investors toward products that the Department favors and away from those it disfavors.  The Rule departs from the historically uniform treatment of annuities, and creates separate exemptions for fixed-rate annuities, on the one hand, and variable and fixed indexed annuities, on the other.  AR74.  Insurance agents and broker-dealers now may sell variable and fixed indexed annuities for a commission only under the BICE.  AR74, 133.  Sales of fixed-rate annuities, by contrast, continue to fall within PTE 84-24, a more "streamlined" and substantially less burdensome exemption.  AR235.

The Department expressly *intended* this regulatory engineering to encourage the sale of certain products and discourage the sale of others, based on the Department's views of their relative merits.  AR439-442, 454-455.  The Department sought to "promote access" to fixed-rate annuities and to decrease access to other annuities, including by diminishing any "regulatory incentive[s] to preferentially recommend indexed annuities."  AR232, 238; *see* AR235, 627 ("consumer-friendly insurance products" may "gain market share").  The Department recognized

that moving products from PTE 84-24 to the BICE created serious risks for sellers of such products, "including class litigation, and liability and associated reputational risk."  AR2.  Thus, by requiring variable and fixed indexed annuities to be sold under "the more stringent conditions" of the BICE, AR233, the Department sought to impair access to those products:  the Rule, the Department explained, is "intended and expected … to move markets toward a more optimal mix of … financial products."  AR624.

### B.   The Department Lacks Statutory Authority To Promote And Discriminate Against Particular Retirement Products

The Department's attempt to engineer the market for retirement products in this manner far exceeds its limited statutory authority.  Although Congress delegated authority to the Department under ERISA to regulate fiduciary *conduct*, 29 U.S.C. §§ 1002(21)(A)(ii), 1106(b), 1108, the Department has no authority to regulate retirement *products*.  Because the Rule does just that—as explained above—the Rule exceeds the Department's authority.  *See, e.g.*, *Cent. Forwarding, Inc. v. ICC*, 698 F.2d 1266, 1285 (5th Cir. 1983) (agencies are "creatures of legislative empowerment, limited in authority by legislative enactment").

Nothing in ERISA or the Tax Code gives the Department the authority to pick and choose retirement products for American consumers or to privilege or disproportionately burden favored and disfavored categories of retirement products.  For at least two reasons, any such assertion of statutory authority would be deeply inconsistent with congressional design.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142-143 (2000).

*First*, the common law of trusts, which ERISA incorporated, rejected efforts to limit the products a fiduciary could recommend.  It is well settled that Congress incorporated into ERISA principles of modern trust law.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1464 (5th Cir. 1983); Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the

"Prudence" Rule, 44 Fed. Reg. 37,221, 37,222 (1979) ("common law of trusts ... forms the basis for" ERISA).  One principle of the modern law of trusts is a repudiation of rigid preferences for and against particular investments.  Historically, some States had enacted laws limiting the types of investments a trustee could select.  By 1974, however, the "modern trend" was to abandon such restrictions in favor of a flexible rule of "prudent" investing.  *See* Restatement (Second) of Trusts § 227 cmt. b (1959); Restatement (Third) of Trusts ch. 17 introductory note (2007). ERISA followed that trend, as Congress declined to restrict the types of investments plan administrators could select, requiring instead that "a prudent fiduciary ... consider the facts and circumstances of each case."  Conf. Rep. No. 93-1280, 93d Cong., 2d Sess. at 304 (1974).

Indeed, that has long been the Department's own understanding of its authority.  The Department's early rulemakings under ERISA disclaimed any intent to create a "list of investments, classes of investment, or investment techniques that might be permissible under the 'prudence' rule."  44 Fed. Reg. at 37,225; *see Cent. Forwarding, Inc.*, 698 F.2d at 1281 ("An agency's contemporaneous interpretation of its own statute is entitled to great weight[.]").  More recently, the Department explained that it "does not sit in independent judgment regarding the appropriateness, attractiveness, economics or prudence of the investment proposals themselves" when promulgating PTEs.  *Modernizing ERISA To Promote Retirement Security:  Hearing Before the Subcomm. on Emp'r-Emp. Relations of the H. Comm. on Educ. and the Workforce*, 106th Cong. 37 (2000) (statement of Leslie Kramerich, Acting Assistant Secretary of Labor for Pension and Welfare Benefits, U.S. Department of Labor).  If the Department intended to depart from its historical understanding of its authority in the rulemaking here, it was obligated to "display awareness that it is changing position" and to justify that change.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  The Department did neither.

*Second*, courts should be particularly skeptical of an agency's newly asserted authority to regulate a subject matter that falls within the jurisdiction of other regulators. *E.g.*, *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 755 (D.C. Cir. 1986); *Bus. Roundtable v. SEC*, 905 F.2d 406, 410-413 (D.C. Cir. 1990). That principle is squarely applicable here, because Congress has entrusted another agency, the Securities and Exchange Commission, with regulation of securities products, *see* 15 U.S.C. § 78a *et seq.*, and has deliberately left undisturbed the States' longstanding authority to regulate insurance products, *see* 15 U.S.C. §§ 1011-1015. That existing regulatory scheme confirms Congress did not intend to delegate to the Department—an agency with no special expertise in securities or insurance products—authority to predetermine which products should succeed or fail, thereby effectively taking those choices away from American consumers.

For these reasons, the Court should vacate the Rule in its entirety or, at a minimum, restore a level playing field by vacating the exclusion of variable and fixed indexed annuities from PTE 84-24.

## V.   THE RULE'S TREATMENT OF VARIABLE AND FIXED INDEXED ANNUITIES IS ARBITRARY AND CAPRICIOUS

Even assuming the Department has statutory authority to favor certain retirement products over others (it does not), the Rule must be vacated. *First*, in subjecting variable and fixed indexed annuity products to the burdens of the BICE, the Department was required to ensure the exemption was "administratively feasible." The BICE is anything but feasible; it remains unworkable in many applications. Compl. ¶¶ 181-184. *Second*, basic principles of reasoned decisionmaking required the Department to account for the singular, documented value of annuity products to consumers before taking regulatory steps that, in purpose and practical effect, will substantially interfere with consumers' access to those products. *Id.* ¶¶ 189-202. *Third*, the Department's obligation carefully to weigh the costs and benefits of the Rule

precluded it from unreasonably dismissing an extensive, and recently strengthened, regulatory framework that already protects annuity consumers.  *Id.* ¶¶ 211-219.  Individually and collectively, these failures of reasoned decisionmaking require vacatur of the Rule.

### A.    The BICE Is Not "Administratively Feasible" For Annuities

Both ERISA and the Code preclude the Department from crafting an exemption, like the BICE, without first "find[ing] that such exemption is … administratively feasible."  29 U.S.C. § 1108(a); *see also* 26 U.S.C. § 4975(c)(2); Reorganization Plan No. 4 of 1978, § 102, 92 Stat. 3790 (Aug. 10, 1978, as amended Sept. 20, 1978).  The BICE badly fails that requirement.

The record developed before the Department demonstrated that:  (1) annuities are enormously valuable to consumers; (2) selling annuities takes more time and effort than other products, and annuities have long been sold on a commission basis for that reason; and (3) forcing annuity sales to occur through the BICE would substantially interfere with consumers' access to annuities and to information about annuities.  Compl. ¶¶ 101-109; App. 206-208, 210, 541-543, 606-607, 641-650, 654-660, 767-768, 776, 804-810.  The Department acknowledged concerns that the BICE would lead broker-dealers to "stop selling" variable annuities, AR73, but asserted that changes to the BICE would make the exemption workable.

That assertion is unreasonable.  *First*, by combining a host of open-ended and ill-defined standards with an unpredictable and inconsistent enforcement regime through state-law contract actions, the BICE dramatically increases litigation costs and risks associated with selling variable and fixed indexed annuities.  App. 233-234, 686.

The BICE mandates that a broker-dealer or insurance agent selling an annuity not be paid more than "reasonable compensation" and provide advice that is in the "best interest" of the purchaser "without regard to" the broker-dealer's or agent's own interests.  AR133, 139.  Yet the Rule provides no meaningful guidance regarding how to comply with these standards.  The

Department, for example, refused to "provide specific examples of 'reasonable' compensation," claiming that by tying reasonable compensation to "ERISA section 408(b)(2) and Code section 4975(d)(2)," it had clarified the matter.  AR87.  But under ERISA regulations, whether compensation is "reasonable … depends on the particular facts and circumstances of each case." 29 C.F.R. § 2550.408c-2(b)(1).  And in more than 200 advisory opinions, the Department has consistently acknowledged that such questions are "inherently factual" and declined to opine on them.  *See, e.g.*, Advisory Opinion Procedure, 41 Fed. Reg. 36,281, 36,282 (1976).  In addition, by creating an ill-defined best interest standard, the BICE creates unpredictable risks for those selling annuity products that a court or jury may later determine, based on hindsight and a lack of familiarity with annuities, were not the best retirement investments for the consumer.  The dangers of relying on the BICE for commission-based sales are particularly acute given that the Department put a heavy thumb on the scale in favor of a conclusion that commissions "bias advice and harm advice recipients."  AR449.

Indeed, the Department compounded the inherent uncertainty of these standards by assigning enforcement, not to a single expert agency, but to class-actions lawyers in state and federal courts across the country.  Compl. ¶ 196.  By delegating enforcement of vague and general standards to private lawyers enforced through private suits, the Department has subjected Plaintiffs and their members to unforeseeable, and potentially conflicting, interpretations of the BICE's requirements.  Those issuing or marketing variable and fixed indexed annuities thus face the near-impossible task of having to predict the hindsight judgments of courts and juries across the nation.  The uncertain, but potentially staggering, liability renders the BICE impractical, App. 233-234, 605, 659-660, 686, and conflicts with the "the central design of ERISA, which is to

provide a single uniform national scheme … without interference from laws of the several States," *Gobeille v Liberty Mut. Ins. Co*., 136 S. Ct. 936, 947 (2016).

*Second*, the BICE is entirely unworkable for proprietary products.  Although purporting to facilitate the sale of such products, the BICE creates serious litigation risk, especially given the Department's professed "deep and continuing concern" about such sales.  AR108; *see* AR18.  In fact, the Department stressed that a broker-dealer or insurance agent "may not, consistent with the Best Interest obligation, recommend a product from its limited menu" "if another type of investment" would be in the investor's best interest.  AR111.  This subjects insurance companies to lawsuits claiming that other products would have better satisfied a retail investor's needs without clear guidance about how to avoid liability.

*Third*, the BICE is unworkable because it cannot be used by IMOs and independent insurance agents to distribute fixed indexed annuities unless issuers assume the liability for parties acting below them in the distribution chain—a decision that drastically interferes with that widely used distribution model.  *See* IALC Mem. Part II.B; Chamber Mem. Part VI; *see also* Compl. ¶ 183(d).

In short, the BICE does not satisfy the statute's specific "administrative feasibility" requirement.  The Department's "*ipse dixit*" that the BICE is administratively feasible, AR59, was insufficient on this record, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011).

## B.     The Department Failed To Account For The Harm To Consumers From Decreased Access To Annuity Products

Even if the BICE somehow satisfied the "administrative feasibility" standard, the Department's treatment of variable and fixed indexed annuities is arbitrary and capricious because the Department failed to acknowledge, much less justify, its decision disproportionately to hamper consumers' access to variable and fixed indexed annuities.  As explained above, the

purpose and effect of the Department's decision to require the sale of those annuity products under the BICE was to steer consumers away from those products.

ERISA as well as APA principles of reasoned decisionmaking required the Department to acknowledge and to justify the damaging impact of the Rule on the sale of variable and fixed indexed annuities and, ultimately, on American consumers who will lose access to those products. ERISA authorizes the Department to issue rules that are "necessary or appropriate," 29 U.S.C. § 1135—terms the Supreme Court has held require an agency to weigh a rule's costs and benefits before adopting it. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). In addition, the APA required the Department to consider "important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983), a requirement that, at the least, obligated the Department to account for the consumer benefits of the products it sought to drive from the marketplace.

The Department violated those standards here. Indeed, the Department failed even to admit that the Rule will restrict access to variable and fixed indexed annuities—let alone to quantify the costs of doing so. As noted, the Department at times asserted that revisions to the BICE resolved concerns that broker-dealers would "stop selling" variable annuities. AR73-74. That is wrong on its own terms, as Plaintiffs have explained. *See supra* pp. 27-29. But, importantly, the Department elsewhere stated that the Rule is "intended and expected … to move markets toward a more optimal mix of financial products." AR624. The Department never said what this "optimal mix" of products would look like. But the Department's anecdotal criticisms of variable and fixed indexed annuities, *see, e.g.*, AR447-448, 463-464, and accompanying decision to subject them to the BICE leaves little doubt that the Department sought to limit consumers' access to those annuities and to information about them.

30

Given that intention, the Department was obligated to grapple with substantial record evidence demonstrating the unique *benefits* that variable and fixed indexed annuities provide retirement consumers.  Compl. ¶¶ 37-48, 102-103; App. 223, 252, 646-650, 776, 869-870. Commenters stressed, for example, that annuities are the *sole* source of guaranteed lifetime income during retirement, App. 210, 541, an important benefit in a marketplace in which consumers are living longer and longer but without pensions.  Others discussed why a range of annuity options was important to consumers to help balance longevity, inflation, and investment risks:  "[a]nnuities often combine insurance against longevity risk with other 'living benefits' that protect against additional financial risks that retirees face, including investment risk and inflation risk."  App. 655.  And others explained how variable annuities provide important insurance protections for retirement savers, while also allowing consumers to benefit from capital market growth.  App. 223, 646-650, 776, 869-870.

The Department did not even cite—much less address—*any* of these comments, and it failed entirely to account for the benefits of variable and fixed indexed annuities.  *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977) (agency must respond to "relevant" and "significant" public comments).  That failure is all the more remarkable because ACLI highlighted this deficiency during the comment period.  App. 252 ("The Department … does not consider the benefits of variable annuity products for IRA holders.").  Because the Rule was "intended and expected" to reduce access to variable and fixed indexed annuities, ERISA and the APA not only required the Department to acknowledge that aim, but to specify what "mix of … financial products" it "intended and expected" the Rule to produce, *see* AR624; to quantify and assess the costs to consumers and the insurance industry of "mov[ing] markets toward" that mix, *see id.*; and to demonstrate that the Rule would create benefits that offset those costs.  The

31

Department did *none* of that, rendering the Rule unlawful.  *See Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1223 (5th Cir. 1991) (holding unlawful "cavalier treatment" of statutory "duty to consider the economic effects"); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1164 (D.C. Cir. 1998) (agency "could not turn a blind eye" to market effects brought to its attention).

### C.    The Department Unreasonably Disregarded Existing Annuity Regulation

In discussing the purported justifications for the Rule, the Department also unreasonably disregarded the extensive, and recently strengthened, regulatory framework that already protects consumers with respect to annuities.  The Department's dismissal of this existing framework fell well short of its obligations to consider all "'relevant factors,'" *Texas*, 690 F.3d at 677, and "to determine whether, under the existing regime, sufficient protections [already] exist[]," *Am. Equity v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010).

The administrative record established that the buying and selling of annuities is subject to comprehensive, and recently enhanced, state and federal regulations that ensure broker-dealers and insurance agents provide consumers with suitable recommendations.  App. 29-31, 253-254, 261-530, 836.  Those regulations, in other words, are targeted at the *same* concerns that underlie the Rule.  Despite that, the Department did not undertake careful analysis of the mandates of existing regulations, explain how or why those regulations left gaps, or attempt to reason how the Rule could fill those gaps.  Instead, the Department sought to dismiss the adequacy of existing regulations out of hand.  Its rationales for doing so fall flat.

In brushing aside existing regulatory controls, the Department put substantial weight on nine quantitative studies that, in its view, demonstrated that, "notwithstanding existing [regulatory] protections, there is convincing evidence that advice conflicts are inflicting losses on IRA investors."  AR426-427, 475-476.  The Department's reliance on those studies is badly misplaced for many reasons, *see* App. 248, 821-828, but two points are particularly relevant.

*First*, the studies relied on by the Department focused almost exclusively on mutual funds, not insurance products such as variable and fixed indexed annuities.  That difference is material given, among other things, that insurance products (unlike mutual funds) are subject to unique state-law suitability standards that protect annuity purchasers.  The Department said that it could extrapolate from mutual-fund studies to "[o]ther types of investments … such as insurance products" because, the Department speculated, those products are also "likely to be subject to underperformance due to conflicts."  AR474.  But the Department offered no reasoned explanation for that claim, *see* IALC Mem. Part I.B.2, and its "own *ipse dixit*" was insufficient.  *Corrosion Proof Fittings*, 947 F.2d at 1226.

*Second*, all of the nine studies relied on data derived from periods well before stricter regulations applicable to annuities went into effect.  Seven relied on data from 2005 or earlier; two relied on data ending in 2007 and 2009, respectively.  For example, FINRA's general suitability rule, FINRA Rule 2111, took effect in 2012 and significantly strengthened the suitability framework.  Since 2012, a broker-dealer must have grounds to believe his or her recommendation is suitable in general and suitable for the particular customer.

Equally important, FINRA Rule 2330 was not fully implemented until 2010.  That rule "provide[s] more comprehensive and targeted protection to investors regarding deferred variable annuities."  FINRA Regulatory Notice 07-53 (2007).  Specifically, annuity sellers must obtain specific customer information, including investment objectives, liquid net worth, financial sophistication, and tax status, before deciding that a customer would benefit from an annuity.  And, in 2010, NAIC promulgated a strengthened model suitability rule, which record evidence demonstrated was having significant marketplace effects.  *See, e.g.*, App. 1160 ("In 2008, there

was one complaint for every $100 million of issued premium.  In 2014, there was only one

complaint for every $633 million of issued premium.").

   The outdated studies relied upon by the Department could not possibly have measured

the efficacy of those newly strengthened regulations.  It was arbitrary and capricious to rely on

studies to show a regulatory failure that, by definition, predate significant regulatory reforms.

*See Resolute Forest Products, Inc. v. Dep't of Agric.*, 2016 WL 2885869, at *19 (D.D.C. May

17, 2016) ("[W]here an agency … has not made a reasonable effort to ensure that appropriate

data was relied upon, its decision is arbitrary and capricious[.]"); *cf. United Airlines, Inc. v.*

*FERC*, 2016 WL 3568136, at *4 (D.C. Cir. July 1, 2016) (agency acted arbitrarily in relying on

data for "time period" that was not "representative").

   Without relevant data bearing on the effectiveness of existing annuity regulations, the

Department was left with limited, anecdotal, and threadbare evidence of harm—from which the

Department unreasonably inferred regulatory failures.  *See* IALC Mem. Part I.B.2.  For example,

in the preamble to the Rule, the Department cited as evidence of "harm" from variable and fixed

indexed annuities a FINRA investor alert and SEC and FINRA staff guidance.  AR73, 237.  But

the FINRA alert simply highlights circumstances in which some consumers might not want a

variable annuity, and it makes clear that "variable annuities can be appropriate as an investment

under the right circumstances."  FINRA, *Variable Annuities: Beyond the Hard Sell* (Aug. 31,

2009).  If anything, the alert demonstrates that regulators are acutely focused on protecting

consumers and continue to monitor the annuity marketplace.  Similarly, the staff guidance cited

suggests that fixed indexed annuities may take time for consumers to understand, but that

obviously does not suggest widespread harm or the insufficiency of existing regulation.

In short, the Department's failure reasonably "to analyze the efficiency of the existing [regulatory] regime renders arbitrary and capricious [the Department's] judgment" that the Rule is necessary to protect consumers. *Am. Equity*, 613 F.3d at 179.

## VI. THE DEPARTMENT FAILED TO PROVIDE NOTICE AND AN OPPORTUNITY TO COMMENT ON ARBITRARY CHANGES THE RULE MADE TO DIFFERENT TYPES OF ANNUITIES

In subjecting sales of group and fixed indexed annuities to the BICE, the Department violated the APA's notice-and-comment requirement.  5 U.S.C. § 553(b), (c); Compl. ¶¶ 220-224, 231-236.  Previously, the Department permitted all annuities to be sold under PTE 84-24. The 2015 Notice of Proposed Rulemaking ("NPRM") proposed to revoke PTE 84-24, but only for "variable annuity contracts and other annuity contracts that are securities under federal securities law," AR789, 793, and solicited comments about whether "this approach … strikes the appropriate balance," AR790.  In the final Rule, however, the Department made two surprise changes:  it excluded from PTE 84-24 (1) certain annuity sales to a "Plan" (thus excluding group annuity sales from PTE 84-24) and (2) fixed indexed annuities.  AR254.

The result is that the more onerous BICE unexpectedly governs the sale of group variable annuities and all fixed indexed annuities.  Gross disparities in the comments submitted by the regulated community made clear that the move of fixed indexed annuities into the BICE was unexpected:  dozens of comments spanning hundreds of pages explained why the BICE was unworkable for variable annuities, but almost none explained the difficulties of subjecting fixed indexed annuities to that regime.  *Compare, e.g.*, App. 183-203, 226-243, 565-581, 685-691, 795-808, 969-1028, 1056-1115, 1124-1151 (discussing unworkability of BICE for variable annuities), *with* App. 858, 908 (discussing unworkability for fixed indexed annuities only in passing).  Indeed, the only comment that meaningfully addressed the BICE's feasibility for fixed indexed annuities (App. 1152-1156) was prompted not by the 2015 NPRM but by a *private*

meeting the Department held the day before the close of the final comment period.  Because the Department did not provide sufficient notice of those changes, the Department violated the APA, as explained more fully by IALC.  *See* IALC Mem. Part III.

This lack of notice severely prejudiced Plaintiffs, who were unable to comment on the unexpected changes, and who would have submitted comments explaining why selling group annuities and fixed indexed annuities under the BICE is infeasible.  For example, because most fixed indexed annuities are distributed by IMOs that do not qualify as "financial institutions" eligible to execute BICE contracts, the Rule effectively requires overhauling, at great expense, current distribution channels.  Compl. ¶ 223.  Plaintiffs would have submitted similar comments regarding group annuities.  *Id.* ¶ 235.  The Rule was not a logical outgrowth of the 2015 NPRM, and Plaintiffs thus never had an opportunity to raise these and other significant concerns to the Department.[9]

## CONCLUSION

For the foregoing reasons, the Court should vacate the Rule, or, in the alternative, declare the Rule unconstitutional and enjoin its enforcement against Plaintiffs and their members when engaged in truthful commercial speech.

---

[9] The Department included fixed indexed annuities in the BICE to avoid creating a regulatory incentive for advisers to recommend fixed indexed annuities over variable annuities and mutual funds.  AR74.  The Rule's defects with respect to fixed indexed annuities thus require vacatur of the Rule in its entirety, as any more limited vacatur would create exactly the uneven playing field the Department sought to prevent.

Dated:  July 18, 2016

Michael A. Yanof (Bar No. 24003215)
THOMPSON COE COUSINS &
   IRONS, LLP
700 North Pearl Street
Twenty-Fifth Floor – Plaza of the
Americas
Dallas, Texas 75201
Tel.: (214) 871-8270
Fax: (214) 871-8209
myanof@thompsoncoe.com

Respectfully submitted,

s/ David W. Ogden
David W. Ogden (*Pro hac vice*)
Kelly P. Dunbar (*Pro hac vice*)
Jessica B. Leinwand (*Pro hac vice*)
Ari Holtzblatt (*Pro hac vice*)
Kevin M. Lamb (*Pro hac vice*)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
david.ogden@wilmerhale.com
kelly.dunbar@wilmerhale.com
jessica.leinwand@wilmerhale.com
ari.holtzblatt@wilmerhale.com
kevin.lamb@wilmerhale.com

Andrea J. Robinson (*Pro hac vice*)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
andrea.robinson@wilmerhale.com

*Counsel for American Council of Life Insurers,
National Association of Insurance and Financial
Advisors, National Association of Insurance and
Financial Advisors-Texas, National Association of
Insurance and Financial Advisors-Amarillo, National
Association of Insurance and Financial Advisors-
Dallas, National Association of Insurance and
Financial Advisors-Fort Worth, National Association
of Insurance and Financial Advisor-Great Southwest,
and National Association of Insurance and Financial
Advisors-Wichita Falls*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of July, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.

s/ David W. Ogden
David W. Ogden