**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FINANCIAL SERVICES INSTITUTE, INC., FINANCIAL SERVICES ROUNDTABLE, GREATER IRVING-LAS COLINAS CHAMBER OF COMMERCE, HUMBLE AREA CHAMBER OF COMMERCE DBA LAKE HOUSTON AREA CHAMBER OF COMMERCE, INSURED RETIREMENT INSTITUTE, LUBBOCK CHAMBER OF COMMERCE, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, and TEXAS ASSOCIATION OF BUSINESS,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS E. PEREZ, SECRETARY OF LABOR,<br>and<br>UNITED STATES<br>DEPARTMENT OF LABOR,<br><br>Defendants. | Civil Action No. 3:16-cv-1476-M<br>Consolidated with:<br>   3:16-cv-1530-C<br>   3:16-cv-1537-N |

### *CHAMBER OF COMMERCE* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 2

I.      FEDERAL AND STATE REGULATION OF FINANCIAL SERVICES
        AND THE BUSINESS OF INSURANCE ............................................. 2

II.     THE ROLE OF THE DEPARTMENT OF LABOR AND THE
        DEFINITION OF "FIDUCIARY" UNDER ERISA AND THE TAX CODE.................. 5

III.    THE LABOR DEPARTMENT'S NEW FIDUCIARY RULE AND
        EXEMPTIONS ...................................................................................... 6

        A.      The Fiduciary Rule .................................................................. 6

        B.      The Best Interest Contract Exemption .................................. 10

        C.      Other Prohibited Transaction Exemptions ........................... 11

STANDARD OF REVIEW ............................................................................... 12

ARGUMENT ................................................................................................... 13

I.      DOL'S RE-INTERPRETATION OF "FIDUCIARY" IS IMPERMISSIBLE ................ 13

        A.      The Plain Language And Structure Of ERISA And The Tax Code
                Confirm That "Fiduciary" Status Exists In Special Circumstances
                That Ordinarily Do Not Include Brokers And Other Sales Agents ..................... 14

        B.      The Department's Overbroad Interpretation Of "Fiduciary" Flouts
                That Term's Plain Meaning And Is Unreasonable And Entitled To No
                Deference ............................................................................... 19

II.     THE DEPARTMENT MISUSED ITS LIMITED EXEMPTIVE
        AUTHORITY UNDER THE TAX CODE TO ESTABLISH NEW,
        SUBSTANTIVE STANDARDS OF CONDUCT FOR SERVICE
        PROVIDERS TO IRAs............................................................................. 23

III.    THE DEPARTMENT IMPERMISSIBLY CREATED A PRIVATE RIGHT
        OF ACTION IN THE BIC AND PRINCIPAL TRANSACTIONS
        EXEMPTIONS ...................................................................................... 27

IV.     THE FEDERAL ARBITRATION ACT PRECLUDES THE
        DEPARTMENT'S BAN OF CLASS WAIVERS IN ARBITRATION
        AGREEMENTS...................................................................................... 31

**TABLE OF CONTENTS** *(continued)*

<u>Page</u>

V.      THE DEPARTMENT BASED ITS ACTION ON A FLAWED
        ASSESSMENT OF THE NEED FOR REGULATION AND ITS BENEFITS
        AND COSTS, AND ARBITRARILY REJECTED LESS ONEROUS
        ALTERNATIVES ........................................................................................................... 33

VI.     DOL SUBSTANTIALLY AND IMPROPERLY CHANGED THE
        REGULATORY TREATMENT OF FIXED-INDEXED ANNUITIES
        WITHOUT NOTICE OR CONSIDERATION OF THE CONSEQUENCES
        AS REQUIRED BY THE APA .......................................................................................... 38

VII.    THE FIDUCIARY RULE AND THE BIC EXEMPTION VIOLATE THE
        FIRST AMENDMENT .................................................................................................... 40

CONCLUSION ......................................................................................................................... 40

## TABLE OF AUTHORITIES

Page(s)

### Cases

*10 Ring Precision, Inc. v. Jones,*
  722 F.3d 711 (5th Cir. 2013) ........................................................12

*Adams Fruit Co. v. Barrett,*
  494 U.S. 638 (1990) ........................................................23

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ........................................................27, 29, 30

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................................22

*Am. Bankers Ass'n v. SEC,*
  804 F.2d 739 (D.C. Cir. 1986) ........................................................23

*Am. Civil Liberties Union v. FCC,*
  823 F.2d 1554 (D.C. Cir. 1987) ........................................................34

*Am. Express Co. v. Italian Colors Rest.,*
  133 S. Ct. 2304 (2013) ........................................................31

*Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life
  Assurance Soc'y. of U.S.,*
  841 F.2d 658 (5th Cir. 1988) ........................................................18

*Astra USA, Inc. v. Santa Clara Cty., Cal.,*
  563 U.S. 110 (2011) ........................................................30

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ........................................................31, 32, 33

*Blitz v. Donovan,*
  740 F.2d 1241 (D.C. Cir. 1984) ........................................................17

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ........................................................37

*Bus. Roundtable v. SEC,*
  905 F.2d 406 (D.C. Cir. 1990) ........................................................23

*Cefalu v. B.F. Goodrich Co.,*
  871 F.2d 1290 (5th Cir. 1989) ........................................................28

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Chamber of Commerce v. U.S. Dep't of Labor,*
174 F.3d 206 (D.C. Cir. 1999) ............................................................25

*Chevron U.S.A., Inc. v. NRDC, Inc.,*
467 U.S. 837 (1984) ..........................................................14, 19, 21

*City of Arlington v. FCC,*
133 S. Ct. 1863 (2013) ......................................................................13

*CompuCredit Corp. v. Greenwood,*
132 S. Ct. 665 (2012) ........................................................................32

*Contender Farms, LLP v. U.S. Dep't of Agric.,*
779 F.3d 258 (5th Cir. 2015) ............................................................29

*D.R. Horton, Inc. v. NLRB,*
737 F.3d 344 (5th Cir. 2013) ............................................................31

*De Asencio v. Tyson Foods, Inc.,*
342 F.3d 301 (3d Cir. 2003) .............................................................35

*Dean Witter Reynolds, Inc. v. Byrd,*
470 U.S. 213 (1985) ..........................................................................31

*FAA v. Cooper,*
132 S. Ct. 1441 (2012) ......................................................................14

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ..........................................................................26

*Firestone Tire & Rubber Co. v. Bruch,*
489 U.S. 101 (1989) ..........................................................................17

*First Am. Bank v. Resolution Trust Corp.,*
30 F.3d 644 (5th Cir. 1994) ..............................................................21

*Granik v. Perry,*
418 F.2d 832 (5th Cir. 1969) ............................................................15

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002) ..........................................................................28

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy,*
706 F.3d 499 (D.C. Cir. 2013) ..........................................................25

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Hughes v. SEC*,
174 F.2d 969 (D.C. Cir. 1949) ........................................................................16

*Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
464 F. Supp. 528 (D. Md. 1978) ......................................................................16

*Khalid v. Holder*,
655 F.3d 363 (5th Cir. 2011) ...........................................................................13

*King v. Burwell*,
135 S. Ct. 2480 (2015)......................................................................................21

*Kramer v. Smith Barney*,
80 F.3d 1080 (5th Cir. 1996) ...........................................................................32

*Lorillard v. Pons*,
434 U.S. 575 (1978)..........................................................................................19

*Loughrin v. United States*,
134 S. Ct. 2384 (2014)......................................................................................24

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014).................................................................25, 28

*Lowe v. SEC*,
472 U.S. 181 (1985)..........................................................................................16

*Luminant Generation Co. v. EPA*,
675 F.3d 917 (5th Cir. 2012) ...........................................................................12

*MCI Telecommunications Corp. v. AT&T Co.*,
512 U.S. 218 (1994)..........................................................................................24

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)..........................................................................................31

*Michigan v. EPA*,
135 S. Ct. 2699 (2015)................................................................................33, 35

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..............................................................................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................12, 13, 33

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Nat'l Pork Producers Council v. EPA*,
  635 F.3d 738 (5th Cir. 2011) ................................................................................19

*NFIB v. Sebelius*,
  132 S. Ct. 2566 (2012) .................................................................................32, 33

*Oak Cliff Bank & Trust Co. v. Steenbergen*,
  497 S.W.2d 489 (Tex. Civ. App. 1973) ................................................................15

*OPE Int'l LP v. Chet Morrison Contractors, Inc.*,
  258 F.3d 443 (5th Cir. 2001) ................................................................................32

*Pollard v. E.I. du Pont de Nemours & Co.*,
  532 U.S. 843 (2001) ..............................................................................................19

*Roberts v. Sea-Land Servs., Inc.*,
  132 S. Ct. 1350 (2012) ..........................................................................................18

*Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  337 F. Supp. 107 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972) .........15, 16

*Rush Prudential HMO, Inc. v. Moran*,
  536 U.S. 355 (2002) ..............................................................................................35

*SEC v. Capital Gains Res. Bureau, Inc.*,
  375 U.S. 180 (1963) ..............................................................................................15

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ................................................................................37

*South Dakota v. Dole*,
  483 U.S. 203 (1987) .........................................................................................32, 33

*Tax Analysts v. IRS*,
  214 F.3d 179 (D.C. Cir. 2000) ..............................................................................29

*Tex. Office of Pub. Util. Counsel v. FCC*,
  183 F.3d 393 (5th Cir. 1999) ................................................................................22

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ................................................................................13

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979) ................................................................................................30

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Wells*,
　519 U.S. 482 (1997) ...........................................................................................14

*United States v. X-Citement Video, Inc.*,
　513 U.S. 64 (1994) ............................................................................................13

*Util. Air Reg. Grp. v. EPA*,
　134 S. Ct. 2427 (2014) ...........................................................................19, 22, 24

*Whitman v. Am. Trucking Ass'ns*,
　531 U.S. 457 (2001) ...........................................................................................26

**Statutes**

5 U.S.C. § 706 .............................................................................................12, 13, 31

9 U.S.C. § 2 .............................................................................................................31

15 U.S.C. § 78o .......................................................................................................25

15 U.S.C. § 78o-3(b)(6) ............................................................................................2

15 U.S.C. § 80b-1 *et seq.* .........................................................................................2

15 U.S.C. § 80b-2(a)(11) ...............................................................................4, 15, 16

26 U.S.C. § 4975 ...............................................................................................6, 10

29 U.S.C. § 1001(b) .................................................................................................5

29 U.S.C. § 1002(21)(A) ...............................................................................5, 7, 14, 18

29 U.S.C. § 1106(b) ...........................................................................................5, 22

29 U.S.C. § 1108 ...............................................................................................5, 19

29 U.S.C. § 1132(a) ................................................................................................28

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L.
　No. 111-203, 124 Stat. 1376 (2010) ..........................................................2, 4, 6, 9

Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat.
　829 (1974) .........................................................................................................6

Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780 (2006) ....................19

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

Reorganization Plan No. 4 of 1978 (Aug. 10, 1978), *reprinted in* 5 U.S.C. app. 1
(2016), *and in* 92 Stat. 3790 (1978) ........................................................................6

**Regulations**

29 C.F.R. § 2510.3-21(c) ...............................................................................................7

Investment Advice–Participants and Beneficiaries, 76 Fed. Reg. 66,136 (Oct. 25,
2011) .....................................................................................................................36, 37

**Other Authorities**

Advisory Opinion FLSA 2006-43, Dep't of Labor (Nov. 27, 2006) ...........................18

*Black's Law Dictionary* (rev. 4th ed. 1951) ................................................................15

*Bogert's Trusts & Trustees* § 481 .................................................................................15

*Borzi Highlights Changes to ERISA as She, Other Speakers Look Back at Law's
40 Years*, Bloomberg BNA, 41 BPR 1929 (Sept. 9, 2014) .......................................23

*Brokers*, FINRA (2016) .................................................................................................3

Financial Conduct Authority, *Financial Advice Market Review Final Report*
(March 2016) ...............................................................................................9, 10, 36

H.R. Rep. No. 93-533 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639 ....................17

H.R. Rep. No. 93-1280 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5038 ....................5

Mark Schoeff Jr., *Despite lawsuits, DOL is working with advisers to help
implement fiduciary rule*, InvestmentNews (July 5, 2016) .....................................27

Nick Thornton, *Who will enforce the DOL rule?*, Benefits Pro (June 1, 2016) ...........29

## INTRODUCTION

This case involves an attempt by defendants to impose the most significant changes in the financial services and insurance industries in decades:  Widely-accepted methods of compensation are being prohibited, entirely new standards of conduct are being established, relationships among financial representatives and their customers and firms are being reconfigured, distinctions between salespeople and fiduciary advisers are being erased, and billions of dollars in costs are being imposed.  Remarkably, these sweeping changes are being instituted not by Congress or even by the nation's principal financial regulatory agency, the U.S. Securities and Exchange Commission ("SEC"), but by the U.S. Department of Labor ("DOL," or "the Department").  And the changes are being instituted primarily through the market for IRAs, even though DOL has no authority to engage in regulation or enforcement with respect to IRAs.

The Department has achieved this regulatory alchemy through a two-step process.  First, it adopted an overbroad interpretation of who is a fiduciary under ERISA and certain parallel provisions of the Tax Code.  This "Fiduciary Rule" makes virtually every person who sells a retirement-related financial product a "fiduciary," contrary to long-established law and practice.  By doing so, it effectively prohibits financial professionals from receiving forms of compensation (such as sales commissions) that have been a mainstay of their business models for decades.  Second, the Department provided limited relief from the prohibitions resulting from this overbroad "fiduciary" interpretation, but only if financial firms "agree" to subject themselves to new standards and class action lawsuits that the Department itself has no authority to impose.

The Department thus exploited its limited interpretive authority to impose unworkable restrictions that necessitate exemptions, and then exploited its authority to grant exemptions by conditioning them on "agreement" to an entirely new regulatory framework that the Department

1

has no power to construct.  And, precisely because the Department lacks enforcement authority in this area, it has delegated enforcement to private and class action litigation.

Plaintiffs and their members do not oppose regulations that require financial and insurance professionals to serve the best interests of their customers, provided those regulations are promulgated by a duly authorized regulator in accordance with law.  In fact, plaintiffs have long supported the development by the SEC of a uniform "best interest" standard, and Congress recently charged the SEC, not DOL, with assessing whether to create such a standard.  DOL's rulemaking, however, would undermine Congress's goal of a uniform best interest standard and would harm the retirement savers DOL purports to help.

The Department's new rules are arbitrary, capricious, prohibited by the plain language of ERISA and the Tax Code, and violate the First Amendment right to engage in truthful, non-misleading commercial speech.  The Fiduciary Rule and its exemptions must be vacated.

## STATEMENT OF FACTS

**I.   FEDERAL AND STATE REGULATION OF FINANCIAL SERVICES AND THE BUSINESS OF INSURANCE**

Financial services and insurance are among the most comprehensively regulated industries in the United States.  The laws regulating financial services include the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Advisers Act"), the Investment Company Act of 1940, and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 913(g), 124 Stat. 1376, 1828 (2010) ("Dodd-Frank Act").  These laws are rigorously enforced by the SEC, among other agencies.  Financial services are also regulated by fifty state regulators and by self-regulatory organizations (or SROs) such as the Financial Industry Regulatory Authority ("FINRA") (*see* 15 U.S.C. § 78o-3(b)(6)).  *See* Appendix ("App.") 15-16, 884-85.  The business

2

of insurance is subject to extensive regulation at the state level.  Certain insurance products—such as variable annuities—are simultaneously regulated as insurance by insurance departments in every State and as securities by the federal government.  *See* App. 1-2.

There are different categories of financial professionals, who offer different types of valuable services and products to their customers.  Brokers—also known as "registered representatives"—offer investment products to their customers.  *See Brokers*, FINRA (2016), http://www.finra.org/investors/brokers.  Ordinarily they charge for their services through a "transaction-based" compensation model, under which the professional receives a "commission"—or a "mark-up," "sales load," or similar fee—for each transaction.  Investment advisers, by contrast, primarily offer investment advice to clients.  They typically use a "fee-based" compensation model, under which the customer pays based on the amount of assets in her account, or pays a flat fee or hourly charge.  *See, e.g.*, App. 1269-71.

Annuities and other insurance products are offered by state-regulated insurance agents (who may also be brokers or investment advisers).  They ordinarily charge on a transaction basis.  *See id.* at 862.

DOL does not dispute that the transaction-based model used by brokers may be preferable for customers who trade infrequently, do not need ongoing financial advice, or wish to reduce the long-term expense of investing.  It may also be the best option for consumers who lack the account minimums generally required under the fee-based model.  *See* AR 47 & n.55, 559, 611 n.573, 615-17, 626; App. 611-13.

For more than 80 years, federal and state laws have recognized the distinctions among brokers, investment advisers, and insurance agents.  Investment advisers are regulated by the Advisers Act, under which they are recognized to be fiduciaries and, as such, owe an especially

high standard of care.  *See* App. 27 & n.22.  Brokers and insurance agents, by contrast, are not

fiduciaries, but must abide by strict standards of conduct, including that they recommend only

transactions that are "suitable" for their customers.

Brokers may provide some financial advice when assisting investors with a sale, but this

by itself does not convert them into an adviser—much less a fiduciary.  As the Advisers Act

makes clear, an "investment adviser" does not include "any broker or dealer" who provides ad-

vice that is "*solely incidental to the conduct of his business as a broker or dealer* and who re-

ceives no special compensation therefor."  15 U.S.C. § 80b-2(a)(11)(C) (emphasis added).

The standards of care applicable to investment professionals are under continual exami-

nation by Congress.  Most recently, in the Dodd-Frank Act, Congress required the SEC to study

whether the existing "standards of care for brokers, dealers, [and] investment advisers" are ade-

quate, *see* Dodd-Frank Act, § 913(b), 124 Stat. at 1824, and "authorize[d], but [did] not require,

the SEC to issue rules addressing [those] standards of care," including potentially by requiring

broker-dealers to adhere to fiduciary standards, AR 45.  Mindful of the differences between bro-

kers, advisers, and the services they offer—and of consumers' interest in deciding for themselves

whether to enter a brokerage or advisory relationship—Congress delineated a variety of factors

for the SEC to consider in deciding whether to adopt new rules.  It explicitly stated that neither

the receipt of "commission[s] or other standard compensation," nor the sale of proprietary prod-

ucts, should be "considered a violation" of any fiduciary standard applied to brokers.  Dodd-

Frank, § 913(g).  The SEC is considering whether to adopt new rules pursuant to this provision.[1]

---

[1]  Dodd-Frank nowhere authorized regulating insurance agents as advisers.  On the contrary, it *barred* the SEC
from regulating a particular type of insurance product known as a "fixed" (or "equity") indexed annuity, pro-
vided the product satisfies certain state regulatory requirements.  Dodd-Frank Act, § 989J, 124 Stat. at 1949-50.

## II.   THE ROLE OF THE DEPARTMENT OF LABOR AND THE DEFINITION OF "FIDUCIARY" UNDER ERISA AND THE TAX CODE

The U.S. Department of Labor—which has responsibility for employment matters such as wages, hours, and workplace safety and health—also regulates employment-based retirement plans under the Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA deline-ates the obligations that fiduciaries have to employee benefit plans and confers enforcement and regulatory authority on DOL, including the authority to interpret certain terms in the Act.  29 U.S.C. § 1001(b).  ERISA defines a person as a "fiduciary" to a plan:

> . . . to the extent (i) he exercises any discretionary authority or discretionary con-trol respecting management of [an ERISA-covered employee benefit] plan or ex-ercises any authority or control respecting management or disposition of its assets, (ii) *he renders investment advice for a fee or other compensation, direct or indi-rect, with respect to any moneys or other property of such plan, or has any au-thority or responsibility to do so*, or (iii) he has any discretionary authority or dis-cretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).  The italicized language is known as the "investment advice" prong of the fiduciary definition.

ERISA bars fiduciaries from engaging in a range of "prohibited transactions," including transactions in which fiduciaries receive compensation from a third party or "compensation that varies based on their investment advice."  29 U.S.C. § 1106(b)(3); AR 132.  Congress created exemptions from these prohibitions, and authorized DOL to grant additional exemptions if it "finds" that an exemption is "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan."  29 U.S.C. § 1108(a).  DOL's exemptive authority is intended to ease the burdens of the prohibited transaction provisions and to allow "quite beneficial" transactions.  H.R. Rep. No. 93-1280 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5187.

When it enacted ERISA, Congress added an essentially identical "fiduciary" definition to

the Internal Revenue Code ("the Code") for purposes of certain tax-favored retirement accounts or "plans," including IRAs.  *See* Pub. L. No. 93-406, 152-53, 88 Stat. 829, 877 (1974); *see also* 26 U.S.C. § 4975(e)(3)(B).  The Code, like ERISA, enumerates a number of "prohibited transactions" that plans and plan fiduciaries may not engage in.  26 U.S.C. § 4975(c).  DOL has been given authority to issue exemptions from these prohibitions, as it does under ERISA, and to interpret relevant provisions under the Code.  *See* Reorganization Plan No. 4 of 1978, § 102 (Aug. 10, 1978), *reprinted in* 5 U.S.C. app. 1 (2016), *and in* 92 Stat. 3790 (1978).  But the Department of the Treasury, not DOL, is responsible for enforcing the Code's prohibited transaction provisions.  This is done through excise taxes and audits, *see* 26 U.S.C. § 4975(a), (f)(8)(E), and not, for example, through an action for damages under the Code by either the Treasury Department or a plan participant.

Determining who is a fiduciary is important, in part, because the prohibited transaction provisions of ERISA and the Code bar fiduciaries from receiving "many common compensation and fee" payments, including third-party payments, commissions, and other transaction-based payments that are prevalent for brokers and insurance agents.  *See, e.g.*, AR 47, 58-59.  These are the same forms of compensation that, in Dodd-Frank, Congress told the SEC could *not* be deemed a fiduciary violation for broker-dealers if the SEC adopted new fiduciary standards for brokers.  *See supra* p. 4.

## III.    THE LABOR DEPARTMENT'S NEW FIDUCIARY RULE AND EXEMPTIONS

This case concerns radical changes DOL has made to its "fiduciary" interpretation, which had been in place since 1975.  DOL also introduced new prohibited transaction exemptions, which are available only to those who agree to new, sweeping obligations.

### A.    The Fiduciary Rule

DOL's 1975 regulation set forth a five-part test for determining who is a fiduciary under

the "investment advice" prong of ERISA's fiduciary definition, which defines "fiduciary" to include those who provide "investment advice for a fee or other compensation" to a plan or plan beneficiary.  29 U.S.C. § 1002(21)(A); 29 C.F.R. § 2510.3-21(c).[2]

DOL's new interpretation in the Fiduciary Rule is not animated by a change in its perception of what "fiduciary" means, but instead by its discontent with aspects of the securities laws, mutual funds, broker-dealers, and other matters outside the Department's authority and expertise. For example, disclosure requirements are a cornerstone of the securities laws, but in the rulemaking, DOL insisted that disclosure was "ineffective to mitigate conflicts in advice" and might actually harm consumers.  AR 5-6; *see also id.* at 424, 427-28, 452.  DOL repeatedly questioned the value of actively managed mutual funds, *id.* at 461-62; the utility of broker-dealers, *id.* at 436-38, 471-74; and even the value of advice about retirement saving, *id.* at 465-69, 631-32, 664. And although Congress determined that "fixed-indexed" annuities should not be regulated by the SEC (provided certain state regulatory requirements are satisfied, *supra* note 1), DOL criticized those products and decided that heightened federal oversight was needed.  *See id.* at 233-34.

DOL's new interpretation of "fiduciary" was first proposed in 2010, and was revised and re-proposed in April 2015.  *See* AR 699-731.  That same day, DOL proposed two new prohibited transaction exemptions and amendments to six others.[3]  After notice and comment, the final Fiduciary Rule and exemptions were adopted and published in the Federal Register in April 2016.

The final Rule covers any person who "provides to a plan, plan fiduciary, plan participant

---

[2]   The regulation defined an investment advice fiduciary as someone who (1) "render[ed] advice as to the value of securities or other property, or [made] recommendations as to the advisability of investing in, purchasing, or selling securities or other property"; (2) on a regular basis; (3) "pursuant to a mutual agreement, arrangement or understanding," with the plan or plan fiduciary; (4) where the advice "serve[d] as a primary basis for investment decisions with respect to plan assets"; and (5) the advice was individualized "based on the particular needs of the plan."  29 C.F.R. § 2510.3-21(c)(1).

[3]   The proposed exemptive rule amendments are contained in pages AR 732 to AR 818 of the Joint Appendix.

or beneficiary, IRA, or IRA owner" specified types of "investment advice" "for a fee or other compensation." AR 52. The Rule broadly defines "investment advice" to include "recommendations" regarding, among other things:

- "the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property";

- "rollovers, transfers, or distributions from a plan or IRA, including whether, in what amount, in what form, and to what destination such a rollover, transfer, or distribution should be made"; and

- "how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or distributed from the plan or IRA."

*Id.* The Rule defines "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." *Id.* A person can become a fiduciary if she simply "[d]irect[s] . . . advice to a specific advice recipient" regarding the "advisability of a particular investment . . . decision." *Id.*

Gone in the new interpretation are the requirements of the old regulation that moored it in the historical hallmarks of fiduciary status: A special relationship of trust and confidence. Those requirements, which DOL has cast aside, included that the advice be given "on a regular basis," "pursuant to a mutual agreement, arrangement or understanding" as to fiduciary status, and that it "serve as a primary basis" for the participant or plan's decision. *See supra* note 2. The new interpretation rejects the distinction between brokers and investment advisers recognized under the securities laws for more than 75 years, and—with narrow exceptions—treats *any* advice in connection with a sale as conferring fiduciary status.[4] "[F]undamentally," the Department pro-

---

[4] The final Rule includes certain carve-outs from its fiduciary interpretation, including for persons engaging in sales activity with "independent fiduciaries with financial expertise." AR 54-55.

claimed, it "rejects the purported dichotomy between a mere 'sales' recommendation, on the one hand, and advice, on the other" in the case of individual investors.  AR 36.  Rather, all transactions in that context will be treated under the Rule as if the investors "pay for, and receive, advice." *Id.*

By ordaining that "fiduciary" covers most, if not all, financial and insurance professionals who assist with IRAs and other retirement accounts, the Department effectively banned common and long-accepted forms of compensation such as commissions, markups, and sales loads (a mutual fund sales charge).  That is because under ERISA and the Code, fiduciaries are prohibited from receiving compensation that varies based on the investment "advice" or transaction.  *See* AR 8-9.  This is a radical transformation of the regulatory framework developed over decades by Congress, the SEC, FINRA, and state legislatures and insurance departments.  *See* App. 44-45.  Broker-dealers and insurance companies have long charged on a commission basis and the practice is expressly contemplated by the securities laws and state insurance regulation; it is safeguarded by the Dodd-Frank Act.  *See id.* at 85-86; *see also id.* at 21; Dodd-Frank, § 913(g)(1).

Record evidence shows that DOL's changes will impair the ability of many Americans to save for retirement, as well as the ability of many individuals and businesses to continue serving their customers, clients, and employees.  The United Kingdom recently moved to a similar fee-based compensation model for financial advice to consumers, and a new study by the principal U.K. financial regulator concluded that the move adversely affected lower-income consumers by "contribut[ing] to many people not being able to get the advice they want and need at a price they are willing to pay."  Financial Conduct Authority, *Financial Advice Market Review Final Report* at 17 (March 2016), *available at* https://www.fca.org.uk/static/fca/documents/famr-final-report.pdf.  The U.K. regulator is concerned that an "advice gap" has arisen for lower-income individuals.  *Id.* at 5-6.  This is in part because fee-based accounts typically require minimum

account balances that are too high for lower-income savers.  *See id.*; *see also, e.g.*, App. 1291.

DOL's Rule will have similar adverse effects—even with the exemptive relief described below.

### B.      The Best Interest Contract Exemption

Having banned compensation arrangements that were fundamental to the provision of fi-

nancial services since at least the 1930s, DOL simultaneously offered regulatory relief (of a sort)

from these prohibitions if affected entities comply with new and amended prohibited transaction

"exemptions."

The most important of these exemptions is the Best Interest Contract or "BIC" exemp-

tion, which allows financial institutions and professionals to receive commissions—albeit on a

much more limited basis—and other transaction-based payments if they adhere to a range of new

conditions.  These include, among other things, that a financial institution:

- (i) acknowledge in writing that it and its professionals are serving as fiduciaries to the client in the context of the advice being given;

- (ii) acknowledge that the financial institution has adopted certain impartial conduct standards under which the professional's recommendations must be in the best interest of the investor (requiring in part that the recommendations be made "without regard to the financial or other interests of the financial advisor or its affiliates"), and the professional does not receive payment "in excess of reasonable compensation";

- (iii) provide warranties as to policies and procedures implemented by the financial institution to ensure adherence to these impartial conduct standards; and

- (iv) make various disclosures of conflicts of interests and third-party payments that may be received from the transaction.  AR 134, 135-36.

Critically, the BIC exemption requires "fiduciaries" to IRAs (and other Code plans) who receive

commissions to enter into enforceable contracts with their customers that bind them to a fiduci-

ary standard of conduct, and to a range of other restrictions and requirements.  *See* AR 58-59.[5]

---

[5] The exemption does not require these new contracts for fiduciaries to ERISA plans, although the other conditions of the exemption apply.  *See* AR 76.

DOL acknowledges that the new exemptive requirements will impose substantial costs. *See* AR 539-68.  Among other things, financial institutions must develop "best interest contracts" to use in a range of transactions, develop the exemption's mandated disclosures and adapt their websites to include them, significantly revise their compensation policies, and develop the policies and procedures regarding conflicts of interest mandated by the BIC exemption.  *See id.* at 540-49.  Procedures must be put in place to identify the clients and accounts to which the BIC exemption applies, as many individuals hold both ERISA-covered and non-retirement accounts with the same financial institution.  In contrast to the securities laws, which allow conflicts to be disclosed and consented to, the new rules bar structural conflicts that could conceivably lead to "biased" recommendations.  *See id.* at 95, 346-51.  In a sea change from current practice, the industry must adapt from a system in which commission amounts are typically determined by the product manufacturer, to one where they are determined by the "fiduciary."  *See* App. 137-38.

The BIC exemption will also introduce significant legal costs, exposure, and uncertainty. The contract required under the exemption is forbidden to include provisions that commonly are used to limit liability, such as a liquidated damages clause or waiver of the ability to participate in  class actions.  AR 132, 134-35.  Some terms that must be included in the contract, such as "reasonable compensation," are ambiguous and, thus, are likely to foster litigation in which the outcome will be uncertain, a problem that will be exacerbated as breach-of-contract suits are brought in all fifty States, further increasing unpredictability and inconsistency.  These litigation costs—which were among commenters' greatest concerns with the rulemaking—were not considered by DOL in its assessment of the Rule's costs and benefits.  *See infra* 35-36.

## C.      Other Prohibited Transaction Exemptions

The second new exemption adopted by DOL, the Principal Transactions exemption, re-

quires the same contractual obligations and liabilities as the BIC exemption.  *See* AR 158-209.[6]

And, in a surprise change from the proposal, the Department narrowed the scope of an important

and long-standing exemption, Prohibited Transaction Exemption 84-24; while only individual

variable annuities were excluded from the proposed exemption (because they are regulated as

securities), the final exemption also excludes group variable annuities and fixed-indexed annui-

ties.  AR 227-28.  It now includes only fixed-rate annuities.

## STANDARD OF REVIEW

Under the APA, this Court "shall . . . hold unlawful and set aside agency action, findings,

and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A), (C)-(D).

Agency action is arbitrary and capricious "if the agency has relied on factors which Con-

gress has not intended it to consider, entirely failed to consider an important aspect of the prob-

lem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise."  *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).  "[S]ignificant

and viable alternatives" to a proposed regulatory action must be considered, *10 Ring Precision,*

*Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (quotation marks omitted), and the agency must

articulate a "satisfactory explanation for its action including a rational connection between the

facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  If it fails to "cogently explain

---

[6]   The Principal Transactions exemption is necessary for financial institutions to engage in principal transactions
and receive payment in connection with transactions where the buyer or seller of certain investments specified
in the exemption—including debt securities and certificates of deposit—is an ERISA or Code plan, participant,
or beneficiary.  AR 202, 204-05, 206, 207.

why it has exercised its discretion in a given manner," its action will be invalidated.  *Id.* at 48.

No deference is given to an agency's statutory interpretation where "Congress has directly spoken to the precise question at issue," or when the agency's interpretation of a statute is "unreasonable" because it "violate[s] [Congress's] intent."  *Texas v. United States*, 497 F.3d 491, 501, 506 (5th Cir. 2007).  An agency's interpretation also must be rejected if it raises "substantial constitutional questions."  *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994).

## ARGUMENT

"No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority."  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (emphasis omitted).  That question is easily resolved here:  The Department has sought to transform the financial services and insurance industries, stepping far beyond its authority under ERISA and the Code.  DOL failed to faithfully interpret the applicable statutes; misused its exemptive authority; ignored inconvenient record evidence; relied on a deeply flawed cost-benefit analysis; and infringed First Amendment rights.  Under the APA, this Court "shall" vacate and set aside the Fiduciary Rule and related exemptions.  *See* 5 U.S.C. § 706, (2)(A), (C)-(D).

## I.  DOL'S RE-INTERPRETATION OF "FIDUCIARY" IS IMPERMISSIBLE

"[A] fundamental precept of administrative law [is] that an agency . . . regulation cannot overcome the plain text enacted by Congress."  *Khalid v. Holder*, 655 F.3d 363, 372 (5th Cir. 2011) (ellipsis in original) (quotation marks omitted).  And, even where there is some room for deference to an agency's interpretation, that interpretation must be "reasonable" and consistent with Congress's "intent."  *Texas v. United States*, 497 F.3d 491, 506 (5th Cir. 2007).  The Department's Fiduciary Rule fails these standards.

**A.      The Plain Language And Structure Of ERISA And The Tax Code Confirm That "Fiduciary" Status Exists In Special Circumstances That Ordinarily Do Not Include Brokers And Other Sales Agents**

A statute's plain meaning is determined by "employing traditional tools of statutory construction," with no deference to the agency's interpretation. *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). Applying those tools of construction here, it is clear that ERISA and the Code foreclose the Department's Fiduciary Rule. Specifically, in redefining fiduciary relationships to include virtually every interaction regarding retirement investment, the Department disregarded (1) established legal principles that were the backdrop against which ERISA was enacted; (2) the plain language distinction between "sales" and "advice"; (3) the structure of ERISA; (4) the meaning of fiduciary reflected in the Dodd-Frank Act; and (5) Congress's acquiescence to DOL's previous, longstanding interpretation of fiduciary.

**1.** Under ERISA and the Code, a "fiduciary" to a plan includes a person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A). While the statutes do not define "fiduciary," "investment advice," or "fee or other compensation," those terms had well-established meanings under the common law of trusts and the securities laws by the time the ERISA and Code provisions were enacted. Those meanings must be considered in interpreting the statutes, because "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) (quotation marks omitted). *Accord United States v. Wells*, 519 U.S. 482, 491 (1997).

Take the term "fiduciary." A fundamental principle of trusts at common law is that a "fiduciary" relationship arises only where "special intimacy or . . . trust and confidence" exists be-

tween the parties. *Bogert's Trusts & Trustees* § 481.[7]  Relationships that lacked that special degree of "trust and confidence"—such as everyday business interactions—were long-recognized as non-fiduciary.  For this and other reasons, a person acting as a broker ordinarily is not a fiduciary, and this was recognized well before 1974.  *See supra* pp. 2-4 and *SEC v. Capital Gains Res. Bureau, Inc.*, 375 U.S. 180, 191, 194-95 (1963) (distinguishing between broker and fiduciary investment adviser); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 113-14 (N.D. Ala. 1971) (broker "had no fiduciary relationship to the plaintiff" based on "executing the plaintiff's orders"), *aff'd*, 453 F.2d 417 (5th Cir. 1972).  The same is true for insurance agents engaged in sales activity.  *See* IALC Mem. Part I.

Similarly, when ERISA and the parallel Code provisions were enacted in 1974, a substantial body of law had developed around the phrase "renders investment advice for . . . compensation."  In using that language in ERISA's fiduciary definition, Congress closely tracked the Advisers Act's definition of an "investment adviser" as a person who "*for compensation . . . advis[es]* others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11) (emphasis added).

The use of this phrase from the Advisers Act is significant for two reasons.  First, by 1974, investment advisers under the Act were widely understood to be fiduciaries—and the *reason* they were fiduciaries was that they had a continuing relationship of trust with their clients.  The Advisers Act "reflects a congressional recognition" that the investment adviser is "a fiduciary," the Supreme Court explained in 1963.  *Capital Gains Res. Bureau*, 375 U.S. at 191, 194-

---

[7]  *See also, e.g., Black's Law Dictionary* 753 (rev. 4th ed. 1951) (defining "fiduciary" based on the "trust and confidence involved" in the relationship); *Granik v. Perry*, 418 F.2d 832 (5th Cir. 1969) (under Florida law, a "fiduciary" relationship exists where "a relation of trust and confidence exists between the parties"); *Oak Cliff Bank & Trust Co. v. Steenbergen*, 497 S.W.2d 489, 493 (Tex. Civ. App. 1973) ("a fiduciary relationship" is "one of trust and confidence").

95.  Two decades later, the Supreme Court affirmed the fiduciary "character" of the investment-adviser relationship as "*requir[ing] frequent and personal contact*."  *Lowe v. SEC*, 472 U.S. 181, 190, 195 (1985).  Second, and as discussed above, the Advisers Act codified the well-recognized distinction between investment advisers and other financial professionals who provide some "advice," but whose relationship with the client did not rise to the level of a fiduciary—namely, broker-dealers.  The term "investment adviser," the Advisers Act clarifies, does not include "any broker or dealer" who provides advice that is "solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."  15 U.S.C. § 80b-2(a)(11)(C).

Courts and regulators have repeatedly confirmed the Advisers Act's distinction between investment advisers, who are fiduciaries, and broker-dealers, who are not.  In *Robinson*, for example, the court concluded that the broker was not an investment adviser and "had no fiduciary relationship to the plaintiff" because "any investment advice was incidental to brokerage services."  337 F. Supp. at 113-14.  The SEC, too, emphasized that "render[ing] investment advice merely as an incident to . . . broker-dealer activities" does not by itself place broker-dealers "in a position of trust and confidence as to their customers."  Broker-Dealer Registration, Exchange Act Release No. 4048, 1948 WL 29537, at *7 (Feb. 18, 1948), *aff'd*, *Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949).  *See also Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 464 F. Supp. 528, 538 (D. Md. 1978) (broker not adviser where "it appear[ed] that the commissions received were for his services in effecting the transactions, not for his rendering of advice").

Accordingly, when Congress used the term "fiduciary" and the phrase "renders investment advice for a fee or other compensation" in ERISA and the Code in 1974, their meanings were well-established, and Congress "is deemed to [have] know[n] the . . . judicial gloss given to

16

[that] language and thus [to have] adopt[ed] the existing interpretation unless it affirmatively act[ed] to change the meaning," *Blitz v. Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984) (ellipsis in original).  Indeed, the Supreme Court has repeatedly held that Congress incorporated principles of trust law into ERISA, *see, e.g.*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989), and the legislative history confirms Congress's familiarity with the meaning of "fiduciary" under the law of trusts, *see* H.R. Rep. No. 93-533, at 11 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4649 ("A fiduciary is one who occupies a position of confidence or trust."). Under these settled legal principles, when a person sells financial products on a commission basis and provides advice only incidentally to making sales, or where the hallmarks of "trust and confidence" are otherwise absent, fiduciary status does not exist.  Moreover, such a sales interaction was legitimate and proper, not a conflict to be outlawed; indeed, it was fundamental to the provision of financial products and services.

**2.**  Even setting aside the settled legal principles against which Congress enacted ERISA, the plain meaning of the phrase "renders investment advice for a fee" necessarily denotes something other than merely selling a product, or other sales-related communications.  An agent who receives a commission on the sale of a product is not paid for "render[ing] investment advice."  She is paid for effecting the sale, as DOL itself recognized.  *See* AR 256 (defining "Insurance Commission" as "a sales commission paid . . . for the service of effecting the purchase of a[n] insurance contract").  Indeed, that the payment is for effecting the sale, not for any advice, is clear from the fact that agents are paid only if they make a sale, regardless of how much "advice" they provide in connection with it.  Courts have long distinguished between "sales" and "advice."  For example, in rejecting a broad interpretation of the Department's 1975 investment-advice regulation, the Fifth Circuit stated, "Simply urging the purchase of [a company's] prod-

ucts does not make [the company] an ERISA fiduciary with respect to those products." *Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y. of U.S.*, 841 F.2d 658, 664 (5th Cir. 1988).  The Department itself has recognized the distinction between "advice" and "sales" not only under ERISA, but under the wage-and-hour laws.  *See* Advisory Opinion FLSA 2006-43, Dep't of Labor, at 2 (Nov. 27, 2006) (stating that sales activity—unlike advice— includes "promotion and business development activities, including the marketing, servicing, and promoting of the firm's financial services and products," and "bring[ing] about the purchase or sale of . . . investments for their clients").

   3.   The structure of ERISA and the Code further confirm this interpretation.  The statutes identify three ways that a person or entity becomes a fiduciary:  by (i) "exercis[ing] any discretionary authority or discretionary control" over the "management" of a plan or "authority or control respecting management or disposition of its assets"; (ii) "render[ing] investment advice for a fee or other compensation"; and (iii) exercising "discretionary authority or discretionary responsibility in" the plan's "administration."  29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3).  The management and administration of a plan are central functions, involving a meaningful, substantial, and ongoing relationship to the plan.  The "investment advice" provision of subsection (ii) must be read in a manner consistent with the surrounding subsections, as "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012).  Congress would not, for two of the provisions, have required a substantial and direct connection to the essentials of plan operation, and for the provision lying inbetween have required only a short-term relationship whose essence was sales rather than significant investment advice provided on a regular basis and through an established relationship.  *See*

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852 (2001).

**4.**  The recent enactment of the Dodd-Frank Act further demonstrates the limitations on "fiduciary" under ERISA and the Code.  Section 913(g) of the Act forbids the SEC from adopting a uniform fiduciary standard of conduct under which receipt of "commission[s] or other standard compensation" by broker-dealers is *ipso facto* a violation.  It is implausible that Congress prohibited the SEC—an agency with broad authority over the financial services industry—from creating a standard for broker-dealers (and insurance agents) that banned commissions, while leaving DOL free to adopt an interpretation with that exact consequence.

**5.**  Finally, the settled meaning of "fiduciary" in DOL's 1975 regulation, which comports with the common law understanding, is confirmed in Congress's acceptance of that DOL interpretation over the past forty years.  Congress has amended ERISA many times, including in the Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780 (2006), where it adopted a new statutory exemption applicable to investment advice and effectively incorporated the current interpretation of fiduciary into that exemption, *see* 29 U.S.C. § 1108(b)(14), (g).  In all of these amendments, Congress left the 1975 regulatory interpretation untouched.  Accordingly, Congress has ratified this interpretation.  *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

**B.**     **The Department's Overbroad Interpretation Of "Fiduciary" Flouts That Term's Plain Meaning And Is Unreasonable And Entitled To No Deference**

Where a statute's ordinary meaning is plain, "that is the end of the matter," for the Court as well as the agency.  *Chevron*, 467 U.S. at 843 & n.9.  "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014); *see also, e.g.*, *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011).  DOL, however, did exactly that in promulgating the Fiduciary Rule.

The Fiduciary Rule takes as its starting point not the text, but the conduct the Department

decided to regulate.  The Rule provides that a person becomes a fiduciary if she makes a single

"recommendation," which is defined as a "suggestion" to take or not take "a particular course of

action."  The recommendation need only be "direct[ed]" "to a specific recipient"; this open-

ended language encompasses a host of interactions, including those that involve nothing more

than suggesting and selling a financial product to the holder of an IRA.  No regular contact is

needed, nor any indicator of a relationship of trust and confidence.  *See* AR 52.  The context in

which the recommendation is given—such as whether it is merely "incidental" to a sale—is also

irrelevant; rather, it is enough if the recommendation relates to one of an array of topics, includ-

ing the "advisability of acquiring" an investment product, "whether . . . a rollover . . . should be

made," or "investment policies or strategies."  *See id*.  And critically, the Rule leaves essentially

no role for non-fiduciary sales communications.  For example, a sales presentation in which the

financial professional identifies investment options she can provide is a "recommendation" under

the Rule.  So is a communication in which a financial professional makes comparisons between

products that her firm offers.  Client referrals or solicitations to other investment professionals

are also fiduciary recommendations, as is a one-time discussion regarding whether to "rollover"

assets from an employer plan to an IRA.

　　This sweeping interpretation of who is a fiduciary indisputably conflicts with the settled

understandings of the term described above.  *See supra* pp. 14-16.  Indeed, DOL was forced to

admit that its "broad test could sweep in some relationships that are not appropriately regarded as

fiduciary in nature and that *the Department does not believe Congress intended to cover as fidu-

ciary relationships*."  AR 3 (emphasis added).  The Department's "solution" to this problem was

to create a host of exclusions and clarifications, including a provision under which financial pro-

fessionals dealing with an experienced fiduciary to a plan will *not* be a fiduciary.  AR 54-55.  But

these carve-outs confirm that the Department's new interpretation is based on its own views about when—as a policy matter—a fiduciary should be present, rather than on a faithful interpretation of what Congress wrote or a consistent, coherent application of the accepted understanding of "fiduciary" and what it means to provide "investment advice for a fee."

Because the Fiduciary Rule conflicts with the plain meaning of ERISA and the Code, DOL's interpretation is impermissible and entitled to no deference. *See Chevron*, 467 U.S. at 842-43; *First Am. Bank v. Resolution Trust Corp.*, 30 F.3d 644, 647 (5th Cir. 1994).

DOL's interpretation also receives no deference because it would empower the Department to exercise power and judgment over a far broader range of the U.S. economy than Congress could have intended in the modest authority it conferred through ERISA and the Code.  By the Department's own account, the Rule will affect trillions of dollars held in IRA accounts by millions of individual investors, requiring hundreds of thousands of financial professionals to abandon or fundamentally alter sales practices that Congress has accepted for generations.  *See* AR 423, 500, 533-34, 558-59.  The Supreme Court recognized the inappropriateness of *Chevron* deference in similar circumstances in *King v. Burwell*, where it declined to defer to an IRS interpretation that "involv[ed] billions of dollars in spending each year and affect[ed] the price of health insurance for millions of people."  135 S. Ct. 2480, 2489 (2015).  In the case of such "a question of deep economic and political significance that [was] central to th[e] statutory scheme[,] had Congress wished to assign that question to an agency, it surely would have done so expressly," particularly where the agency "has no expertise" in the matter.  *Id.* (quotation marks omitted).  So here, had Congress intended to give DOL authority to institute sweeping changes for broker-dealers, insurance agents, and others, it would have directly said so.

Finally, *Chevron* deference is inappropriate given the "serious constitutional doubts"

raised by the Department's statutory interpretation.  *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 443 (5th Cir. 1999); *see* ACLI Mem. Part III.

Even if there were room for deference, DOL's new interpretation is unreasonable and must be rejected.  The Department's Rule makes the sale of a financial product a determinant of fiduciary status, yet under ERISA fiduciaries generally are prohibited from selling financial products to plans.  *See* 29 U.S.C. § 1106(b); AR 8.  It is unreasonable to treat sales that fiduciaries cannot make as a dispositive indicator that someone *is* a fiduciary.  It is also unreasonable to interpret the purchase of "advice" to include the purchase of a product.  DOL proclaimed that its Rule "rejects the purported dichotomy" between sales and advice, AR 36, but that dichotomy is not "purported"; it is statutory, and it is wholly unreasonable for an agency to reject a distinction that Congress established.  DOL further defied congressional intent by basing its Rule on a rejection of the disclosure regime established by Congress under the securities laws, and even arguing that disclosures intended by Congress to aid consumers will actually harm them.  *See id.* at 5-6. Repeatedly, DOL justified its Rule by contending that certain significant financial decisions should be accompanied by fiduciary advice.  But concern over certain large financial transactions—like "investing hundreds of millions of dollars in plan assets" in "the most critical investment decision the plan ever makes," *id.* at 10—is no basis for a rule so broad that every time a broker suggests and sells a financial product to an IRA holder, she acts as a fiduciary.  *See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 152-53 (D.C. Cir. 1993) (agency's rationale for regulatory action failed to support mechanism chosen in final rule).  On the whole, the Rule is impractical and "disastrously unworkable," "bring[ing] about an enormous and transformative expansion in [DOL's] regulatory authority," producing results that are "incompatible" with Congress's intent.  *Util. Air*, 134 S. Ct. at 2432, 2443, 2448.

\* \* \*

22

The DOL official responsible for the Rule has described the modern regulatory state this way: "Back in the day, when people wanted to make changes, they passed legislation."  But today, "we've shifted from the way that social change and legal change and financial change is accomplished through congressional action to two different avenues for making changes:  The main one being regulation and the second one being litigation."  *Borzi Highlights Changes to ERISA as She, Other Speakers Look Back at Law's 40 Years*, Bloomberg BNA, 41 BPR 1929 (Sept. 9, 2014).  That view of DOL's role leaps off virtually every page of this gargantuan rulemaking, in which the Department has used a toehold of authority to broadly regulate practices in the financial and insurance industries.  Yet that view is not shared by our Constitution, Congress, or courts.  As the D.C. Circuit said when the SEC tried to broadly "redefine" "broker" to justify the regulation of "banks," an agency may not "use its definitional authority to expand its own jurisdiction and to invade the jurisdiction" of other agencies.  *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 754-55 (D.C. Cir. 1986).  *See also Bus. Roundtable v. SEC*, 905 F.2d 406, 412-13 (D.C. Cir. 1990) (SEC may not use power to regulate listing standards as means to regulate corporate governance).  The Department's misuse of its interpretive authority must be rejected here too.

## II.   THE DEPARTMENT MISUSED ITS LIMITED EXEMPTIVE AUTHORITY UNDER THE TAX CODE TO ESTABLISH NEW, SUBSTANTIVE STANDARDS OF CONDUCT FOR SERVICE PROVIDERS TO IRAs

"[I]t is fundamental that an agency may not bootstrap itself into an area in which it has no jurisdiction."  *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (quotation marks omitted).  That is what DOL has done here through its exemptive authority.

DOL's authority under the Code is limited.  DOL may grant exemptions from the Code's prohibited transaction rules, but it has no authority to inspect, investigate, or otherwise regulate or bring enforcement actions against fiduciaries or plans under the Code.  Its interpretive authori-

ty is limited to the Code's definition of "fiduciary." *Supra* p. 6.   But here, DOL used its exemptive authority to comprehensively regulate service providers to tax-preferred plans such as IRAs in a manner that it could not do directly.   Under the BIC exemption, broker-dealers, insurance agents, and other newly-minted fiduciaries must comply with ERISA's duties of loyalty and prudence, AR 133, even though Congress chose not to include those duties in the Code, *see* AR 337. As DOL candidly explained, it "intended to effectively incorporate" into the Code "the objective standards of care and undivided loyalty that have been applied under ERISA."   *Id.* at 84.

This is *ultra vires*.   Congress, which chose not to include in the Code the civil liability for breaches of fiduciary duties that it included in ERISA, did not authorize or expect that liability to be added by administrative fiat.   It certainly did not authorize it to be done by an agency that has no regulatory authority under the Code, let alone through use of an authority to *relax* regulatory burdens.   On the contrary, the fact that Congress "includes particular language in" ERISA, "but omit[ted] it in" parallel provisions of the Code, indicates "that Congress intended a difference in meaning."   *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014).   It is not the Department's role to "improve" upon Congress's vision.

For this and other reasons, the courts have long recognized that regulations as significant as the new Fiduciary Rule cannot be predicated on a limited grant of authority directed at an entirely different subject (in this case, whether to relax prohibited transaction rules).   In *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218, 234 (1994), for example, the Court rejected an agency's claim that its authority to "modify" the requirements in a statute allowed it to regulate one requirement away entirely.   The agency could not "effectively . . . introduc[e] . . . a whole new regime of regulation" through its modification authority; it "may well be a better regime but is not the one that Congress established."   *Id.   See also Util. Air*, 134 S. Ct. at 2438,

2442-43 (rejecting EPA interpretation that created anomalous results); *Loving v. IRS*, 742 F.3d

1013, 1021 (D.C. Cir. 2014) (IRS interpretation would have "empowered" the agency "for the

first time to regulate hundreds of thousands of individuals in the multi-billion dollar tax-

preparation industry[,] [y]et nothing in the statute's text or the legislative record contemplate[d]

that vast expansion of the IRS's authority").

The degree to which DOL has overstepped its statutory role is reflected in the breadth of

the critique of the financial services industry that it used to justify its actions.  Our securities

laws, and the regulation of broker-dealers specifically, are founded on disclosure (*see, e.g.*, 15

U.S.C. § 78o)—yet the Department insists that "disclosing . . . conflicts of interest can make

consumers worse off."  AR 459.  The difference between investment advisers and brokers is also

fundamental to the securities laws, but DOL derided it as a "fine legal distinction[]" that should

be disregarded because it is "often completely lost on plan participants."  *Id*. at 10.  DOL—an

expert on employment and employee benefit plans—has predicated this rulemaking in part on

skepticism about actively managed funds, *see id*. at 461, and its "deep and continuing concerns"

with proprietary products, *id*. at 108, such as an annuity that an insurance company develops and

markets to its customers.  These widely accepted practices—which have benefited generations of

Americans—are wholly outside DOL's regulatory responsibility and expertise.

The Department's error is all the more pronounced because it used its authority to *reduce*

regulatory burdens as a means to *impose* significant new obligations.  Agencies may not manipu-

late "safe harbor criterion" to conduct "backdoor regulation."  *Hearth, Patio & Barbecue Ass'n*

*v. U.S. Dep't of Energy*, 706 F.3d 499, 507-08 (D.C. Cir. 2013); *see also Chamber of Commerce*

*v. U.S. Dep't of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999) (OSHA could not "leverage" its in-

spection authority to impose new substantive duties).  Nor does Congress "hide elephants in

mouseholes"—it does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), or "delegate a decision of . . . economic and political significance to an agency in so cryptic a fashion," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).  In these rulemakings, however, DOL has used its narrow authority under the Code to establish a highly detailed, expansive new regulatory regime over financial professionals and financial institutions.  *See* AR 115-16.

The justifications the Department gives for this regulation-by-exemption do not withstand scrutiny.  "Congress gave the Department broad discretion" to create exemptions, the Department argued in the rulemaking, and nothing in ERISA or the Code precludes it from "condition[ing] exemptions on contractual terms or commitments," including fiduciary standards of conduct or an enforceable contract.  AR 116.  These claims would stretch the Department's exemptive authority beyond any bounds, limited only by DOL's own imagination of what might protect plan participants.  Under that approach, the Department could condition an exemption on the private party agreeing to be held to a strict liability standard, or to charge only a set amount for a given transaction, or agreement to be liable for treble damages in case of breach.

DOL also claimed that "[t]he conditions to an exemption are not equivalent to a regulatory mandate that conflicts with or changes the statutory remedial scheme."  AR 117.  Anyone who objects to the BIC conditions, DOL says, can forgo the exemption and merely "change their compensation structure and avoid committing a prohibited transaction," or rely on another exemption.  *Id.*  But in truth, no such option exists.  The record evidence is indisputable, for instance, that certain accounts cannot be serviced using a fee-based compensation model.  *See* App. 327-30; *see also id.* at 603-14.  Approximately 95% of accounts under $25,000 rely on transaction-based models, *id.* at 592, and to serve those customers, financial professionals must

rely on the BIC exemption.  Indeed, DOL contended in the rulemaking that it would be "abusive conduct" for a professional to recommend a fee-based account for consumers with "low trading activity and no need for ongoing monitoring or advice."  AR 67-68 n.18.  By the Department's own reasoning, then, in those circumstances the professional will be legally obligated to offer a transaction-based fee under the BIC exemption.  DOL's claim that the BIC exemption is a mere choice also conflicts with a senior DOL official's recent warning against firms "looking for ways out of the contract requirement."  Mark Schoeff Jr., *Despite lawsuits, DOL is working with advisers to help implement fiduciary rule*, InvestmentNews (July 5, 2016), http://tinyurl.com/gwvpolu.

For all of these reasons, the BIC exemption must be vacated, and vacatur of that exemption requires vacatur of the Fiduciary Rule and all related exemptions.  DOL repeatedly said that the BIC exemption is integral to the remedial scheme envisioned under the Rule because DOL's expanded interpretation of fiduciary is premised on the availability of that exemption.  *See, e.g.*, AR 18, 47.  The BIC exemption is essential, DOL said, to "preserv[ing] beneficial business models for delivery of investment advice" that would otherwise be imperiled by the broad new fiduciary interpretation, which in turn would harm retirement savers.  *See id.* at 1-2.  DOL's entire cost-benefit analysis is predicated on the presence of the exemption.  These provisions were adopted together, and together now must fall.

## III.   THE DEPARTMENT IMPERMISSIBLY CREATED A PRIVATE RIGHT OF ACTION IN THE BIC AND PRINCIPAL TRANSACTIONS EXEMPTIONS

Only Congress, not a federal agency, may create a private right of action.  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  The Department ignored this basic principle in the BIC and Principal Transactions exemptions by requiring, as a condition of exemption, that financial institutions enter into contracts that subject them to lawsuits on terms and in forums dictated by the

Department.  The Department said it did this to ensure IRA owners "have an effective legal mechanism to enforce the [fiduciary] standards," AR 89, and to "police" compliance, *id.* at 368. In other words, the Department found the "legal mechanism[s]" established by Congress to be "[in]effective," and created a private right of action.  It may not do so.

Congress created separate and carefully delineated enforcement regimes under ERISA and the Code.  Under ERISA, the Secretary of Labor or a plan participant, beneficiary, or fiduciary can bring an action for breach of fiduciary duty to restore any losses to the plan, 29 U.S.C. § 1132(a)(2); a participant, beneficiary, or fiduciary may also bring an action seeking equitable relief, *id.* § 1132(a)(3).  ERISA's civil remedies are thus limited in scope, *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-10 (2002), and the statute broadly preempts state law, including breach-of-contract actions, *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1295 (5th Cir. 1989).  Yet the BIC exemption purports to permit ERISA plans and participants to sue for breach of requirements that go well beyond ERISA's fiduciary conduct standards and statutory exemptions, including requirements regarding policies and procedures.  *See, e.g.*, AR 64, 98.

The private rights of action the Department appended to the Code are even more extraordinary.  DOL acknowledges that IRA owners lack "an independent statutory right to bring suit against fiduciaries for violation of the prohibited transaction rules"; that the Department cannot "bring suit to enforce the prohibited transaction rules on their behalf"; and that the only liability Congress provided under the Code was the imposition of excise taxes by the Treasury Department.  AR 77.  It nonetheless created the "best interest contract" to provide "IRA investors [a mechanism] to enforce their rights and ensure[] that they will have a remedy," including through "class litigation."  *Id*. at 2.  The Principal Transactions exemption, too, vests IRA owners with a new private right of action.  AR 145-208.  This contrivance, explained a senior DOL official,

28

was the result of DOL being "creative to try to find a way to make the . . . fiduciary responsibil-ity [in ERISA] . . . enforceable in the IRA context."  Nick Thornton, *Who will enforce the DOL rule?*, Benefits Pro (June 1, 2016), http://tinyurl.com/goobyjk; *see also* AR 76-77, 82-85.

No amount of "creative" statutory interpretation, however, permits the Department to create a private right of action.  "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 532 U.S. at 291.  *See also, e.g.*, *Tax Analysts v. IRS*, 214 F.3d 179, 186 (D.C. Cir. 2000) ("[W]here Congress has otherwise enacted a comprehensive legislative scheme[,] includ-ing an integrated system of procedures for enforcement, there is a strong presumption that Con-gress deliberately did not create a private cause of action." (quotation marks omitted)).  Settled law, therefore, prohibits the Department from doing exactly what it attempted in the BIC and Principal Transactions exemptions:  Using its interpretive and exemptive authority to paint fi-nancial professionals into a corner where they have no choice but to accept the exemption's terms—which transport ERISA-like duties, rights, and remedies into the Code—and to subject themselves to private suits that the statute does not establish.

The Department has argued that it did not create a private right of action, but merely a condition to an exemption, which is within its exemptive authority.  AR 116.  But it defies basic tenets of statutory construction and administrative law to suppose that Congress, in authorizing the Department to *exempt* entities from statutory obligations, deputized it to create whole new enforcement mechanisms—including mechanisms that Congress consciously omitted from the Code.  An agency rule cannot "effectively gut Congress's carefully articulated existing system." *Loving*, 742 F.3d at 1020; *see also, e.g.*, *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 273 (5th Cir. 2015) (even a "broad grant of general rulemaking authority does not allow

[the] agency to make amendments to statutory provisions").

The Department has also asserted that it did not mandate a private right of action because financial institutions supposedly may choose whether to comply with the BIC and Principal Transactions exemptions. *See, e.g.*, AR 76. But as explained above at Part II, many swept in by the Rule's expanded fiduciary interpretation have no real choice *but* to comply with the exemptions. *See also* App. 824 (result of Rule is that new "fiduciaries" "will be required to . . . comply with [the BIC] Exemption" or otherwise "curtail" services).

The terms of the contractual obligations in the BIC and Principal Transactions exemptions confirm that DOL has improperly veered into creating private rights and remedies, rather than merely conditions for an exemption. *Cf. Sandoval*, 532 U.S. at 291. The required terms include disclosures, warranties, and policies and procedures regarding compensation and conflicts of interest, none of which are in ERISA or the Code. *See* AR 63-64. Time and again in crafting the rights of action, the Department exercised essentially legislative judgment on questions such as what damages should be available, whether class actions should be permitted, and whether arbitration should be banned entirely. *Id.* at 64. These are not decisions to be made by an administrative agency, much less an agency that has no authority to regulate or enforce, but only to interpret and to *exempt* parties from regulatory burdens. "Recognition of any private right of action for violating a federal statute . . . must ultimately rest on congressional intent to provide a private remedy." *Astra USA, Inc. v. Santa Clara Cty., Cal.*, 563 U.S. 110, 117 (2011) (quotation marks and alteration omitted).

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). The Supreme Court has

expressed its "unwillingness to infer causes of action in the ERISA context" particularly, "since that statute's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate express-ly." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quotation marks and emphasis omit-ted). The same caution is warranted with the Code provisions that were adopted in conjunction with ERISA—and that omit obligations, rights, and remedies that ERISA's "carefully crafted" enforcement regime includes. This Court should vacate the private rights of action in the BIC and Principal Transactions exemptions, and with them, the entirety of the rulemaking.

## IV.  THE FEDERAL ARBITRATION ACT PRECLUDES THE DEPARTMENT'S BAN OF CLASS WAIVERS IN ARBITRATION AGREEMENTS

The conditions in the BIC and Principal Transactions exemptions prohibit agreements to waive participation in class actions, including arbitration agreements that require individual arbi-tration and, thus, preclude class actions. This "condition" violates the Federal Arbitration Act ("FAA") and accordingly, the APA, 5 U.S.C. § 706(2)(A).

The FAA establishes a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and provides that any arbi-tration agreement in a commercial contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). This includes arbitration agreements that fa-vor individual adjudication and contain class waivers. *See, e.g., AT&T Mobility LLC v. Concep-cion*, 563 U.S. 333, 343 (2011); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 362 (5th Cir. 2013).

The FAA thus prohibits attempts—by States or federal agencies—to condition the en-

31

forceability of arbitration agreements on the presence or absence of particular terms.  In *Concepcion*, the Supreme Court held that "the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures."  563 U.S. at 336.  The Fifth Circuit also held that the FAA prohibits a State from conditioning the enforceability of an arbitration agreement on the absence of a forum selection provision.  *OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 447 (5th Cir. 2001) (per curiam).

Yet, the Department has impermissibly attempted to dictate the terms of arbitration agreements through the BIC and Principal Transactions exemptions.  For transactions involving transaction-based (rather than fee-based) payments, it conditions the exemptions on the availability of class actions in court, and thereby regulates the terms on which arbitration agreements under the exemptions may be enforced.  The Department could only have done this if the FAA were "overridden by a contrary congressional command."  *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012).  But neither ERISA nor the Code contains such a "contrary" command.  Indeed, the Fifth Circuit has affirmed that "Congress did not intend to exempt statutory ERISA claims from the dictates of the [FAA]."  *Kramer v. Smith Barney*, 80 F.3d 1080, 1084 (5th Cir. 1996).

The Department's defense of its unlawful class waiver ban is familiar:  The exemptions are voluntary, and financial institutions are free to have arbitration agreements with class waivers; they just will not qualify for exemptive relief.  AR 100.  That claim of "voluntariness" is no more persuasive here than elsewhere; at most, institutions have a Hobson's choice.  *Supra* Part II.  To have a "voluntary" choice, affected persons must have a genuine opportunity of "not yielding."  *NFIB v. Sebelius*, 132 S. Ct. 2566, 2603 (2012).  Thus, for example, Congress may "attach conditions on [States'] receipt of federal funds," but "the financial inducement" may not

"be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 206, 211 (1987) (citation omitted).  This same coercion is present here, since whether to enter into the BIC exemption is not "the prerogative of the [institution]," *NFIB*, 132 S. Ct. at 2604 (quoting *Dole*, 483 U.S. at 211), but results from DOL placing a "gun to the [institution's] head" and giving it the option of overhauling its business entirely or complying with the exemption.  *See id.*  That is no choice at all.

In any event, even if the Department had imposed only a preference for arbitration contracts without class waivers—rather than adopting this effective prohibition of such arbitration agreements—that would still be precluded by the FAA because "[t]he point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute." *Concepcion*, 563 U.S. at 344.  By interfering with this discretion, DOL's rules impermissibly "interfere with fundamental attributes of arbitration" and obstruct the FAA's "design[] to promote arbitration." *Id.* at 344-45.

## V.   THE DEPARTMENT BASED ITS ACTION ON A FLAWED ASSESSMENT OF THE NEED FOR REGULATION AND ITS BENEFITS AND COSTS, AND ARBITRARILY REJECTED LESS ONEROUS ALTERNATIVES

The Department based its adoption of the Rule and exemptions not only on a misconception of its role, but also on a misappraisal of existing practices, of the need for further regulations, and of the benefits and costs they would generate.  "[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions," of which "costs" is a significant part. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).  Moreover, when an agency adopts a rule for its supposed financial benefits and those benefits are grossly exaggerated while significant costs are ignored, the agency has overlooked an "important aspect of the problem" and failed to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Rule

33

and exemptions are deficient in all these respects, and must be vacated.

**1.**  In projecting that the Rule would deliver billions of dollars in benefits by eliminating conflicts of interest that supposedly sharply reduce retirement savings, the Department relied on a single factor related to a single type of investment product—and then ignored comments that this factor was misevaluated.  Specifically, the Department admittedly based savers' projected financial gains on research regarding "only one" issue:  the purported "conflict that arises from variation in the share of front-end-loads that advisers receive when selling different mutual funds that charge such loads to IRA investors."  AR 326.  This research provides no basis for regulating products—such as annuities—that may not invest in mutual funds at all, and was not even a proper assessment of mutual fund performance.

For starters, in estimating that the average mutual fund sold by brokers underperformed its benchmark, *id.* at 325, the Department improperly used performance data on certain unrepresentative funds to draw conclusions about the entire mutual fund market, *see* App. 815-17.  The Department compounded this error by relying on data for the period 1993 through 2009 (a cherry-picked sample encompassing the entire global financial crisis and nearly none of the recovery) and basing its underperformance estimate not on actual holding periods, or even over a full market cycle, but rather on the single year in which funds were purchased, "a fundamental oversight that does not permit reliable conclusions to be drawn."  *See id.* at 337.  The Department then ignored studies in the record that refuted its flawed estimates, *see, e.g.*, *id.* at 801-15, in further violation of rulemaking requirements, *see Am. Civil Liberties Union v. FCC*, 823 F.2d 1554, 1581 (D.C. Cir. 1987) (per curiam).

**2.**  The outsized benefits the Department claimed for its Rule were principally the result of manipulating the "law of large numbers" by spreading small marginal benefits across the tril-

lions of dollars in retirement savings.  But when it came to the Rule's costs, the Department downplayed and outright ignored the effects its action would have across millions of retirement accounts, focusing on firms' direct compliance costs to the exclusion of virtually all other direct and indirect consequences.  *See* AR 326.  But "'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost."  *Michigan*, 135 S. Ct. at 2707.  The result of DOL's single-minded focus was a skewed analysis that grossly understated the Rule's adverse consequences in at least four respects.

*First*, DOL ignored the costs of the class action lawsuits that will proliferate under the BIC exemption, costs that will be borne by the defendants in those actions and by consumers who pay higher prices.  *See* App. 1160; *see also id.* at 362-63.  Class actions threaten potentially enormous liability and consequently exert "hydraulic" pressure on defendants to settle even non-meritorious cases.  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 310 (3d Cir. 2003).  And yet, while the Department was admittedly "creative" in fashioning new rights of action, and purposely relied on class actions as an "enforcement" mechanism (*supra* Part III), it ignored rulemaking comments about the adverse consequences, such as the inconsistent standards resulting from 50 different States' interpretation of a company's contract, and the "chilling effect" on innovation and communication resulting from risking class-wide liability under new and vaguely-articulated legal commitments.[8]  *See* App. 353-54, 362-63, 463-65, 1191; *see also id.* at 766-67.  In assigning *no* cost estimate to class action litigation in its cost analysis, DOL improperly failed to respond to significant comments in the record, *see, e.g.*, *id.* at 919, and ignored an "important aspect of the problem"—indeed, one of the most controversial aspects of the entire rulemaking.

---

[8]  This result directly conflicts with ERISA's policy of uniform application in federal courts.  *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002) (noting "ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct").

Simply, it was arbitrary and capricious to insist on class actions to enforce these rules, but to re-fuse to assess their adverse effects.

*Second*, the Department ignored the costs to individuals whom the Rule will deprive of assistance in retirement saving.  That problem is real, and serious:  The U.K. has determined that its move to a fee-based compensation model adversely affected retirement savers, particularly those with lower incomes.  *See* Financial Conduct Authority, *Financial Advice Market Review Final Report* at 5-6, 17.  The Department dismissed concerns with this "advice gap" by, in part, suggesting that receiving financial assistance was not helpful to retirement savers.  "There is little evidence," it said, "that financial advisers improve retirement savings."  AR 631-32.

DOL's belittling of the value of advice is flatly inconsistent with its own projections five years earlier that investment mistakes cost investors approximately $114 billion per year, that access to financial assistance reduced the cost of those mistakes by $15 billion per year, and that increased access to financial assistance would enable them to save billions more.  Investment Advice–Participants and Beneficiaries, 76 Fed. Reg. 66,136, 66,152/2-3 (Oct. 25, 2011).  Confronted with this contradiction in the rulemaking, DOL said that its earlier projections had concerned assistance provided by a fiduciary—no such benefits, the Department said, could be attributed to a financial representative who has no fiduciary obligations.  AR 631.  That is false:  DOL's 2011 estimate was based on a range of services that are regularly performed by brokers, and that do not involve the asserted conflicts of interest that animated the rulemaking.  For example, the Department said in 2011 that billions in savings would result from financial professionals helping savers avoid excess taxes, improper risk, failure to diversify their investments, or simply prevent "mistakes."  *See* 76 Fed. Reg. at 66,152/2-3.  The Department's *ex post facto* re-characterization of these earlier statements was arbitrary, capricious, and precisely the sort of

"opportunistic[]" treatment of economic evidence that requires vacatur.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011).

*Third*, and related, DOL failed to give appropriate weight to an economic analysis demonstrating that the loss of advice caused by the Rule could cost savers as much as $80 billion in a single major stock market correction.  *See* App. 319; AR 632.  DOL concluded that the analysis "provides no empirical evidence," *id.* at 633, and cited some studies that suggested "investors who receive advice from a broker exhibit worse market timing than those who don't," *id.* at 634.  Yet in 2011 DOL posited the opposite—advice prevents investors from embedding their losses by selling off during a market downturn.  76 Fed. Reg. at 66,153/3-66,154/1.  It was arbitrary and capricious to reject this analysis without reconciling these inconsistencies with DOL's prior position.

*Finally*, DOL barely acknowledged the Rules' impact on annuities, even though the costs imposed on those products will be immense.  *See* ACLI Mem. Part V; *infra* Part VI.

An agency may not "trumpet" the benefits of a rule without properly considering *all* related costs.  *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983).  But DOL made that error here, in circumstances where even modest adjustments to its projections would have dictated a fundamentally different course.  The Department estimated a 10-year compliance cost of as much as $31.5 billion, with benefits during that period as low as $33 billion.  AR 326.  That $1.5 billion net benefit would have been dwarfed by proper consideration of any of the neglected costs discussed above.  If DOL had made even modest adjustments to account for the value it attributed to advice in 2011, or for the evidence in the Economists Incorporated report (App. 312-45), the same "law of large numbers" would have revealed how costly—for investors— these rules will be.

Ultimately, DOL's failure to properly assess the impact and costs of its action caused it to arbitrarily short-shrift less burdensome alternatives.  For example, commenters suggested a "seller's" exception that would apply to all sellers and customers, effectuated by a clear and simple disclosure that the seller is not a fiduciary.  This disclosure, which would have greatly reduced the costs of the Rules, would be in the context of a relationship that was indeed a seller's relationship according to the traditional understanding, and that was subject to a range of existing State and federal requirements.  DOL arbitrarily rejected this alternative.  *See* AR 5, 36.  Now, vacatur of the Fiduciary Rule and exemptions is required.

## VI.   DOL SUBSTANTIALLY AND IMPROPERLY CHANGED THE REGULATORY TREATMENT OF FIXED-INDEXED ANNUITIES WITHOUT NOTICE OR CONSIDERATION OF THE CONSEQUENCES AS REQUIRED BY THE APA

The Department's treatment of fixed-indexed annuities is another example of its failure to properly assess the costs of the Rule, and of substituting its judgment for Congress's on matters outside the Department's jurisdiction and expertise.  These annuities are often sold through independent insurance agents who may be part of an independent marketing organization ("IMO"), which is not a "Financial Institution" defined in the BIC exemption that must supervise transactions for compliance with the exemption.[9]  In this situation, the only "Financial Institution" that is likely to be available is an insurance company.  *See* AR 133, 139; *see also* IALC Mem. Part II.

But it is impossible for the insurance company to comply with the BIC exemption's supervisory requirements with respect to independent insurance agents selling fixed-indexed annuities.  Such an agent might, for example, offer seven fixed-indexed annuities from four different

---

[9]   This supervision includes identifying, mitigating, and disclosing conflicts of interest, and "insulat[ing] the Adviser from incentives to violate the Best Interest Standard, including incentives created by any other Financial Institution."  AR 123; *see also* AR 139.

insurance companies.  If the compensation varies between insurance companies, that is a conflict that must be managed and disclosed.  However, none of the companies has authority to dictate an independent agent's or IMO's product offerings or to affect the other companies' compensation. Moreover, under the BIC exemption, if the Financial Institution issues the product, the sale is subject to additional requirements as the sale of a "Proprietary Product," AR 140, 136-37, even though the agent is offering products from multiple insurance companies.

These independent agents, many of which are small businesses or sole proprietorships, will therefore be unable to satisfy the BIC exemption and will be forced to exit the fixed-indexed annuity market, unless the agents join a broker-dealer or other "Financial Institution" willing to assume the associated fiduciary liability.  Those options are not viable for most insurance-only licensed agents working through an IMO or operating independently who offer fixed-indexed annuities, because they are not registered representatives licensed to sell securities.

The Department took no account of these difficulties when, in the final Rule—and without prior notice required by the APA—it required that fixed-indexed annuities be offered in compliance with the BIC exemption.  DOL asserted that the insurance company could serve as the Financial Institution if no other eligible entity is involved in the transaction.  *See* AR 73-74.  The Department plainly misunderstood the market it sought to regulate.  It also improperly substituted its judgment for that of Congress, which in Dodd-Frank concluded that these products do not merit federal regulation so long as they are offered consistent with prevailing state standards.  *Supra* note 1.

For these reasons, and for the reasons set forth in Part II of the IALC plaintiffs' brief and Parts V-VI of the ACLI plaintiffs' brief, which are hereby incorporated by reference, this Court should direct the Department to vacate the Rule and related exemptions.

## VII.   THE FIDUCIARY RULE AND THE BIC EXEMPTION VIOLATE THE FIRST AMENDMENT

Plaintiffs incorporate by reference the arguments made by the ACLI plaintiffs in Part III of their summary judgment brief.

## CONCLUSION

Plaintiffs respectfully request that this motion for summary judgment be granted, and that the entire Rule, BIC exemption, and other related exemptions be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner.

Respectfully submitted,

Dated:  July 18, 2016

s/ Eugene Scalia

James C. Ho, Texas Bar No. 24052766
Russell H. Falconer, Texas Bar No. 24069695
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 110
Dallas, TX  75291
Telephone:  (214) 698-3264
Facsimile:  (214) 571-2917
jho@gibsondunn.com
rfalconer@gibsondunn.com

Eugene Scalia*
Jason J. Mendro*
Paul Blankenstein*
Rachel E. Mondl*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
escalia@gibsondunn.com
jmendro@gibsondunn.com
pblankenstein@gibsondunn.com
rmondl@gibsondunn.com

*Counsel for Plaintiffs Chamber of Commerce
of the United States of America, Financial Ser-
vices Institute, Inc., Financial Services
Roundtable, Greater Irving-Las Colinas
Chamber of Commerce, Humble Area Chamber
of Commerce DBA Lake Houston Area Cham-
ber of Commerce, Insured Retirement Institute,
Lubbock Chamber of Commerce, Securities In-
dustry and Financial Markets Association, and
Texas Association of Business*

\* Admitted *pro hac vice*

(*continued on next page*)

Steven P. Lehotsky*
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone:  (202) 463-5337
Facsimile:  (202) 463-5346
slehotsky@uschamber.com

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

David T. Bellaire*
Robin Traxler*
FINANCIAL SERVICES INSTITUTE, INC.
607 14th Street, N.W.
Suite 750
Washington, DC 20005
Telephone:  (888) 373-1840
Facsimile:  (770) 980-8481
david.bellaire@financialservices.org
robin.traxler@financialservices.org

*Counsel for Plaintiff Financial Services Institute, Inc.*

Kevin Richard Foster*
Felicia Smith*
FINANCIAL SERVICES ROUNDTABLE
600 13th Street, N.W.
Suite 400
Washington, DC 20005
Telephone:  (202) 289-4322
Facsimile:  (202) 589-2526
richard.foster@FSRoundtable.org
felicia.smith@FSRoundtable.org

*Counsel for Plaintiff Financial Services Roundtable*

J. Lee Covington II*
INSURED RETIREMENT INSTITUTE
1100 Vermont Avenue, N.W.
Washington, DC 20005
Telephone:  (202) 469-3000
Facsimile:  (202) 469-3030
lcovington@irionline.org

*Counsel for Plaintiff Insured Retirement Institute*

Kevin Carroll*
Ira D. Hammerman*
SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, N.W.
8th Floor
Washington, DC 20005
Telephone:  (202) 962-7300
Facsimile:  (202) 962-7305
kcarroll@sifma.org
ihammerman@sifma.org

*Counsel for Plaintiff Securities Industry and Financial Markets Association*

\* Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 18, 2016, the foregoing document was elec-

tronically submitted with the clerk of the court for the United States District Court, Northern Dis-

trict of Texas, using the electronic case file system of the court.  I hereby certify that I have

served all counsel of record electronically or by another manner authorized by Federal Rule of

Civil Procedure 5(b)(2).


<u>s/ Eugene Scalia                 </u>
Eugene Scalia*

1