**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FINANCIAL SERVICES INSTITUTE, INC., FINANCIAL SERVICE ROUNDTABLE, GREATER IRVING-LAS COLINAS CHAMBER OF COMMERCE, HUMBLE AREA CHAMBER OF COMMERCE DBA LAKE HOUSTON AREA CHAMBER OF COMMERCE, INSURED RETIREMENT INSTITUTE, LUBBOCK CHAMBER OF COMMERCE, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, and TEXAS ASSOCIATION OF BUSINESS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:16-cv-1476-M Consolidated with: |
| THOMAS E. PEREZ, SECRETARY OF LABOR, and UNITED STATES DEPARTMENT OF LABOR, | ) ) ) ) | 3:16-cv-1530-C 3:16-cv-1537-N |
| Defendants. | ) ) | |

**THE INDEXED ANNUITY LEADERSHIP COUNCIL PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................1

FACTUAL AND REGULATORY BACKGROUND ...................................................2

    A.      The Benefits Of Fixed Indexed Annuities To Retirement Savers ..........................2

    B.      State Regulation Of Fixed Indexed Annuities ........................................................4

    C.      The Historical Absence Of Federal Regulation Of Fixed Annuities ......................5

    D.      The Compensation And Distribution Schemes Developed Under The
             Existing Regulatory Systems ...................................................................................8

    E.      The Department's Rulemaking .................................................................................9

          1.      Proposed fiduciary rule ...............................................................................9

          2.      Proposed amendment to and partial revocation of 84-24 exemption ........10

          3.      Proposed "Best Interest Contract" exemption ..........................................11

          4.      The final rules ............................................................................................11

ARGUMENT ...................................................................................................................13

I.      THE DEPARTMENT'S NEW DEFINITION OF A "FIDUCIARY" IS INVALID. .......13

    A.      The New Definition Of A "Fiduciary" Is Inconsistent With The Plain
             Meaning Of ERISA And The Code. ......................................................................13

    B.      The Department Acted Arbitrarily And Capriciously In Treating
             Those Who Provide Advice Incidental To Sales Of Fixed Annuities As
             Fiduciaries. ............................................................................................................14

          1.      The Department failed to identify empirical evidence that parties to
                 sales of fixed annuities are actually in relationships of trust. ....................14

          2.      The Department failed to justify changing the regulatory treatment
                 of those who provide advice incidental to sales of fixed annuities............18

II.     THE DEPARTMENT ACTED ARBITRARILY AND CAPRICIOUSLY IN
       REVOKING THE 84-24 EXEMPTION FOR FIXED INDEXED ANNUITIES.............21

    A.      The Department Failed To Justify Imposing The Requirements Of The
             BIC Exemption On Sales Of Fixed Indexed Annuities, Particularly In

Light Of The Extensive Protections Provided By State Law And The
84-24 Exemption....................................................................................................22

B.     The Department Failed To Conduct A Reasonable Cost-Benefit Analysis For
Moving Fixed Indexed Annuities To The BIC Exemption. .................................24

C.     The Department Drew An Arbitrary And Unjustified Distinction Between
Fixed Indexed Annuities And Other Fixed Annuities. .........................................28

III.     THE DEPARTMENT FAILED TO PROVIDE ADEQUATE NOTICE AND
OPPORTUNITY TO COMMENT ON THE REVOCATION OF THE 84-24
EXEMPTION FOR SALES OF FIXED INDEXED ANNUITIES. ................................31

CONCLUSION.......................................................................................................................34

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Driver Serv., Inc. v. Truck Ins. Exchange*,
631 N.W.2d 140 (Neb. Ct. App. 2001) ........................................................15

*Am. Equity Inv. Life Ins. Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ................................................................7, 23, 24

*Brass Metal Prods., Inc. v. E-J Enters., Inc.*,
984 A.2d 361 (Md. Ct. Spec. App. 2009) ..................................................15

*Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*,
403 F.3d 771 (D.C. Cir. 2005) .....................................................................28

*Business Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ................................................20, 26, 27, 28

*Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*,
392 N.E.2d 759 (Ill. App. Ct. 1979) ..........................................................15

*Chavez v. Chenoweth*,
89 N.M. 423 (N.M. Ct. App. 1976) .............................................................15

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) .......................................................................................13

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ..........................................................................23

*DeNaples v. Office of Comptroller of Currency*,
706 F.3d 481 (D.C. Cir. 2013) .....................................................................30

*Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*,
662 N.E.2d 1074 (Ohio 1996) .....................................................................15

*Encino Motorcars, LLC v. Navarro*,
579 U.S. __, slip op. (June 20, 2016) ....................................................18, 19

*Envtl. Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ..............................................................31, 32

*Gibson v. Gibson*,
534 S.W.2d 100 (Mo. Ct. App. 1976) .........................................................15

*Glob. Van Lines, Inc. v. ICC*,
   714 F.2d 1290 (5th Cir. 1983) ............................................................31

*Gonzalez v. Union Pac. R.R.*,
   803 N.W.2d 424 (Neb. 2011)..............................................................15

*HBO, Inc. v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) ...............................................................31

*Hi-Ho Tower, Inc. v. Com-Tronics*,
   761 A.2d 1268 (Conn. 2000) ..............................................................16

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
   407 F.3d 1250 (D.C. Cir. 2005)......................................................32, 33

*Kap-Pel Fabrics, Inc. v. R.B. Jones & Sons, Inc.*,
   402 S.W.2d 49 (Mo. Ct. App. 1966)...................................................15

*Kapoor v. Dybwad*,
   49 N.E.3d 108 (Ind. Ct. App. 2015)....................................................15

*Kooritzky v. Reich*,
   17 F.3d 1509 (D.C. Cir. 1994) ...........................................................33

*MCI Telecomms. Corp. v. FCC*,
   57 F.3d 1136 (D.C. Cir. 1995) ...........................................................34

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015)........................................................................24

*Moses v. Manufacturers Life Ins. Co.*,
   298 F. Supp. 321 (D.S.C. 1968)..........................................................15

*Motor Veh. Mfrs. Ass'n v. State Farm Ins. Co.*,
   463 U.S. 29 (1983)........................................................................23, 26

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
   116 F.3d 520 (D.C. Cir. 1997) ...........................................................33

*N.Y. State Bar Ass'n v. FTC*,
   276 F. Supp. 2d 110 (D.D.C. 2003) ....................................................27

*Neogenix Oncology, Inc. v. Gordon*,
   133 F. Supp. 3d 539 (E.D.N.Y. 2015) ................................................15

*PDK Labs Inc. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) ...........................................................30

*Pitts v. Jackson Nat'l Life Ins. Co.*,
   574 S.E.2d 502 (S.C. Ct. App. 2002).....................................................................15

*Plaquemines Parish Comm'n Council v. Delta Dev. Co.*,
   502 So.2d 1034 (La. 1987) ....................................................................................15

*Prometheus Radio Project v. FCC*,
   652 F.3d 431 (3d Cir. 2011).................................................................................33

*Pryor v. Bistline*,
   30 Cal. Rptr. 376 (Cal. Dist. Ct. App. 1963) .......................................................15

*Rishel v. Pacific Mut. Life Ins. Co. of Cal.*,
   78 F.2d 881 (10th Cir. 1935) ................................................................................15

*Roman Catholic Diocese of Jackson v. Morrison*,
   905 So.2d 1213 (Miss. 2005).................................................................................15

*SEC v. Variable Annuity Life Ins. Co. of Am.*,
   359 U.S. 65 (1959)..................................................................................................5

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005)................................................................................24

*Small Refiner Lead Phase-Down Task Force v. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) .............................................................................31

*Sprint Corp. v. FCC*,
   315 F.3d 369 (D.C. Cir. 2003)..............................................................................33

*Stockett v. Penn Mut. Life Ins. Co.*,
   82 R.I. 172 (1954).................................................................................................15

*Tummelson v. White*,
   47 N.E.3d 579 (Ill. App. Ct. 2015) .......................................................................15

*United States v. Reed*,
   601 F. Supp. 685 (S.D.N.Y. 1985), *rev'd on other grounds*, 773 F.2d 477 (2d
   Cir. 1985) ..............................................................................................................18

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*,
   828 F.2d 314 (5th Cir. 1987) ...............................................................................31

*Van Woy v. Willis*,
   14 So.2d 185 (Fla. 1943).......................................................................................15

*Westar Energy, Inc. v. FERC*,
   473 F.3d 1239 (D.C. Cir. 2007)............................................................................31

*Yoneji v. Yoneji*,
    354 P.3d 1160 (Haw. Ct. App. 2015) .................................................................15

**Statutes**

5 U.S.C. § 553 ..........................................................................................................31

5 U.S.C. § 706 ..........................................................................................................13

15 U.S.C. § 77c ..........................................................................................................5

26 U.S.C. § 408 ..........................................................................................................6

26 U.S.C. § 4975 ........................................................................................................6

29 U.S.C. § 1002 ........................................................................................................6

29 U.S.C. § 1104 ........................................................................................................6

29 U.S.C. § 1106 ........................................................................................................6

29 U.S.C. § 1108 ..................................................................................................6, 17

The Harkin Amendment to the Dodd-Frank Wall Street Reform and Consumer
    Protection Act, Pub. L. No. 111-203, § 989J, 124 Stat. 1376, 1949–50 (2010) .................7, 24

Reorganization Plan No. 4 of 1978, 92 Stat. 3790, 3790 (codified at 5 U.S.C.
    App.) ......................................................................................................................6

**Other Authorities**

40 Fed. Reg. 50840 (Oct. 31, 1975) ..........................................................................7

74 Fed. Reg. 3138 (Jan. 16, 2009) .............................................................................7

75 Fed. Reg. 65263 (Oct. 22, 2010) ..........................................................................9

80 Fed. Reg. 21928 (Apr. 20, 2015) ..........................................................................9

80 Fed. Reg. 21960 (Apr. 20, 2015) ........................................................................11

80 Fed. Reg. 22010 (Apr. 20, 2015) ..........................................................................7

81 Fed. Reg. 20946 (Apr. 8, 2016) ..........................................................................12

81 Fed. Reg. 21002 (Apr. 8, 2016) ..........................................................................12

81 Fed. Reg. 21147 (Apr. 8, 2016) ............................................................................2

APCO Insight, *Certified Financial Planner Board of Standards: Senior Financial Exploitation Study*, Aug. 2012, *available at* http://www.cfp.net/docs/news-events---supporting-documents/senior-americans-financial-exploitation-survey.pdf?sfvrsn=0...........................................................................................................21

D. Schwarcz & P. Siegelman, "Insurance Agents in the 21st Century: The Problem of Biased Advice," in *Research Handbook on the Economics of Insurance Law* (Edward Elgar Pub. 2015)...............................................................................................20

G. Bogert, *Confidential Relations and Unenforcible Express Trusts*, 13 Cornell L. Q. 237 (1928)...............................................................................................................15, 16

R. Evans & R. Fahlenbrach, "Institutional Investors and Mutual Fund Governance: Evidence from Retail—Institutional Fund Twins," *The Review of Financial Studies* 25, no. 12 (2012)........................................................................................19

## INTRODUCTION

The Indexed Annuity Leadership Council (IALC) is an association of insurance companies that offer fixed indexed annuities. The insurance companies that are plaintiffs are members of IALC and providers of these products. Through this action, plaintiffs challenge sweeping new rules issued by the Department of Labor that dramatically and unlawfully change the regulatory treatment of sales of these products.

First, the new rules improperly expand the definition of a "fiduciary" under the Employee Retirement Income Security Act of 1974 (ERISA) and the Internal Revenue Code (the Code) in order to sweep in those who sell fixed annuities. Properly construed, neither ERISA nor the Code authorizes the Department to treat advice incidental to one-time sales of such products as fiduciary investment advice. But even if it had such authority, the rule is arbitrary and capricious. The Department conceded that it can regulate such advice *only* if the parties to the sales are in relationships of trust and confidence. Yet it failed to identify substantial evidence that sales of these products actually take place in such relationships. Nor did it show that such sales cause harms sufficient to justify upending a four decades-old interpretation of ERISA and the Code.

Second, the Department arbitrarily and capriciously decided to regulate fixed indexed annuities differently than other fixed annuities—despite Congress's recent decision to reject a similar distinction that the Securities and Exchange Commission (SEC) tried to draw between these extremely similar products. The Department further failed to demonstrate the benefits—or justify the enormous costs—of its rules. Most state insurance laws require those who sell fixed indexed annuities to determine that the product is "suitable" for the purchaser. The Department did not explain what regulatory "defect" would be remedied by its draconian new rules or why applying the new requirements it imposed for other fixed annuities would not (separately or in

1

conjunction with state insurance laws) prevent the asserted harms it seeks to eliminate. And the Department essentially brushed aside the enormous costs of its new rules.

Finally, the Department failed to provide adequate notice of this new treatment for fixed indexed annuities. The Department initially proposed to treat all fixed annuities the same. But the final rule treats fixed indexed annuities like securities, based on reasoning that did not appear in the Department's notice. For this reason as well, the rule should be vacated.[1]

## FACTUAL AND REGULATORY BACKGROUND

### A.      The Benefits Of Fixed Indexed Annuities To Retirement Savers

Annuities are insurance contracts that protect against "longevity risk," *i.e.*, the risk of outliving retirement savings. In exchange for principal contributed by an individual, the insurance company makes payments at regular intervals or, at times, all at once. An "immediate" annuity entitles the contract owner to payments from the insurer beginning immediately, whereas a "deferred" annuity entitles the owner to payments later in life, often upon retirement. The insurer's payments can be made in a lump sum, in installments for a specified term, or in installments for the lifetime of the owner or a designee. Because Americans are living longer and increasingly bear primary responsibility for their retirement planning, annuities have become a critically important financial tool to help ensure that retirees have sufficient funds to last throughout their retirement years. *See* App. 2–3.

There are two basic types of deferred annuities—fixed and variable. *See* App. 2, 137; 81 Fed. Reg. 21147, 21178–80 (AR258–60). The critical distinction between the two is that fixed annuities shield the purchaser from loss of principal due to "investment risk." App. 2. With a fixed annuity, the insurer bears the market risk, and interest credited to the contract is

---

[1] The IALC plaintiffs also agree with and hereby incorporate by reference the arguments of the Chamber of Commerce plaintiffs and the ACLI plaintiffs.

guaranteed. *See id.* Premiums paid by the owner are not placed in a separate account or invested in a specific product or market, but are supported by the insurer's general account. *See id.*; App. 137. Fixed annuities thus provide an affordable and low-risk option for individuals seeking guaranteed income in retirement.

Fixed *indexed* annuities, which first emerged in the mid-1990s, are also supported by the insurer's general account and thus also shield the purchaser from the loss of principal due to investment risk. Fixed indexed annuities differ from traditional fixed annuities in only one respect—the method of calculating the amount of interest to be credited. With a traditional fixed annuity, earnings accrue at an interest rate that may be guaranteed for a term of years or periodically declared by the insurer. *See* App. 2. With a fixed indexed annuity, the interest rate is tied to an established market index, such as the S&P 500. Indexed formulas typically come with a cap, so the owner will not see the value of the annuity rise as much as the index rises. But (and unlike investing in the stock market), the contract sets a "floor." Only the *positive* change of a market index is used to calculate the interest rate credit, so the credit can never be less than zero and the owner will not lose any principal if the index declines. Fixed indexed annuities can thus provide greater protection than traditional fixed annuities against "inflation risk," *i.e.*, the risk that the owner's payments will not keep pace with rising prices, while also protecting principal against loss due to investment risk. *See id.*

Fixed annuity purchasers do not pay up-front fees, nor do purchasers pay a commission to the insurance agent. *See* App. 2, 137. However, because fixed annuities are intended primarily to provide guaranteed income in retirement, contract owners pay a surrender charge if they choose to cash-in the contract early. *See* App. 2. Though surrender charges and periods vary

between insurers and among fixed annuity products, insurers may charge no more than is permitted under state insurance standards. AR258.

### B.      State Regulation Of Fixed Indexed Annuities

State legislatures and commissioners, often operating under the auspices of the National Association of Insurance Commissioners (NAIC), have developed "a robust set of consumer protection[s]" to ensure that those selling annuities act in a manner that protects the interests of retirement savers. App. 133; *see also* App. 4. One important component of this framework is the NAIC's model "suitability" regulations. Versions of these regulations have been adopted by most states, and insurance companies selling fixed indexed annuities generally apply suitability standards at least as stringent as the model regulations even if domiciled in states that have not adopted them, in order to benefit from recent federal legislation exempting fixed indexed annuities from federal securities regulation. App. 113. Thus, virtually all fixed indexed annuity sales are as a legal or practical matter subject to requirements that are at least as stringent as the NAIC model regulations. App. 4, 113.

Only state-licensed insurance agents may sell fixed indexed annuities, and they must complete an annuity-specific training course, as well as training about each specific product they wish to sell. App. 111; NAIC Suitability In Annuity Transactions Model Regulation §§ 6(F)(1)(b)-(c), 7(A) (App. 220, 222). Each type of fixed indexed annuity must be filed with, and approved by, each state in which it is sold. App. 109. And an agent may not recommend even state-approved fixed indexed annuities unless the agent has "reasonable grounds for believing that the recommendation is suitable for the consumer." App. 218 § 6(A).

To make a suitability determination, the agent must evaluate a host of factors, including the consumer's age, income, intended use of the fixed indexed annuity, assets and liquid net worth, financial needs and experience, financial time horizon, liquidity needs, risk tolerance, and

tax status. App. 218–219 §§ 5(I), 6(A). An agent must also have a reasonable basis to believe that the "consumer would benefit from certain features of the annuity, such as tax-deferred growth, annuitization or death or living benefit." App. 219 § 6(A)(2). An agent also must ensure the consumer has received a reasonable explanation of the fixed indexed annuity, including the surrender period, early surrender charges, any other fees or charges, and limitations on interest credited. *Id.* § 6(A)(1). And before the annuity contract can be issued, the insurance company must review and approve the transaction as suitable. *Id.* § 6(C).

The consumer must also be given a written disclosure statement at the time of sale. App. 113. Under the NAIC's Annuity Disclosure Model Regulation, this statement must explain, *inter alia*, the guaranteed and non-guaranteed elements of the contract, including the elements used to determine the index-based interest, such as the participation rates, caps or spread, and an explanation of how they operate, as well as any death benefit. App. 113–114.

State laws also include a wide range of enforcement mechanisms. State insurance commissioners have broad powers to examine and investigate the affairs of every insurer in the state to ensure they do not engage in unfair trade practices. *See* App. 133. As the NAIC explained, "[s]uch authority allows state regulators to identify market issues and take the appropriate regulatory action swiftly and effectively," and "states have a strong record of protecting consumers, especially seniors, from inappropriate sales practices or unsuitable products." *Id*.

## C.    The Historical Absence Of Federal Regulation Of Fixed Annuities

Consistent with the longstanding role of states as primary regulators of insurance, federal law has long eschewed regulation of fixed annuities. In 1933, Congress exempted annuity contracts from federal securities regulation. 15 U.S.C. § 77c(a)(8). In 1959, the Supreme Court held that *variable* annuities fell outside this exemption, because they place all of the investment

risk on the owner. *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65 (1959). As a result, variable annuities are registered securities, and are regulated by the SEC and the Financial Industry Regulatory Authority (FINRA), as well as by the states. *See* App. 4, 137. Fixed annuities, however, remained subject to the exemption.

In 1974, Congress enacted ERISA and parallel provisions of the Code. Among other things, ERISA requires fiduciaries of an ERISA plan to act prudently and "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a), and prohibits certain transactions absent an exemption, *id.* § 1106. Under the Code, fiduciaries of individual retirement accounts (IRAs)[2] and plans not covered by ERISA are also subject to prohibited transaction rules. 26 U.S.C. § 4975. The Department may grant exemptions from the prohibited transaction rules if it makes certain findings. 29 U.S.C. § 1108.[3]

Under both ERISA and the Code, a person is a fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3).

Shortly after the statute was enacted, the Department confirmed that sellers of fixed annuities are ordinarily not fiduciaries. Persons lacking discretionary authority or control with

---

[2] The term "individual retirement account" encompasses other types of trusts that satisfy certain statutory requirements. *See* 26 U.S.C. § 4975; *id.* § 408.

[3] Reorganization Plan No. 4 of 1978, 92 Stat. 3790, 3790 (codified at 5 U.S.C. App.), transferred the Secretary of the Treasury's authority to issue regulations, rulings, opinions, and exemptions under section 4975 of the Code to the Secretary of Labor.

respect to the investment of plan assets did not "rende[r] investment advice for a fee"—and thus were not fiduciaries—unless, *inter alia*, they provided advice to a plan or plan fiduciary "on a regular basis." 40 Fed. Reg. 50840, 50840 (Oct. 31, 1975). Advice incidental to the sale of a financial product thus has not generally qualified as fiduciary investment advice, and persons making such sales have generally not been subject to the prohibited transaction rules.

Even a person who meets the definition of a fiduciary may engage in prohibited transactions with respect to a plan or IRA if any of multiple exemptions applies. One such exemption, originally promulgated in 1977, covers "certain prohibited transactions that occur when plans or IRAs purchase insurance and annuity contracts." 80 Fed. Reg. 22010, 22011 (Apr. 20, 2015) (AR786). Known today as Prohibited Transaction Exemption 84-24, this exemption has long permitted "insurance agents, insurance brokers and pension consultants that are parties in interest or fiduciaries with respect to plans and IRAs to effect the purchase of the insurance or annuity contracts for the plans or IRAs and receive a commission on the sale." AR787.

In 2009, the SEC proposed a rule that would have treated many fixed indexed annuities as securities subject to registration and federal supervision. 74 Fed. Reg. 3138 (Jan. 16, 2009). The proposed rule was invalidated, however, in *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), because the SEC "fail[ed] to determine whether, under the existing [state-law] regime, sufficient protections existed to enable investors to make informed investment decisions and sellers to make suitable recommendations to investors." *Id.* at 179. Shortly thereafter, Congress concluded that federal regulation of fixed indexed annuity sales was unwarranted in light of existing state-law protections. The Harkin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 989J, 124 Stat. 1376, 1949–50 (2010), provides that fixed annuities sold in states that have adopted the latest

NAIC model suitability regulation, or by companies following the latest NAIC model regulation, shall be treated as exempt securities not subject to federal regulation.

     **D.**     **The Compensation And Distribution Schemes Developed Under The Existing Regulatory Systems**

The longstanding regulatory regime described above shaped compensation arrangements and distribution mechanisms for sales of fixed indexed annuities. *See* App. 3. While these products are sold through a variety of channels, including by banks, broker-dealers, and "career" or "captive" agents, who sell products predominantly for one insurance company, App. 3, 15, 112, the vast majority of sales (some 70%) are made by independent insurance agents, who may be licensed to sell products of multiple companies. App. 138. These agents are generally compensated through commissions. This commission-based compensation system has benefited both insurance agents and consumers.

As noted, to comply with "suitability" requirements, insurance agents must understand buyers' financial circumstances and risk tolerances, as well as the various products and optional benefits that can be tailored to their specific situations. Commissions—which are paid by the insurance company and not deducted from the annuity buyer's principal—compensate agents for the substantial investment of time and effort needed to learn and analyze the products and to provide the information necessary for their customers to make informed decisions.

The primary alternative compensation arrangement is a fee model. In such an arrangement, a consumer pays an advisor to manage his or her money, placing funds in various investments and shifting assets over time in accordance with an investment strategy worked out by the consumer and advisor. For this ongoing service, consumers are charged, and are willing to pay, ongoing, usually annual, fees. *See* App. 111. The sale of a fixed indexed annuity, however,

represents a one-time "buy and hold" transaction. *Id*. The predicate for a fee-for-advice arrangement—ongoing investment advice—does not exist.

Adopting a fee-for-advice compensation model for such transactions, moreover, would be more expensive for many annuity buyers, and would likely deprive many lower-income individuals of valuable financial assistance. Many advisory firms have minimum "assets under management" requirements that exclude the less wealthy. App. 120. Those firms charge an annual fee that is often at least 2%. Over time, the management of $100,000 in assets would generate much larger fees under a fee-based system than the one-time commission the insurance company would pay to an agent on a $100,000 fixed annuity. App. 120–121.

###### E.    The Department's Rulemaking

In 2010, the Department proposed a regulation that would have broadened the test for determining when a person "renders investment advice for a fee" and is thus a fiduciary. 75 Fed. Reg. 65263 (Oct. 22, 2010). Even under this proposed test, the Department recognized that advice that is incidental to the sale of a financial product "ordinarily should not result in fiduciary status … if the purchaser knows of the person's status as a seller whose interests are adverse to those of the purchaser, and that the person is not undertaking to provide impartial investment advice." *Id.* at 65267. After receiving numerous comments and holding a hearing on the proposal, the Department withdrew it. In April 2015, the Department revisited the subject, issuing a series of notices of proposed rulemaking pertaining to fiduciary status and the scope of the prohibited transaction rules under ERISA and the Code.

###### 1.    Proposed fiduciary rule

The Department proposed to dramatically expand the definition of fiduciary investment advice. 80 Fed. Reg. 21928, 21929 (Apr. 20, 2015) (AR700). "Investment advice" would include advice pursuant to an agreement or understanding that the advice is individualized or specifically

directed to the recipient for consideration in making investment or management decisions with respect to securities or other property of an ERISA plan or IRA, even if not provided on a regular basis as part of an ongoing advisory relationship. AR705, 711. A one-time sales pitch could thus render a person a fiduciary and trigger the prohibited transaction provisions.

As the Department recognized, its expanded definition would sweep in communications that "Congress did not intend to cover as fiduciary 'investment advice' and that parties would not ordinarily view as communications characterized by a relationship of trust or impartiality." AR712. The Department accordingly proposed to adopt a number of "carve-outs" for specified categories of communications to which fiduciary status would not attach "notwithstanding the [proposal's] general definition." *Id.*

One of these proposed "carve-outs" exempted "incidental advice provided in connection with an arm's length sale" of a financial product. *Id.* Unlike in the 2010 proposal, the Department did not extend this "seller's carve-out" generally to sales transactions in which the buyer should reasonably understand that the seller has adverse interests and is not rendering impartial investment advice. Rather, the Department proposed to limit the carve-out to transactions involving an independent fiduciary of large employee benefit plans. *Id.*

## 2.      Proposed amendment to and partial revocation of 84-24 exemption

Having expanded the definition of "fiduciary" to capture transactions never before subject to regulation under ERISA or the Code, the Department also proposed to revoke relief under the 84-24 exemption for insurance agents who "receive a commission in connection with the purchase by IRAs of variable annuity contracts and other annuity contracts that are securities under federal securities laws." AR787. The 84-24 exemption would remain available for sales to IRAs of annuities that are not treated as securities—including fixed indexed annuities—and for sales of all annuities (fixed and variable) to ERISA plans. AR790.

In addition, the Department proposed to amend the 84-24 exemption in order to "increase the safeguards of the exemption." AR787. Most significantly, to rely on the 84-24 exemption, fiduciaries would now have to "adhere to certain 'Impartial Conduct Standards,' including acting in the best interest of the plans and IRAs when providing advice." *Id.*

### 3.   Proposed "Best Interest Contract" exemption

Transactions falling outside the scope of the 84-24 exemption could continue only if they complied with the onerous conditions of the new "Best Interest Contract" (BIC) exemption. 80 Fed. Reg. 21960 (Apr. 20, 2015) (AR732–61). To qualify for this exemption, the adviser and the financial institution had to enter into a contract in which they "acknowledge fiduciary status, commit to adhere to basic standards of impartial conduct, warrant that they have adopted policies and procedures reasonably designed to mitigate any harmful impact of conflicts of interest, and disclose basic information on their conflicts of interest and on the cost of their advice." AR733. Under this contract, the adviser and financial institution had to abide by new standards, including a requirement to act only in the customer's "best interest," "without regard to the financial or other interests" of the adviser or financial institution, AR742, to disclose any "material conflicts of interest," AR744, and to receive no more than "reasonable compensation," AR742. Critically, unlike the 84-24 exemption, the BIC exemption required the insurance company to assume supervisory responsibility over and contractually warrant compliance of agents, including independent agents who work for multiple insurance companies. AR741–44, 759–60. Moreover, the Department conditioned the availability of the BIC exemption on the advisers' and institutions' agreement to submit to enforcement through private class actions. AR744–45.

### 4.   The final rules

The final rule adopted the broadened fiduciary definition set forth in the proposed rule, with minor adjustments. Critically, under the final rule, no ongoing advisory relationship is

required for a person to be a fiduciary; one-time provision of the enumerated types of advice suffices. 81 Fed. Reg. 20946, 20948 (Apr. 8, 2016) (AR3). The Department also declined to extend the "seller's carve-out" to sales to IRAs and small plans. AR35–39. Thus, under the new rule, commission-based sellers of fixed annuities qualify as "fiduciaries."

The final BIC exemption also retained "the core" provisions of the proposal. 81 Fed. Reg. 21002, 21007 (Apr. 8, 2016) (AR63), including acknowledgment of fiduciary status, adherence to "Impartial Conduct Standards," advice in the customer's "best interest," "reasonable" compensation limits, disclosure of all "material" conflicts of interest, and the supervisory obligations of insurance companies. *Id.* For IRAs and non-ERISA plans, the financial institution must commit to the Impartial Conduct Standards in an enforceable contract. AR64. For ERISA plans, the financial institution must acknowledge its fiduciary status and that of its advisers. *Id.* For both IRAs and ERISA plans, financial institutions cannot disclaim liability for compensatory remedies or waive or qualify the customer's rights to bring or participate in a class action suit. AR76–77.

The final 84-24 exemption retained the enhanced requirements of the proposal, including the requirement to adhere to "Impartial Conduct Standards." But, in sharp contrast to the proposed rule, the Department abruptly changed course with regard to the partial revocation of the 84-24 exemption. Abandoning the securities-based distinction in the proposal, the final rule revoked the 84-24 exemption for sales of one type of annuity not regulated as a security—fixed indexed annuities—and revoked the exemption for sales both to IRAs and to ERISA plans. AR228. As a result, the only annuities that continue to qualify for the 84-24 exemption are "Fixed Rate Annuity Contracts"—a new defined term introduced for the first time in the final

rule. *Id.* Sales of all other annuities, including fixed indexed annuities and variable annuities, are limited to relief under the BIC exemption. *Id.*

## ARGUMENT

## I.   THE DEPARTMENT'S NEW DEFINITION OF A "FIDUCIARY" IS INVALID.

Because "traditional tools of statutory construction," *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 & n.9 (1984), make clear that providing advice incidental to the sale of a retirement product is not fiduciary conduct, the Department's contrary interpretation is "not in accordance with law." 5 U.S.C. § 706. And even if the statutory definition of a "fiduciary" does not exclude those who provide incidental advice—and it does—the Department's decision to regulate such advice in connection with fixed annuities was arbitrary and capricious.

### A.   The New Definition Of A "Fiduciary" Is Inconsistent With The Plain Meaning Of ERISA And The Code.

Despite the fact that it was abandoning a more than 40-year old statutory interpretation, the Department was vague about the basis and limits of its new interpretation. At one point, it appeared to reject the premise that the statutory definition of a fiduciary requires any relationship of trust and confidence, stating that any person who provides "investment advice to a plan or IRA for a fee" falls within the "broad sweep of the statutory text." AR45. This claim fails the first step of *Chevron*'s two-step analysis. *See* Chamber Br. § I.A.

Elsewhere, however, the Department admitted that its new "broad test could sweep in some relationships that are not appropriately regarded as fiduciary in nature," but it claimed that "carve-outs" save the new rule because they "avoi[d] burdening activities that do not implicate relationships of trust." AR3–4. In these and other statements, the Department effectively (and

properly) conceded that only advisers in relationships of trust and confidence can be fiduciaries.[4]

Nevertheless, the Department essentially concluded that, in the absence of exceptional circumstances, advice incidental to a single sale of a retirement product is always rendered in a relationship of trust. This alternative theory is also invalid. *See* Chamber Br. § I.B. Properly construed, ERISA and the Code preclude the Department from treating those who provide advice incidental to the sale of an investment product as fiduciaries.

As plaintiffs explain below, the Department's decision to treat sellers of fixed annuities as fiduciaries is also arbitrary and capricious and must be set aside for this reason as well.

> **B.     The Department Acted Arbitrarily And Capriciously In Treating Those Who Provide Advice Incidental To Sales Of Fixed Annuities As Fiduciaries.**
>
> > **1.     The Department failed to identify empirical evidence that parties to sales of fixed annuities are actually in relationships of trust.**

Even if the statutory definition of a fiduciary is ambiguous—and it is not—the Department conceded that it can regulate only activities that "implicate relationships of trust." AR3–4. Thus, assuming, *arguendo*, that it has any authority to regulate advice incidental to a one-time sale, that authority depends on a factual showing that those providing such advice are *actually* in relationships of trust and confidence. The Department failed, however, to identify evidence justifying such a conclusion for sales of any annuities, including fixed indexed annuities. Indeed, it did not even discuss, much less analyze, the factors relevant to such a determination.

---

[4] *See* AR10 (prior rule did not ensure that "*trusted advisers* g[a]ve prudent and unbiased advice") (emphasis added); AR35 (purpose of carve-out was "to avoid imposing ERISA fiduciary obligations on sales pitches that are part of arms' length transactions where neither side assumes that the counterparty to the plan is acting as an impartial or *trusted adviser*") (emphasis added); AR38 (excluding "arms-length transactions between investment professionals or large asset managers who do not have a legitimate expectation that they are in a *relationship of trust and loyalty*") (emphasis added).

In an influential article published nearly 90 years ago, Professor Bogert (later the author of a leading treatise on trust law) explained that a confidential or fiduciary relationship arises when (a) one party reposes in another *special* trust and confidence—*i.e.*, "extraordinary" confidence that causes the trusting party to "drop his guard, abandon formalities, and deal with another in intimacy"—and (b) this special confidence creates a "superiority of influence on the side of the confidante." G. Bogert, *Confidential Relations and Unenforcible Express Trusts*, 13 Cornell L. Q. 237, 245, 247 (1928) (App. 152, 160, 162).[5] For decades, therefore, courts have recognized that, absent special circumstances, a sale by an insurance agent does not create a fiduciary relationship.[6]

---

[5] Numerous cases reflect these requirements. *See, e.g., Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 554 (E.D.N.Y. 2015) ("[A] fiduciary relationship 'exists only when a person reposes a high level of confidence and reliance on another, who thereby exercises control and dominance over him'"); *Tummelson v. White*, 47 N.E.3d 579, 584 (Ill. App. Ct. 2015) ("[T]rust and confidence are not enough to create a fiduciary relationship; *superiority and influence* must *result* from the trust and confidence") (emphases added); *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996) (fiduciary relationship is one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is resulting position of superiority or influence"); *Gonzalez v. Union Pac. R.R.*, 803 N.W.2d 424, 446 (Neb. 2011) (in a fiduciary relationship, confidence must be "rightfully reposed on one side and a resulting superiority and opportunity for influence are thereby created on the other"); *Pryor v. Bistline*, 30 Cal. Rptr. 376, 381 (Cal. Dist. Ct. App. 1963) (same); *Van Woy v. Willis*, 14 So.2d 185, 191 (Fla. 1943) (same); *Yoneji v. Yoneji*, 354 P.3d 1160, 1167–68 (Haw. Ct. App. 2015) (same); *Kapoor v. Dybwad*, 49 N.E.3d 108, 129 (Ind. Ct. App. 2015) (same); *Plaquemines Parish Comm'n Council v. Delta Dev. Co.*, 502 So.2d 1034, 1040 (La. 1987) (same); *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 389 (Md. Ct. Spec. App. 2009) (same); *Roman Catholic Diocese of Jackson v. Morrison*, 905 So.2d 1213, 1239 (Miss. 2005) (same); *Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*, 392 N.E.2d 759, 763–64 (Ill. App. Ct. 1979) ("A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another"); *Gibson v. Gibson*, 534 S.W.2d 100, 104 (Mo. Ct. App. 1976) ("a confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special confidence is reposed on one side and there is resulting domination and influence on the other").

[6] *Rishel v. Pacific Mut. Life Ins. Co. of Cal.*, 78 F.2d 881, 886 (10th Cir. 1935) ("[t]he law does not cast upon insurance companies the affirmative burden cast upon trustees who deal with the property of their cestuis"); *Stockett v. Penn Mut. Life Ins. Co.*, 82 R.I. 172, 177 (1954) ("Ordinarily an insurance company stands in no fiduciary relationship to a legally competent applicant for an annuity"); *Kap-Pel Fabrics, Inc. v. R.B. Jones & Sons, Inc.*, 402 S.W.2d 49, 58 (Mo. Ct. App. 1966) (when an insured buys a policy from an insurance company, "two contracting parties are dealing with each other at arm' length" and a fiduciary relationship is not established); *Moses v. Manufacturers Life Ins. Co.*, 298 F. Supp. 321, 323 (D.S.C. 1968) ("claim of fiduciary relationship … cannot rest upon the mere relationship of insurer and insured"); *Chavez v. Chenoweth*, 89 N.M. 423, 430 (N.M. Ct. App. 1976) ("Something more than the fact of the insurance relationship is required before a fiduciary relationship results"); *Am. Driver Serv., Inc. v. Truck Ins. Exchange*, 631 N.W.2d 140, 148 (Neb. Ct. App. 2001) ("the contractual nature of an insurance policy does not give rise to a presumption of a fiduciary relationship . . . . Neither are we persuaded by the argument that a fiduciary relationship existed because [the insurer] had superior knowledge or bargaining power and that [the insured] was dependent on [the insurer] due to lack of knowledge"); *Pitts v. Jackson Nat'l Life Ins. Co.*,

The Department sought to justify its new definition of a fiduciary based on its views that (1) retirement products are complex, (2) retirement savers are confused by the products and unable to distinguish good advice from bad, (3) older savers are particularly vulnerable, (4) retirement decisions are important, and (5) sellers of retirement products have superior expertise and knowledge. *See* AR11, 35–36, 319–20, 324, 422, 424–26, 433, 435, 439, 451–56. But even if these conclusions are valid, they are not *evidence* that the relationship between sellers and purchasers of annuities, including fixed indexed annuities, involves special trust and confidence.

Instead, they reflect the Department's view that sellers of retirement products should be fiduciaries because they have greater knowledge and expertise than consumers. But special knowledge, or "dominance," "is not a relevant factor in determining the *existence* of a confidential relation." Bogert, *Confidential Relations* at 247 (App. 162); *see also id.* at 246 (App. 161) ("that A is ignorant and inexperienced, and B educated and skilled in affairs, does not tend to prove that A and B are in a confidential relationship"); *Hi-Ho Tower, Inc. v. Com-Tronics*, 761 A.2d 1268, 1280 (Conn. 2000) ("[s]uperior skill and knowledge alone do not create a fiduciary duty among parties involved in a business transaction"). Instead, "[s]uch superiority is *an effect or consequence of* the confidential relation." Bogert, *Confidential Relations* at 246 (App. 161) (emphasis added).

In reality, the factors the Department identified are reasons why an agency with *plenary* regulatory authority might decide to impose heightened standards of care on *non-fiduciaries*. But the Department lacks the authority to declare that sellers of annuities are fiduciaries simply because, in its view, "[t]he absence of adequate fiduciary … safeguards" is "problematic in light of the growth of participant-directed plans and self-directed IRAs [and] the gap in expertise and

---

574 S.E.2d 502, 508 (S.C. Ct. App. 2002) ("[T]he cases clearly establish the sale of insurance is an arm's length commercial transaction, which does not give rise to a fiduciary relationship").

information between advisers and … customers." AR11. The Department's policy view that annuity purchasers would be better off *if* sellers were subject to fiduciary duties is not "evidence" that such transactions involve relationships of special trust and confidence.

Compounding this error, the Department claimed that "application of suitability standards to recommendations to retail investors involving annuity product transactions …. undermines" the argument for carving such sales out of the new definition, AR37, and it cited compliance with those standards to show that purchasers reasonably rely on advice incidental to the sale of those products, AR26. Essentially, the Department cites suitability standards as evidence that agents are acting as trusted fiduciaries. But this reasoning is backwards. Suitability standards necessarily regulate *non-fiduciary* relationships; if the relationships were already fiduciary in nature, it would be nonsensical to impose less stringent suitability standards. And sales agents cannot become fiduciaries by complying with *non-fiduciary* regulatory standards.

The Department also mistakenly relied on § 1108(b)(14) of ERISA, *see* AR36–37 & n.33, a provision that creates a prohibited transaction exemption when "investment advice described in section 1002(A)(21)(ii)"—*i.e.*, advice by a fiduciary—is provided to plan participants, beneficiaries, and IRA owners about investments available under self-directed plans or IRAs. 29 U.S.C. § 1108(b)(14). Under this provision, fiduciaries can receive compensation from the investment options they recommend if certain conditions are met. *Id.* But the fact that Congress has placed conditions on how *fiduciaries* can be compensated when they recommend certain investments does not demonstrate that everyone who makes investment recommendations *is* a fiduciary. Congress imposed restrictions on advisers who actually occupy a position of trust and confidence. The question here is whether those who provide advice incidental to sales of fixed annuities occupy positions of trust. Section 1108(b)(14) sheds no light on that question.

Finally, the Department argued that, "because brokers routinely market their services as advisory, investors' reasonably expect advice loyal to their interests, and their expectations justify application of a fiduciary standard of conduct to their advisory activities." AR428 (citing A. Laby, *Selling Advice and Creating Expectations: Why Brokers Should Be Fiduciaries*, 87 Wash. L. Rev. 707 (2012)). But under settled law, national advertising cannot create fiduciary relationships. *See supra* 15–16 & n.5. In all events, brokers sold only 15% of all fixed rate annuities and only 15% of all fixed indexed annuities in 2014. *See* AR447. Thus, even if the fiduciary-through-advertising theory had any legal basis, the Department still failed to offer evidence that the overwhelming majority of sellers of fixed annuities engaged in advertising that (by hypothesis) could create relationships of trust with purchasers of such products.[7]

### 2. The Department failed to justify changing the regulatory treatment of those who provide advice incidental to sales of fixed annuities.

The Department's treatment of sellers of fixed annuities should be set aside for yet another reason. As the Supreme Court recently explained, where the Department's prior policy has engendered "decades of industry reliance," the agency has a "duty to explain why it deemed it necessary to overrule its previous position." *Encino Motorcars, LLC v. Navarro*, 579 U.S. __, slip op. at 10 (June 20, 2016); *see also id.* at 9 (agency must "'show that there are good reasons for the new policy'"). Here, the Department knew that its new definition would capture sellers of fixed annuities, who for decades fell outside the definition of a fiduciary (or were covered by an exemption in the limited circumstances where they were fiduciaries), and who have structured their compensation arrangements and distribution channels accordingly. But the Department did

---

[7] The Department also cited a survey showing that 60% of respondents thought insurance agents must meet fiduciary standards. AR498 (citing Joint Letter from AARP et al. to Hon. Mary L Shapiro, Chairman, SEC (Sept. 15, 2010), Att. B at 2). Unilateral expectations, however, do not justify imposition of fiduciary duties. *See United States v. Reed*, 601 F. Supp. 685, 715 (S.D.N.Y. 1985) (confidential relationships exist "only in situations in which it is shown that the confidence reposed by one party was actually accepted by the other"), *rev'd on other grounds*, 773 F.3d 477 (2d Cir. 1985).

not identify substantial evidence that sales of such annuities cause harm and thus failed to show why it was "necessary to overrule its previous position." *Encino Motorcars,* slip op. at 10.

Noting that advisers "often profit more when investors select some mutual funds or insurance products rather than others," the Department claimed that a "wide body of economic evidence supports [its] finding that the impact of these conflicts of interest on retirement investors is large and negative." AR5; *see also* AR320, 426–27, 444–46, 465–71, 474–82. But this claim—the centerpiece of the Department's purported showing of harms—is based on analyses of mutual funds, *not* fixed annuity products. AR474–82. Even setting aside the defects in its analysis of mutual funds, *see* Chamber Br. § V.1, the Department's effort to extrapolate from mutual funds to fixed annuities is fatally flawed.

The Department claimed that conflicted advice "inflict[s] … losses … by prompting IRA investors to trade more frequently, which will increase transaction costs and multiply opportunities for chasing returns and committing timing errors." AR474; *see also* AR469 (same). But commission-based sales cannot cause such losses for fixed annuities because they are "buy and hold" products. Similarly, the Department asserted that conflicts cause underperformance for actively managed mutual funds. AR467, 491. But fixed annuities are not actively managed, because returns are fixed (as a specified rate or an indexed rate).

These significant differences completely belie the Department's claim that "insurance products also are likely to be subject to underperformance due to conflicts." AR474. Indeed, the article it cited for this proposition does not discuss fixed annuities. *See* R. Evans & R. Fahlenbrach, "Institutional Investors and Mutual Fund Governance: Evidence from Retail-Institutional Fund Twins," *The Review of Financial Studies* 25, no. 12 (2012). By contrast, a recent article that the Department cited with approval acknowledges that studies of potential bias

*by insurance sellers* have produced "few robust conclusions" and that the "relevant evidence is scant." D. Schwarcz & P. Siegelman, "Insurance Agents in the 21st Century: The Problem of Biased Advice," in *Research Handbook on the Economics of Insurance Law* (Edward Elgar Pub. 2015) at 44, 47 (App. 175, 178). Thus, the Department's reliance on the alleged harms of conflicted advice in the mutual fund market does not demonstrate harms from commission-based sales of fixed annuities; its contrary claims are mere "ipse dixit." *Business Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011).

Stripped of its linchpin theory of harm, the Department is left with a grab-bag of outdated, irrelevant, and/or unsubstantiated assertions concerning fixed annuities. The Department cited studies of contingent commissions in the property-casualty insurance market and studies of the annuity and life insurance markets in Chile, Germany, and India. AR438, 463–65. But studies in other countries "are not necessarily applicable to the U.S. market, where competitive and regulatory structures may be quite different." Insurance Agents in the 21st Century at 47 (App. 178). Nor are studies of different types of insurance relevant, as "much depend[s] on . . . the particulars of the insurance markets examined." *Id.* at 44 (App. 175).

The Department also cited "surveys conducted among life insurance professionals in 1990, 1995 and 2003," AR463–64; a comment by the North American Securities Administrators Association, submitted as part of a 2008 SEC rulemaking, which claimed that "[e]quity-indexed annuities … have often been used as instruments of fraud and abuse," AR234; and a study by the Financial Planning Coalition, in which approximately 42% of respondents reported "financial exploitation that involved equity-indexed or variable annuities." AR448. The first two studies, however, clearly predate the significant steps the states have taken in the wake of the NAIC's 2010 Model Suitability Regulation. And this same problem infects the Financial Planning

Coalition's 2012 study: planners were asked if they knew an older person who had been subjected to an unfair practice—without any time limit—and 74% identified "unsuitable products" from a list of practices.[8] Because "suitability rules can help to meaningfully mitigate the risk of incompetent and self-interested advice," Insurance Agents in the 21st Century at 60 (App. 191), reliance on studies that do not account for the impact of those rules cannot justify a decision to upend a 40-year-old interpretation of ERISA.

Finally, the Department cited a FINRA investor alert and an SEC investor bulletin, AR234, and "media reports" and "class action lawsuits," AR448. But the FINRA alert and SEC bulletin cite no evidence of harmful sales practices; they just discuss features of fixed indexed annuities. And media reports and allegations (not judgments) are unsubstantiated.

That the Department felt compelled to rely on studies so out-of-date and far afield, and on assertions so irrelevant or unsubstantiated, underscores the lack of evidence of real-world harms associated with commission-based sales of fixed annuity products. None of these materials provides the "good reasons" necessary to justify jettisoning the four decades-old recognition that sellers of these products do not act as fiduciaries. The Department's expansion of the definition of a fiduciary to encompass such sellers is thus arbitrary and capricious.

## II.   THE DEPARTMENT ACTED ARBITRARILY AND CAPRICIOUSLY IN REVOKING THE 84-24 EXEMPTION FOR FIXED INDEXED ANNUITIES.

The Department's decision to revoke the 84-24 exemption for fixed indexed annuities was also arbitrary, capricious, and not the product of the reasoned decision-making process the APA requires. The rule is therefore unlawful and must be vacated.

---

[8] *See* APCO Insight, *Certified Financial Planner Board of Standards: Senior Financial Exploitation Study*, Aug. 2012, *available at* http://www.cfp.net/docs/news-events---supporting-documents/senior-americans-financial-exploitation-survey.pdf?sfvrsn=0.

**A.      The Department Failed To Justify Imposing The Requirements Of The BIC Exemption On Sales Of Fixed Indexed Annuities, Particularly In Light Of The Extensive Protections Provided By State Law And The 84-24 Exemption.**

The Department's decision to revoke the 84-24 exemption for fixed indexed annuities rests centrally on its claim that "the greater protections" of the BIC exemption are necessary to prevent harms to retirement savers from the "sales practices associated with these products." AR233. But as plaintiffs have just shown, the Department failed to offer substantial evidence that commission-based sales of fixed indexed annuities have caused harms that would justify imposing fiduciary regulation, let alone regulation under the BIC exemption. And it failed to explain why the extensive consumer protections afforded by state law, together with the enhanced protections of the 84-24 exemption, are insufficient consumer safeguards.

The Department's inability to produce substantial evidence of abusive sales practices in the fixed indexed annuity market is not surprising, given the extensive protections against such practices that state law already provides. As discussed above, and as numerous commenters showed, the sale of annuities, including fixed indexed annuities, is subject to state insurance regulations designed to ensure that insurance agents are adequately trained and supervised, that they recommend only those annuities that are suitable in light of the customer's particular needs and circumstances, and that all material information regarding the annuity's terms and risks is reasonably disclosed and explained. *See supra* at 4–5; App. 2–4, 109–118, 146–148, 37–39, 55–57; NAIC Suitability Model Regulation (App. 216–224); NAIC Annuity Disclosure Model Regulation (App. 202–215). And state law affords consumers and regulators alike ample remedies against any agents or insurers who transgress these requirements. App. 146, 116–117.

Despite the commentary and evidence in the record on the significant protections provided by state law, the Department never explained why these existing state regulations are inadequate. It said it had "reviewed NAIC model laws and regulations and state reactions to

22

those models in order to ensure that the requirements of th[e BIC] exemption work cohesively with the requirements currently in place." AR74. But asserting that federal and state regulation can "work cohesively" does not explain why federal regulation is necessary in the first place. The Department also lamented "the absence of national annuity suitability standards." AR358; *see* AR427, 601. But without some explanation of why uniformity is necessary, this rationale— which could justify federal regulation of virtually anything—likewise fails to explain why state regulation is inadequate or why additional federal regulation is needed.

In failing to meaningfully address the adequacy of state regulation, the Department shirked its obligations to "consider [each] important aspect of the problem," *Motor Veh. Mfrs. Ass'n v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983), and to respond to "relevant and significant" comments, *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015). It also committed precisely the error the D.C. Circuit identified when it invalidated the SEC's similar attempt to regulate fixed indexed annuities. In *American Equity*, the agency's analysis was found "incomplete because it fail[ed] to determine whether, under the existing regime, sufficient protections existed to enable investors to make informed investment decisions and sellers to make suitable recommendations to investors." 613 F.3d at 179. Likewise here, "the [Department's] failure to analyze the [adequacy] of the existing state law regime renders arbitrary and capricious [its] judgment" that existing regulations are inadequate to protect retirement savers from harmful sales practices. *Id.*

The Department's disregard of state regulation is particularly troubling in light of Congress's recent determination, in a closely related context, that additional federal regulation of fixed indexed annuities is unwarranted in light of state regulation. In the Harkin Amendment to the Dodd-Frank Act, passed in the wake of *American Equity*, Congress directed the SEC to treat

fixed indexed annuities as "exempt securities" as long as they satisfy state nonforfeiture laws and meet a single, uniform standard for suitability: the NAIC model regulation. 124 Stat. at 1949. The Department offered no reason to believe that Congress's view is inapposite here, but simply reached the opposite policy conclusion. The substantial tension between the Department's approach and Congress's most recent and relevant action on the subject demands, at least, a more thorough explanation. *See Shays v. FEC*, 414 F.3d 76, 100–02 (D.C. Cir. 2005).

Finally, the Department compounded its error by failing to explain why the new protections the Department added to the 84-24 exemption, together with state regulation, are insufficient to prevent any abusive sales practices associated with fixed indexed annuities. The revised 84-24 exemption requires insurance agents to adhere to "Impartial Conduct Standards" that require them to "provid[e] prudent advice without regard to [their own] interests." AR240. It also requires disclosure of any material conflicts of interest, including commissions the agent will receive, AR248, and prohibits the agent and the insurance company from accepting excessive compensation, AR246. The Department never explained why these protections are inadequate and, thus, acted arbitrarily and capriciously in this respect as well.

### B.    The Department Failed To Conduct A Reasonable Cost-Benefit Analysis For Moving Fixed Indexed Annuities To The BIC Exemption.

As the Supreme Court recently recognized, "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions"—which is why "[a]gencies have long treated cost as a centrally relevant factor" in their decisionmaking. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). This obligation to confront and compare the costs and benefits of regulation is an essential aspect of administrative rationality. Here, the Department failed to reasonably evaluate the costs and benefits of revoking the 84-24 exemption for fixed indexed annuities and, thus, acted arbitrarily and capriciously.

The Department estimated that revoking the 84-24 exemption for fixed indexed annuities would impose between $34 million and $37.8 million in additional costs on insurance companies over ten years. AR601–02. This estimate, however, accounts for only a fraction of the full cost insurance companies will incur under the BIC exemption. Most importantly, the Department failed to consider that the BIC exemption is wholly unworkable for fixed indexed annuities in light of their primary distribution channel—independent insurance agents. *See* AR418, 447. Subjecting fixed indexed annuities to the BIC exemption will upend this longstanding and efficient distribution model, imposing massive costs on insurers, independent marketing organizations (IMOs), and independent insurance agents. *See* App. 138–139.

Critically, under the BIC exemption, insurance companies selling through most IMOs must serve as the "Financial Institution" that enters into the best interest contract with the customer, supervises the agents, and warrants their compliance with fiduciary standards. AR139. This is wholly unworkable for an independent-agent distribution model. Among other things, the BIC exemption requires the insurance company to "insulate the [agent] from incentives to violate the Best Interest Standard, *including incentives created by any other Financial Institution*." AR123 (emphasis added). Independent insurance agents typically sell products of multiple insurance companies, and no single company possesses the information or requisite control to identify, mitigate, supervise, and disclose the agent's conflicts. For example, an insurance company does not know what commissions an independent agent receives for selling other companies' products, and thus is in no position to warrant that the agent faces no "incentives that … would reasonably be expected to cause [the agent] to make recommendations that are not in the Best Interest of the Retirement Investor." AR133. Nor does an insurance company know

what other products the independent agent sells or possess the information necessary to warrant that its own product was the "best" option for a particular customer.

If forced to comply with the BIC exemption, therefore, insurance companies will have to overhaul their primary distribution model for fixed indexed annuities. This will impose massive costs on the insurance industry—costs the Department nowhere accounted for in its estimate of the cost of revoking the 84-24 exemption. The Department's failure to address this issue is particularly glaring given that its notice of proposed rulemaking—which retained the 84-24 exemption for fixed indexed annuities—specifically highlighted distribution channels as an important factor in determining the appropriate regulatory treatment for non-security annuities. *See* AR790 ("The Department is not certain that … the distribution methods and channels of insurance products that are not securities would fit within the [BIC] exemption's framework."). In its final rule, however, the Department inexplicably ignored this "important aspect of the problem," *State Farm*, 463 U.S. at 43, and thus failed to conduct a reasonable cost-benefit analysis, *cf. Business Roundtable*, 647 F.3d at 1150 (holding it was "arbitrary for the Commission not to estimate" certain costs that "commenters expected to be quite large").

The Department's cost estimate also failed to account for the substantial costs to retirement savers that will result from the Department's revocation of the 84-24 exemption for fixed indexed annuities. The BIC exemption's increased costs will limit the availability and raise the cost of fixed indexed annuities, to the detriment of retirement savers who would otherwise benefit from higher interest crediting rates. *See* App. 6, 119–120, 43, 55, 61, 35–37. The Department all but conceded that its rule will "promote access" to traditional fixed annuities at the expense of fixed indexed annuities. *See* AR232, 627 (stating that the Department's rules may cause "consumer-friendly insurance products" to "gain market share," "producing a more

optimal mix of financial products"). But the Department never showed that traditional fixed annuities are better for retirement savers than fixed indexed annuities. And its cost estimate ignored the costs to retirement savers for whom a fixed indexed annuity would be "optimal" but who, because of the Department's rules, will not be able to obtain one, or will have to pay more.

Even apart from the many flaws in the Department's cost estimate, the rule is arbitrary and capricious because the Department failed to show that revoking the 84-24 exemption would produce benefits commensurate to its conceded costs. To do so, the Department needed to demonstrate or at least explain why any incremental benefits of the BIC exemption—over and above the protections already provided by state law and the newly enhanced 84-24 exemption— could reasonably be expected to justify the BIC exemption's substantial costs. *See supra* § II.A; *cf. Business Roundtable*, 647 F.3d at 1151 (an agency's "reasoning, which fails to view a cost at the margin, is illogical and, in an economic analysis, unacceptable"); *N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 146 (D.D.C. 2003) ("exemptions are typically granted when 'the burdens of regulation yield a gain of trivial or no value'").

Because the Department cited no meaningful evidence that existing protections are insufficient to prevent abusive sales practices, it failed to show that revoking the 84-24 exemption for fixed indexed annuities will yield *any* marginal benefits, let alone benefits sufficient to outweigh the substantial costs and disruption of subjecting fixed indexed annuities to the BIC exemption. This omission removes any rational support for the conclusion that moving fixed indexed annuities into the BIC exemption is cost-justified. *See Business Roundtable*, 647 F.3d at 1155 (agency acted arbitrarily and capriciously by failing to "adequately address the probability the rule will be of no net benefit as applied to" entities already subject to

regulation). The Department's decision to revoke the 84-24 exemption for fixed indexed annuities was therefore arbitrary and capricious and must be set aside.

### C. The Department Drew An Arbitrary And Unjustified Distinction Between Fixed Indexed Annuities And Other Fixed Annuities.

As discussed above, the Department originally proposed to retain the 84-24 exemption for all fixed annuities and to revoke the exemption only for variable annuities and other annuities that are regulated as securities. AR790. In the final rule, however, the Department retained the 84-24 exemption only for "Fixed Rate Annuity Contracts"—a defined term it first introduced in the final rule—and subjected fixed indexed annuities, along with variable annuities, to the BIC exemption. AR237–38. The Department, however, failed to give a reasoned explanation for the new distinction it drew between fixed indexed annuities and other fixed annuities. Because the "agency applie[d] different standards to similarly situated [products] and fail[ed] to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005).

Until now, all fixed annuities have been regulated in the same way. For good reason: fixed indexed annuities are identical to traditional fixed annuities in almost all respects. Most importantly, in contrast to variable annuities and other securities, both fixed rate annuities and fixed indexed annuities protect the owner against loss of principal due to investment risk. App. 2–4, 136. With a variable annuity, the owner's premiums are invested in separate accounts, and the owner bears the risk of loss of principal due to the performance of the underlying fund. App. 3–4. By contrast, with fixed annuities, "the contract's premium is not invested in a separate account or specific investment, but rather is supported by the general account of the insurance company," and "the insurance company assumes the market risk." App. 2.

Even though all fixed annuities protect against investment risk, the Department asserted that fixed indexed annuities pose "downside risk" to retirement savers. AR234. But the only "downside risk" the Department identified is the potential loss of principal that can occur if the owner cancels the contract early and as a result incurs surrender charges or tax penalties. *See* AR234, 237 n.32. The same, however, is true of fixed rate annuities. As the Department's own comparison chart states, "[i]f the owner [of a fixed rate annuity] withdraws all or part of the value out of the annuity within a specified period, [a] surrender charge will be applied." AR259. Moreover, both fixed rate annuities and fixed indexed annuities provide the same limits on this risk, as "[t]he surrender value must always equal at least the Nonforfeiture Amount," which under most current state laws must equal "at least 87.5% of premiums paid." AR258.

Fixed rate annuities and fixed indexed annuities are identical in other respects as well. Neither generally have express fees. AR260. Both can offer the same kinds of optional benefits. *Id.*; App. 138. Both are covered by state guaranty funds. App. 137. Both are sold only by state-licensed insurance agents who typically receive a commission for the sale. App. 2, 138. And both are regulated as insurance products by state insurance regulators rather than as securities by the SEC and FINRA. App. 2, 137.

In reality, "[t]he *only* difference among these fixed annuity products is the method for determining the interest earnings that are credited to the policy." App. 2 (emphasis added). For fixed indexed annuities the interest rate moves within a specified range based on a market index, whereas for fixed rate annuities the rate may move above a minimum rate based on the insurer's discretion. AR258. Thus, compared to traditional fixed annuities, fixed indexed annuities can offer retirement savers greater protection against inflation risk, while at the same time protecting them from losses due to investment risk. *See* AR357.

The Department never explained why this difference alone justifies disparate regulatory treatment of fixed annuities that "directly compete against one another in the market." App. 136; *see* App. 137. The Department claimed that placing fixed indexed annuities and variable annuities in the BIC exemption "avoids creating a regulatory incentive to preferentially recommend indexed annuities." AR238. But, of course, it does so only by creating a regulatory incentive to preferentially recommend fixed rate over fixed indexed annuities. The Department neither acknowledged this nor explained why the latter distortion is less problematic. Instead, despite its lack of authority to regulate insurance products, the Department chose to "promote access" to fixed rate annuities because it believed their terms "are more understandable to consumers," AR232, which does not necessarily make them *better* for consumers.

Moreover, in claiming that fixed indexed annuities require additional regulation because of their "complexity," the Department cited characteristics that are *true of fixed rate annuities as well*. *See* AR234 (citing, *inter alia*, "surrender terms and charges," "the scope of any downside risk," "administrative and other charges," "the insurer's authority to revise terms and charges," and "optional benefits"). "If an agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Even when such distinctions "may be justifiable," an agency "must acknowledge these differences explicitly" and "explain why they make sense." *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 493 (D.C. Cir. 2013). In basing its disparate treatment of fixed indexed annuities largely on characteristics shared by all fixed annuities, the Department acted arbitrarily and capriciously. *See PDK Labs Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). The rule must be set aside for this reason too.

III.   **THE DEPARTMENT FAILED TO PROVIDE ADEQUATE NOTICE AND OPPORTUNITY TO COMMENT ON THE REVOCATION OF THE 84-24 EXEMPTION FOR SALES OF FIXED INDEXED ANNUITIES.**

Finally, the rule must also be set aside because the Department failed to provide interested parties the required notice of, and opportunity to comment on, its revocation of the 84-24 exemption with regard to sales of fixed indexed annuities to plans and IRAs.

"The notice-and-comment provisions of the APA enable the agency promulgating a rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Glob. Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983); *see* 5 U.S.C. § 553. These provisions "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

An agency must "make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *HBO, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977). The Notice of Proposed Rulemaking (NPRM) must therefore "describe the range of alternatives being considered with reasonable specificity," *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983), and "set out [the agency's] thinking," so that parties can respond with an "adversarial critique of the agency," *HBO*, 567 F.2d at 36, 55. Thus, although the final rule need not be identical to the proposed rule, *Small Refiner,* 705 F.2d at 546, the two "may differ only insofar as the latter is a 'logical outgrowth' of the former," *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996–97 (D.C. Cir. 2005); *United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 317–18 (5th Cir.

1987) (a "new comment period" is required where the agency "alters the proposed rule" and the final rule is not a "logical outgrowth" of the proposal).

The treatment of fixed indexed annuities in the final rule was not a "logical outgrowth" of the proposal. The NPRM had proposed to revoke the 84-24 exemption only for sales of variable annuities and other annuities that are securities, *see* AR789, and had expressly proposed to *retain* the exemption for sales of annuities—including fixed indexed annuities—that are not treated as securities. AR790. Without any further notice of proposed rulemaking or new comment period, the final rule revoked the exemption for fixed indexed annuities.

Critically, the Department's new outcome was based on new reasoning and criteria. The NPRM's key criterion for applying the 84-24 exemption was whether the annuity is treated as a security. *See, e.g*, *id*. The Department explained that annuities treated as securities are distributed through the same channels, and are already subject to similar disclosure requirements, as are many other investments that would be covered by the BIC exemption. *Id.* The final rule instead distinguished among products based on their perceived "complexity." AR237–38.

Agencies may not "use the rulemaking process to pull a surprise switcheroo." *Envtl. Integrity Project*, 425 F.3d at 996–97. *See also Int'l Union, United Mine Workers*, 407 F.3d at 1259–60 (final rule adopting a *maximum* air velocity standard is not a logical outgrowth of proposed rule setting a *minimum* air velocity standard); *Envtl. Integrity Project*, 425 F.3d at 998 ("Whatever a 'logical outgrowth' of this proposal may include, it certainly does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse."). By switching from a "treatment as securities" rationale to a "complexity" rationale, the Department short-circuited the opportunity for meaningful public engagement and critique.

Indeed, the Department sought comment simply on whether its proposed securities/non-securities distinction "strikes the appropriate balance and is protective of the interests of the IRAs." AR790.[9] This request provided no notice that the final rule would sever fixed indexed annuities from other fixed annuities and single them out for different treatment, or that the basis for that distinction would turn on the Department's new assessment of their relative complexity. In fact, in proposing to revoke the exemption for variable annuities, the Department did not even *mention* their complexity as a consideration. *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (general questions requesting comment are insufficient to provide notice). Moreover, the Department's non-specific request for comment never mentioned that the 84-24 exemption would be revoked not only for sales to IRAs but also for sales to ERISA plans. That kind of complete about-face cannot be a logical outgrowth of the proposal. *See Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997); *Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C. Cir. 1994) ("Something is not a logical outgrowth of nothing").

It was not until the final days of the comment period that IALC learned—as a result of another group's meeting with Department staff—that the Department was contemplating an approach to fixed indexed annuities starkly different from what the NPRM had proposed. *See Montz Declaration (App. 225–226)*. As a result, on the last day of the comment period, IALC submitted a supplemental letter that briefly explained some of the reasons the new proposed BIC exemption "would not work in the context of any fixed annuity product." *See* App. 138. But a conversation with staffers cannot "provide 'actual notice' sufficient to remedy [an agency's] procedural shortcomings." *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003). And indications of the Department's thinking gleaned through informal back channels "is decidedly

---

[9] In the proposed BIC exemption, the Department similarly requested comment merely on "whether [it had] drawn the correct lines" in making that distinction. AR747.

not how the notice and comment requirement of the APA is supposed to work." *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1143 (D.C. Cir. 1995).

Here, IALC's final letter shows that, even after the eleventh-hour revelation of the Department's potential change in course, IALC continued to lack meaningful notice of the basis of the Department's new rationale. Thus, while IALC contended that "[t]here is nothing particularly more complex about [fixed indexed annuities] as compared with other fixed annuities," App. 138, it did not know to address the specific features of fixed indexed annuities that the Department would later conclude (unjustifiably) render them. *See* AR74.

Had it received adequate, timely notice of the decision to revoke the exemption for sales of fixed indexed annuities (to IRAs and plans) and the Department's rationale for doing so, IALC and others could have filed detailed comments refuting the Department's "greater complexity" theory, *supra* at 29–31, bolstering comments showing how uncommon abuses are in the sales of fixed indexed annuities, and explaining how subjecting fixed indexed annuities to the BIC exemption would impose massive and unnecessary costs on providers and retirement savers. IALC's third comment letter "bear[s] ... out," in its content and brevity, that "it did not have actual notice of the [Department]'s intentions." *MCI*, 57 F.3d at 1142.

## CONCLUSION

For the foregoing reasons, this Court should vacate and enjoin enforcement of (1) the new fiduciary definition, or at least that portion that reaches advice incidental to one-time sales of fixed annuities, and (2) the revisions to the 84-24 exemption insofar as they exclude fixed indexed annuities. Alternatively, this Court should vacate and enjoin implementation of the BIC exemption insofar as it creates an enforceable private right of action and prohibits arbitration.

Dated: July 18, 2016                          Respectfully submitted,

                                              s/ Joseph R. Guerra

                                              Joseph R. Guerra (*pro hac vice*)
                                              Peter D. Keisler (*pro hac vice*)
                                              Eric D. McArthur (*pro hac vice*)
                                              SIDLEY AUSTIN LLP
                                              1501 K Street, NW
                                              Washington, DC 20005
                                              Telephone: (202) 736-8000
                                              Facsimile: (202) 736-8711
                                              pkeisler@sidley.com
                                              jguerra@sidley.com
                                              emcarthur@sidley.com

                                              Yvette Ostolaza (Bar No. 00784703)
                                              SIDLEY AUSTIN LLP
                                              2001 Ross Ave., Suite 3600
                                              Dallas, TX 75201
                                              Telephone: (214) 981-3401
                                              Facsimile: (214) 981-3400
                                              yvette.ostolaza@sidley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2016, I caused the foregoing to be electronically filed using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

s/ Joseph R. Guerra

Joseph R. Guerra*

\*Admitted *pro hac vice*