**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
FINANCIAL SERVICES INSTITUTE, INC.,
FINANCIAL SERVICES ROUNDTABLE,
GREATER IRVING-LAS COLINAS
CHAMBER OF COMMERCE, HUMBLE
AREA CHAMBER OF COMMERCE DBA
LAKE HOUSTON AREA CHAMBER OF
COMMERCE, INSURED RETIREMENT
INSTITUTE, LUBBOCK CHAMBER OF
COMMERCE, SECURITIES INDUSTRY
AND FINANCIAL MARKETS
ASSOCIATION, and
TEXAS ASSOCIATION OF BUSINESS,

        Plaintiffs,

   v.

U.S. DEPARTMENT OF LABOR and THOMAS E.
PEREZ, SECRETARY OF LABOR,

        Defendants.

Civil Action No. 3:16-cv-1476-M
Consolidated with:
3:16-cv-1530-C
3:16-cv-1537-N

**BRIEF OF *AMICUS CURIAE* THE FINANCIAL PLANNING COALITION IN
SUPPORT OF DEFENDANTS**

Brendan S. Maher
Texas Bar No. 24053336
Douglas D. Geyser
Texas Bar No. 24059817
STRIS & MAHER LLP
6688 N. Central Expy., Suite 1650
Dallas, TX 75206
Tel.: (214) 396-6631
Fax: (210) 978-5430
*brendan.maher@strismaher.com*

*Counsel for* Amicus Curiae *The Financial
Planning Coalition*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................................. 1

ARGUMENT ................................................................................................................. 3

    I.     INVESTORS SUFFERED UNDER THE PREVIOUS RULE ............................. 3

    II.    MIDDLE-INCOME INVESTORS WILL RETAIN READY
        ACCESS TO PROFESSIONAL FINANCIAL ADVICE
        UNDER A FIDUCIARY STANDARD OF CONDUCT ...................................... 5

        A.    The Rule Need Not Drive Advisers Out Of Business ................................. 6

        B.    Middle-Income Investors Will Continue To Receive
                Effective Financial Advice—Now From Advisers
                Acting In The Investors' Best Interests Rather than
                Their Own ................................................................................................. 7

        C.    The Industry Will Adapt And Modify Its
                Compensation Practices To Satisfy The Rule And
                Benefit Consumers ................................................................................. 10

    III.    FINANCIAL PROFESSIONALS CAN SATISFY THE
         BEST INTEREST CONTRACT EXEMPTION'S
         REQUIREMENTS ................................................................................... 13

# TABLE OF AUTHORITIES

**Regulations**

Department of Labor, Definition of the Term "Fiduciary": Conflict of
  Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20,946
  (Apr. 8, 2016) (29 C.F.R. Pts. 2509, 2510, 2550) ......................................................5

Department of Labor, Best Interest Contract Exemption, 81 Fed. Reg.
  21,002 (Apr. 8, 2016) (29 C.F.R. Pt. 2550) ................................................14, 15, 16


**Other Authorities**

Aité Group, *Building a Wealth Management Practice: Measuring
  CFP® Professionals' Contribution* (Feb. 2016) .......................................................6

Aité Group, *Fiduciary Study Findings* (June 2013)..................................................8, 9

Angela Hung, et al., RAND Corp., Investor and Industry Perspectives
  on Investment Advisers and Broker-Dealers (Jan. 3, 2008) .......................................3

Arthur D. Postal, *Industry Insiders React Cautiously to DOL Fiduciary
  Rule*, LifeHealthPro (Apr. 7, 2016) .........................................................................11

BusinessWire, *Advicent Product Suite Empowers Firms and Advisors
  to Comply with Impending DOL Fiduciary Rule While Keeping
  Financial Planning at the Core* (June 28, 2016) ....................................................11

CFP Board, *Standards of Professional Conduct*, Rules of Conduct 1.3,
  1.4, 2.2, 4.1, 4.3 and 4.4..........................................................................................13

Fondulas Strategic Research, *Quantitative Survey: Consumers' Beliefs
  About Financial Planners* (Jan. 2014)......................................................................4

FSI, *DOL Fiduciary Rule Resources* ........................................................................12

Global Newswire, *RegEd Announces Expanded Compliance
  Education and Product Training Solutions in Response to DOL
  Fiduciary Rule* (June 2, 2016) ...............................................................................12

Greg Iacurci, *Insurers Developing Fee-based Fixed-indexed Annuities
  Post-DOL Fiduciary Rule*, Fiduciary Focus (July 14, 2016)...................................10

Greg Iacurci, *Morningstar Launching 401(k) Service for Broker-dealers Worried About DOL Fiduciary Risk*, Fiduciary Focus (Aug. 8, 2016) ....................................................................................11

InfoGroup, U.S. Investors and the Fiduciary Standard (Sept. 15, 2010) ........................................3

Investment Company Institute, *Retirement Assets Total $24.1 Trillion in First Quarter 2016* (June 23, 2016) ......................................................6

Letter from Robert L. Reynolds, President and CEO of Putnam Investments, to Office of Regulations and Interpretations, Employee Benefit Security Administration, U.S. Department of Labor (Jul. 20, 2015) ...................................................................................4

Michael Finke & Thomas Langdon, *The Impact of the Broker-Dealer Fiduciary Standard on Financial Advice*, Journal of Financial Planning (Jul. 2012) .......................................................................9

Nick Thornton, *Voya Rolls Out New, Less Expensive FIAs*, BenefitsPro (June 15, 2016) ....................................................................11

Princeton Research Associates International, *Fiduciary Standard Survey* (Feb. 2014) ...........................................................................8, 9

Putnam Advisory Company, LLC, SEC Form ADV Part 2A (Mar. 30, 2016) ...................................................................................................4

Robert Schmidt, *Wall Street Splits With Smaller Firms Over Broker-Rule Lawsuit*, Bloomberg (June 23, 2016) ..............................................12

Tariro Mzezewa, *LPL Lowers Minimums, Cuts Fees to Prepare for Fiduciary Rule*, Reuters (Mar. 16, 2016) ................................................10

ThinkAdvisor, *LPL, Edward Jones Pre-DOL Rule Shifts: Smart Moves or Overreaction?* (Mar. 17, 2016) ........................................................10

ThinkAdvisor, *New Firm Caps Account Fees at $1,500* (June 21, 2016) ....................................10

Wall Street Journal, *Reactions to the Labor Department's Fiduciary Rule* (Apr. 6, 2016) ...............................................................................12, 14

## INTEREST OF *AMICUS CURIAE*

*Amicus* the Financial Planning Coalition (the Coalition) advocates for policy measures that advance trustworthy, effective financial planning services. It is a collaboration of three leading national organizations of financial planners: Certified Financial Planner Board of Standards (CFP Board), the Financial Planning Association (FPA®), and the National Association of Personal Financial Advisors (NAPFA). CFP Board is a non-profit organization that fosters professional standards in personal financial planning through its setting and enforcement of the competency and ethical standards for CERTIFIED FINANCIAL PLANNER™ certification. FPA® is the largest membership organization for CFP® professionals in the U.S.; its members use a range of compensation models. NAPFA, whose members are required annually to sign a Fiduciary Oath and to subscribe to its Code of Ethics, is the nation's leading organization of financial planning advisers who use fee-only compensation models. FPA® and NAPFA embrace CFP® certification as a foundation for the financial planning profession.

Together, they represent nearly 80,000 financial planning professionals of all business models and sizes, who are devoted to providing competent, cost-effective financial planning services in the best interest of the public. These stakeholders—including registered investment advisers (RIAs), registered representatives of broker-dealers, and insurance agents—have a strong interest in the outcome of this proceeding.

The Coalition's experience offers a reality that starkly contrasts with the speculation from Plaintiffs and provides the Court with a unique perspective on the issues in this case. Since 2008, CFP® professionals across all business and compensation models have been required to operate under a fiduciary standard similar to that required by the Department of Labor's (Department's)

Rule.[1] During that time, CFP® professionals have not just survived; they have thrived. The CFP® ranks have swelled 30% while providing financial advice in the best interests of their clients, including service to middle-income Americans.

The Coalition submits that the experiences of its professionals and their clients show that a broadly applicable fiduciary standard represents a win-win for both industry and the public. The current regulatory framework, however, fails to align advisers' interests with investors' by leaving open significant loopholes that allow for the sale of a financial product that may not be in the best interests of the investor. The Department's strengthened fiduciary rule is therefore necessary and appropriate to protect the public.

The Coalition accordingly opposes Plaintiffs' motions for summary judgment, and fully supports the Department's opposition and cross-motion for summary judgment. To minimize duplicative briefing for the Court, the Coalition's brief focuses on three critical points: (1) investors currently suffer from a lack of complete, truthful disclosures; (2) empirical research and the Coalition's practical experience confirm that middle-income investors will retain ready access to professional financial advice under a fiduciary standard of conduct; and (3) based on CFP® professionals' experience under standards similar to those required by the Best Interest Contract Exemption, that exemption provides a workable solution to the conflict-of-interest problem.

---

[1] "Rule" refers to the administrative rule and related "prohibited transaction exemptions" recently promulgated by the U.S. Department of Labor and challenged by Plaintiffs in this case. *See* Chamber Compl. [Dkt. No. 1] ¶ 1 & n.1 (defining "Rule").

**ARGUMENT**

## I.    INVESTORS SUFFERED UNDER THE PREVIOUS RULE

Plaintiffs allege that the Rule's disclosure requirements "are not necessary to an informed and effective commercial transaction" and thereby infringe on financial professionals' "right to engage in truthful, non-misleading speech." Chamber Compl. [Dkt. 1] ¶¶ 148, 196. The assumption underlying this misguided legal attack is the factual predicate that investors currently receive all the information they need to make an informed decision.

Not so. In truth, investors struggle even to identify which financial professionals owe fiduciary duties and which do not, confusion that is further exacerbated by industry parlance and advertising. Non-fiduciary professionals, for example, frequently offer services identical to those offered by fiduciary advisers using titles (*e.g.*, "financial adviser") that are inherently ambiguous and cause confusion. It was no surprise when a 2010 study concluded that fully 75% of investors incorrectly believed that all "financial planners" *already* operate under a fiduciary standard.[2] Similarly, that same study found that three of five investors believed that "insurance agents" owe fiduciary duties, and that two out of three thought the same for stockbrokers.

Other studies confirm this enduring, pervasive confusion. For instance, a 2008 study sponsored by the Securities and Exchange Commission and conducted by the RAND Center for Corporate Ethics relayed that "[e]xisting studies suggest that investors do not have a clear understanding about the distinction between broker-dealers and investment advisers and their

---

[2] InfoGroup, U.S. Investors and the Fiduciary Standard (Sept. 15, 2010), *available at* http://www.hastingsgroup.com/fiduciarysurvey/docs/091510%20Fiduciary%20survey%20report %20FINAL2.pdf. Unsurprisingly, the same proportion of investors mistakenly thought that "financial advisors" are uniformly held to a fiduciary standard.

different levels of fiduciary responsibility."[3] Another study recounted that 82% of consumers believe that a "financial planner" is essentially the same as a "financial advisor," and there is only slightly less confusion between the titles "financial planner," "wealth manager" and "investment advisor."[4]

Moreover, investors can hardly be blamed for failing to ascertain the fine distinction between a "financial advisor" and an "investment advisor" in light of some financial institutions' misleading marketing communications. For example, one firm trumpets that it "proudly strive[s] to embrace [its] own fiduciary responsibilities" and that its "highest value is to 'always put the client first'"[5] even though its Form ADV brochure (a dense regulatory filing that the SEC requires also be given to clients) confessed otherwise in legalese, drily observing that "[d]oing business with our affiliates could involve conflicts of interest if, for example, we were to use affiliated products and services when those products and services may not be in our clients' best interests."[6] It is thus little wonder that investors believe that their advisers are acting in the investors' best interests even when their lengthy legal disclosures directly state they are not.

---

[3] Angela Hung, et al., RAND Corp., Investor and Industry Perspectives on Investment Advisers and Broker-Dealers 33 (Jan. 3, 2008), *available at* http://www.rand.org/ pubs/technical_reports/TR556.html.

[4] Fondulas Strategic Research, *Quantitative Survey: Consumers' Beliefs About Financial Planners* (Jan. 2014) (on file with the Coalition).

[5] Letter from Robert L. Reynolds, President and CEO of Putnam Investments, to Office of Regulations and Interpretations, Employee Benefit Security Administration, U.S. Department of Labor (Jul. 20, 2015), *available at* https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-ZA25/00077.pdf.

[6] Putnam Advisory Company, LLC, SEC Form ADV Part 2A at 25, Mar. 30, 2016, *available at* http://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS N_ID=375046. (Putnam Investments wholly owns Putnam Advisory Company through various subsidiaries).

Importantly, the distinction between fiduciary and non-fiduciary advice is far from academic. Professionals who are not constrained by the fiduciary "best interests" standard may take advantage of current loopholes in the regulatory framework to steer clients toward products that are more profitable for the advisor than other available options that would better serve the clients' needs. *See, e.g.*, 81 Fed. Reg. 20,946, 20,949-51 (Apr. 8, 2016). Unfortunately, without the Rule, those tactics will remain perfectly legal for the broad swath of financial professionals who are not otherwise subject to a fiduciary standard when providing financial advice.

Plaintiffs' declaration that the essence of a fiduciary relationship is one involving a "special relationship of trust and confidence," Chamber Br. 8, is true but misses the point. They cannot explain why an individual making a single financial decision—which might be that person's single most important financial decision of her life, such as whether and how to roll over employer-sponsored retirement assets—is less deserving of her adviser's utmost "trust and confidence" than a wealthy investor seeking ongoing advice. Yet Plaintiffs would have the Court hold that the Department's decision to require that this one-time advice be provided in the investor's best interests is not only wrong but wholly irrational. Their position is not tenable.

## II.   MIDDLE-INCOME INVESTORS WILL RETAIN READY ACCESS TO PROFESSIONAL FINANCIAL ADVICE UNDER A FIDUCIARY STANDARD OF CONDUCT

The thrust of Plaintiffs' attack is that the Rule will force financial advisers out of business rather than comply with a fiduciary standard, and that the advisers who stay in business will not be able to profitably serve middle-income investors who have smaller asset bases. This speculation is inconsistent with the real experience of CFP® professionals who already operate under a fiduciary standard of conduct when providing financial planning services and various studies confirming the lessons of that experience.

## A.     The Rule Need Not Drive Advisers Out Of Business

Plaintiffs' contention that the Rule and its exemptions are so restrictive that some advisers will go out of business (or at least cease to provide a full panoply of financial advice to all segments of society), *see, e.g.*, Compl.¶¶ 8, 86, 201(c); Chamber Br. 1, 39, is belied by the tens of thousands of CFP® professionals who successfully operate under similar standards. Indeed, when the CFP Board adopted a fiduciary standard for CFP® professionals in 2008, it heard the very same arguments the Department and the Court are hearing now. Like Plaintiffs, major firms in the brokerage and insurance industries told CFP Board that a fiduciary standard of conduct was incompatible with their business models and that they would have no choice but to require their advisors to relinquish their CFP® certification if it added a fiduciary standard.

Yet just the opposite occurred. Since CFP Board established the fiduciary requirement in 2008, the number of CFP® professionals has grown by 30% to over 74,000. And these professionals reach every corner of the industry—working in large firms and small businesses, advising large 401(k) plans and individuals with only a few thousand dollars to invest, and using fee-based and transaction-based compensation models. Far from going out of business, they have grown their businesses and benefitted the public at the same time.

Despite Plaintiffs' doom-and-gloom predictions, this reality should not come as a surprise. U.S. investors have over fourteen trillion dollars invested in 401(k) plans and IRAs.[7] It defies credibility to think that financial advisors will simply give up on providing services regarding those kinds of sums rather than comply with the burden of a fiduciary duty. Adherence to a fiduciary standard has not only proven to be economically viable, it has also been found beneficial to the

---

[7] *See* Investment Company Institute, *Retirement Assets Total $24.1 Trillion in First Quarter 2016* (June 23, 2016), *available at* https://www.ici.org/research/stats/retirement/ret_16_q1.

quality of planners' relationships with their clients. A 2016 study relates that nearly 70% of CFP®

professionals found the certification a benefit to client trust and technical expertise.[8] These

professionals can proudly—and truthfully—boast to potential and existing clients that they provide

financial advice in the best interests of their investors.

>  **B.     Middle-Income Investors Will Continue To Receive Effective Financial Advice—Now From Advisers Acting In The Investors' Best Interests Rather Than Their Own**

Plaintiffs also claim that the Rule will force financial professionals exclusively to use fee-

based compensation models that will close off middle-income investors from obtaining

professional financial guidance. *See, e.g.*, Chamber Compl. ¶¶ 105, 135, 137; Chamber Br. 1, 9.

This contention is doubly wrong: commission-based compensation will survive, and financial

professionals will continue to serve middle-income investors using all types of existing

compensation models and other innovative methods.

Once again, the Court need not wonder about the accuracy of Plaintiffs' predictions, for

we already know what happens when financial professionals operate under a fiduciary standard of

conduct: they continue providing financial advice to U.S. investors of all income levels, but now

do so in those investors' best interests. As noted, thousands of CFP® professionals and FPA and

NAPFA members across the country currently provide fiduciary-level services to everyday

Americans with business models requiring no or very low minimum assets under management.

The successes of these organizations' stakeholders clearly reveal that the dire consequences

anticipated by Plaintiffs are not a necessary outcome of the Rule.

---

[8] Aité Group, *Building a Wealth Management Practice: Measuring CFP® Professionals' Contribution* 4, Feb. 2016, *available at* http://www.cfp.net/docs/default-source/news-events---research-facts-figures/2016-cfpboard-aite-white-paper.pdf.

What's more, the Coalition's experiences are confirmed by a variety of real-world studies demonstrating that an industry-wide fiduciary standard will not prevent ordinary investors from readily obtaining professional financial advice. These studies compared services offered under a non-fiduciary standard to those offered under a fiduciary standard and found no meaningful differences in the availability of services:

- A 2014 study interviewed professionals who either changed from a lower standard of care to a fiduciary standard or who operated under both standards, and reported that 80% of these professionals either maintained or increased their range of services when using a fiduciary standard, and 69% maintained or increased their range of products under a fiduciary standard of conduct. The study also noted that, while a "strong majority of all respondents" thought that extending the fiduciary standard would increase the costs of advising investors, that "belief is in stark contrast to the actual experience of financial professionals who have switched from a suitability standard to a fiduciary standard of care or operate under both."[9]

- A 2013 study compared the client base of fiduciary and non-fiduciary registered representatives and found that each group serviced a comparable number of clients with under $100,000 of investable assets and that fiduciary advisers actually spent a smaller percentage of their time on compliance than did other advisers. It concluded that extending

---

[9] Princeton Research Associates International, *Fiduciary Standard Survey* 1, 6 (Feb. 2014), *available at* http://financialplanningcoalition.com/wp-content/uploads/2015/07/Princeton-Research-Fiduciary-Study-Final.pdf.

the fiduciary standard would not reduce the availability of advisory services for lower-income investors.[10]

- A 2012 study that compared broker-dealer registered representatives in states that impose fiduciary standards to those in states that do not found no statistical differences between the two across a wide range of areas, including: the proportion of lower-income (less than $75,000) clients served; the range of products offered (including under commission-based compensation arrangements); and the advisers' ability to tailor advice to their clients. The authors concluded that there was "no evidence that the broker-dealer industry is affected significantly by the imposition of a stricter legal fiduciary standard," and thus "the industry is likely to operate after the imposition of fiduciary regulation in much the same way it did" before.[11]

Critically, while adherence to a fiduciary standard did not negatively affect the *availability* of services, it did positively affect the *quality* of services. According to the 2014 study, over 80% of financial professionals who had switched to a fiduciary standard reported that the change was mostly positive for their clients and their own practice, and 76% reported increases in both revenue and assets under management.[12] Similarly, the 2013 study related that professionals operating under a fiduciary standard reported stronger asset and revenue growth for their clients.[13] In sum,

---

[10] Aité Group, *Fiduciary Study Findings* 3 (June 2013), *available at* http://cfp.net/docs/public-policy/aite-fiduciary-study-june-2013.pdf.

[11] Michael Finke & Thomas Langdon, *The Impact of the Broker-Dealer Fiduciary Standard on Financial Advice*, Journal of Financial Planning (Jul. 2012), available at https://www.onefpa.org/journal/Pages/The%20Impact%20of%20the%20Broker-Dealer%20Fiduciary%20Standard%20on%20Financial%20Advice.aspx.

[12] Princeton Research Associates International, *supra* note 9, at 6, 21.

[13] Aité Group, *supra* note 10, at 3.

these studies confirm what Coalition stakeholders have known for years—providing services under a fiduciary standard benefits both the industry and the public.

### C.   The Industry Will Adapt And Modify Its Compensation Practices To Satisfy The Rule And Benefit Consumers

As shown by the experiences of financial professionals already operating under a fiduciary standard, the industry will adapt to meet the needs of consumers while maintaining compliance with the Rule. The trillions of dollars available for investment provide a strong incentive to do so, and Plaintiffs acknowledge (as they must) that "[t]he financial services industry and small businesses have evolved to meet consumer preferences." Chamber Compl. ¶ 43. That evolution will continue, and, in fact, has already begun.

**1.** For instance, brokerages have already begun lowering fees and asset minimums. LPL Financial, the largest independent broker-dealer in the country, announced in March that it would reduce pricing on some funds and lower some account minimums from $15,000 to $10,000. *See* Tariro Mzezewa, *LPL Lowers Minimums, Cuts Fees to Prepare for Fiduciary Rule*, Reuters (Mar. 16, 2016).[14] These changes are expected to yield 30% cost savings for consumers compared to LPL's current pricing structure. *Id.* LPL has also been lauded for the novelty of a new fund-only brokerage IRA. *See* ThinkAdvisor, *LPL, Edward Jones Pre-DOL Rule Shifts: Smart Moves or Overreaction?* (Mar. 17, 2016).[15] Like LPL, Edward Jones is reducing some minimums to just

---

[14] *Available at* http://www.cnbc.com/2016/03/16/reuters-america-lpl-lowers-minimums-cuts-fees-to-prepare-for-fiduciary-rule.html.

[15] *Available at* http://www.thinkadvisor.com/2016/03/17/lpl-edward-jones-pre-dol-rule-shifts-smart-moves-o?slreturn=1471978349.

$5,000. *Id.* Other firms are adopting similar business practices, such as implementing a hard cap on fees. *See* ThinkAdvisor, *New Firm Caps Account Fees at $1,500* (June 21, 2016).[16]

2.　　　Firms in the annuities sector also have already begun to innovate. Four of the top ten fixed-indexed annuity sellers (including the top seller) are developing fee-based fixed-indexed annuities, "forging ahead into virtually uncharted territories for product development." Greg Iacurci, *Insurers Developing Fee-based Fixed-indexed Annuities Post-DOL Fiduciary Rule*, Fiduciary Focus (July 14, 2016).[17] Although the Rule did create a "sense of urgency," these products also meet a "growing appetite for fixed indexed annuities in this space." *Id.* One of those firms, Voya Financial, also has introduced new fixed-indexed annuity products with lower surrender fees. *See* Nick Thornton, *Voya Rolls Out New, Less Expensive FIAs*, BenefitsPro (June 15, 2016).[18] The company explained that these products are more "flexible" and "fit better with new trends, customer preference and the market." *Id.* These changes support the prediction of one indexed-annuity consulting firm that any negative effect will disappear "[o]nce the industry has had time to adjust," for "[t]he bottom line is that consumers want indexed annuities' guarantees; they want protection from market volatility and the ability to outpace CDs as well." Arthur D. Postal, *Industry Insiders React Cautiously to DOL Fiduciary Rule*, LifeHealthPro (Apr. 7, 2016).[19]

---

[16] *Available at* http://www.thinkadvisor.com/2016/06/21/new-firm-caps-account-fees-at-1500?eNL=576be213160ba0da747e92d5.

[17] *Available at* http://www.investmentnews.com/article/20160714/FREE/160719964/insurers-developing-fee-based-fixed-indexed-annuities-post-dol.

[18] *Available at* http://www.benefitspro.com/2016/06/15/voya-rolls-out-new-less-expensive-fias?page_all=1&slreturn=1470760535.

[19] *Available at* http://www.lifehealthpro.com/2016/04/07/industry-insiders-react-cautiously-to-dol-fiduciar?slreturn=1470762278.

**3.**      And other companies have stepped in to provide assistance and services for advisers worried about liability risk. Morningstar, for example, is launching a new service for broker-dealers wanting to outsource 401(k) responsibility. *See* Greg Iacurci, *Morningstar Launching 401(k) Service for Broker-dealers Worried About DOL Fiduciary Risk*, Fiduciary Focus (Aug. 8, 2016).[20] Another company is offering financial-planning software aimed at compliance strategies, while a third is adding compliance training courses covering the new standards. *See* BusinessWire, *Advicent Product Suite Empowers Firms and Advisors to Comply with Impending DOL Fiduciary Rule While Keeping Financial Planning at the Core* (June 28, 2016);[21] Global Newswire, *RegEd Announces Expanded Compliance Education and Product Training Solutions in Response to DOL Fiduciary Rule* (June 2, 2016).[22] Financial Services Institute, a Plaintiff in this lawsuit, is providing its members "five critical tools to assist firms in complying with the BIC exemption of the Department of Labor's (DOL) fiduciary rule."[23] All these new products and services provide compelling evidence of an industry ready and willing to adapt to the new Rule.

**4.**      Consistent with these early adapters and the economic incentive to continue servicing investors of all income levels, some major players in the financial sector publicly disagreed with Plaintiffs filing this lawsuit, including some of the biggest banks on Wall Street. *See* Robert Schmidt, *Wall Street Splits With Smaller Firms Over Broker-Rule Lawsuit*, Bloomberg

---

[20] *Available at* http://www.investmentnews.com/article/20160808/FREE/160809924/morningstar-launching-401-k-service-for-broker-dealers-worried-about.

[21] *Available at* http://www.businesswire.com/news/home/20160628006452/en/Advicent-product-suite-empowers-firms-advisors-comply.

[22] *Available at* https://globenewswire.com/news-release/2016/06/02/845653/0/en/RegEd-Announces-Expanded-Compliance-Education-and-Product-Training-Solutions-in-Response-to-DOL-Fiduciary-Rule.html.

[23] FSI, *DOL Fiduciary Rule Resources*, *available at* http://www.financialservices.org/DOL-Fiduciary-Rule-Resources/.

(June 23, 2016).[24] Wells Fargo even "threatened to quit [the trade group Securities Industry and Financial Markets Association] if it joined the suit." *Id.* Reactions to the Rule collected by the Wall Street Journal further confirm industry support for the Department's actions. *See* Wall Street Journal, *Reactions to the Labor Department's Fiduciary Rule* (Apr. 6, 2016). For example, broker-dealer Cetera Financial Group initially opposed the Rule but explained that "the final rule shows that the Labor Department has listened to some of the brokerage industry's early criticisms." *Id.* Merrill Lynch and LPL were likewise "pleased" with the Department's response, and 401(k) and IRA manager Financial Engines, who has supported the Department throughout the rulemaking process, stated that the Rule is "an unqualified win for the public and will ultimately benefit the industry." *Id.* Plaintiffs may disagree with these peers and the Department's decision, but that disagreement supplies no basis for vacating the Rule.

## III.   FINANCIAL PROFESSIONALS CAN SATISFY THE BEST INTEREST CONTRACT EXEMPTION'S REQUIREMENTS

Recognizing that transaction-based compensation can be desirable, the Department properly crafted the Best Interest Contract Exemption to address the conflict-of-interest problems inherent in transaction-based compensation while still allowing financial professionals to use those compensation arrangements. Plaintiffs contend that the exemption's requirements are so impractical that the exemption is useless, and, as a consequence, professionals will have no choice but to switch uniformly to fee-based compensation models. Plaintiffs are wrong. Again, their dire predictions cannot be squared with the real experience of CFP® professionals who have worked under standards similar to those in the Best Interest Contract Exemption.

---

[24] *Available at* http://www.bloomberg.com/news/articles/2016-06-23/wall-street-splits-with-smaller-firms-over-broker-rule-lawsuit.

As already discussed, CFP® professionals have for years successfully provided financial planning services under a fiduciary standard using a variety of business models. Plaintiffs offer no reason to think that they and their members will be unable to do the same. As the chart below reflects, many of the Best Interest Contract Exemption's conditions match requirements for CFP® professionals, including: (1) to act in the best interest of the client; (2) to exercise a reasonable and prudent judgment; (3) to execute a written contract with the client; (4) to identify and mitigate conflicts of interest between the client and the CFP® professional and his or her employer; and (5) to provide written disclosures including the full costs of products and services and the compensation to the CFP® professional and/or employer.[25]

| | Best Interest Contract Exemption | Analogous CFP Board Rule or Standard (if providing financial planning) |
|---|---|---|
| Fiduciary Standard | Required | Rule of Conduct 1.4 |
| Written Contract | Required | Rule of Conduct 1.3 |
| Disclosure of Certain Fees and Costs | Required | Rule of Conduct 2.2(A) and Practice Standards 100-1 and 500-1 (require disclosure of accurate and understandable information related to costs and compensation, along with any material changes to that information) |
| Conflicts of Interest | Requires written notification of conflicts of interest | Rule of Conduct 2.2(B) and Practice Standards 100-1, 400-3, and 500-1 (require disclosure of summary of likely conflicts of interest) |
| Prudent Standards | Required | Rule of Conduct 4.4 (requires reasonable and prudent professional judgment) |
| Policies to Mitigate Conflicts | Required | Rule of Conduct 4.1 (requires integrity and objectivity in providing professional services) |

---

[25] CFP Board, *Standards of Professional Conduct*, Rules of Conduct 1.3, 1.4, 2.2, 4.1, 4.3 and 4.4, *available at* http://www.cfp.net/for-cfp-professionals/professional-standards-enforcement/standards-of-professional-conduct/rules-of-conduct.

And the Department did not charge forward without heeding the advice of commenters on the Proposed Rule. On the contrary, the Department made multiple revisions in the final Rule "to ease implementation in response to commenters' concerns about [the exemption's] workability." 81 Fed. Reg. 21,002, 21,008 (Apr. 8, 2016). Multiple financial firms expressly and publicly recognized the Department's receptiveness to industry critiques. As a Morningstar representative succinctly explained, "because the final rule incorporates the financial-services industry's comments, 'It will be harder for people in the industry to argue that the DOL didn't take their feedback into account.'" Wall Street Journal, *Reactions to the Labor Department's Fiduciary Rule* (Apr. 6, 2016); *see also id.* (noting comments that the Department "listened to some of the brokerage industry's early criticisms" (Cetera Financial Group), the Department "worked to address many of the practical concerns raised" (Merrill Lynch), and that the Department "made sincere efforts to streamline the original rule and make it easier for the industry to accommodate to the rule and minimize the unintended consequences and cost of complying" (Financial Engines)).

The Department's responsiveness is evident even from examining only modifications made corresponding to issues raised by the Coalition:

- The Coalition (as did other commenters) urged the Department to expand the exemption to include "small, participant-directed plans." Comment at 22. The Department did just that, agreeing that extending the exemption "would better promote the provision of best interest advice to all retail Retirement Investors." 81 Fed. Reg. at 21,014.

- The Coalition also made several suggestions to address the feasibility of the exemption's requirement that the financial professional enter into a written contract with the customer: permit the contract to be executed concurrently with signing an engagement contract or

opening an account, rather than, as the Proposed Rule mandated, before the adviser makes any recommendations; permit the contract requirement to be satisfied for existing clients through "negative consent," *i.e.*, by notifying the client of the new obligations undertaken by the adviser under the exemption; and, to ease compliance for business models that use adviser call centers, allow the financial institution itself, rather than the individual adviser, to execute the contract. Comment at 25-26. Again, the Department accepted these recommendations to increase the exemption's flexibility. *See* 81 Fed. Reg. at 21,023-24. Notably, some commenters advocated keeping the stricter timing rules, for instance, but the Department nonetheless readily modified them in accordance with the Coalition's (and other commenters') concerns.

- In response to the proposal that the Department "remove the disclosure requirements for Adviser-level compensation," Comment at 29, the Department specified that the "disclosures need not contain amounts paid to specific individuals." 81 Fed. Reg. at 21,050.

- Where the Coalition requested a specific good-faith compliance exception for certain warranties and disclosure requirements, Comment at 30, the Department implemented such "a good faith correction mechanism" in two separate parts of the Rule. 81 Fed. Reg. at 21,059.

The Department has thus created a regulatory framework that both protects consumers and gives financial advisers the flexibility to provide much-needed financial advice consistent with a wide range of business models. Plaintiffs cannot credibly insist that they support a "best interest" standard while challenging a reasonable implementation of that very standard.

16

**CONCLUSION**

Plaintiffs' motion for summary judgment should be denied, and Defendants' cross-motion

for summary judgment should be granted.

Dated: August 24, 2016                              Respectfully submitted.


                                                    /s/ *Brendan S. Maher*
                                                    Brendan S. Maher
                                                    Texas Bar No. 24053336
                                                    Douglas D. Geyser
                                                    Texas Bar No. 24059817
                                                    STRIS & MAHER LLP
                                                    6688 N. Central Expy., Suite 1650
                                                    Dallas, TX 75206
                                                    Tel.: (214) 396-6631
                                                    Fax: (210) 978-5430
                                                    *brendan.maher@strismaher.com*

                                                    *Counsel for* Amicus Curiae *The Financial
                                                    Planning Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2016, I electronically filed the foregoing document with the clerk of the court for the Northern District of Texas using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Brendan S. Maher*
Brendan S. Maher