**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.

*Plaintiffs,*

v.

THOMAS E. PEREZ, SECRETARY OF LABOR,
and UNITED STATES DEPARTMENT OF
LABOR,

*Defendants.*

Civil Action No. 3:16-cv-1476-M
Consolidated with:
      3:16-cv-1530-C
      3:16-cv-1537-N

**BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS**

DEEPAK GUPTA
MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Tel.: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*

MARTIN WOODWARD
STANLEY LAW GROUP
6116 N. Central Expressway
Dallas, TX 75206
Tel.: (214) 443-4301
Fax: (214) 443-0358
*mwoodward@stanleylawgroup.com*

*Counsel for Amicus Curiae
American Association for Justice*

# TABLE OF CONTENTS

Table of authorities .................................................................................................................... ii

Interest of *amicus curiae* ........................................................................................................ 1

Introduction and summary of argument .................................................................................. 1

Background ............................................................................................................................... 3

Argument ................................................................................................................................ 10

The fiduciary rule's class-action provision is a valid exercise of the Department's authority
that does not conflict with the Federal Arbitration Act. ...................................................... 10

    I.     The Department acted well within its statutory authority when it conditioned
          an exemption on the availability of class actions. ...................................................... 10

    II.    The rule is fully consistent with the Federal Arbitration Act. ................................... 12

         A.    The rule does not preclude the enforcement of any arbitration
                agreements.................................................................................................... 12

         B.    The rule covers only those who choose to invoke an exemption. ............... 14

         C.    The rule can—and therefore must—be harmonized with the
                Federal Arbitration Act's policies. .............................................................. 15

Conclusion .............................................................................................................................. 16

i

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Donovan,*
  757 F.2d 330 (D.C. Cir. 1985) ...................................................................... 10, 11

*American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway,*
  387 U.S. 397 (1967).............................................................................................. 11

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011)...................................................................................... 2, 3, 12

*Charles Schwab & Co. v. FINRA,*
  861 F.Supp.2d 1063 (N.D. Cal. 2012)................................................................ 16

*Chase Bank USA, N.A. v. McCoy,*
  562 U.S. 195 (2011)............................................................................................. 13

*City of New York v. Slater,*
  145 F.3d 568 (2d Cir. 1998) ............................................................................... 10

*Commissioner of Internal Revenue v. Keystone Consolidated Industries, Inc.,*
  508 U.S. 152 (1993)............................................................................................. 15

*CompuCredit Corp. v. Greenwood,*
  132 S. Ct. 665 (2012)........................................................................................... 13

*D.R. Horton, Inc. v. NLRB,*
  737 F.3d 344 (5th Cir. 2013) ........................................................................ 2, 5, 13

*Decker v. Northwest Environmental Defense Center,*
  133 S. Ct. 1326 (2013)......................................................................................... 13

*In Re Checking Account Overdraft Litigation,*
  685 F.3d 1269 (11th Cir. 2012) ............................................................................ 7

*Jicarilla Apache Tribe v. Andrus,*
  687 F.2d 1324 (10th Cir. 1982) .......................................................................... 16

*Lewis v. Epic Systems Corporation,*
  823 F.3d 1147 (7th Cir. 2016) .............................................................................. 5

*Metropolitan Life Insurance Co. v. Glenn,*
  554 U.S. 105 (2008).............................................................................................. 10

*Morris v. Ernst & Young LLP,*
  __ F.3d __, 2016 WL 4433080 (9th Cir. Aug. 22, 2016) ..................................... 5

*Morton v. Mancari,*
    417 U.S. 535 (1974) ........................................................................................... 16

*National Federation of Independent Businesses v. Sebelius,*
    132 S. Ct. 2566 (2012) ............................................................................... 2, 14, 15

*Rucker v. Wabash Railroad Co.,*
    418 F.2d 146 (7th Cir. 1969) ............................................................................. 13

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ........................................................................................... 11

*Shearson/American Express, Inc. v. McMahon,*
    482 U.S. 220 (1987) ................................................................................... 3, 10, 15

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ........................................................................................... 14

*United States v. Mersky,*
    361 U.S. 431 (1960) ........................................................................................... 16

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,*
    489 U.S. 468 (1989) ........................................................................................... 13

**Statutes and legislative materials**

7 U.S.C. § 26(n)(2) .................................................................................................. 6

9 U.S.C. § 2 ....................................................................................................... 3, 12

10 U.S.C. § 987(e) ................................................................................................... 4

10 U.S.C. § 987(f)(1) ............................................................................................... 5

15 U.S.C. § 78s(b)(1) ............................................................................................... 4

26 U.S.C. § 4975(c)(2) ........................................................................................... 11

29 U.S.C. § 1108(a). .............................................................................................. 10

Consolidated Appropriations Act 2016, Pub. L. No. 114–113, § 8096, 129 Stat.
    2242 (2015) ........................................................................................................ 6

Department of Defense Appropriations Act 2010, Pub. L. No 111–118, § 8116,
    123 Stat. 3409 (2009) ......................................................................................... 6

Pub. L. No. 93–406, § 2003(a) (2014) .................................................................... 15

## Administrative and regulatory materials

17 C.F.R. 249.819.................................................................................................... 4

41 Fed. Reg. 42942 (Sept. 29, 1976)....................................................................... 4

76 Fed. Reg. 76874 (Dec. 9, 2011) .......................................................................... 5

80 Fed. Reg. 42167 (July 16, 2015).......................................................................... 5

80 Fed. Reg. 42710 (July 20, 2015).......................................................................... 5

80 Fed. Reg. 43559 (July 22, 2015).......................................................................... 5

81 Fed. Reg. 32829 (May 24, 2016)................................................................. 4, 7, 8

81 Fed. Reg. 39330 (June 16, 2016)......................................................................... 5

Consumer Financial Protection Bureau, *Arbitration Study: Report to Congress* (2015)..................... 7, 8

FINRA Code of Arbitration Procedure for Customer Disputes 12204(d).................... 4

*In re Department of Enforcement v. Charles Schwab & Co.*,
  2014 WL 1665738 (FINRA Bd. 2014) ................................................................ 16

*In re D.R. Horton, Inc.*, 357 NLRB 2277, 2012 WL 36274 (2012) .................................... 5

52 S.E.C. Docket 2189, 1992 WL 324491 (October 28, 1992).................................. 3, 4

S.E.C., Order Approving Proposed Rule Change Relating to the Exclusion of
  Class Actions From Arbitration Proceedings, 57 Fed. Reg. 52659
  (Nov. 4, 1992) ....................................................................................................... 4

## Other authorities

Barbara Black & Jill I. Gross, *Investor Protection Meets the Federal Arbitration Act*, 1 Stan.
  J. Complex Litig. 1 (2012) ................................................................................... 4

CFPB Director Richard Cordray, Remarks at the Field Hearing on Arbitration
  Clauses (May 5, 2016) .......................................................................................... 7

Discover Financial Services, Annual Report (Form 10-K) (Feb. 25, 2015) .................. 6

Bernadette Bollas Genetin, *Expressly Repudiating Implied Repeals Analysis: A New
  Framework For Resolving Conflicts Between Congressional Statutes And Federal Rules*, 51
  Emory L.J. 677 (2002) ........................................................................................ 16

Kenneth R. Harney, *Fannie Follows Freddie in Banning Mandatory Arbitration*, Wash.
  Post, Oct. 9, 2004 .................................................................................................. 4

## INTEREST OF *AMICUS CURIAE*

The American Association for Justice (formerly known as the American Trial Lawyers Association) was established in 1946 to safeguard victims' rights, strengthen the civil justice system, and protect access to the courts. With members in the United States, Canada, and abroad, AAJ is the world's largest trial bar. It files this brief to show that the Department of Labor acted within its authority when it conditioned exemptions from its rule on the preservation of investors' ability to participate in class actions. No other amicus brief addresses this issue.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since 1992, the Financial Industry Regulatory Authority (FINRA)—under the SEC's oversight—has allowed arbitration of individual investor disputes while preserving the right of investors to participate in class actions. Many, if not most, investment firms and broker-dealers covered by the Department of Labor's new fiduciary conflict-of-interest rule are *already* covered by these existing rules, which have governed the securities industry for more than two decades.

The Department's new rule is just one among several steps taken by Congress and federal agencies in recent years to curb companies' efforts to shield themselves from class actions through the fine print. In the Dodd-Frank Wall Street Reform Act of 2010, Congress banned forced arbitration in all residential mortgages, and delegated to the SEC and the new Consumer Financial Protection Bureau (CFPB) broad authority to restrict arbitration in investor and consumer contracts. As mandated by Congress, the CFPB recently released the most comprehensive empirical study ever conducted on forced arbitration. Its findings are stark: class-action bans do not channel claims to a better, faster, cheaper system of dispute resolution. Instead, they kill the claims altogether. Their real-world effect is to shield corporate misconduct from public oversight, encourage future wrongdoing, and inhibit development of the law.

Beyond the SEC and CFPB, a range of federal agencies have moved to restrict either forced arbitration, class-action bans, or both. These include the Department of Defense (to protect servicemembers from predatory lenders), the Department of Agriculture (to protect poultry farmers from agribusinesses), the Department of Education (to protect students from for-profit trade colleges schools), the Department of Health and Human Services (to protect nursing-home patients), the Federal Trade Commission (to protect consumers asserting warranty claims), and the National Labor Relations Board (to ensure that workers can band together).

In two key respects, the Department of Labor's new rule is more modest than most of these measures. *First*, it does not preclude the enforcement of *any* arbitration agreements. By its terms, the rule "does not purport to render an arbitration provision in a contract between a Financial Institution and a Retirement Investor invalid, revocable, or unenforceable." AR at 100. Instead, firms "remain free to invoke and enforce arbitration provisions, including provisions that waive or qualify the right to bring a class action." *Id. Second*, the rule affects only firms that *choose* to take advantage of the prohibited-transaction exemptions. If a firm decides to ban class actions, the only consequence under federal law is that its contract "does not meet the conditions" for exemption. *Id.* And if it nevertheless imposes class bans while engaging in prohibited transactions, those bans would still be enforceable in court. Its compensation, however, could be subject to an excise tax, which "leaves an individual with a lawful choice to do or not do a certain act." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2600 (2012).

Both features unmistakably differentiate this rule from the California and NRLB rules struck down in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 342 (2011), and *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013). Those rules were held to violate the Federal Arbitration Act because they (1) rendered arbitration clauses with class-action bans unenforceable, and (2) left companies with no choice but to comply. The Department's rule, by contrast, is fully consistent

2

with the FAA's command that "[a] written provision in any . . . contract . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any such contract." 9 U.S.C. § 2. And it does not violate the FAA's core purpose of "ensur[ing] that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344. Again, the rule doesn't prevent the enforcement of *any* agreement.

Finally, the rule is compatible with the "liberal federal policy favoring arbitration agreements." Chamber Br. 31. The Supreme Court has held that the FAA's policies do not preclude a federal agency from employing its delegated authority from Congress to adopt "rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 234 (1987). In any event, because the rule and the statute both have the force of federal law, the Court should read them in harmony.

## BACKGROUND

### A.   Across a wide range of areas, Congress and federal agencies have limited the use of forced arbitration agreements and class-action bans.

The SEC was among the first federal agencies to regulate arbitration to preserve the availability of class actions. In 1992, at the request of FINRA (the financial industry's self-regulatory organization), the SEC approved a rule governing "the content of [any] pre-dispute arbitration agreements" entered into between FINRA members and their customers. 52 S.E.C. Docket 2189, 1992 WL 324491 (October 28, 1992). Because the SEC "believe[d] that investor access to the courts should be preserved for class actions . . . arising out of securities industry disputes," it endorsed a rule allowing individual arbitration but prohibiting FINRA members

from compelling arbitration against members of certified or putative class actions.[1] *Id.* It also required that any arbitration agreement "clearly state that class action claims are specifically outside the scope of arbitration contracts entered into by members." *Id.* For nearly twenty-five years, every FINRA member—including many entities that are subject to the Department of Labor's rule here—has complied with this regime. *See* Barbara Black & Jill I. Gross, *Investor Protection Meets the Federal Arbitration Act*, 1 Stan. J. Complex Litig. 1, 24–29 (2012).

Among financial regulators, the SEC is not alone. For investors subject to oversight by the Commodities Futures Trading Commission, it has been the rule—for forty years—that any arbitration agreement contained in a commodities contract must abide by certain restrictions. 41 Fed. Reg. 42942 (Sept. 29, 1976). In 2003 and 2004, Fannie Mae and Freddie Mac both decided to stop purchasing all mortgages with forced arbitration. Kenneth R. Harney, *Fannie Follows Freddie in Banning Mandatory Arbitration*, Wash. Post, Oct. 9, 2004, *available at* http://wapo.st/2bm97eb. And perhaps most significantly, in May of this year—following its congressionally mandated study—the CFPB proposed a rule to "prohibit providers from using a pre-dispute arbitration agreement to block consumer class actions in court" and require companies "to submit certain records relating to arbitral proceedings to the Bureau," effectively creating a public record of how consumers fare. 81 Fed. Reg. 32829, 32830 (May 24, 2016).

Beyond the financial and investment-services industry, many regulators have likewise moved to limit forced arbitration. The Department of Defense has used its authority under the Military Lending Act to ban arbitration in certain loans made to servicemembers. *See* 10 U.S.C. § 987(e) (making certain extensions of credit to servicemembers unlawful where "the creditor

---

[1] *See* FINRA Code of Arbitration Procedure for Customer Disputes 12204(d); S.E.C., Order Approving Proposed Rule Change Relating to the Exclusion of Class Actions From Arbitration Proceedings, 57 Fed. Reg. 52659, 52661 (Nov. 4, 1992) (citing Securities and Exchange Act, section 19(b)(1), 15 U.S.C. § 78s(b)(1), and Rule 19b-4, 17 C.F.R. 249.819).

4

requires the borrower to submit to arbitration"); *id.* § 987(f)(1) (making a knowing violation a misdemeanor); 80 Fed. Reg. 43559 (July 22, 2015) (expanding definition of covered consumer credit and banning arbitration clauses in such products). The Department of Education has proposed a rule that would prohibit schools participating in its direct loan program from entering into pre-dispute agreements with students that mandate arbitration of certain claims or waive their right to participate in class actions. *See* 81 Fed. Reg. 39330 (June 16, 2016). The FTC's regulations implementing the Magnuson-Moss Warranty Act have barred the use, in consumer warranty agreements, of arbitration agreements that would result in binding decisions. *See* 80 Fed. Reg. 42710 (July 20, 2015). The Department of Agriculture has restricted the ability of companies to force arbitration on poultry farmers by requiring that production contracts include language on the signature page allowing farmers to decline arbitration. 76 Fed. Reg. 76874 (Dec. 9, 2011). And the Department of Health and Human Services is finalizing new rules that would limit the use of forced arbitration by any long-term care facility participating in Medicare and Medicaid. 80 Fed. Reg. 42167 (July 16, 2015).

And, in perhaps the most sweeping agency action thus far, the National Labor Relations Board in 2012 issued an order ruling that an employer violates the National Labor Relations Act by requiring its workers to waive their right to maintain class or collective actions. *See In re D.R. Horton, Inc.*, 357 NLRB 2277, 2012 WL 36274 (2012). As a result, the NLRB adopted a policy that any employment contract with such a waiver is "unlawful." *Id.* at 2280.[2]

---

[2] The Fifth Circuit rejected the Board's effort to restrict class waivers under the NLRA, *see D.R. Horton v. NLRB*, 737 F.3d 344 (5th Cir. 2013), though, as we explain below, the court's holding and reasoning do not apply here. Recently, two other circuits have called the Fifth Circuit's decision into question, *see Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016); *Morris v. Ernst & Young LLP*, __ F.3d __, 2016 WL 4433080 (9th Cir. Aug. 22, 2016), but, of course, it continues to remain controlling in this Circuit. At any rate, the Department's rule does not contravene *D.R. Horton*.

For its part, Congress, too, has often prohibited the use or enforcement of forced arbitration for certain sorts of statutory claims. *See, e.g.*, 7 U.S.C. § 26(n)(2) (banning enforcement of forced arbitration clauses in CFTC whistleblower suits); 15 U.S.C. § 1226(a)(2) (banning enforcement of forced pre-dispute (but not voluntary post-dispute) arbitration clauses in motor vehicle franchise contracts). In other contexts, it has restricted who can take advantage of a particular arbitration agreement, for example, by barring certain private federal contractors from enforcing pre-dispute arbitration agreements in any case involving either claims under Title VII of the Civil Rights Act or common-law sexual assault or harassment claims. *See* Department of Defense Appropriations Act 2010, Pub. L. No 111−118, § 8116, 123 Stat. 3409, 3454 (2009) and Consolidated Appropriations Act 2016, Pub. L. No. 114−113, § 8096, 129 Stat. 2242, 2374 (2015) (enforcing such restrictions for large defense contractors as a condition of federal funding).

**B.    A growing body of empirical evidence shows that class-action bans suppress claims, thwart the enforcement of statutory rights, and inhibit development of the law.**

These many agency and congressional efforts to regulate the use of forced arbitration build on an emerging body of empirical research focused on the effect of forced arbitration in standard-form contracts. This research has demonstrated that, by taking advantage of clauses inserted into take-it-or-leave-it contracts that ban class actions, companies across sectors have succeeded in suppressing claims and sidestepping whole swaths of law—a point that even major companies openly acknowledge. *See, e.g.*, Discover Financial Services, Annual Report (Form 10-K) (Feb. 25, 2015) at 43 ("[W]e have historically relied on our arbitration clause in agreements with customers to limit our exposure to consumer class action litigation . . . ."). As a result, cases that previously would have been litigated and publicly recorded are now either diverted to a private arbitrator or (more likely) not brought at all—resulting in what one agency head has

called a "legal lockout." CFPB Director Richard Cordray, Remarks at the Field Hearing on Arbitration Clauses (May 5, 2016), *available at* http://bit.ly/1UCGKWT.

Consider the CFPB's recent study on the use of arbitration agreements—the single most "comprehensive empirical" look at class-action bans and forced arbitration. *See* Consumer Financial Protection Bureau, *Arbitration Study: Report to Congress* 2 (2015), *available at* http://bit.ly/19cVrvE. In March 2015—after nearly four years of study—the Bureau released its long-awaited report. It found that the use of class-action bans in arbitration agreements does not simply channel claims into a cheaper, faster alternative forum. Instead, these clauses effectively suppress claims altogether and immunize companies from accountability. 81 Fed. Reg. at 32859.

One example from the CFPB's report illustrates the point. The Bureau's research included a case study of recent class actions filed against twenty-three banks for illegally charging consumers millions of dollars in excessive overdraft fees. *Id.* at § 8, at 39–46 (discussing *In Re Checking Account Overdraft Litig.*, 685 F.3d 1269 (11th Cir. 2012)). All of the banks had the same practice. Consumers reached eighteen settlements, resulting in a total of $1 billion in cash relief that was transferred directly to the bank accounts of over twenty-eight million people. But when the Bureau reviewed the outcomes in cases against five banks that had forced consumers into individual arbitration, it was unable to verify that even one consumer had received any relief.

Data from established arbitration providers reinforces the Bureau's conclusions. The Bureau reviewed several years of records from the leading arbitration provider documenting the amount of compensation consumers received for small-dollar claims. It was able to identify only *four* consumers that had received affirmative relief on claims of less than $1,000, compared to the tens of millions of people who got relief through group litigation. *Id.* at § 5, at 13. The amounts of recoveries were also remarkably one-sided. The agency found that class actions returned over $200 million annually in settlements for consumers, while disputes settled through arbitration

7

netted just over $350,000 in a two-year period. Press Release, Consumer Financial Protection Bureau, CFPB Study Finds That Arbitration Agreements Limit Relief for Consumers, March 10, 2015, *available at* http://bit.ly/2bmlPty.

The upshot: though class actions offer the most "effective means of securing relief for large numbers of consumers affected by common legally questionable practices," arbitration agreements "block many class action claims that are filed and discourage the filing of others." 81 Fed. Reg. at 32855; *see also id.* at 32830 (explaining that the study's findings establish that class-action waivers "are being widely used to prevent consumers from seeking relief from legal violations on a class basis" despite the fact that "consumers rarely file individual lawsuits or arbitration cases to obtain such relief").

## C.   The Department's rule encourages the availability of class actions but does not require the invalidation of a contract that contains a class-action ban.

Like other agencies, the Department of Labor has sought to protect investors by ensuring the availability of class actions. The purpose of its rule is much the same as other agency-approved rules: It "ensure[s] that Retirement Investors receive the full benefit of the exemption's protections by preventing them from being contracted away." AR at 98. Class actions, the Department explained, "address systemic violations affecting many different investors" and "create[] a powerful incentive for Financial Institutions to carefully supervise individual Advisers, and ensure adherence" to the exemption standards. AR at 99. The Department also recognized that "[o]ften the monetary effect on a particular investor is too small to justify pursuit of an individual claim, even in arbitration"—meaning that the "ability to bar investors from bringing or participating" in a class action "would undermine important investor rights and incentives for Advisers to act in accordance with the Best Interest standard." *Id.*

8

Compared with many other agency efforts, however, the Department's approach to protecting the class action is far more modest. By its terms, the rule denies "relief" for an "exemption" from ERISA's prohibited transactions "if a Financial Institution's contract contains" a "provision under which the Plan, IRA, or Retirement Investor waives or qualifies its right to bring or participate in a class action or other representative action in court in a dispute with the Adviser of Financial Institution." AR at 134.

But the rule "does not purport to render an arbitration provision in a contract between a Financial Institution and a Retirement Investor invalid, revocable, or unenforceable" AR at 100. And it expressly "does not prohibit" class-action waivers. *Id.* Quite the opposite: As the Department explained in its commentary, "[b]oth Institutions and Advisers remain free to invoke and enforce arbitration provisions, including provisions that waive or qualify the right to bring a class action or any representative action in court." *Id.* The Department's rule also "does not prevent" investors from "voluntarily agreeing to arbitrate" class claims "after the dispute has arisen" or, like FINRA's approach, "permitting mandatory pre-dispute arbitration for individual claims." AR at 98.

If a contract prohibits investors from bringing class actions in court, the only consequence under federal law is that "such a contract simply does not meet the conditions for relief from the prohibited transaction provisions of ERISA and the Code" and "the exemption is unavailable." AR at 100, 76. As a result, "the Financial Institution and Adviser would remain fully obligated under both ERISA and the Code to refrain from engaging in prohibited transactions." *Id.* The statutory penalty for ignoring this command would be "the imposition of an excise tax under the Code, payable to the Treasury," not the invalidation of the class–action ban or contract. AR at 90.

**ARGUMENT**

**THE FIDUCIARY RULE'S CLASS-ACTION PROVISION IS A VALID EXERCISE OF THE DEPARTMENT'S AUTHORITY THAT DOES NOT CONFLICT WITH THE FEDERAL ARBITRATION ACT**

## I.    The Department acted well within its statutory authority when it conditioned an exemption on the availability of class actions.

The Department's modest approach to conditioning an exemption on the availability of class actions is well within its delegated regulatory authority. The rule is not only consistent with "Congress' desire to offer employees enhanced protection for their benefits," *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008), but specifically falls within the requirement that the Department restrict the receipt of conflicted compensation. ERISA section 408(a) authorizes the Secretary to "grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of [ERISA's prohibited transactions]." 29 U.S.C. § 1108(a). As part of the Department's exemption, it has required covered entities—"[a]s a condition of receiving compensation that would otherwise be prohibited under ERISA and the Code"—to "adhere" to certain standards "set forth in an enforceable contract" with each investor. AR at 59. Allowing class actions in court is one of these standards.

This species of delegated authority is neither controversial nor novel. When a "statute expressly grants the Secretary authority to grant exemptions," the Secretary's determinations are "entitled to great deference." *AFL-CIO v. Donovan*, 757 F.2d 330, 343 (D.C. Cir. 1985); *see also City of New York v. Slater*, 145 F.3d 568, 570–71 (2d Cir. 1998). The Supreme Court, in fact, has construed similar grants of "broad authority" as delegating an agency "expansive power" to "ensure that arbitration procedures adequately protect statutory rights." *McMahon*, 482 U.S. at 233–34.

Given this, the Chamber wisely avoids directly challenging the Department's authority under section 408(a) to condition an exemption on the availability of class actions. Instead, it opts to lodge a broader attack, arguing that the Department's authority under section 408(a) is essentially boundless—"limited only by DOL's own imagination." Chamber Br. 26. That is wrong. The statute itself places three quite specific limitations on the Secretary's authority to grant a conditional exemption: The Secretary "may not grant an exemption" unless he "finds that such exemption is—(A) administratively feasible, (B) in the interests of the plan and of its participants and beneficiaries, and (C) protective of the rights of participants and beneficiaries of such plan." 26 U.S.C. § 4975(c)(2). And the Chamber makes no attempt to show that the arbitration-related restrictions are inconsistent with these requirements—for good reason. The Secretary explicitly found that conditioning an exemption on the availability of class actions "satisfies these requirements" because, "consistent with the position of the SEC and FINRA, courts are generally better equipped to handle class claims than arbitration procedures." AR at 101. That determination is entitled to "great deference." *AFL-CIO*, 757 F.2d at 343.

It is also irrelevant that the Department's rule here is broader than it was in 1975. The Chamber seems to think (at 35) that, because the Department's rule here imposes a set of "new obligations," it has exceeded its authority. But agencies are "neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 416 (1967). That the Department's 1975 rule conditioned exemptions on a more narrow set of criteria does not mean that those rules must "last forever." *Id.* An agency "must be given ample latitude to adapt [its] rules and policies to the demands of changing circumstances." *Rust v. Sullivan*, 500 U.S. 173, 186–87 (1991). The Department has done just that here.

11

## II.      The rule is fully consistent with the Federal Arbitration Act.

### A.      The rule does not preclude the enforcement of any arbitration agreements.

The FAA provides that "[a] written provision in any . . . contract . . . to settle by arbitration a controversy . . . *shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any such contract." 9 U.S.C. § 2 (emphasis added). Its purpose is "to ensure that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344. The Chamber argues that the rule violates this command, and frustrates the FAA's purpose, by "condition[ing] the enforceability of arbitration agreements on the presence or absence of particular terms." Chamber Br. 31–33.

But the rule here does no such thing: Institutions and advisers "remain free to invoke and enforce arbitration provisions, including provisions that waive or qualify the right to bring a class action or any representative action in court." AR at 100. The consequence of including such a provision is simply that the contract will "not meet the conditions" for the exemption, so that conflicted compensation will be subject to taxation. *Id.* The conditions placed on the exemption, however, "do[] not purport to render an arbitration provision in a contract between a Financial Institution and a Retirement Investor invalid, revocable, or unenforceable." *Id.* Indeed, the Department has specifically disclaimed the possibility that the rule may be used to render an arbitration clause invalid. *Id.* ("[I]f a Financial Institution enters into a contract requiring binding arbitration of class claims, the Department would not purport to invalidate the provision."). The Chamber ignores every one of these statements.

To win, the Chamber must convince this Court that the rule is something other than what it is. It takes on that task by, in effect, inventing a different rule—suggesting that the Department cannot be trusted to explain its own rule. But the Chamber never explains why the

Court should not simply read the rule as it is written. *See Rucker v. Wabash R.R. Co.*, 418 F.2d 146, 149–50 (7th Cir. 1969) (administrative rules "are to be construed to effectuate the intent of the enacting body," and court must "look first to the plain language" and the "purpose behind its enactment"). Moreover, the Chamber never offers any reason to doubt the Department's interpretation, to which this Court owes deference. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011). "When an agency interprets its own regulation," courts, "as a general rule, defer[] to it unless that interpretation is plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013). The Court should take the Department at its word—not only because there is no basis to doubt its sincerity, but also because principles of agency deference require that it do so.

The FAA poses no barrier here. It "requires courts to enforce agreements to arbitrate according to their terms," *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012), but it "does not confer a right to compel arbitration of any dispute at any time." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Because the Department's rule does not affect the enforceability of agreements one way or another, it does not even implicate the FAA. That makes this rule fundamentally different from the California state-law and NLRB rules at issue in *Concepcion* and *D.R. Horton*, both of which directly conditioned the enforcement of arbitration clauses on the availability of class procedures. *Compare* 737 F.3d at 358 (holding that the NLRB violated "the requirement under the FAA that arbitration agreements must be enforced according to their terms") *with* AR at 100 (rule's "exemption does not purport to render an arbitration provision … invalid, revocable, or unenforceable.").

**B.      The rule covers only those who choose to invoke an exemption.**

Even apart from the fact that the rule does not prevent the enforcement of any arbitration agreements, the voluntary nature of the rule provides another, independent reason why this case is controlled by neither *Concepcion* nor *D.R. Horton*.

*First*, institutions may freely choose whether to either (1) continue to receive conflicted compensation under the conditions set forth by the best-interest-contract exemption or (2) avoid those conditions by "structur[ing] their operations to avoid prohibited transactions." *See* AR at 81. The Chamber accepts that this is the correct reading of the rule but denies that advisers may freely make this choice, analogizing to Spending Clause cases like *South Dakota v. Dole*, 483 U.S. 203 (1987), and *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012). That is a stretch, to put it mildly. Spending Clause jurisprudence says nothing about the federal government's ability to impose obligations on regulated *private parties*, and specifically rests on the States' unique status as "separate and independent sovereigns." *Id* at 2603. In any event, the rule's exemptions are a far cry from the coercion inherent in the federal government's ability to withhold all Medicaid payments from a State. *Id.* at 2607. And the Chamber offers nothing more than speculation (at 33) to support its hyperbolic claim that this rule is like a "gun to the [] head."

*Second*, even if they have freely decided to obligate themselves to the rule's restrictions, institutions face a second choice: They may lawfully choose between (1) complying and being exempt from the excise tax on prohibited transactions, or (2) not complying and being subject to the tax. That is voluntary as a matter of law; the "imposition of a tax nonetheless leaves an individual with a *lawful choice* to do or not do a certain act, so long as he is willing to pay a tax levied on that choice." *Id.* at 2600 (emphasis added).

In *NFIB*, the Court determined that the Affordable Care Act's imposition of a "[s]hared responsibility payment" should be considered a tax for several distinct reasons, including that (1)

the payment "is paid into the Treasury," (2) "[t]he requirement to pay is found in the Internal Revenue Code and enforced by the IRS," and (3) it "yields the essential feature of any tax: it produces at least some revenue for the Government." *Id.* at 2594. Applying this approach compelled the conclusion that "the mandate is not a legal command to buy insurance," *id.* at 2593–94, and further than failure to comply need not be considered "unlawful," as it triggered no "negative legal consequences . . . beyond requiring a payment to the IRS," *id.* at 2597. The excise tax on prohibited transactions here meets each of these factors—the Treasury collects the payment, the Code requires it, and the government coffers benefit. What's more, the consequence of engaging in a prohibited transaction (absent qualifying for an exemption) not only functions as a tax—thus meeting the *NFIB* test—but also has been specifically labeled to be such by both Congress and the Supreme Court. *See* Pub. L. No. 93–406, § 2003(a) (2014) (amending the Code to add "Sec. 4975. Tax On Prohibited Transactions"); *C.I.R. v. Keystone Consol. Indus.*, 508 U.S. 152, 155 (1993) ("Section 4975 of the Internal Revenue Code . . . imposes a two-tier excise tax on specified 'prohibited transactions' between a pension plan and a 'disqualified person.'").

### C.   The rule can—and therefore must—be harmonized with the Federal Arbitration Act's policies.

Unable to identify a square conflict between the rule and the FAA, the Chamber suggests (at 33) that the FAA's policies impede agencies from even promoting "a preference for arbitration contracts without class waivers." Nothing in existing FAA jurisprudence supports that suggestion.

To the contrary, the Supreme Court has made clear that federal agencies may properly employ their general delegated authority from Congress—even if that authority says nothing specific about arbitration—to regulate arbitration procedures and "protect statutory rights." *McMahon*, 482 U.S. at 233–34 (recognizing SEC's "broad authority to oversee and to regulate . . .

the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights"). Indeed, the rule here follows the path first charted by the SEC under the very authority approved in *McMahon*, allowing individual-investor arbitration and preserving class actions. Only once has this SEC rule been challenged under the FAA, and it lost in both court and agency adjudication. *See Charles Schwab & Co. v. FINRA*, 861 F.Supp.2d 1063 (N.D. Cal. 2012); *In re Dep't of Enforcement v. Charles Schwab & Co.,* 2014 WL 1665738 (FINRA Bd. 2014). And the Supreme Court has never suggested that a federal program offends the FAA merely by encouraging participants in the program to forgo arbitration, or placing conditions on its use.

Even assuming a tension between the rule and what the Chamber identifies as the FAA's pro-arbitration policies, the two sources of law must be harmonized. The Department's rule has "the force of law, . . . just as if all the details had been incorporated into the congressional language," *United States v. Mersky*, 361 U.S. 431, 437−38 (1960), and "[r]egulations are generally subject to the same rules of construction as statutes," *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1332 (10th Cir. 1982), including the fundamental obligation to reconcile statutes capable of co-existence. "The courts are not at liberty to pick and choose" among these sources of federal law; where, as here, they are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *see* Bernadette Bollas Genetin, *A New Framework For Resolving Conflicts Between Congressional Statutes And Federal Rules*, 51 Emory L.J. 677, 701−726 (2002).

## CONCLUSION

The Court should hold that the contract requirements in the best-interest-contract exemption and the principal transactions exemption do not violate the Federal Arbitration Act.

Respectfully submitted,

/s/ Martin Woodward
Martin Woodward
STANLEY LAW GROUP
6116 N. Central Expressway
Suite 1500
Dallas, TX 75206
Tel.: (214) 443-4301
Fax: (214) 443-0358
mwoodward@stanleylawgroup.com

Deepak Gupta
(*pro hac vice* admission pending)
Matthew W.H. Wessler
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Tel.: (202) 888-1741
Fax: (202) 888-7792
deepak@guptawessler.com

*Attorneys for Amicus Curiae*
*American Association for Justice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of August, I electronically filed the foregoing amicus brief with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel required to be served.

*/s/ Martin Woodward*
Martin Woodward

August 26, 2016