## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al*.,

        Plaintiffs,

    v.

EDWARD HUGLER, ACTING
SECRETARY OF LABOR, and UNITED
STATES DEPARTMENT OF LABOR,

        Defendants.

**Civil Action No. 3:16-cv-1476-M**

Consolidated with:

      3:16-cv-1530-C

      3:16-cv-1537-N

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' Cross-Motions for Summary Judgment (ECF Nos. 48, 51, 54, 67). On November 17, 2016, the Court held oral argument on the Motions. For the reasons stated below, Plaintiffs' Motions for Summary Judgment are **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED**.

## I.    Introduction

Plaintiffs U.S. Chamber of Commerce ("COC"), the Indexed Annuity Leadership Council ("IALC") and the American Council of Life Insurers ("ACLI") (collectively, "Plaintiffs") bring this lawsuit to challenge three rules published by the Department of Labor ("DOL") on April 8, 2016, which were to become effective on April 10, 2017.[1] Shortly after the final rules were published, COC filed this action. On June 21, 2016, the Court consolidated that

---

[1] On February 3, 2017, the President issued a memorandum directing the Secretary of Labor to conduct a further review of the fiduciary rule. Memorandum from the President of the United States, to the Secretary of Labor (Feb. 3, 2017), https://www.whitehouse.gov/the-press-office/2017/02/03/presidential-memorandum-fiduciary-duty-rule. That same day, the acting Secretary of Labor stated the DOL will now consider its legal options to delay the applicability date to comply with the President's memorandum. Those matters do not moot this dispute.

case with cases filed by IALC and ACLI. On July 18, 2016, the Plaintiffs filed their Motions for

Summary Judgment, asking the Court to vacate the new rules in their entirety.[2]

Prior to the new rules, a financial professional who did not give advice to a consumer on

a regular basis was not a "fiduciary," and therefore was not subject to fiduciary standards under

the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code (the

"Code"). Unless fiduciaries qualify for an exemption, they are prohibited by ERISA and the

Code from receiving commissions, which are considered to present a conflict of interest. Prior to

the new rules, fiduciaries could qualify for an exemption known as the Prohibited Transaction

Exemption 84-24 ("PTE 84-24"), which, if they qualified, allowed them to receive commissions

on all annuity sales as long as the sale was as favorable to the consumer as an arms-length

transaction and the adviser received no more than reasonable compensation.

The new rules modify the regulation of conflicts of interest in the market for retirement

investment advice, and consist of: 1) a new definition of "fiduciary" under ERISA and the Code;

2) an amendment to, and partial revocation of, PTE 84-24; and 3) the creation of the Best Interest

Contract Exemption ("BICE"). The first rule revises the definition of "fiduciary" under ERISA

and the Code, and eliminates the condition that investment advice must be provided "on a regular

basis" to trigger fiduciary duties.[3] The second rule amends PTE 84-24, which provides

exemptive relief to fiduciaries who receive third party compensation for transactions involving

an ERISA plan or individual retirement account ("IRA").[4] The DOL excluded those selling fixed

indexed annuities ("FIAs") as eligible for exemptions under amended PTE 84-24. The third rule,

---

[2] Unless individually specified, the Court refers to Plaintiffs collectively.

[3] Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice (*Final Fiduciary Definition*), 81 Fed. Reg. 20,946 (Apr. 8, 2016) (to be codified at 29 C.F.R. pts. 2509, 2510, and 2550).

[4] Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters (*Final PTE 84-24*), 81 Fed. Reg. 21,147 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550).

BICE, creates a new exemption for FIAs and variable annuities, and allows fiduciaries to receive commissions on the sale of such annuities only if they adhere to certain conditions, including signing a written contract with the consumer that contains enumerated provisions.[5]

Plaintiffs complain that financial professionals are improperly being treated as fiduciaries and should not be required to comply with heightened fiduciary standards for one-time transactions. Plaintiffs also complain that the conditions to qualify for an exemption under BICE are so burdensome that financial professionals will be unable to advise the IRA market and sell most annuities to ERISA plans and IRAs. They challenge the new rules and rulemaking procedure, and ask the Court to vacate them in their entirety.

## II.   Definitional Issues

### A.  Annuities

Annuities are insurance contracts where the purchaser invests money and receives payments at set intervals or over the lifetime of the individual. They are generally used as retirement vehicles. Annuity payments may be immediate or deferred. Deferred annuities have two phases: in the first phase, they accumulate value through premium payments and interest; in the second phase, they pay out based on an application of a predetermined formula. The three most common types of deferred annuities are fixed rate annuities, variable annuities, and FIAs (fixed indexed annuities).

Fixed rate annuities guarantee the purchaser will earn a minimum rate of interest during the accumulation phase. Insurance companies bear the market risk on fixed rate annuities because the annuity is guaranteed to earn at least the declared interest rate for the time period specified in the contract. When the purchaser begins to receive payments, income payments are

---

[5] Best Interest Contract Exemption (*Final BICE*), 81 Fed. Reg. 21,002 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550).

either based on the original guaranteed rate or the insurer's current rate, whichever is higher. Fixed rate annuities are subject to state insurance regulations and are not regulated by federal securities laws. Fixed rate annuities are usually sold by banks and insurance agents.

Variable annuities do not guarantee future income. Instead, returns on such annuities depend on the success of the underlying investment strategy. Premiums are invested, and the consumer bears the investment risk for both principal and interest. There is opportunity for greater return, but it comes with a higher risk. Variable annuities are regulated under federal securities laws and are usually sold by broker-dealers.

FIAs share features of fixed rate and variable annuities. FIAs earn interest based on a market index, such as the Dow Jones Industrial Average, or the S&P 500. Depending on the performance of the market index chosen by the consumer, returns on FIAs can be higher or lower than the guaranteed rate of a fixed rate annuity. At the same time, the rate of return cannot be less than zero, even if the index is negative for the relevant time period. Principal, therefore, is shielded from poor market performance. FIAs give the purchaser more risk but more potential return than fixed rate annuities, but less risk and less potential return than variable annuities. FIAs are not regulated under federal securities laws and are usually sold by insurance agents. They, like fixed rate annuities, are regulated by state insurance regulators.

### B.  Investment Advisers and the Distribution Model for Sale of FIAs

Three groups of professionals generally provide investment advice to retirees: registered investment advisers, broker-dealers, and insurance agents. Registered investment advisers must register with the Securities and Exchange Commission ("SEC"). Broker-dealers are not required to register with the SEC as investment advisers if their advice is "solely incidental" to the

conduct of their business and they receive no "special compensation" for advisory services.[6]

Broker-dealers are generally subject to a suitability standard, which requires they have a

reasonable basis to believe that a recommended transaction or investment strategy involving

securities is suitable for the consumer based on the consumer's investment profile.[7]

      Financial professionals generally charge for their services in one of two ways. In a

transaction-based compensation model, the professional receives a commission, mark-up, or

sales load on a per transaction basis. In a fee-based compensation model, the investor pays based

on either the amount of assets in the account, or pays a flat, hourly, or annual fee.

      FIAs are most often sold by independent insurance agents. Independent marketing

organizations ("IMOs") serve as intermediaries between independent agents and insurance

companies, and provide product education, marketing, and distribution services to agents.[8]

### C.  Title I of ERISA: Employee Benefit Plans

      To protect employee benefit plan beneficiaries, Title I of ERISA, 29 U.S.C § 1021 *et*

*seq.*, imposes obligations on persons who engage in activities related to employee benefit plans

as fiduciaries. Under Title I, a person "is a fiduciary with respect to a plan" if:

    i)     [h]e exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

    ii)    [h]e renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

    iii)   [h]e has any discretionary authority or discretionary responsibility in the administration of such plan.[9]

---

[6] 15 U.S.C. § 80b-2(a)(11)(C).

[7] Regulatory Impact Analysis at AR348-50 (ECF No. 47-1) (citing FINRA rules).

[8] Insurance companies compensate IMOs based on a percentage of an agent's sales. IMOs and their independent insurance agents are the largest distribution channel for FIAs, and approximately 65% of FIAs are sold by insurance agents who are not affiliated with a broker-dealer.

[9] 29 U.S.C. § 1002(21)(A) (emphasis added).

Under Title I, a fiduciary must adhere to the duties of loyalty and prudence, which requires the fiduciary to:

> [d]ischarge his duties with respect to a plan solely in the interest of the participants and the beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of plan administration; and act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.[10]

Title I also protects plan beneficiaries from a broad range of transactions deemed to present a conflict of interest for fiduciaries.[11] The prohibited transaction rule prevents a fiduciary from participating in a transaction if he or she:

> [k]nows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest; lending of money or other extension of credit between the plan and a party in interest; furnishing of goods, services, or facilities between the plan and a party in interest; transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.[12]

Congress delegated authority to the DOL to grant conditional or unconditional exemptions from the prohibited transaction rule, so long as such an exemption is 1) administratively feasible; 2) in the interests of the plan, its participants and beneficiaries; and 3) protective of the rights of the plan participants and beneficiaries.[13] The DOL, fiduciaries, plan participants and beneficiaries may bring civil actions under Title I to enforce the fiduciary duty and prohibited transactions provisions.[14] Title I of ERISA fully preempts state law.

---

[10] 29 U.S.C. § 1104(a)(1)(A)–(B).

[11] Congress enacted the prohibited transactions to supplement a fiduciary's general duty of loyalty to the plan's beneficiaries by "categorically barring certain transactions deemed likely to injure the pension plan." *Harris Trust Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

[12] 29 U.S.C. § 1106. In addition, "a fiduciary may not deal with the assets of the plan in his own interest or for his own account," and "may not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *Id*.

[13] 29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2).

[14] 29 U.S.C. § 1132(a)(2), (3), (5).

### D.   Title II of ERISA: IRAs

Title II of ERISA establishes rules for the tax treatment of IRAs and other plans not subject to Title I. Unlike Title I, Title II applies to IRAs and other plans that are not created or maintained by either the plan beneficiary's employer or union.[15] In Title II, Congress amended the Code to make the definition of fiduciary under Title II identical to the definition under Title I.[16] Title II also has a prohibited transaction rule that prevents the same transactions involving conflicts of interest as does Title I.[17] Title II, however, does not expressly impose the duties of loyalty and prudence on fiduciaries. Congress delegated the same authority to the DOL under Title II to grant conditional or unconditional exemptions from prohibited transactions, with the same three limitations described above.[18] Title II subjects violators of the Code's prohibited transaction rule to excise taxes.[19] However, Title II does not create a private right of action, nor does it fully preempt state law with respect to causes of action relating to IRAs.[20]

### E.   1975 Definition of "Fiduciary"

Under the second prong of ERISA's fiduciary definition, a person is a fiduciary if "he renders investment advice for a fee or other compensation, direct or indirect."[21] In 1975, the DOL issued a regulation establishing a five-part test for determining when a person "renders investment advice." If the following elements were present, the regulation would have the effect of rendering that person a fiduciary:

1) [The person] [r]enders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property,
2) On a regular basis,

---

[15] 26 U.S.C. § 4975(e)(1).
[16] *Compare* 26 U.S.C. § 4975(e)(3), *with* 29 U.S.C. § 1002(21)(A).
[17] 26 U.S.C. § 4975(c).
[18] 26 U.S.C. § 4975(c)(2).
[19] 26 U.S.C. § 4975(a)–(b).
[20] *See* 29 U.S.C. § 1144.
[21] 29 U.S.C. § 1002(21)(A)(ii).

3) Pursuant to a mutual agreement, arrangement or understanding, with the plan or a
plan fiduciary,

4) The advice will serve as a primary basis for investment decisions with respect to plan
assets, *and*

5) The advice will be individualized based on the particular needs of the plan. [22]

Until the DOL's recent rulemaking, the five-part test had governed the applicability of the

prohibited transaction rules under Title I and Title II. Because of the second element of the test,

sporadic or one-time advice would not constitute advice on a regular basis that would activate

ERISA's prohibited transaction rule, which only applies to fiduciaries.

## F.  Prohibited Transaction Exemption 84-24 (PTE 84-24)

The DOL originally adopted PTE 84-24 in 1977 as PTE 77-9, providing exemptive relief

for parties who "receive[d] commissions when plans and IRAs purchased recommended

insurance and annuity contracts."[23] The exemption applied to "[t]he receipt, directly or

indirectly, by an insurance agent or broker or a pension consultant of a sales commission from an

insurance company in connection with the purchase, with plan assets[,] of an insurance or

annuity contract."[24] Relief under PTE 84-24 was conditional, requiring that any otherwise

prohibited transaction was "on terms at least as favorable to the plan as an arm's–length

transaction with an unrelated party," and that "[t]he combined total of all fees, commissions and

other consideration received by the insurance agent or broker, pension consultant, insurance

company, or investment company principal underwriter…is not in excess of 'reasonable

compensation'" under ERISA and the Code.[25] PTE 84-24 made exemptive relief available for the

sale of fixed and variable annuities. Prior to the recent rulemaking, therefore, insurance

---

[22] Definition of the Term "Fiduciary," 40 Fed. Reg. 50,842 (Oct. 31, 1975).

[23] *Final PTE 84-24*, 81 Fed. Reg. at 21,148.

[24] Amendments to Class Exemption for Certain Transactions Involving Insurance Agents and Brokers, Pension
Consultants, Insurance Companies, Investment Companies and Investment Company Principal Underwriters (*1984
Amendment to PTE 84-24*), 49 Fed. Reg. at 13,211 (Apr. 3, 1984).

[25] *Id.*

companies could compensate employees and independent agents by commissions on the sale of any annuity product to ERISA plans and IRAs, so long as the related investment advice was not provided on a regular basis, or the transaction was as favorable as an arm's-length transaction and for a reasonable fee.

### G. **Recent Rulemaking**

#### a.  Proposed Rule

In 2010, the DOL published a notice proposing to revise the 1975 regulation's five part-test for determining when a person "renders investment advice."[26] In 2011, the DOL withdrew that proposal. On April 20, 2015, the DOL issued a new proposal, which modified both the 1975 regulation and the prohibited transaction exemptions. It is that proposal which is being challenged here.

##### 1.  The DOL Proposed Replacing the Five-Part Test

The DOL stated in the 2015 notice that the five part-test had been created "prior to the existence of participant-directed 401(k) plans, widespread investments in IRAs, and the now commonplace rollover of plan assets from fiduciary-protected plans to IRAs," and that these rollovers "will total more than $2 trillion over the next 5 years."[27] Because the rollover of plan assets to an IRA is a one-time action, it did not satisfy the regular basis element of the five part test, and thus was not subject to the prohibited transaction rule, despite the fact that, as the DOL

---

[26] Definition of the Term "Fiduciary," 75 Fed. Reg. 65,263 (proposed Oct. 22, 2010) (to be codified at 29 C.F.R. 2510).
[27] Definition of the Term "Fiduciary;" Conflict of Interest Rule–Retirement Investment Advice, 80 Fed. Reg. 21,928, 21,932 (proposed Apr. 20, 2015) (to be codified at 29 C.F.R. pts. 2509 and 2510). In this context, a rollover transfers retirement savings from an employee benefit plan, such as a 401(k), to an IRA. *See* IRS.gov, https://www.irs.gov/taxtopics/tc413.html (last visited February 7, 2017); *see also* Investopedia.com, http://www.investopedia.com/terms/i/ira-rollover.asp (last visited February 7, 2017).

put it, rollover investments are often "the most important financial decisions that many

consumers make in their lifetime."[28]

The 2015 notice also stated that since 1975, "the variety and complexity of financial

products has increased," and that retirees "are increasingly moving money from ERISA-covered

plans, where their employer has both the incentive and the fiduciary duty to facilitate sound

investment choices, to IRAs where both good and bad investment choices are myriad and advice

that is conflicted is commonplace."[29] With these marketplace changes in mind, the DOL

proposed replacing the five-part test with a new approach that would cover "a wider array of

advice relationships than the existing ERISA and Code regulations."[30]

    2.   Proposed Changes to PTE 84-24

The DOL also proposed significant modifications to PTE 84-24. The proposal "revoke[d]

[PTE 84-24] relief for insurance agents, insurance brokers and pension consultants to receive a

commission in connection with the purchase by IRAs of variable annuity contracts and other

annuity contracts that are securities under federal securities laws."[31] The proposal required

variable annuity sellers to use a new exemption, BICE, as the basis for being permitted to receive

third-party compensation. The initial proposal did not contemplate revoking relief under PTE 84-

24 for fixed rate annuities and FIAs.

    3.   BICE Proposal

Finally, the DOL proposed BICE, a new exemption from prohibited transactions for

fiduciaries who do not qualify for PTE 84-24. BICE would exempt "investment advice

---

[28] *Id*. at 21,951.

[29] *Id*. at 21,932.

[30] *Id*. at 21,928.

[31] Proposed Amendment to and Proposed Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies and Investment Company Principal Underwriters (*Proposed Amendment to and Proposed Partial Revocation of PTE 84-24*), 80 Fed. Reg. 22,010, 22,012 (proposed Apr. 20, 2015) (to be codified at 29 C.F.R. pt. 2550).

fiduciaries, including broker-dealers and insurance agents," from prohibited transactions, including receipt of commissions and other third party compensation otherwise prohibited by ERISA and the Code. [32] However, BICE proposed stricter conditions to securing an exemption from the prohibited transactions than did PTE 84-24. To qualify for BICE, financial institutions and advisers would have to enter into a written contract with the retirement investor, agreeing to: 1) acknowledge their fiduciary status, 2) commit to complying with standards of impartial conduct and to act in the customer's "best interest," 3) receive no more than "reasonable compensation," 4) adopt policies and procedures reasonably designed to minimize the effect of conflicts of interest, and 5) disclose basic information about conflicts of interest and the cost of their advice.[33]

      b.  <u>Final Rules</u>

The DOL provided a ninety-day comment period on the three proposed rules, during which it held a four-day public hearing in August 2015, and received over three thousand comment letters. On April 8, 2016, the DOL published its final rules.[34]

      1.  Fiduciary Rule

By this rule ("Fiduciary Rule"), the DOL replaced the five-part test with a new approach to the analysis of when one "renders investment advice," and in turn redefined who is a fiduciary under ERISA. The DOL concluded that significant developments since 1975 in the retirement savings and investment market warranted removing the "regular basis" limitation in the definition of "fiduciary."[35] The DOL also concluded that the 1975 regulation had "narrowed the

---

[32] Proposed Best Interest Contract Exemption, 80 Fed. Reg. 21,960 (proposed Apr. 20, 2015) (to be codified at 29 C.F.R. pt. 2550).
[33] *Id.* at 21,961, 21,969–72.
[34] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,946; *Final BICE*, 81 Fed. Reg. at 21,002; *Final PTE 84-24*, 81 Fed. Reg. at 21,147.
[35] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,954.

scope of the statutory definition of fiduciary investment advice," and that the Fiduciary Rule

"better comports with the statutory language in ERISA and the Code."[36] Under the Fiduciary

Rule, a person "render[s] investment advice," if:

(1) Such person provides to a plan, plan fiduciary, plan participant or beneficiary, IRA, or IRA owner the following types of advice for a fee or other compensation, direct or indirect:

    (i)    A recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property, or a recommendation as to how securities or other investment property should be invested after the securities or other investment property are rolled over, transferred, or distributed from the plan or IRA;

    (ii)    A recommendation as to the management of securities or other investment property, including, among other things, recommendations on investment policies or strategies, portfolio composition, selection of other persons to provide investment advice or investment management services, selection of investment account arrangements (e.g., brokerage versus advisory); or recommendations with respect to rollovers, transfers, or distributions from a plan or IRA, including whether, in what amount, in what form, and to what destination such a rollover, transfer, or distribution should be made; and

(2) With respect to the investment advice described in paragraph (a)(1) of this section, the recommendation is made either directly or indirectly (e.g., through or together with any affiliate) by a person who:

    (i)    Represents or acknowledges that it is acting as a fiduciary within the meaning of the Act or the Code;

    (ii)    Renders the advice pursuant to a written or verbal agreement, arrangement, or understanding that the advice is based on the particular investment needs of the advice recipient; or

    (iii)    Directs the advice to a specific advice recipient or recipients regarding the advisability of a particular investment or management decision with respect to securities or other investment property of the plan or IRA.[37]

The Fiduciary Rule defines "recommendation" as "a communication that, based on its content,

context, and presentation, would reasonably be viewed as a suggestion that the advice recipient

---

[36] *Id.* at 20,948, 20,954.
[37] 29 C.F.R. § 2510.3-21(a)(2016).

engage in or refrain from taking a particular course of action."[38] Under the Fiduciary Rule, a person suggesting a consumer buy a particular annuity to hold in an IRA would assumedly "render investment advice."

### 2. PTE 84-24

The DOL's final revised PTE 84-24 eliminated the 2010 proposal's exemption for FIAs.[39] Therefore, fiduciaries who provide investment advice for fixed rate annuities can obtain exemptions under PTE 84-24, but those selling FIAs and variable annuities cannot use PTE 84-24 to exempt their receipt of third-party compensation, including commissions. Instead, under the final rules, BICE, described below, is their only option for obtaining exemptive relief from the prohibited transaction rules under ERISA and the Code.[40] To qualify for PTE 84-24, fiduciaries must sign a written contract with the customer, which requires adherence to "Impartial Conduct Standards."[41]

### 3. BICE

To qualify for BICE[42], a Financial Institution, must:

1) Acknowledge fiduciary status with respect to investment advice to the Retirement Investor;

---

[38] *Id.* § 2510.3-21(b)(1).

[39] *Final PTE 84-24*, 81 Fed. Reg. at 21,177.

[40] *Id.* at 21,153.

[41] Both PTE 84-24 and BICE have a written contract requirement. Although Plaintiffs challenge many aspects of BICE under various legal theories, Plaintiffs only challenge PTE 84-24's contract requirement by arguing it creates a private right of action and violates the FAA.

[42] BICE defines "Retirement Investor" as (1) a participant or beneficiary of a Plan subject to Title I of ERISA or described in section 4975(e)(1)(A) of the Code, with authority to direct the investment of assets in his or her Plan account or to take a distribution, (2) the beneficial owner of an IRA acting on behalf of the IRA, or (3) a Retail Fiduciary with respect to a Plan subject to Title I of ERISA or described in section 4975(e)(1)(A) of the Code or IRA. BICE defines "Financial Institution" as an entity that employs the Adviser or otherwise retains such individual as an independent contractor, agent or registered representative and that satisfies one of the four requirements laid out in the exemption. BICE defines "Adviser" as (1) a fiduciary of the Plan or IRA solely by reason of the provision of investment advice described in ERISA section 3(21)(A)(ii) or Code section 4975(e)(3)(B), or both, and the applicable regulations, with respect to the assets of the Plan or IRA involved in the recommended transaction; (2) is an employee, independent contractor, agent, or registered representative of a Financial Institution; and (3) satisfies the federal and state regulatory and licensing requirements of insurance, banking, and securities laws with respect to the covered transaction, as applicable. *Final BICE*, 81 Fed. Reg. at 21,083–84.

2) Adhere to Impartial Conduct Standards requiring them to:

- Give advice that is in the Retirement Investor's Best Interest (i.e., prudent advice that is based on the investment objectives, risk tolerance, financial circumstances, and needs of the Retirement Investor, without regard to financial or other interests of the Adviser, Financial Institution, or their Affiliates, Related Entities or other parties);

- Charge no more than reasonable compensation; and

- Make no misleading statements about investment transactions, compensation, and conflicts of interest;

3) Implement policies and procedures reasonably and prudently designed to prevent violations of the Impartial Conduct Standards;

4) Refrain from giving or using incentives for Advisers to act contrary to the customer's best interest; and

5) Fairly disclose the fees, compensation, and Material Conflicts of Interest associated with their recommendations.[43]

If a Financial Institution provides investment advice to IRAs or other plans not covered by Title I, it must enter into a written contract with the consumer that includes all but the fourth provision listed above.[44] Exemptive relief under BICE is not available if the written contract includes: 1) "provisions disclaiming or otherwise limiting liability of the Adviser or Financial Institution for a violation of the contract's terms," 2) a provision that "waives or qualifies [the] right to bring or participate in a class action or other representative action," or 3) a liquidated damages provision.[45] The contract may, however, include provisions that reasonably agree to arbitrate individual claims, knowingly waive punitive damages, and waive the right to rescission

---

[43] *Id.* at 21,007.
[44] *Id.* at 21,020. Section II(a) of the exemption provides that the contract must be enforceable against the Financial Institution. As long as that is the case, the Financial Institution is not required to sign the contract. *Id.* at 21,024.
[45] *Id.* at 21,041, 21,078.

of recommended transactions. Such provisions are permitted "to the extent such a waiver is permissible under applicable state or federal law."[46]

## III.    Analysis

Plaintiffs' challenge is based on several grounds. First, Plaintiffs argue the Fiduciary Rule exceeds the DOL's statutory authority under ERISA. Second, Plaintiffs argue BICE exceeds the DOL's exemptive authority, because it requires fiduciaries who advise Title II plans, such as IRAs, to be bound by duties of loyalty and prudence, although that is not expressly provided for in the statute. Third, Plaintiffs argue the written contract requirements in BICE and PTE 84-24 impermissibly create a private right of action. Fourth, Plaintiffs argue the rulemaking process violates the Administrative Procedure Act ("APA") for several reasons, including that the notice and comment period was inadequate, the DOL was arbitrary and capricious when it moved exemptive relief provisions for FIAs from PTE 84-24 to BICE, the DOL failed to account for existing annuity regulations, BICE is unworkable, and the DOL's cost-benefit analysis was arbitrary and capricious. Fifth, Plaintiffs argue BICE does not meet statutory requirements for granting exemptions from the prohibited transaction rules. Sixth, ACLI argues the new rules violate the First Amendment, as applied to the truthful commercial speech of their members. Last, Plaintiffs argue the contractual provisions required by BICE violate the Federal Arbitration Act ("FAA"). The Court addresses each argument in turn.

### A.  The Fiduciary Rule Does Not Exceed the DOL's Authority

Courts analyze an agency's interpretation of a statute using the two-step approach set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At step one, courts assess "whether the intent of Congress is clear," and if "Congress has directly

---

[46] *Id.*

spoken to the precise question at issue." *Id.* at 842–43. If it has, "that is the end of the matter," and courts "must give effect to the unambiguously expressed intent of Congress." *Id.* If it has not, courts move to step two, and must defer to the agency's interpretation of ambiguous statutory language if it is based on a "permissible construction of the statute." *Id.* Plaintiffs challenge the Fiduciary Rule under both steps of *Chevron*.

        a.   <u>The Fiduciary Rule is Not Unambiguously Foreclosed by ERISA</u>

A person is a "fiduciary" under ERISA if "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys of other property of such plan."[47] Under the Fiduciary Rule, a person "renders investment advice" if he or she makes a "recommendation as to the advisability of acquiring…investment property" that is provided "based on the particular investment needs of the advice recipient."[48] A "recommendation" includes "communication[s] that…would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action."[49]

The plain language of ERISA does not foreclose the DOL's interpretation. ERISA does not expressly define "investment advice," and expressly authorizes the DOL to "prescribe such regulations as [it] finds necessary or appropriate to carry out the provisions of [ERISA]," and to "define [the] accounting, technical and trade terms used in [ERISA]."[50] Further, there is no "serious dispute that someone who provides a recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property is providing investment advice." *Nat'l Ass'n for Fixed Annuities v. Perez*, CV 16-1035, 2016 WL 6573480, at *15 (D.D.C. Nov. 4, 2016) (citations and internal quotation marks omitted). Aside

---

[47] 29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3)(B).
[48] 29 C.F.R. 2510.3-21(a)(2016).
[49] *Id.* at 2510.3-21(b)(1).
[50] 29 U.S.C. § 1135.

from the plain language of ERISA, Plaintiffs cite six other reasons why the Fiduciary Rule fails

at *Chevron* step one.

      1.   The Common Law of Trusts

Plaintiffs argue Congress confined the definition of "fiduciary" under ERISA to

relationships where special intimacy or trust and confidence exists between parties, in

accordance with the common law of trusts. Plaintiffs contend that because everyday business

interactions are not relationships of trust and confidence, a person acting as a broker or an

insurance agent engaged in sales activity is not a fiduciary. This argument is not supported by the

plain language of ERISA.[51]

    Although fiduciary duties under ERISA "draw much of their content from the common

law of trusts," "trust law does not tell the entire story…[and] will offer only a starting point."

*Varity Corp. v. Howe*, 516 U.S. 489, 496–97 (1996); *see also Pegram v. Herdrich*, 530 U.S. 211,

225 (2000) ("[t]he analogy between ERISA fiduciary and common law trustee becomes

problematic"). When Congress enacted ERISA, it made a "determination that the common law

of trusts did not offer completely satisfactory protection." *Varity Corp.*, 516 U.S. at 497.[52] In

defining "fiduciary," Congress made "an express statutory departure" from the common law of

trusts. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 264 (1993). In particular, ERISA does not define

"fiduciary" "in terms of formal trusteeship, but in *functional* terms of control and authority over

the plan…thus expanding the universe of persons subject to fiduciary duties." *Id*. at 262.

---

[51] ERISA defines fiduciary in the same way under Title I and Title II.

[52] COC's reply brief cites *Varity Corp.* to argue it is appropriate to look at the common law. That point is not in dispute. *Varity Corp.* also held that trust law does not tell the entire story, only offers a starting point, that ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection, and that the Court "believe[s] that the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." 516 U.S. at 497.

In its reply brief, COC claims that the express statutory departure referenced by the

Supreme Court in *Mertens* applies only to "those expressly named as trustees."[53] This reading

narrows the interpretation of the statutory text so that "renders investment advice" would only

refer to plan managers, administrators, and others in comparable roles. The Supreme Court's

holding in *Mertens*, however, interpreted ERISA to define fiduciaries as "*not only the persons

named as fiduciaries* by a benefit plan… but also *anyone else who exercises discretionary

control* or authority over the plan's management, administration, or assets." *Mertens*, 508 U.S. at

262 (emphasis added).[54]

Further, even if the interpretation of "renders investment advice" were limited to the

common law of trusts, Plaintiffs do not convince the Court that the Fiduciary Rule varies from

the common law of trusts.

### 2. The Investment Advisers Act ("IAA")

The IAA defines the term "investment adviser," and in doing so, specifically excludes

"any broker or dealer whose performance of such services is solely incidental to the conduct of

his business as a broker or dealer and who receives no compensation therefor." Plaintiffs assert

this distinction must be maintained by the DOL because in drafting ERISA, Congress closely

tracked the IAA's definition of an investment adviser.[55]

In defining a "fiduciary," ERISA does not exempt investment advice that is "solely

incidental to the conduct of [the] business."[56] It defines a fiduciary as anyone who "renders

---

[53] COC Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 109 at 4).
[54] The Fifth Circuit has noted that ERISA imposed a duty on a broader class of fiduciaries than existing trust law before *Mertens*. *Donovan v. Cunningham*, 716 F.2d 1455, 1464 n.15 (5th Cir. 1983).
[55] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 15).
[56] *See Fin. Planning Ass'n v. S.E.C.* 482 F.3d 481, 489 (D.C. Cir. 2007) (noting Congress intended to define "investment adviser" broadly in the IAA and that it only created an exemption for broker-dealers).

investment advice for a fee or other compensation, direct or indirect."[57] Congress did use the IAA as a source for ERISA, but only in certain express contexts, such as when ERISA addressed a plan trustee's authority.[58] In defining a fiduciary, however, ERISA did not refer to the IAA. The Supreme Court has held, "[w]here words differ…Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). In enacting ERISA, Congress was obviously fully aware of the IAA, but did not limit the definition of fiduciary in ERISA to that in the IAA. ERISA does not unambiguously foreclose the DOL's new interpretation, and the IAA cannot derivatively do so.

### 3.   The Fiduciary Rule Regulates Those Rendering Advice for a Fee

A person is a fiduciary under ERISA if he:

(i)     exercises *any* authority *or* discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets *or*

(ii)    he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, *or*

(iii)   he has *any* discretionary authority or discretionary responsibility in the administration of such plan.[59]

Plaintiffs argue the Fiduciary Rule exceeds the coverage of ERISA because it imposes fiduciary status on those who earn a commission merely for selling a product, regardless of whether advice is given. Actually, the Fiduciary Rule plainly does not make one a fiduciary for selling a product without a recommendation. The rule states:

[I]n the absence of a recommendation, nothing in the final rule would make a person an investment advice fiduciary merely by reason of selling a security or investment property to an interested buyer. For example, if a retirement investor asked a broker to purchase a mutual fund share or other security, the broker would not become a fiduciary investment adviser merely because the broker purchased the mutual fund

---

[57] 29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3)(B).
[58] *See* 29 U.S.C. §§ 1002(38)(B), 1103(a)(2).
[59] 29 U.S.C. § 1002(21)(A) (emphasis added).

share for the investor or executed the securities transaction. Such 'purchase and sales' transactions do not include any investment advice component.[60]

Because Plaintiffs' contention is directly contradicted by the plain language of the Fiduciary Rule, the Court rejects it.

Plaintiffs also argue that financial professionals who receive sales commissions are not rendering investment advice for a fee. However, Plaintiffs' interpretation truncates the statute and does not address the next clause, "or other compensation, direct or indirect." The word "indirect" contradicts the notion that compensation must be paid principally for investment advice, as opposed to advice rendered in the course of a broader sales transaction. Plaintiffs' interpretation is also at odds with market realities and their own description of the role insurance agents and brokers play in annuity sales. ACLI notes that insurance agents and broker-dealers help consumers assess whether an annuity is a good choice and which types of annuities and optional features suit consumers' financial circumstances. Such advice requires significant and detailed analysis, often more than is required to sell other financial products, and therefore "insurers typically pay a sales commission to compensate agents and broker-dealers for the significant effort involved in learning about, marketing, and selling annuities."[61] This fits comfortably within the description of someone who renders investment advice for indirect compensation, thus imposing fiduciary duties under ERISA. Further, in its own prior regulations, the DOL has interpreted the second prong of ERISA's fiduciary definition to include commissions for advice incidental to sales transactions, and courts have held the same.[62]

---

[60] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,984.

[61] ACLI Brief in Support of Motion for Summary Judgment (ECF No. 49 at 4–5).

[62] *See* 40 Fed. Reg. 50,842 (Oct. 31, 1975); *see also Farm King Supply Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 291–92; *Thomas, Head & Griesen Emps. Trust v. Buster*, 24 F.3d 1114, 1120 (9th Cir. 1994); *Eaves v. Penn*, 587 F.2d 453, 458 (10th Cir. 1978); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 710 (W.D. Mich. 2007); *Brock v. Self*, 632 F. Supp. 1509, 1520 n.11 (W.D. La. 1986).

4.   ERISA Does Not Require Covered Advice to Be Given on a Regular Basis

Plaintiffs argue the first and third prongs of ERISA's definition of fiduciary require a "meaningful, substantial, and ongoing relationship to the plan," and that advice must be "provided on a regular basis and through an established relationship," as had been required by the five-part test.[63] Nothing in ERISA suggests "investment advice" was intended only to apply to advice provided on a regular basis, and the plain language of the first and third prongs do not indicate that an ongoing relationship is required.[64] To the contrary, all three prongs are broad and written disjunctively; a person is a fiduciary if he satisfies any of the three prongs.

Plaintiffs also claim that the first and third prongs of ERISA's definition of a fiduciary involve a direct connection to the essentials of plan operation and that management and administration of a plan are central functions; as a result, they argue the second prong must be read consistently with the other two subsections, and a meaningful and substantial role of the fiduciary, that is ongoing, is required.[65] It is true that the first prong addresses management and the third prong addresses administration, but that does not lead to the conclusion advocated by Plaintiffs. The second prong does not require a "meaningful, substantial, and ongoing relationship" with the recipient of the investment advice, nor must such advice be given on a regular basis for the adviser to qualify as a fiduciary. That is not required by the statute, and Plaintiffs' attempt to read that into the language of the second prong is unpersuasive.

5.   The Dodd-Frank Act Does Not Foreclose the DOL's Interpretation

Plaintiffs argue that because § 913(g) of the Dodd-Frank Act prohibits the SEC from adopting a standard of conduct that disallows commissions for broker-dealers, it is implausible

---

[63] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 18–19).
[64] Given that one time transactions such as rollovers can be the most important decision an investor makes, such transactions are both meaningful and substantial.
[65] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 18).

that Congress intended to allow the DOL, through ERISA, to promulgate a regulation that would do just that. The enactment of § 913(g) in Dodd-Frank does not address what Congress intended when it enacted ERISA. Further, the DOL's final rules do not prohibit commissions for broker-dealers. They only provide for modifications to exemptions from prohibited transactions, and if a person or entity qualifies for an exemption, that would allow the applicant to receive commissions and other forms of third party compensation.

### 6.   Congress Has Not Ratified the Five-Part Test

Plaintiffs argue that because Congress has repeatedly amended ERISA since 1975, without ever amending the five-part test, that test has de facto been incorporated into ERISA by way of ratification.[66] Generally, congressional inaction "deserves little weight in the interpretive process…[and] lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). At the same time, if Congress "frequently amended or reenacted the relevant provisions without change…[Congress] at least understood the interpretation as statutorily permissible." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002).

There is a stark difference between Congress acquiescing to a permissible interpretation and Congress affirmatively deciding that an interpretation is the only permissible one. If Plaintiffs' argument were correct, the DOL could never revisit the five-part test because it has been, in effect, enshrined into the statute. To the contrary, courts have "consistently required express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated." *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987) (citing cases). Congress has not taken any express action or otherwise indicated that the five-part test is the only

---

[66] Plaintiffs cite the amendments in the Pension Protection Act of 2006 to support their ratification argument.

possible way to determine who is a fiduciary under ERISA. Plaintiffs concede that the DOL's interpretive authority under ERISA and the Code includes the definition of fiduciary.[67] The DOL has defined what it means to render investment advice since 1975, and decided its new interpretation is more suitable given the text and purpose of ERISA, along with new marketplace realities. Congress has neither ratified the five-part test nor has it excluded other interpretations not precluded by the statute.

  b.   The Fiduciary Rule Is a Permissible Interpretation Under *Chevron* Step Two

Because the Fiduciary Rule is not unambiguously foreclosed by the plain language of ERISA, the Court's analysis moves to *Chevron* step two. *Chevron*, 467 U.S. at 843. Plaintiffs advance four arguments that allegedly render the final rules unreasonable under *Chevron* step two.

  1.   The DOL Reasonably Removed the Regular Basis Requirement

Plaintiffs argue the DOL's interpretation of what it means to render investment advice is entitled to no deference, because ERISA requires regular contact between an investor and a financial professional to trigger a fiduciary duty. If anything, however, the five-part test is the more difficult interpretation to reconcile with who is a fiduciary under ERISA. The broad and disjunctive language of ERISA's three prong fiduciary definition suggests that significant one-time transactions, such as rollovers, would be subject to a fiduciary duty. Under the five-part test, however, such a transaction would not trigger a fiduciary duty.[68] This outcome is seemingly at odds with the statute's text and its broad remedial purpose, especially given today's market

---

[67] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 23–24). Further, as noted *supra* Page 16, the DOL has express authority to "prescribe such regulations as [it] finds necessary or appropriate to carry out the provisions of [ERISA]," and to "define [the] accounting, technical and trade terms used in [ERISA]." 29 U.S.C. § 1135.

[68] 81 Fed. Reg. at 20,955. The DOL elaborated on this scenario in the Fiduciary Rule, stating the "plan could be investing hundreds of millions of dollars in plan assets," and "investing all or substantially all of the plan's assets," yet a fiduciary duty would not be triggered under the five-part test. *Id.*

realities and the proliferation of participant-directed 401(k) plans, investments in IRAs, and rollovers of plan assets to IRAs. [69] An interpretation covering such transactions better comports with the text, history, and purposes of ERISA.[70]

        2.  The DOL May Regulate Issues of Deep Economic and Political Significance

Plaintiffs argue the coverage of the Fiduciary Rule will be vast, involving billions of dollars, presenting issues "of deep economic and political significance," and that, therefore, the DOL is not entitled to *Chevron* deference under *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). In *Burwell*, the parties disputed whether the IRS was authorized to interpret the Affordable Care Act to allow tax credits for individuals who enroll in an insurance plan through a Federal Exchange. The Supreme Court found that *Chevron* analysis was altogether inappropriate, because *Chevron* is "premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps…however, there may be reason to hesitate before concluding that Congress has intended such an implicit design." *Id*. at 2488–89 (citations omitted). The hesitation expressed by the Court in *Burwell* was that the interpretation by the IRS presented a

---

[69] ERISA was enacted to serve broad protective and remedial purposes; as the Supreme Court explained, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993); *see also R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 173 (5th Cir. 2000) (stating "remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened").

[70] Plaintiffs also point to the DOL's acknowledgment that its interpretation may include some "relationships that are not appropriately regarded as fiduciary in nature." 81 Fed. Reg. at 20,971. The context of the Fiduciary Rule clarifies the DOL's actions. The DOL exempted certain transactions from the Fiduciary Rule because it determined they are not recommendations, and therefore not within the definition of investment advice, including: swap transactions and arms-length transactions with certain plan fiduciaries who are licensed financial professionals or plan fiduciaries who have at least $50 million under management. The DOL reasonably found this was faithful to the remedial purpose of the statute. Further, those transactions do not relate to the sale of annuities or insurance agents, and Plaintiffs do not challenge the carve outs. Even if Plaintiffs' argument were correct, they do not cite any reason why they would have standing to bring such a claim or why the DOL's interpretation of its own regulation would not be granted deference under *Auer v. Robbins*, 519 U.S. 452 (1997), which grants broad deference to an agency's interpretations of its own regulations.

> [q]uestion of deep economic and political significance that is central to this statutory scheme; had Congress wished to assign that question to [the IRS], it surely would have done so expressly. It is especially unlikely that Congress would have delegated this decision to the IRS, which has no expertise in crafting health insurance policy of this sort. This is not a case for the IRS.

*Id.* at 2489. The Court decided *Chevron* was not applicable in the first instance, not that the IRS' interpretation was entitled to no deference at *Chevron* step two.

Here, in contrast, the DOL may "prescribe such regulations as [it] finds necessary or appropriate to carry out the provisions of [ERISA]," and to "define [the] accounting, technical and trade terms used in [ERISA]."[71] The Affordable Care Act did not expressly delegate interpretive authority to the IRS. Here, however, ERISA clearly envisioned the DOL would exercise interpretive authority, and specifically empowered the DOL to define terms, pass necessary rules and regulations, and to create exemptions.[72] Unlike in *Burwell*, where the IRS "had no expertise in crafting health insurance policy," for almost forty years the DOL has defined what it means to render investment advice, regulated investment advice to IRAs and employee benefit plans, and granted conditional exemptions from conflicted transactions. Although *Burwell* was not a case for the IRS, interpreting what it means to render investment advice under ERISA is certainly a question for the DOL. Therefore, the Supreme Court's reasoning in *Burwell* does not invalidate the Fiduciary Rule.

---

[71] Plaintiffs concede the DOL has the authority to define who is a fiduciary under ERISA. *See* COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 23–24); *see also* 29 U.S.C. § 1135; *Johnson v. Buckley*, 356 F.3d 1067, 1073 (9th Cir. 2004) (holding the DOL had broad authority to promulgate regulations governing ERISA).

[72] Plaintiffs also argue an agency may not use its definitional authority to expand its own jurisdiction and to invade the jurisdiction of other agencies. *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 754–55 (D.C. Cir. 1990). The Fiduciary Rule does not expand the DOL's jurisdiction or invade other agencies' jurisdiction; the DOL's authority is found in 29 U.S.C. § 1135. The DOL has defined who is a fiduciary via the five part-test for forty years. In *American Bankers*, the SEC interpreted the definition of "broker-dealer" in the Glass-Steagall Act to include banks, even though the statute expressly excluded banks from the definition. No similar provision exists here.

### 3.   The DOL's Rules Reflect Congressional Intent

Plaintiffs argue the Fiduciary Rule contradicts congressional intent because it in effect rejects the "disclosure regime established by Congress under the securities laws."[73] However, ERISA was enacted on the premise that the then-existing disclosure requirements did not adequately protect retirement investors, and that more stringent standards of conduct were necessary.[74] Although ERISA includes disclosure requirements, it also imposes "standards of conduct, responsibility, and obligation[s]" for fiduciaries.[75] The DOL's new rules comport with Congress' expressed intent in enacting ERISA. As a result of as the rulemaking process, the DOL rejected a disclosure-only regime, finding that disclosure was ineffective to mitigate the problems ERISA sought to remedy.[76]

### 4.   The DOL Justified Its New Interpretation

Plaintiffs argue the DOL did not justify changing the regulatory treatment of those giving incidental advice in connection with sales of annuities. The DOL may change existing policy "as long as [it] provide[s] a reasoned explanation for the change…and show[s] there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). Here, the DOL concluded that the five-part test significantly narrowed the breadth of the statutory definition of a fiduciary under ERISA, allowing advisers "to play a central role in shaping plan and IRA investments, without ensuring the accountability that Congress intended for persons having such influence and responsibility."[77] In reversing that approach, the DOL

---

[73] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 22).
[74] "Experience…has demonstrated the inadequacy of the…Disclosure Act in regulating the private pension system for the purpose of protecting rights and benefits due to workers. It is weak in its limited disclosure requirements and wholly lacking in substantive fiduciary standards." H.R. Rep. No. 93-533 (1973); *see also* S. Rep. No. 93-127 (1973).
[75] 29 U.S.C. § 1001(b). These standards are readily enforceable via "remedies, sanctions, and ready access to the Federal courts." *Id.*
[76] *Final BICE,* 81 Fed. Reg. at 21,062.
[77] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,946, 20,955.

found the Fiduciary Rule more closely reflected the scope of ERISA's text and purposes.[78] This reasoning, and the rest of what the DOL produced in the administrative record, satisfy the *Encino Motorcars*' requirement that the agency explain the change.

For the reasons stated above, the Fiduciary Rule is a reasonable interpretation under ERISA and is entitled to *Chevron* deference.

### B. DOL Did Not Exceed Its Statutory Authority to Grant Conditional Exemptions

Plaintiffs next challenge the DOL requirement that fiduciaries who advise Title II plans, such as IRAs, agree to be bound by duties of loyalty and prudence as conditions to qualify for BICE. Although fiduciaries under Title I of ERISA are expressly subject to duties of loyalty and prudence, fiduciaries under Title II are not.[79] The prohibited transaction rules, in contrast, apply to both employee benefit plans under Title I and to IRAs under Title II. In the modified PTE 84-24 and BICE, the DOL granted exemptions from otherwise prohibited transactions, but conditioned the exemptions by requiring fiduciaries to "act with the care, skill, prudence, and diligence [of] a prudent person acting in a like capacity…without regard to the financial or other interests of the Adviser, Financial Institution…or other party."[80] These conditions mirror the duties of loyalty and prudence under Title I and thus add new duties to advisers of IRAs and other Title II plans.[81] Plaintiffs argue the DOL exceeded its statutory authority when it extended fiduciary duties expressed only in Title I to advisers of Title II plans through the regulatory scheme. The Court analyzes this argument under *Chevron*'s two-step approach.

### a. The Exemptions Are Not Unambiguously Foreclosed by ERISA or the Code

Nothing in ERISA or the Code unambiguously prevents the DOL from conditioning

---

[78] *Id.* at 20,946.
[79] *Compare* 29 U.S.C. § 1104, *with* 26 U.S.C. § 4975.
[80] *Final BICE*, 81 Fed. Reg. at 21,077; *Final PTE 84-24*, 81 Fed. Reg. at 21,176.
[81] The exemption conditions do not affect advisers to Title I plans, as they were already subject to these duties.

exemptive relief under Title II on the fiduciary's adherence to the duties of loyalty and prudence. The DOL does not impose the duties of loyalty and prudence on fiduciaries covered by Title II; it only provides an exemption from prohibited transactions. In other words, the DOL simply specifies conditions to qualify for exemptions when fiduciaries engage in transactions that are otherwise prohibited by ERISA and the Code.[82] Plaintiffs assert that because Congress explicitly chose not to include the duties of loyalty and prudence in Title II, the DOL may not sweep Title I duties into Title II via exemption. According to Plaintiffs, congressional intent is clear and the DOL's interpretation of its exemptive authority is unambiguously foreclosed.

Congress, however, expressly granted the DOL broad authority to adopt "conditional or unconditional exemption[s]" from prohibited transactions under Title II, so long as any exemption is 1) administratively feasible; 2) in the interests of the plan, its participants and beneficiaries; and 3) is protective of the rights of the plan participants and beneficiaries.[83] Plaintiffs advance four reasons why the DOL's use of its exemptive authority fails at *Chevron* step one.

### 1. The DOL May Require Compliance with Title II Duties

Congress' decision to impose duties of loyalty and prudence to plans under Title I, but not under Title II, does not answer the question of whether Congress intended to foreclose the DOL from requiring that fiduciaries under Title II comply with the duties of loyalty and prudence as a condition for exemptive relief. Congressional silence does not overcome the DOL's express statutory authority to grant exemptive relief. If Plaintiffs' reasoning were correct, the DOL "would be barred from imposing any condition on a [T]itle II exemption that relies on a

---

[82] The DOL has used its statutory authority to attach substantive conditions on exemptions since ERISA was enacted. *See PTE 77-9*, 42 Fed. Reg. 32,395, 32,398 (June 24, 1977) (qualifying for the exemption required the transaction was "on terms at least as favorable to the plan as an arm's-length transaction with an unrelated party.")
[83] 26 U.S.C. § 4975(c)(2). The DOL made the required three findings. *Final BICE,* 81 Fed. Reg. at 21,020–61.

duty or obligation that Congress imposed categorically on Title I plans." *Nat'l Ass'n for Fixed Annuities*, 2016 WL 6573480, at *23.[84] That outcome would be contrary to the plain language of ERISA and the Code. Plaintiffs advocate for a limitation that would prevent the DOL from granting exemptions even if the DOL satisfied Congress' three requisite findings, essentially imposing a non-textual fourth limitation on the DOL's express authority to grant conditional or unconditional exemptions. Title II does not contain such a limitation. No rule of statutory interpretation supports the conclusion that Congress clearly intended to bar the DOL from imposing a Title I duty as a condition for granting exemptive relief under Title II.

### 2.   BICE Is Not Unduly Burdensome, Nor Is It a Mandate

Plaintiffs make two claims as to why BICE fails at *Chevron* step one; first, that the DOL's exemptive authority is limited to reducing regulatory burdens, and second, that financial professionals have no choice but to comply with BICE, making it a mandate that exceeds the DOL's authority, rather than an exemption.[85]

Any exemption the DOL grants from the prohibited transaction rules reduces the industry's regulatory burden. Without PTE 84-24, BICE, or some other exemption, the plain language of ERISA and the Code would apply, and fiduciaries would be barred from engaging in prohibited transactions altogether. In fact, the DOL is not required to grant any exemptions under ERISA or the Code.[86] Although BICE imposes different obligations than did previous exemptions, it does not follow that the new exemptions exceed the DOL's authority.

Plaintiffs further argue the DOL has not imposed conditions for exemptions, but instead

---

[84] If Plaintiffs were correct, the DOL would have the inability to "condition that the adviser refrain from recommending transactions that benefit third parties at the expense of the plan participant," "condition an exemption on the disclosure of the same type of information that [T]itle I requires plan administrators to disclose," or condition that "a covered financial institution not employ individuals convicted of embezzlement or fraud."

[85] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 24–25).

[86] 29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2) (The DOL "*may* grant a conditional or unconditional exemption") (emphasis added).

has created a regulatory mandate where financial professionals have no choice but to meet the requirements of BICE. In particular, Plaintiffs contend that because certain accounts cannot be serviced using a fee-based compensation model and 95% of accounts under $25,000 rely on transaction-based models, in order to serve those customers, financial professionals must rely on BICE.[87] The DOL has not required Plaintiffs or its members to take a particular action; instead, the DOL has established conditions for qualifying for BICE. Plaintiffs' interpretation would contravene ERISA by usurping the DOL's authority to grant conditional exemptive relief.[88] Plaintiffs and their members acting as fiduciaries under the new definition may adjust their compensation models, while others may decide BICE is their best option. Although the industry may have less ideal options than before the current rulemaking, the industry has been given viable choices. The industry's choices for compensation models do not impact whether the DOL unambiguously its exemptive authority. Plaintiffs do not point to any portion of the statute or its legislative history showing Congress considered the particulars of financial professionals' compensation practices when it enacted ERISA. Therefore, a change in their current compensation structure does not affect the meaning of a statute Congress enacted in 1974.

> ### b.   BICE Does Not Exceed the DOL's Authority Under *Chevron* Step Two[89]

Because the DOL's use of its exemptive authority in BICE is not unambiguously foreclosed by the statute, the Court moves to an analysis of BICE under *Chevron* step two. The exemption created by the DOL is entitled to deference unless it is arbitrary and capricious.  *Am.*

---

[87] Transaction-based models refer to commissions, while fee-based compensation models refer to payments based on an hourly rate or an agreed-upon percentage of managed assets.

[88] The DOL has consistently granted conditional exemptions since ERISA was first enacted. *See, e.g.,* PTE 93-33, 58 Fed. Reg. 31,053 (May 28, 1993), as amended at 59 Fed. Reg. 22,686 (May 2, 1994); 64 Fed. Reg. 11,044 (March 8, 1999); PTE 97-11, 62 Fed. Reg. 5855 (Feb. 7, 1997), as amended at 64 Fed. Reg. 11,042 (Mar. 8, 1999); PTE 91-55, 56 Fed. Reg. 49,209 (Sept. 27, 1991), as corrected at 56 Fed. Reg. 50,729 (Oct. 8, 1991).

[89] The Court reads Plaintiffs' briefs to argue only that BICE exceeds the DOL's exemptive authority under *Chevron* step two, but given that PTE 84-24's conditions are less stringent than BICE, the Court would come to the same conclusion with respect to PTE 84-24 as well.

*Trucking Assocs. v. ICC*, 656 F.2d 1115, 1127 (5th Cir. 1981). When a statute expressly

delegates "the authority to grant [an] exemption and [the agency] is required to make certain

other determinations in order to do so…[t]hat grant and those determinations have legislative

effect, and are thus entitled to great deference under the 'arbitrary and capricious' standard."

*AFL-CIO v. Donovan*, 757 F.3d 330, 343 (D.C. Cir. 1985). Plaintiffs argue that for two reasons

BICE is arbitrary and capricious under *Chevron* step two.

       1.  Congress Has Delegated Exemptive Authority to the DOL

      Plaintiffs cite several cases to support their argument that the DOL's use of exemptive

authority is arbitrary and capricious because:

> when an agency claims to discover in a long-extant statute an unheralded power to
> regulate a significant portion of the American Economy, [the Supreme Court]
> greet[s] its announcement with a measure of skepticism [and]…expect[s] Congress
> to speak clearly if it wishes to assign an agency decisions of vast economic and
> political significance.

*Util. Air Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) (citing *FDA v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 159 (2000)); *see also Whitman v. Am. Trucking Ass'n.*, 531 U.S.

457, 468 (2001); *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994). This

case is a far cry from the line of precedent on which Plaintiffs rely. *See Verizon v. FCC*, 740 F.3d

623, 638 (D.C. Cir. 2014).

      In *Brown & Williamson*, the FDA departed from statements it had repeatedly made to

Congress since 1914 that it did not have jurisdiction over the tobacco industry. The FDA

changed its position, despite the fact that Congress had created a distinct regulatory scheme over

the tobacco industry and expressly rejected proposals to give the FDA such jurisdiction. 529 U.S.

at 159–60. Here, in contrast, the DOL has exercised its exemptive authority by granting

conditional exemptions from otherwise prohibited transactions since at least 1977, including

31

regulating investment advice that is rendered to IRAs.

In *Whitman*, the Supreme Court held Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." 531 U.S. at 468. However, Congress expressly created a regulatory scheme through which the DOL has explicit and broad authority to regulate IRAs and employee benefit plans by granting conditional or unconditional exemptions from otherwise prohibited transactions.[90] The retirement investment market may be an "elephant," but it is in plain sight, and the exemptive authority of 26 U.S.C. § 4975(c)(2) and 29 U.S.C. § 1108(a) is "no mousehole." *Verizon*, 740 F.3d at 638. Instead, Congress put a lock on prohibited transactions, and gave the DOL the key.

In *Utility Air*, the Supreme Court held that "it would be patently unreasonable—not to say outrageous—for EPA to insist on seizing expansive power that it admits the statute is not designed to grant," and found that a "long-extant statute [did not give EPA] an unheralded power to regulate a significant portion of the American Economy." 134 S. Ct. at 2444. Contrary to the EPA in *Utility Air*, the DOL has long and continuously exercised the authority to regulate the retirement investment market under ERISA. The DOL has granted conditional exemptions under ERISA and the Code for almost half a century.  Nor does the DOL's interpretation "bring about an enormous and transformative expansion in [its] authority without clear congressional authorization." *Id.* The new rules are compatible with the substance of Congress' regulatory scheme, as the broad remedial purpose of ERISA is to protect retirement investors and benefit plans.

---

[90] 26 U.S.C. § 4975(c)(2).

In contrast to the situations in the cases cited by Plaintiffs, in ERISA Congress *did* speak clearly, and assigned the DOL the power to regulate a significant portion of the American economy, which the DOL has done since the statute was enacted. The circumstances of *Utility Air*, *Brown & Williamson*, *MCI*, *Whitman*, and *King v. Burwell* cannot reasonably be compared to the DOL's decisions to move FIAs from PTE 84-24 to BICE and to condition the availability of BICE on a contract requiring exercise of the duties of loyalty and prudence. Congress gave the DOL broad discretion to use its expertise and to weigh policy concerns when deciding how best to protect retirement investors from conflicted transactions. Although BICE may cover more advisers and institutions and its conditions may be more onerous than past exemptions, it does not follow that the DOL's rules are within the orbit of the cases Plaintiffs cite, nor that the DOL's use of exemptive authority is unreasonable. *Nat'l Ass'n for Fixed Annuities*, 2016 WL 6573480, at *55.

Plaintiffs also argue that if BICE is not arbitrary and capricious, the DOL would have "virtually unfettered authority to create substantive obligations."[91] The DOL's exemptive authority, however, is limited by at least three factors. First, any exemption must be "administratively feasible, in the interest of the plan and of its participants and beneficiaries, and protective of the rights of participants and beneficiaries of the plan."[92] Second, the Agency is bound by the APA and *Chevron*, and the DOL's actions are assessed by courts on a rule by rule basis. Just because BICE is reasonable does not mean that any exemption the DOL could fathom

---

[91] COC Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 109 at 16).
[92] 26 U.S.C. § 4975(c)(2).

would necessarily be reasonable. And third, the DOL must comply with the procedures for obtaining exemptions, as the DOL has previously established.[93]

### 2.   The Conditions and Consequences of BICE Are Reasonable

Plaintiffs claim the conditions to qualify for BICE, as well as BICE's consequences, are arbitrary and capricious, thus running afoul of *Chevron*. In particular, Plaintiffs note that certain accounts cannot be serviced using a fee-based compensation model, and that IRA advisers who are paid on a commission basis thus must seek exemptive relief. If such relief is extended via BICE, they will be subject to Title I fiduciary duties, while those duties will not extend to those paid an asset management fee. Plaintiffs assert this outcome is unreasonable. However, the DOL reasonably found that institutions and advisers that are paid on a commission basis may very well make investment recommendations that benefit themselves, at the expense of plan participants and beneficiaries. Advisers who are paid in asset-based fee arrangements are not faced with such a conflict of interest. Because small differences in investment performance will accumulate over time, those differences can have a profound impact on an investor's retirement income; as the DOL noted, an "investor who rolls her retirement savings into an IRA could lose 6 to 12 and possibly as much as 23 percent of the value of her savings over 30 years of retirement by accepting advice from a conflicted financial adviser."[94] Therefore, BICE's affect on compensation models is not arbitrary or capricious. To the contrary, it is reasonable for the DOL to incentivize certain compensation models over others to protect plan participants and beneficiaries.

---

[93] *Id*. The DOL is required to establish a procedure for granting exemptions, and the DOL would have to provide a reasoned explanation for a change in its exemptive procedure.
[94] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,949, 20,956.

The DOL outlined several ways the industry could innovate and adapt to BICE. In particular, the DOL noted

> there is ample room for innovation and market adaption on the way advisers are compensated…as consumers gain awareness that advice was never 'free,' demand is likely to grow not only for asset-based fee arrangements, but also for hourly or flat fee arrangements…Advisory firms may compensate advisers less by commission and more by salary or via rewards tied to customer acquisition or satisfaction.[95]

Here, the input of *amicus* Financial Planning Coalition ("FPC") is pertinent. Although FPC heard the same concerns regarding compensation when it implemented similar standards to BICE in 2008, commission-based compensation has survived, and FPC's financial professionals continue "to serve middle-income investors using all types of [] compensation models and other innovative methods."[96]

The Court also finds that the conditions to qualify for BICE are reasonable. FPC notes that its almost 80,000 members have since 2008 successfully operated under a regime similar to that in BICE, including a fiduciary standard, a written contract, disclosure of certain fees, costs, and conflicts of interest, prudency standards, and policies to mitigate conflicts.[97] At oral argument, the DOL represented that Mass Mutual and Lincoln National, which sell variable annuities, "fully intend to use" BICE, and that broker-dealers such as Morgan Stanley, Ameriprise, and Raymond James have expressed their intent to do the same.[98] Although the industry will likely respond in different ways to BICE, BICE does not appear to be a "Hobson's choice," and the exemption's conditions have been deemed workable by many in the industry.

BICE's written contract requirement is reasonable because state law breach of contract

---

[95] Regulatory Impact Analysis at AR638 (ECF No. 47-1).
[96] Brief of *Amicus Curiae* The Financial Planning Coalition in Support of Defendants (ECF No. 102 at 6–7).
[97] *Id*. (ECF No. 102 at 1–2, 14).
[98] Tr. Oral Arg. (ECF No. 126 at 119–120).

claims for IRAs existed before the rulemaking, as an annuity is a contract enforceable under traditional principles of contract law. The imposition of the duties of loyalty and prudence are reasonable given the DOL's findings on the negative impact that conflicted transactions have on retirement investors, and that the new standards could save retirement investors up to $36 billion over the next ten years, and $76 billion over the next twenty years.[99] As for the BICE condition requiring that the written contract with the retirement investor may not waive or qualify the investor's ability to participate in a class action, the Court does not find it to be unreasonable, especially when variable annuities have been subject to similar conditions under FINRA's Customer Code since 1992. The DOL weighed the pros and cons of the class action provision, and reasonably found it was in the best interest of retirement investors, helped prevent systemic fiduciary misconduct, and provided an incentive for the industry to comply with BICE. For these reasons, the Court finds that the conditions to qualify for BICE and the consequences Plaintiffs cite are reasonable.

### C.  BICE and PTE 84-24 Do Not Create a Private Right of Action

Plaintiffs bring an additional challenge to the DOL's exemptive authority, arguing that BICE and PTE 84-24 impermissibly create a private right of action, in violation of *Alexander v. Sandoval*, which held that "private rights of action to enforce federal law must be created by Congress." 532 U.S. 275, 286 (2001). There is no dispute that Title I of ERISA expressly creates a private right of action, while Title II does not. According to Plaintiffs, the only possible sanction under federal law for violating Title II is the excise tax and disgorgement.[100] The DOL's exemptions, however, neither create a new sanction under federal law nor a private right of action. PTE 84-24 and BICE require that certain terms be included in written contracts if

---

[99] Regulatory Impact Analysis at AR326, 622 (ECF No. 47-1).
[100] Tr. Oral Arg. (ECF No. 126 at 21–22).

financial institutions and advisers wish to qualify for exemptions from otherwise prohibited transactions. The consequence may be a lawsuit for non-compliance with the contract, but the exemptions do not create a federal cause of action under Title II. This conclusion is supported by three factors.

First, any lawsuit seeking to enforce the terms of the written contract must be brought under state law.[101] An IRA holder could not file a breach of contract suit claiming federal question jurisdiction; any suit on the contract would be adjudicated by a federal court sitting in diversity or by a state court, and state law would control the enforceability of any and all contractual provisions. As the DOL noted at oral argument, "when claims are brought in state court, the remedy and enforcement of that contract will be governed by state law."[102] Although BICE requires the inclusion of the contractual terms as a condition to qualify for the exemptions from prohibited transactions, it does not do more. If a court interpreting state law held a required provision of a contract under BICE or PTE 84-24 to be unenforceable, the fact that the DOL required it as a condition for an exemption would not impact the contract's enforceability. This is consistent with ERISA's preemption principles, as Title I completely preempts state law claims, but Title II does not.[103]

Second, prior to BICE and amended PTE 84-24, annuities held in IRAs were *already* subject to breach of contract claims. As ACLI noted during the rulemaking, "[i]nsurers are familiar with the idea of an enforceable contract between a financial institution and its customer. All annuity owners have contractual rights enforceable against the insurer and recourse to state insurance departments and state courts;" therefore, BICE and the amended PTE 84-24 do not

---

[101] An IRA holder, moreover, does not have the ability to enforce the Code's prohibited transaction provisions; they may only be enforced by the IRS via excise tax.
[102] Tr. Oral Arg. (ECF No. 126 at 91).
[103] *Compare* 29 U.S.C. § 1144(a), *with* 26 U.S.C. § 4975.

change the enforcement regime that existed prior to the current rulemaking.[104] The exemptions merely add certain new terms to contracts that already existed and were enforceable under state law.[105]

Third, there is precedent for federal regulations that require regulated entities to enter into written contracts with mandatory provisions. The DOL, in fact, has previously imposed similar conditions to qualify for an exemption from a prohibited transaction under ERISA. Qualification for PTE 84-14 is conditioned on "Qualified Professional Asset Managers" acknowledging they are fiduciaries in a "written management agreement."[106] Qualification for PTE 06-16 is conditioned on a written loan agreement with several mandatory terms, including that "the plan has a continuing security interest in…collateral," and that the "compensation is reasonable and is paid in accordance with the terms of a written instrument."[107]

Regulations with such conditions are not unique to the DOL. Under its export credit guarantee program, the Department of Agriculture requires each exporter to enter into a written sales contract with the importer that must include nine terms.[108] The Department of Agriculture also requires participants in its Food for Progress Program to "enter into a written contract with each provider of goods, services, or construction work," and states the contract "must require the provider to maintain adequate records…to comply with any other applicable requirements that may be specified…in the agreement."[109] The Department of Transportation requires foreign air carriers that provide charter flights in the United States to include two provisions in its written

---

[104] Cmt. 3050 ACLI (Sep. 24, 2015) (ECF No. 115 at AR46171–72). FIAs are insurance contracts.
[105] *See, e.g.*, *Knox v. Vanguard Group, Inc.*, No. 15-13411, 2016 WL 1735812, at *4–6 (D. Mass. May 2, 2016); *Abbit v. ING USA Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1197–99 (S.D. Cal. 2014).
[106] *PTE 84-14*, 49 Fed. Reg. 9494, 9503 (Mar. 13, 1984).
[107] *PTE 06-16*, 71 Fed. Reg. 63,786, 63,796–97 (Oct. 31, 2006).
[108] 7 C.F.R. § 1493.20. The mandatory terms include quantity, quality specifications, delivery terms to the eligible country or region, delivery period, unit price, payment terms, and Date of Sale.
[109] 7 C.F.R. § 1499.11(k).

agreement, including a statement releasing the surety's liability under certain circumstances.[110]

And the Federal Communications Commission allows for "an alternative out of band emission

limit…pursuant to a private contractual arrangement."[111]

Plaintiffs attempt to distinguish the details of the aforementioned mandatory contractual

terms with BICE and the amended PTE 84-24.[112] Plaintiffs' argument that the DOL created a

federal private right of action, however, is that *any* written contract requirement as a condition

for financial institutions to qualify for BICE and PTE 84-24 violates *Sandoval*, irrespective of

the terms. The contract's mandatory terms, therefore, are irrelevant to this analysis. As COC

concedes, a challenge to the contract's required terms presents a *Chevron* step two question,

which was addressed above.[113]

Plaintiffs cite three cases to support their argument that the written contract requirement

creates a private right of action. In *Astra USA, Inc. v. Santa Clara Cty.*, the Supreme Court held

it was "incompatible with the statutory regime" to permit a medical facility to bring suit as a

third-party beneficiary to an agreement between a federal agency, HHS, and drug manufacturers.

563 U.S. 110, 113 (2011). There, the government was required to enter into the contract with

drug manufacturers, but the contract only incorporated statutory obligations. The third-party

beneficiary suit was nominally a breach of contract suit, but essentially sought to "enforce the

statute itself." *Id.* at 119. Here, however, investors would not bring suit under any statutory

provision. Instead, the legal obligation and potential lawsuit would arise only from the contract,

which has its own terms.[114] *Astra*, therefore, does not answer the question of whether an agency

---

[110] 14 C.F.R. § 212.3(c).
[111] 47 C.F.R. § 24.238(c).
[112] COC Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 109 at 23–24).
[113] *Id.*
[114] In a footnote, the Supreme Court expressly stated it did not reach the question of "whether a contracting agency may authorize third-party suits to enforce a Government contract." *Astra USA*, 563 U.S. at 119 n.4. This question,

may condition a regulatory exemption on a written contract between two private parties enforceable under state law.

In *Umland*, the plaintiff brought a breach of contract suit based on the "implied terms" of a federal statute, FICA. *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59 (3d Cir. 2008). The issue was not whether a contract created a private right of action, but whether or not FICA itself created a private right of action. The Third Circuit held that FICA's provisions could not be read into an employment contract, and that FICA did not create a private right of action. In *MM&S*, the Eighth Circuit held a breach of contract claim was barred by the Securities Exchange Act of 1934, which grants "exclusive jurisdiction to federal courts to hear all claims for breach of duties created under the Exchange Act." *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 911–12 (8th Cir. 2004). These cases do not hold the DOL lacks the authority to condition a regulatory exemption on the execution of a written contract enforceable under state law. The DOL has not created a private cause of action, nor has it violated *Sandoval*.

### D.  Neither the New Rules Nor the Rulemaking Violate the APA

Plaintiffs argue that various parts of the new rules or the rulemaking process were arbitrary and capricious under the APA, for five reasons.[115]

### a.   The Notice and Comment Period Was Adequate

In its proposed rule, the DOL kept existing exemptive relief from prohibited transactions for all fixed annuities. The final version of PTE 84-24, however, provides an exemption only for fixed rate annuity contracts, not variable annuities or FIAs. Plaintiffs claim the DOL failed to

---

however, is still beside the point, because a third party attempting to enforce a contract between the government and a private party is distinguishable from a contract created as a result of BICE, which is between financial professionals and the investor.

[115] 5 U.S.C. § 706(2)(A).

provide the requisite notice to the regulated industry or provide an opportunity to comment on its decision to shift FIAs from PTE 84-24 to BICE, in contravention of the APA.

The APA requires an agency to publish in its proposed rulemaking notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007). The APA is satisfied if the proposal "fairly apprises interested persons of the subjects and issues the agency is considering; the notice need not specifically identify every precise proposal which the agency may ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). An agency "may decide to modify its original proposed rule," but the final rule must be a logical outgrowth of the proposal. *United Steelworkers of Am. v. Schuylkill Metals Corp.*, 828 F.2d 314, 317 (5th Cir. 1987). The Supreme Court has interpreted a "logical outgrowth" as something that was reasonably foreseeable. *Long Island Care*, 551 U.S. at 175.

In its 2015 notice of proposed rulemaking ("NPRM") for the modified PTE 84-24 and for BICE, the DOL requested comment on the appropriate treatment of annuities. The NPRM distinguished between transactions that involve securities and those that involve insurance products that are not securities. It proposed keeping PTE 84-24 for annuities like FIAs, while subjecting securities, including variable annuities, to BICE.[116] The DOL noted it was "not certain that the conditions of [BICE], including some of the disclosure requirements, would be readily applicable to insurance and annuity contracts that are not securities." The DOL then requested comment on its proposed approach, asking

> whether we have drawn the correct lines between insurance and annuity products that are securities and those that are not, in terms of our decision to continue allow IRA transactions involving non-security insurance and annuity contracts to occur under the conditions of PTE 84-24 while requiring IRA transactions involving securities to occur under the conditions of [BICE]…and…whether the proposal to

---

[116] *Proposed Amendment to and Proposed Partial Revocation of PTE 84-24*, 80 Fed. Reg. at 22,015.

> revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities strikes the appropriate balance and is protective of the interests of the IRAs.[117]

This language satisfies the APA because it notified the public and the industry about the possibility the DOL would remove FIAs from PTE 84-24 and make them instead subject to BICE. In the NPRM, the DOL expressly asked whether FIA transactions should continue under PTE 84-24. Requiring sellers of FIAs to rely on BICE, as opposed to PTE 84-24, was thus a logical outgrowth of the DOL's proposal. The NPRM contemplated revoking relief for some types of annuities while leaving in place existing exemptive relief for others, but questioned whether the proposal drew the correct lines between types of annuities, and whether the proposal struck the appropriate balance in protecting IRA investors. Thus, it was "reasonably foreseeable" that the DOL could put FIAs on the other side of the line, and Plaintiffs could reasonably have anticipated such a modification.[118]

Some commenters, including IALC, expressly anticipated what became the terms of the final rule, as a logical outgrowth of the DOL's proposal.[119] IALC submitted an extensive comment addressing the proposal and commended the DOL for keeping FIAs in PTE 84-24. IALC further commented that FIAs and fixed rate annuities were not appropriate for BICE, stating that "we believe the conditions of BICE would be problematic for fixed annuities and would not offer any meaningful additional protections for sales of fixed annuities to IRA

---

[117] *Proposed Best Interest Contract Exemption*, 80 Fed. Reg. at 21,975; *Proposed Amendment to and Proposed Partial Revocation of PTE 84-24*, 80 Fed. Reg. at 22,015.

[118] Plaintiffs also argue they lacked notice that the final rule would make variable annuity sales to ERISA plans unavailable under PTE 84-24. This argument fails for the same reasons stated above. Regardless, even if this constituted lack of notice, it would not mandate setting aside the rule. *See Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *17 (D. Kan. Nov. 28, 2016) ("The proposed rule's reference only to IRA transactions does not render the agency's notice insufficient under the APA.").

[119] Cmt. 718, Allianz Life Ins. Co. of North America (July 21, 2015) (ECF No. 115 at AR41624) ("The Proposal specifically requests comment on which exemption, the BICE, or a revised PTE 84-24, should apply to different types of annuity products.").

holders."[120] IALC clearly interpreted the NPRM to mean the DOL was contemplating moving all fixed annuity transactions from PTE 84-24 to BICE. It is difficult for Plaintiffs to argue inadequate notice when one of the Plaintiffs' comments to the NPRM accurately predicted what the final rule could be. *See Chem. Mfrs.*, 870 F.2d at 221.

The Fifth Circuit's holding in *Schuylkill Metals* supports the Court's conclusion that the DOL satisfied the APA's notice requirement. 828 F.2d 314 (5th Cir. 1987). There, the agency sought comment on "what should be the appropriate scope" of a provision, which the Fifth Circuit held "more than adequately sufficed to apprise fairly an interested party" on the relevant issue. *Id.* at 318. The Fifth Circuit noted that "at least one party…saw fit to comment on precisely this issue," and "other parties provided extensive comments," thus illustrating that "it was readily apparent to the interested parties that the scope of [the provision] was in dispute." *Id.* The Fifth Circuit's reasoning in *Schuylkill Metals* is pertinent here, as IALC and several other commenters noted the possibility of the change from the NPRM to the final rule. Accordingly, Plaintiffs cannot persuasively argue that they could not have anticipated the DOL's final rule.

Plaintiffs also argue they did not have an opportunity to meaningfully comment because the DOL's final rules were based on new reasoning and criteria. In particular, the DOL's proposal reasoned PTE 84-24 would apply depending on whether or not an annuity is a security, but the final rules distinguished between annuities based on their complexity. The APA does not require such a detailed rationale and analysis to satisfy notice requirements. The rationale for a final rule can be different from that of a proposed rule, because the "whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *Am. Fed'n of Labor & Cong. of*

---

[120] Cmt. 774, IALC (July 20, 2015) (ECF No. 115 at AR42540–41).

*Indus. Orgs. v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985). Plaintiffs' reading of the APA notice requirement would strip the comment period of its purpose.

Plaintiffs also argue lack of notice because they did not learn the DOL was contemplating a deviation from the NPRM until another industry group's meeting with the DOL in the final days of the comment period. In the meeting, the DOL indicated it was leaning toward grouping FIAs with variable annuities in BICE. The meeting is not relevant to satisfying the APA, as the NPRM itself gave Plaintiffs adequate notice of the potential change. At the meeting, the DOL discussed its preliminary view with the industry, to receive additional feedback before the comment period closed. In any case, Plaintiffs had further opportunity to comment between the meeting and the close of the comment period, and there was nothing improper about the meeting. *See Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 327 (5th Cir. 2001).

   b.   The DOL Reasonably Moved FIAs From PTE 84-24 to BICE

Plaintiffs argue retaining PTE 84-24 for fixed rate annuities, but subjecting FIAs and variable annuities to BICE, is action that is arbitrary and capricious, because fixed rate annuities and FIAs are nearly identical and the DOL failed to give a reasoned explanation for distinguishing them. An agency acts arbitrarily and capriciously if it applies different standards to similarly situated products without providing a reasoned explanation. *Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005). The Court considers whether the agency "examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219–20 (5th Cir. 2016). The DOL's "factual findings must be upheld as long as they are supported by substantial evidence…[which] is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Knapp v. USDA*, 796

F.3d 445, 453–54 (5th Cir. 2015). The DOL's decision to exclude FIAs from PTE 84-24 based

on their complexity, risk, and conflicts of interest associated with recommendations of FIAs is

supported by substantial evidence in the administrative record.[121] In particular, the DOL justified

its decision in three steps: 1) by explaining the complexity and risk of FIAs, 2) distinguishing

between fixed rate annuities and FIAs, and 3) demonstrating how FIAs and variable annuities are

similar.

     1.  The Complexity and Risk of FIAs

     The DOL described the complexity of FIAs in its Regulatory Impact Analysis ("RIA").

The RIA explained that FIAs generally provide "crediting for interest based on changes in a

market index," but noted there are hundreds of indexed annuity products, thousands of index

annuity strategies, and that "the selection of the crediting index or indices is an important and

often complex decision.[122] Further, there are several methods for determining changes in the

index, with different methods resulting in varying rates of return.[123] Rates of return are also

affected by "participation rates, cap rates, and the rules regarding interest compounding."[124]

Because "insurers generally reserve rights to change participation rates, interest caps, and fees,"

FIAs can "effectively transfer investment risks from insurers to investors."[125] The DOL found

that FIAs may offer guaranteed living benefits, but such benefits "may come at an extra cost and,

because of their variability and complexity, may not be fully understood by the consumer."[126]

The DOL also cited the SEC, which recently stated, "[y]ou can lose money buying an indexed

---

[121] *Final PTE 84-24*, 81 Fed. Reg. at 21,157–58.
[122] Regulatory Impact Analysis at AR435 (ECF No. 47-1).
[123] *Id.* at AR439.
[124] *Id.*
[125] *Id.*
[126] *Id.* at AR435.

annuity…even with a specified minimum value from the insurance company, it can take several years for an investment in an indexed annuity to break even."[127]

Based on the RIA's findings on complexity, the DOL determined that FIAs are "complex products requiring careful consideration of their terms and risks" and that FIA investors

> can all too easily overestimate the value of these contracts, misunderstand the linkage between the contract value and the index performance, underestimate the costs of the contract, and overestimate the scope of their protection from downside risk (or wrongly believe they have no risk of loss). As a result, Retirement Investors are acutely dependent on sound advice that is untainted by the conflicts of interest posed by Advisers' incentives to secure the annuity purchase, which can be quite substantial.[128]

Citing the RIA, the DOL further determined that "increasing complexity and conflicted payment structures associated with [FIAs] have heightened the conflicts of interest experienced by investment advice providers that recommend them."[129] In the final PTE 84-24, the DOL justified excluding FIAs partly because they are "extremely complex investment products that have often been used as instruments of fraud and abuse…[and] have taken an especially heavy toll on our nation's most vulnerable investors."[130]

### 2.  The Differences Between FIAs and Fixed Rate Annuities

The DOL then differentiated FIAs from fixed rate annuities. In the RIA, the DOL described record sales of FIAs, cited graphs showing a steady decline of fixed rate annuities accompanied by a steady increase in FIAs, explained the features of the various annuity products, and distinguished them based on complexity and risk.[131] The DOL explained how FIA sales can generate conflicts of interest, and that with increased sales of FIAs there have been

---

[127] *Id*. at AR600.
[128] *Final BICE*, 81 Fed. Reg. at 21,018; *Final PTE 84-24*, 81 Fed. Reg. at 21,154.
[129] *Final PTE 84-24*, 81 Fed. Reg. at 21,154.
[130] *Id*. (citing statement of the North American Securities Administrators Associations on FIAs).
[131] Regulatory Impact Analysis at AR433–42, 447–48 (ECF No. 47-1).

additional complaints that the products were sold to customers who did not need them. The DOL noted a perceived relationship between increased sales of FIAs and unusually high commissions, which are typically higher than for fixed rate annuities.[132] The DOL also noted that FINRA and the SEC concluded that FIAs are riskier than fixed rate annuities, citing FINRA's conclusion that FIAs "are anything but easy to understand" and "give you more risk (but more potential return) than [a fixed rate annuity]."[133]

It should be noted that in *American Equity Inv. Life Insurance Co. v. S.E.C.*, 613 F.3d 166, 172–76 (D.C. Cir. 2010), the D.C. Circuit held that the SEC reasonably interpreted the term "annuity contract" to exclude FIAs, partly because they are hybrid financial products with similarities to variable annuities. *Id.* This holding supports the conclusion that the DOL acted reasonably when it found FIAs to be more like variable annuities than fixed rate annuities, and thus decided to regulate FIAs and fixed rate annuities differently.

### 3.   The Similarities Between FIAs and Variable Annuities

The DOL further justified grouping FIAs with variable annuities. The DOL found FIAs "are as complex as variable annuities, if not more complex," that "[s]imilar to variable annuities, the returns of [FIAs] can vary widely, which results in a risk to investors," and that "[u]nbiased and sound advice is important to all investors but it is even more crucial in guarding the best interests of investors in [FIAs] and variable annuities."[134] FIA sales are also "rapidly gaining market share compared to variable annuity sales."[135]

The DOL determined that "[b]oth categories of annuities, variable and [FIAs], are susceptible to abuse, and Retirement Investors would equally benefit in both cases from the

---

[132] *Id.* at AR448.
[133] *Id.* at AR600.
[134] *Id.* at AR439.
[135] *Id.*

protections of [BICE]."[136] The DOL also determined that placing FIAs and variable annuities in BICE would "create a level playing field" and "avoid[] creating a regulatory incentive to preferentially recommend indexed annuities."[137] This conclusion is also supported by *American Equity*, which found it reasonable to treat variable annuities and FIAs the same way for securities law purposes, because both are "hybrid financial product[s] [that] involve considerations of investment not present in the conventional contract of insurance." 613 F.3d at 174.

Contrary to Plaintiffs' argument, the DOL drew a reasonable distinction between FIAs and fixed rate annuities and justified moving FIAs from PTE 84-24 to BICE. The DOL thoroughly considered and analyzed the relevant data and evidence, and determined that FIAs should be moved from PTE 84-24 to BICE because variable annuities and FIAs share common complexity, high commissions, and resulting conflicts of interest. The DOL acknowledged some similarities between FIAs and fixed rate annuities, but found the differences between them sufficient to justify different treatment. Because the DOL's determinations are supported by substantial evidence in the administrative record, the Court should defer to the DOL's judgment.[138]

      c.   <u>The DOL Accounted for Existing Annuity Regulation</u>

Relying on *American Equity*, Plaintiffs argue that in moving FIAs from PTE 84-24 to BICE, the DOL failed "to determine whether, under the existing regime, sufficient protections existed" for annuities. 613 F.3d at 179. In *American Equity*, the D.C. Circuit vacated a final rule

---

[136] *Final BICE*, 81 Fed. Reg. at 21,018.

[137] *Id.*

[138] ACLI also argues the DOL exceeded its statutory authority because "it deliberately disfavored variable annuities and FIAs and promoted other retirement products." *See* ACLI Brief in Support of Motion for Summary Judgment (ECF No. 49 at 23–24). The DOL did not impermissibly discriminate between retirement products; rather, it used its express authority under ERISA to create a new exemption for otherwise prohibited transactions (BICE) and to change another (PTE 84-24). The DOL found the changes were in the best interest of retirement investors and sufficiently justified its distinctions.

because the Securities Act of 1933 required the SEC to "determine whether an action is necessary or appropriate in the public interest…[for] the protection of investors [and] whether the action will promote efficiency, competition and capital formation," but the SEC failed to do so in its rulemaking. *Id*. at 176–77 (citing 15 U.S.C. § 77b(b)). In particular, the SEC did not analyze the efficiency of the existing state law regulatory regime, which "render[ed] arbitrary and capricious the SEC's judgment that applying federal securities law would increase efficiency." *Id*. at 179. To change which annuities qualify for a certain exemption under ERISA, there is no similar statutory requirement that the DOL analyze for efficiency.

The standard for determining whether the DOL's decision to move FIAs from PTE 84-24 to BICE was arbitrary and capricious is "whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders*, 826 F.3d at 219–20. The administrative record shows the DOL met this standard.

The DOL comprehensively assessed existing securities regulation for variable annuities, state insurance regulation of all annuities, academic research, government and industry statistics on the IRA marketplace, and consulted with numerous government and industry officials, including the National Association of Insurance Commissioners ("NAIC"), SEC, FINRA, the Department of the Treasury, the Consumer Financial Protection Bureau, the Council of Economic Advisers, and the National Economic Council. The DOL found the protections prior to the current rulemaking insufficient to protect investors.[139]

---

[139] Regulatory Impact Analysis at AR344-63, 421-28, 430, 443-83, 585-87 (ECF No. 47-1). Plaintiffs' arguments are specifically refuted by sections of the record titled "Intersection with Other Governing Authorities" AR344, "Need For Regulatory Action" AR 421, "Current Protections" AR426, and "Conclusion" AR482-83. The DOL did consider whether existing regulation was sufficient, but this is not the standard the DOL must meet. *Id*.

The DOL found the annuity market to be influenced by contingent commissions, which "align the insurance agent or broker's incentive with the insurance company, not the consumer," that existing protections do not "limit or mitigate potentially harmful adviser conflicts," and that "notwithstanding existing [regulatory] protections, there is convincing evidence that advice conflicts are inflicting losses on IRA investors."[140] The DOL found the conflicts would cost investors "at least tens and probably hundreds of billions of dollars over the next 10 years…despite existing consumer protections," and that "the material market changes in the marketplace since 1975 have rendered [prior regulation] obsolete and ineffective."[141] In particular,

> today's marketplace [commissions]…give[]…advisers a strong reason, conscious or unconscious, to favor investments that provide them greater compensation rather than those that may be most appropriate for the participants…an ERISA plan investor who rolls her retirement savings into an IRA could lose 6 to 12 and possibly as much as 23 percent of the value of her savings over 30 years of retirement by accepting advice from a conflicted financial adviser."[142]

The DOL also found that state insurance laws and their enforcement vary significantly because only thirty-five states have adopted the NAIC model regulation, producing inconsistent protections and confusion for consumers. The U.S. Department of the Treasury noted that the absence of a national standard is problematic because there are unprecedented numbers of retirement investors, and financial professionals are selling increasingly complex products, therefore more uniform regulation is necessary to protect investors.[143]

The DOL considered comments recommending more regulation "to enhance retirement investor protection in an area lacking sufficient protections for investors in tax qualified

---

[140] *Id*. at AR426–27, 475–76. As noted above, the DOL also considered product complexity and the rise of FIAs in the marketplace.
[141] *Id*. at 421.
[142] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,949, 20,956.
[143] Regulatory Impact Analysis at AR358, 427, 601 (ECF No. 47-1).

accounts."[144] For example, one commenter thought "IRA owners need greater protections when investing in indexed annuities precisely because such products are not regulated as securities."[145] The DOL also considered comments expressing concern about federal interference with state insurance regulatory programs, but rejected them because it "reviewed NAIC model laws and regulations and state reactions to those models in order to ensure that [new regulations] work cohesively with the requirements currently in place."[146] The DOL determined the new rules would work with and complement state insurance regulations.[147]

> With all these considerations in mind, the DOL explained:
>
> The extensive changes in the retirement plan landscape and the associated investment market in recent decades undermine the continued adequacy of the original approach in PTE 84-24. In the years since the exemption was originally granted in 1977, the growth of 401(k) plans and IRAs has increasingly placed responsibility for critical investment decisions on individual investors rather than professional plan asset managers. Moreover, at the same time as individual investors have increasingly become responsible for managing their own investments, the complexity of investment products and range of conflicted compensation structures have likewise increased. As a result, it is appropriate to revisit and revise the exemption to better reflect the realities of the current marketplace.[148]

The DOL's rationale and findings satisfy the APA. Plaintiffs argue, however, that the DOL acted unreasonably when it relied upon studies focused almost exclusively on mutual funds, as opposed to FIAs, and that the studies relied on data collected before more stringent annuity regulation went into effect. The Court would find that the DOL satisfied the APA even without the mutual fund studies because the DOL relied on other evidence, as described below, but the Court will nonetheless address the mutual fund studies.[149]

---

[144] *Final PTE 84-24*, 81 Fed. Reg. at 21,157.
[145] *Id*.
[146] *Final BICE*, 81 Fed. Reg. at 21,018.
[147] *Id*. at 21,019.
[148] *Final PTE 84-24*, 81 Fed. Reg. at 21,153.
[149] Consideration of the mutual fund studies also support the conclusion that the DOL considered the existing FINRA rule.

The DOL acted reasonably when it relied on studies that primarily involved mutual funds. It found FIAs and mutual funds comparable, because both are subject to disclosure and suitability requirements, and agents selling both products are compensated with upfront commissions that depend on the product sold.[150] The RIA found these commissions created similar conflicts for mutual funds and FIAs, and that the conflicts for FIAs can actually be more detrimental than mutual fund conflicts.[151] Broker-sold mutual funds provide an incentive to brokers to sell their products, but the record reflects that conflicted brokers "reinforce erroneous beliefs about the market" and "guide people towards high-fee funds."[152] Mutual fund sales are subject to a suitability disclosure regime; if this proved insufficient to protect mutual fund consumers from the harms of conflicts, the DOL could reasonably conclude the conflict would justify similar treatment for annuities.[153] The DOL's determinations are supported by substantial evidence in the administrative record, so the Court defers to the DOL's judgment.

The conclusion that the DOL reasonably extrapolated from mutual fund studies is further supported by the fact that annuity data is not readily and widely available, while mutual fund studies are obtainable because the relevant data is publicly disclosed under SEC regulations. The DOL requested annuity data from industry groups as early as 2011, but was told the information was not available and would be prohibitively expensive to collect.[154] The Supreme Court has held "[i]t is one thing to set aside agency action under the [APA] because of failure to adduce empirical data that can be readily obtained. It is something else to insist upon obtaining the

---

[150] Regulatory Impact Analysis at AR349, 357, 444, 447 (ECF No. 47-1).
[151] *Id*. at 438, 447.
[152] *Id*. at 481.
[153] The DOL specifically considered an exemption based on disclosure alone, but after thorough analysis, found reliance only on disclosure would be ineffective and yield little to no investor gains. *Id*. at AR584-587.
[154] *Id.* at 485 n.385. The DOL also considered studies outside of the mutual fund context; in particular, it also analyzed studies that focused on continued commissions in casualty insurance and assessments relating to actual life insurance sales. *Id.* at 438, 464.

unobtainable." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009); *see also*

*ConocoPhillips Co. v. E.P.A.*, 612 F.3d 822, 841–42 (5th Cir. 2010) (deferring to the agency's

evaluation of studies despite opponent's argument that it was arbitrary for agency to find studies

comparable because "the agency must make do with the available information" and "when an

agency is faced with such informational lacunae, the agency is well within its discretion to

regulate on the basis of available information rather than to await the development of

information in the future").

Plaintiffs also argue the DOL acted unreasonably because it relied on studies from

periods prior to the strengthened NAIC model rules, which mitigated the need for new

regulation. But the DOL considered data through 2015, reviewed data from 2008 through 2014

submitted by commenters, considered that regulators continued to express concern that the prior

regulatory scheme did not provide adequate protections, and came to the same conclusions.[155]

Analysis of multiple data sets through 2014 and 2015 rebuts Plaintiffs' argument that the DOL

relied upon old or unrepresentative data, and further supports the conclusion that the DOL's

actions were not arbitrary or capricious.[156]

It was reasonable to shift FIAs from PTE 84-24 to BICE given the DOL's analysis of

mutual fund studies; changes in the marketplace since 1975; harmful conflicts that could cost

investors over the next decade, despite existing regulation; the opaque nature and incentives of

---

[155] *Id*. at AR435, 450, 456, 479–82, 600, 646–47, 649.

[156] Plaintiffs also argue that the Harkin Amendment to the Dodd-Frank Act prevents the DOL from regulating FIAs. This argument ignores the fact that the DOL has authority to do so under ERISA. The Harkin Amendment creates a safe harbor from securities regulations if certain standards are not met. Neither ERISA nor the Code is a securities law, and the DOL made its decision based on conflict of interest and complexity concerns. The Harkin Amendment is not a congressional determination that state regulation is sufficient to address conflicts of interest in annuity sales. Further, the SEC is not currently regulating FIAs, so sellers of FIAs need not satisfy the SEC's safe harbor.

commission-based compensation; concerns from SEC and FINRA regulators; and the lack of uniformity among the states.[157]

> d.  BICE Is Not Unworkable

Plaintiffs' next argument is that BICE is unworkable, and therefore contravenes the APA. Here, the Court is to determine "whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders*, 826 F.3d at 219–20. The DOL's decision will not be vacated unless it "entirely failed to consider an important aspect of the problem," and courts "will uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 460 (5th Cir. 2016). Whether the DOL's decision was "ideal, or even necessary, is irrelevant to the question of whether it was arbitrary and capricious so long as the agency gave at least minimal consideration to the relevant facts as contained in the record." *City of Arlington v. FCC*, 668 F.3d 229, 261 (5th Cir. 2012). Plaintiffs make five arguments that BICE is unworkable.

> 1.  Maintenance of the Independent-Agent Distribution Model

IMOs and their independent insurance agents are the largest distribution channel for FIAs, and approximately 65% of FIAs are sold by insurance agents who are not affiliated with a broker-dealer. Plaintiffs claim that under the new rules, insurance companies selling covered annuities will be unable to maintain their independent agent distribution model, through which FIAs are primarily sold. However, the record reflects the DOL acknowledged the importance of

---

[157] Regulatory Impact Analysis at AR483 (ECF No. 47-1).

independent insurance agents, IMOs, and the current distribution channel, but found that conflicts of interest for insurance intermediaries negatively impacted consumers.[158]

The DOL discussed the various ways IMOs and independent agents could respond to the new rules, including: relying on BICE or another exemption, avoiding potential conflicts and thereby minimizing the need for an exemption, or ceasing to advise IRA clients to buy covered annuities.[159] To qualify for BICE, a "Financial Institution," which is defined in the regulation, must enter into a contract with the investor.[160]  The DOL considered comments to the NPRM and adjusted the final version of BICE to address concerns expressed by commenters, noting "the final exemption has been revised so that the conditions identified by commenters are less burdensome and more readily complied with by Financial Institutions, including insurance companies and distributors of insurance products."[161] Specifically, commenters had expressed concern about "marketing or distribution affiliates and intermediaries that would not meet the definition of Financial Institution," and would therefore be unable to receive third-party compensation.[162] In response, the DOL revised the final version of BICE to allow IMOs to petition for an individual exemption from the "Financial Institution" definition.[163] The industry

---

[158] Regulatory Impact Analysis at AR417-420 (discussing agents and IMOs, finding FIA sales "heavily rely on independent insurance agents"); AR447 (chart of annuity sales by distribution channel); AR460 ("Adviser compensation often is not fully transparent…potential conflicts affecting insurance intermediaries are likewise varied, complex, and difficult for consumers to discern.") (ECF No. 47-1).

[159] *Id.* at AR625–27.

[160] BICE defines "Financial Institution" as an entity that employs the Adviser or otherwise retains such individual as an independent contractor, agent or registered representative and that is either: (1) registered as an investment adviser under the Investment Advisers Act of 1940 or under the laws of the state in which the adviser maintains its principal office and place of business; (2) a bank or similar financial institution supervised by the United States or state, or a savings association (as defined in section 3(b)(1) of the Federal Deposit Insurance Act); (3) an insurance company qualified to do business under the laws of a state (provided that such insurance company satisfies three requirements articulated in the exemption); or (4) a broker or dealer registered under the Securities Exchange Act of 1934. *Final BICE*, 81 Fed. Reg. at 21,083–84.

[161] *Final BICE*, 81 Fed. Reg. at 21,018.

[162] *Id.* at 21,067.

[163] *Id.*

has already begun to take advantage of this option.[164] The DOL identified several other solutions for potential adverse impacts on the distribution model. For example, because more than sixty percent of insurance agents are registered to handle securities, an affiliated broker or registered investment adviser could serve as the Financial Institution under BICE.[165] Either the insurance company or the IMO could sign the contract required by BICE, and then an IMO can take on the oversight responsibility of insurance companies.

The DOL anticipated the most common distribution model would remain workable, predicting firms "will gravitate toward structures and practices that efficiently avoid or manage conflicts to deliver impartial advice consistent with fiduciary conduct standards."[166] The administrative record shows the DOL considered the common distribution model, identified potential solutions, and addressed commenter concerns. In doing so, the DOL satisfied the APA's requirements.

### 2.   The DOL Provided Guidance on Reasonable Compensation

Plaintiffs argue there is no meaningful guidance in the rules on what constitutes "reasonable compensation," which is a provision in the written contract required to qualify for BICE, and that the exemption is therefore unworkable. In fact, the DOL has used the same "reasonable compensation" language in BICE in numerous exemptions from prohibited transactions going back to 1977.[167] The DOL provided further guidance on what constitutes reasonable compensation by cross referencing both ERISA and the Code, and by stating:

> The reasonableness of the fees depends on the particular facts and circumstances at
> the time of the recommendation. Several factors inform whether compensation is

---

[164] *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *11 (D. Kan. Nov. 28, 2016) (as of September 14, 2016, there were 10 applications for individual exemptions).
[165] *Id.* at AR419; *see also Final BICE*, 81 Fed. Reg. at 21,083.
[166] Regulatory Impact Analysis at AR626 (ECF No. 47-1).
[167] *See* 71 Fed. Reg. at 5889 (Feb. 3, 2006); 49 Fed. Reg. at 13,211 (Apr. 3, 1984); 42 Fed. Reg. at 32,398 (Jun. 24, 1977).

reasonable including…the market pricing of service(s) provided and the underlying asset(s), the scope of monitoring, and the complexity of the product. No single factor is dispositive in determining whether compensation is reasonable; the essential question is whether the charges are reasonable in relation to what the investor receives. Consistent with the [DOL's] prior interpretations of this standard, [the DOL] confirms that an Adviser and Financial Institution do not have to recommend the transaction that is the lowest cost or that generates the lowest fees without regard to other relevant factors. In this regard, [the DOL] declines to specifically reference FINRA's standard in the exemption, but rather relies on ERISA's own longstanding reasonable compensation formulation.[168]

Plaintiffs respond that this provides no clarity. The DOL considered this critique and rejected it, noting that the standard "has long applied to financial services providers," that parties could "refer to [the DOL's] interpretations under ERISA § 408 (b)(2) and Code § 4975(d)(2)" for further guidance, that the industry could request the DOL to provide guidance, and that nothing prevents parties from "seeking impartial review of their fee structures to safeguard against abuse."[169] Further, the DOL cross referenced sections of ERISA and the Code in BICE to provide clarity. For example, compensation is unreasonable if it exceeds what "would ordinarily be paid for like services by like enterprises under like circumstances."[170] Courts seemingly have had little trouble applying the concept of reasonable compensation and other similar standards over the years, showing it is far from unworkable.[171]

### 3. The DOL Considered Litigation Liability

Plaintiffs argue the "vague" and "ill-defined" best interest standard, along with inconsistent state law enforcement of contracts required under BICE, make those potentially

---

[168] *Final BICE*, 81 Fed. Reg. at 21,030.

[169] *Id*. at 21,030–31.

[170] 29 U.S.C. § 1108(b)(2), 26 U.S.C. § 4975(d)(2); *see also* 26 C.F.R. § 1.162-7; 29 C.F.R. § 2550.408c-2(b)(5) (ERISA regulation incorporating 26 C.F.R. § 1.162-7); 26 C.F.R. § 54.4975-6(e)(6) (Code regulation doing the same).

[171] *See N.Y. State Teamsters Health & Hosp. Fund v. Centrus Pharmacy Sols.*, 235 F. Supp. 2d 123, 129 (N.D.N.Y. 2002); *Chao v. Graf*, No. 01-0698, 2002 WL 1611122, at *13 (D. Nev. Feb. 1, 2002); *Guardsmark, Inc. v. BlueCross & BlueShield of Tenn.*, 169 F. Supp. 2d 794, 803 (W.D. Tenn. 2001); *I.B.E.W. Local 1448 Health & Welfare Fund v. Thorndyke Int'l, Inc.*, No. 97-CV-5718, 1998 WL 764753, at *4 (E.D. Pa. Oct. 26, 1998); *Kouba v. Joyce*, No. 83-C-451, 1987 WL 33370, at *6 n.22 (N.D. Ill. Dec. 31, 1987).

covered by the exemption susceptible to unforeseeable, potentially conflicting, and staggering liability from private litigation.[172] The DOL considered these issues, but determined that potential litigation would incentivize compliance and that certain features of BICE

> should temper concerns about the risk of excessive litigation. In particular, the exemption permits Advisers and Financial Institutions to require mandatory arbitration of individual claims, so that claims that do not involve systemic abuse or entire classes of participants can be resolved outside of court. Similarly, the exemption permits waivers of the right to obtain punitive damages or rescission based on violation of the contract.[173]

The best interest standard is not vague; the standard is explained thoroughly in BICE, and is drawn from the duties of loyalty and prudence, which are "deeply rooted in ERISA and the common law of agency and trusts."[174] As for unforeseeable or potentially conflicting results, Plaintiffs do not articulate why these concerns did not arise before BICE, as state law litigation was already available to remedy wrongs occurring in IRA transactions.[175] If annuity owners had contractual rights enforceable against an insurer prior to the subject rulemaking, BICE would not exacerbate Plaintiffs' liability risks and concerns over possibly conflicting or inconsistent judicial decisions.[176] Further, Plaintiffs cite no reason why courts' decisions would be expected to diverge widely when applying common legal principles of contract law.

### 4.   The DOL's Guidance on Proprietary Products Is Clear

Proprietary products are defined in BICE as products "that are managed, issued or sponsored by the Financial Institution or any of its Affiliates."[177] Plaintiffs argue BICE is unworkable for proprietary products because the lack of clear guidance on how to avoid liability

---

[172] ACLI Brief in Support of Motion for Summary Judgment (ECF No. 49 at 28).
[173] *Final BICE*, 81 Fed. Reg. at 21,022.
[174] *Id*. at 21,027–29.
[175] *See, e.g.*, *Knox v. Vanguard Group, Inc.*, No. 15-13411, 2016 WL 1735812, at *4–6 (D. Mass. May 2, 2016); *Abbit v. ING USA Annuity & Life Ins. Co.*, 999 F. Supp. 2d 1189, 1197–99 (S.D. Cal. 2014).
[176] *See* Cmt. 3050 ACLI (Sep. 24, 2015) (ECF No. 115 at AR46171–72).
[177] *Final BICE*, 81 Fed. Reg. at 21,052.

creates a serious litigation risk. However, in Section IV of the exemption, the DOL created a

checklist to provide guidance on how proprietary product providers can satisfy BICE.[178] It also

expressly addressed Plaintiffs' and commenters' concerns, stating the exemption "does not

impose an unattainable obligation…to somehow identify the single 'best' investment…out of all

the investments in the national or international marketplace, assuming such advice were even

possible."[179] Rather, BICE states it is imprudent to recommend a propriety product that does not

satisfy the "prudence and loyalty standards with respect to the particular customer, and in light of

that customer's needs."[180] This requirement is not unclear.

     5.   Plaintiffs Misconstrue the Supervisory Responsibilities Imposed by the Rules

     Plaintiffs claim insurance companies will be unable to comply with the responsibilities

BICE imposes on financial institutions to supervise independent agents. COC presented for

consideration by the Court a hypothetical case, where an independent agent sells seven FIAs

established by four different insurance companies, which would evidence a conflict of interest if

the agent's compensation varied from insurer to insurer.[181] In this situation, COC argues one

insurance company cannot supervise the sale of another company's products or the other

company's compensation, and that the disclosure and management requirements are thus

unworkable. This hypothetical misconstrues BICE. Insurance companies are not required to

supervise the sale of other companies' products. Instead, insurers are only required to meet the

standards with respect to the recommendation and sales of their own products. This is articulated

in BICE, which only places obligations on the "Financial Institution" and "any Affiliate or

---

[178] *Id*. at 21,052–55.
[179] *Id*. at 21,029.
[180] *Id.* at 21,055.
[181] COC Brief in Support of Motion for Summary Judgment (ECF No. 61 at 39).

Related Entity."[182] When "more than one 'Financial Institution' is involved in the sale of a financial product," the financial institution that signs the contract is responsible for incentives associated with such transaction, and BICE does not condition relief on "execution of the contract or oversight by more than one Financial Institution."[183]

The DOL considered the relevant factors for BICE's workability, addressed commenter concerns, and reasonably justified its conclusions, thereby satisfying the APA's requirements.

e.   The DOL's Cost Benefit Analysis Was Reasonable

Plaintiffs make four arguments that the DOL overstated the benefits and underestimated the costs of its rulemaking, and thus violated the APA, by conducting an unreasonable cost-benefit analysis. Plaintiffs' claims are to be analyzed under the same standard of deference to the agency as their "workability" argument. An agency is not required to "conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Michigan v. EPA*, 135 S. Ct. 2699, 2711 (2015).[184] The Court finds the DOL adequately weighed the monetary and non-monetary costs on the industry of complying with the rules, against the benefits to consumers. In doing so, the DOL conducted a reasonable cost-benefit analysis.

1.   Mutual Fund Studies Were Not a Single Unrepresentative Factor

First, Plaintiffs claim the DOL inappropriately relied on a single unrepresentative factor, front-end-load mutual fund conflicts, to conclude the rulemaking would save retirement investors billions of dollars.[185] In addition to arguing mutual fund studies are not comparable to FIAs,

---

[182] *Final BICE*, 81 Fed. Reg. at 21,077.
[183] *Id.* at 21,067.
[184] Because the DOL relied on its specific exemptive authority under 29 U.S.C. § 1108(a) and 26 U.S.C. § 4975(c)(2), as opposed to its general authority under 29 U.S.C. § 1135, the DOL is not bound by the same requirements as the EPA in *Michigan v. EPA* (interpreting statute that required the EPA to determine whether its regulation was "appropriate and necessary").
[185] A front-end load is a commission or sales charge applied at the time of the initial purchase of an investment, usually for purchase of mutual funds and insurance policies. It is deducted from the investment amount and, as a result, lowers the size of the investment. *See Yameen v. Eaton Vance Distributors, Inc.,* 394 F. Supp. 2d 350, 352

Plaintiffs contend the DOL failed to conduct a proper assessment of mutual fund performance. These assertions are contradicted by the administrative record.[186] The DOL collected and studied a wide range of evidence to assess harm to IRA investors, including public comments, academic research, government and industry statistics, public comments, and consultations with various agencies and industry organizations. The DOL relied on a compilation of nine studies to generate a quantitative estimate of the cost of conflicted advice in the mutual fund segment of the IRA market.[187] It also relied on the Christofferson, Evans, and Musto ("CEM") study to quantify an estimate for investor gains if they received non-conflicted advice. This was appropriate, because the DOL found the CEM study provided the most accurate quantitative data for this purpose.[188] The studies upon which the DOL relied were also largely consistent with the other evidence it considered, including NPRM comments and statements made at the public hearing. Considering the studies and substantial empirical and quantitative evidence, the Court concludes the DOL could reasonably extrapolate its qualitative conclusions from mutual funds to annuities.

The DOL's assessment of mutual fund performance was reasonable. It did not, as COC argues, select an unrepresentative time frame. Using 1993 through 2009 as a relevant time period was not arbitrary, as it was the period used in the CEM study upon which the DOL relied. But this was not the only data set the DOL relied on. It conducted its own review of mutual fund performance analysis at points from 1980 through 2015, considered a study referenced by a commenter which used data from 2008 to 2014, and updated the record to include another study which used data from 2003 through 2012.[189] Because the DOL did not have a long-term study of

---

(D. Mass. 2005); *see also* Investopedia.com, http://www.investopedia.com/terms/f/front-endload.asp (last visited February 7, 2017).
[186] *See also infra*, Section III-(D)(c).
[187] Schwarcz & Siegelman, "Insurance Agents in the 21st Century: The Problem of Biased Advice." *Research Handbook in the Law and Economics of Insurance* (Edw. Elgar 2015) (ECF No. 115 at AR31681–84).
[188] Regulatory Impact Analysis at AR485-94, 656-80. (ECF No. 47-1).
[189] *Id*. at AR479-82, 646-55. (ECF No. 47-1).

how broker-sold mutual funds underperformed and conflicts negatively impacted consumers, the DOL acted reasonably when it "consider[ed] evidence from multiple studies, which, in aggregate, span a long time horizon."[190]

Nor did the DOL ignore criticisms made during the comment period of its methodology and its estimates of savings for consumers. The DOL responded to concerns cited by Plaintiffs and other commenters, but concluded its data was fairly representative and its methodology was sound.[191] COC argues the DOL based "its [conflicted advice] underperformance estimate not on actual holding periods, or even a full market cycle, but rather on the single year in which funds were purchased," which COC claims is a fundamental oversight that makes use of the data unreasonable. The DOL addressed this concern in the record, stating that further analysis and related literature showed "the CEM results should hold for the life of the fund, not just the first year following an inflow."[192] The administrative record suggests that had data been available for the life of the mutual fund, quantifiable losses would likely be even worse, because advisers' conflicts of interest exacerbated market timing problems.[193] Additionally, the DOL specifically requested the industry provide any and all relevant data for IRA investments, but was told the data either did not exist or would be too expensive to collect.[194] The DOL must make do with the available information and may regulate on the basis of available information. *ConocoPhillips*, 612 F.3d at 841–42.

---

[190] *Id*. at AR481.

[191] *Id*. at AR479-82, AR666-68. The DOL rejected "ICI's contention that the data presented…contradict the claims made in the 2015 NPRM…[and] bases this rejection on the following findings." The DOL also hired outside consultants who confirmed that its methodology and estimates were sound. *Id*. at 480-82.

[192] *Id*. at AR662-64.

[193] *Id*. at AR472, 477, 632-34. Market timing is the act of moving in and out of the market or switching between asset classes based on using predictive methods. Because it is difficult to predict the future direction of the stock market, investors who try to time the market, especially mutual fund investors, tend to underperform investors who remain invested. *See In re Mut. Funds Inv. Litig.,* 384 F. Supp. 2d 845, 852 n.1 (D. Md. 2005); *see also* Investopedia.com, http://www.investopedia.com/terms/m/markettiming.asp (last visited February 7, 2017).

[194] *Id*. at AR485 n.385.

2.   The DOL Considered Costs on the Industry and Retirement Investors

Next, Plaintiffs claim the DOL did not consider the costs to the industry of more class action lawsuits or the costs to consumers of decreased access to investment advice. The DOL did not specifically quantify potential class action litigation costs, but it is not required to do so. It considered the relevant issues and satisfied the APA's requirements. The DOL requested the industry provide supplemental litigation cost data, but again, the industry did not do so because "of the extreme uncertainties surrounding litigation risk."[195] Further, the DOL considered litigation costs when it accounted for increased fiduciary liability insurance premiums, while acknowledging that some costs may not be covered if the insured loses in litigation.[196] BICE itself addresses the costs of litigation, and states that "a number of features [in BICE]… should temper concerns about the risk of excessive litigation… [because it] permits Advisers and Financial Institutions to require mandatory arbitration of individual claims, so that claims that do not involve systemic abuse or entire classes of participants can be resolved outside of court."[197] BICE, therefore, aims to ensure that only allegations of systemic egregious conduct will be litigated via class actions.

The DOL provided at least two reasons why Plaintiffs' cost concerns are overstated. First, BICE's class action provision does not drastically change the regulatory regime. Prior to the rulemaking, transactions regulated by FINRA were already subject to class actions, and there were several high profile class action lawsuits involving FIAs and variable annuities. [198] Second,

---

[195] Cmt. 3036 Financial Services Inst. (Sep. 24, 2015) (ECF No. 115 at AR46067).
[196] Regulatory Impact Analysis at AR555-58. (ECF No. 47-1). This also includes costs for at least some potential settlements.
[197] *Final BICE*, 81 Fed. Reg. at 21,022.
[198] Regulatory Impact Analysis at AR448 (ECF No. 47-1); *see also Final BICE*, 81 Fed. Reg. at 21,043 ("FINRA arbitration rule 12,204 specifically excludes class actions from FINRA's arbitration process and requires that pre-dispute arbitration agreements between brokers and customers contain a notice that class action matters may not be arbitrated.").

"courts impose significant hurdles for bringing class actions," so they are likely more limited than Plaintiffs suggest.[199] The DOL reasonably found the benefits outweighed the costs.

The DOL also assessed Plaintiffs' concerns that the rules would decrease access to investment advice.[200] After analyzing the relevant evidence, the DOL found fewer conflicts of interest, more transparency, and a more efficient market would "increase the availability of quality, affordable advisory services for small plans and IRA investors," and that it would not have "unintended negative effects on the availability or affordability of advice."[201] The DOL further relied on data from the United Kingdom's more aggressive regulatory regime, which banned all commissions on retail investment products. Because evidence showed the UK's comprehensive changes did not result in advisers abandoning consumers, the DOL reasonably found its less burdensome rulemaking would not cause a material number of advisers to leave the market or negatively impact access to investment advice.[202]

### 3.   The DOL Considered the Compliance Costs of BICE

Third, Plaintiffs argue the DOL did not consider the cost for IMOs, and other agents who sell FIAs, to comply with BICE. In fact, the DOL considered compliance costs, which were quantified based on the industry's own estimates.[203] The DOL also recognized there would be costs for training "employees to recognize when they are offering advice, so that they do not…become fiduciaries unintentionally."[204] The DOL further acknowledged independent insurance agents could be affected, and that its analysis may not account for all costs to

---

[199] *Id.* at 21,043.
[200] Regulatory Impact Analysis at AR623-34 (ECF No. 47-1). Plaintiffs also appear to argue the DOL was required to consider the costs of reducing investor access to FIAs and variable annuities, but the Court is unpersuaded that the new rules reduce consumer access to FIAs or variable annuities.
[201] *Id.* at AR628-29, 634.
[202] *Id.* at AR 393-94. The UK banned commissions, while the DOL's rulemaking has not.
[203] *Id.* at AR553-54, 599-602, 622.
[204] *Id.* at AR554

independent insurance agents. The DOL explained that it did not have complete data because the industry declined to provide it, but the DOL accounted for the available cost data.[205]

The final estimate of "ten-year compliance cost [with the new rules] is estimated to be between $10.0 billion and $31.5 billion," while estimated gain for IRA investors would be "between $33 billion and $36 billion over 10 years and between $66 and $76 billion over 20 years."[206] The Court notes the DOL "aimed to err on the side of overestimating compliance costs by assuming wide use" of exemptions, even though that is uncertain.[207] The DOL also noted compliance costs would be less than anticipated if "more efficient advisory models and financial products gain market share."[208] The administrative record makes clear that the DOL considered compliance costs and reasonably concluded the benefits to annuity investors and the potential for more cost effective business models outweighed the estimated costs.

### 4.   The DOL Considered the Costs of Excluding Certain Annuities

Fourth, Plaintiffs argue the DOL did not weigh the costs and benefits of excluding FIAs and variable annuities from PTE 84-24. Actually, the DOL calculated additional costs for the FIA industry to comply with BICE, rather than PTE 84-24. It found providing relief under PTE 84-24 instead of BICE would reduce costs

> by between $34.0 million and $37.8 million over ten years. The largest costs associated with [BICE] are fixed costs that are triggered during the first instance that a financial institution uses [BICE]. These costs are borne by financial institutions whether they use the exemption once or regularly. Therefore, the financial institutions that would be most likely to realize significant cost savings from providing relief for [FIAs] under PTE 84-24 instead of [BICE] are those financial institutions that would not sell any other product requiring relief under [BICE].[209]

---

[205] *Id.* at AR554 n.519.
[206] *Id.* at AR326, 622.
[207] *Id.* at AR622.
[208] *Id.*
[209] *Id.* at AR601-02.

Plaintiff IALC argues the rulemaking is arbitrary and capricious because the DOL did not show the benefits of compliance would outweigh these costs. The DOL had no specific data to quantify likely investor gains from applying BICE to FIAs, either from its own work or that of the industry.[210] However, the DOL thoroughly analyzed the likely qualitative benefits, and found BICE provided investors with more protection than did PTE 84-24. This conclusion was warranted by the complexity and risk to consumers of FIAs and variable annuities, which the DOL found "would equally benefit…from the protections of [BICE]."[211] The DOL's analysis further showed BICE compliance costs would significantly decrease after the first year.[212] As noted above, the DOL also quantified the rulemaking as a whole, determining that benefits would be greater than costs. Based on its analysis, it was reasonable for the DOL to conclude that investor gains outweigh the costs to the industry.

### E.  BICE Meets the Prohibited Transaction Rules Exemptive Requirements

As noted above, to grant exemptive relief from a prohibited transaction, the DOL must find the exemption is 1) administratively feasible; 2) in the interests of the plan, its participants and beneficiaries; and 3) is protective of the rights of the plan participants and beneficiaries.[213] Plaintiffs argue BICE violates ERISA because the DOL failed to consider whether BICE was administratively feasible for the industry. The DOL argues that this requirement refers to whether or not the exemption is feasible for the agency to apply, not for the regulated industry to satisfy. No party cites a case supporting its position, but the Court finds the DOL to be correct for three reasons.

---

[210] *Id.* at AR485 n.385; *see ConocoPhillips*, 612 F.3d at 841–42 (the agency must make do with the available information and is well within its discretion to regulate on the basis of available information).

[211] *Final BICE*, 81 Fed. Reg. at 21,018.

[212] Regulatory Impact Analysis at AR602 (ECF No. 47-1). For example, compliance with BICE as opposed to PTE 84-24 was estimated at $14.1 million the first year, but just $2 million on average for the next nine years.

[213] 26 U.S.C. § 4975(c)(2); 29 U.S.C. § 1108(a). The DOL found it satisfied the three requirements. *See Final BICE*, 81 Fed. Reg. at 21,020.

First, assessing whether BICE is feasible for the industry would always require a cost-benefit or economic-impact analysis. When Congress requires a cost-benefit or economic-impact analysis to be conducted by an agency, it expressly states in a statute what is required.[214] Nothing in the exemption requirements of ERISA or the Code call for such analysis. Second, canons of statutory construction support the DOL's position. The second and third criteria the DOL must consider before granting an exemption protect plans, and their participants and beneficiaries.[215] Given the purpose and history of ERISA, it is unlikely Congress was concerned about the burdens of an exemption on the regulated industry, particularly when the default ERISA rule is that all such transactions are prohibited. If an exemption was not feasible for the DOL to administer, the DOL could not ensure that plans, participants, and beneficiaries were protected, as Congress intended. Third, ERISA's legislative history supports the DOL's position. Legislative history discussing the prohibited transaction rules states "additional exceptions may be obtained *administratively* upon a showing that the transaction is in the best interest of the plan and its participants, that adequate safeguards are provided, and that the exception is *administratively* feasible."[216] The first use of administratively unambiguously refers to the agency, as only the agency has the authority to grant exemptions. The second use of the word should be construed to have the same meaning when used later in the sentence. *See Gustafson v. Alloyd Co. Inc.,* 513 U.S. 561, 570 (1995) ("[n]ormal rules of statutory construction [dictate] that identical words used in different parts of the same act are intended to have the same meaning."). For these reasons, the Court concludes administrative feasibility refers to the DOL, and

---

[214] For example, in the EPA and Clean Air Act context, Congress provided "No fuel or fuel additive may be controlled or prohibited…except after consideration of available scientific and economic data, including a cost benefit analysis…" 42 U.S.C. § 7545(c)(2)(B).

[215] *See supra* page 6 (citing 29 U.S.C. § 1108(a) and 26 U.S.C. § 4975(c)(2)).

[216] S. Rep. No. 93-1090, at 60 (1974) (emphasis added); *see also* 1974 U.S.C.C.A.N. 4639 (1973) (any use of the word "administrative" clearly refers to an agency).

feasibility for the industry need not be analyzed for exemptive relief granted by the DOL pursuant to ERISA and the Code.[217]

### F. Waiver Applies and the Rules Do Not Violate the First Amendment

Plaintiffs did not raise any First Amendment issues during the rulemaking process. However, Plaintiffs now assert a First Amendment claim. Plaintiffs argue the rules violate the First Amendment because they directly regulate speech by insurance agents, broker-dealers, and others, prohibit recommendations unless BICE is satisfied, and effectively ban commercial sales speech, as "salespersons now may speak as a fiduciary, or not at all."[218] Plaintiffs claim these constraints violate the First Amendment, under either strict or intermediate scrutiny, as applied to truthful commercial speech of those who Plaintiffs represent.

Before the Court can address the First Amendment issue, it must decide the threshold issue of whether this argument was waived because it was not raised during the rulemaking process.

### a. Plaintiffs Waived Any First Amendment Claim During the Rulemaking

Plaintiffs advance three arguments against waiver: first, that typical waiver principles do not apply because they assert a pre-enforcement First Amendment claim under the Declaratory Judgment Act; second, that it is impossible to waive a constitutional objection to an agency rule; and third, that the substance of the First Amendment was in fact raised in several comments. The Court finds these arguments unpersuasive.

---

[217] *See* 91 Pens. & Ben. Rep. (BNA) A-4 (June 21, 1976) (A DOL statement at American Bar Association event characterized "administratively feasible" as "involv[ing] consideration of the resources of the Department and the Internal Revenue Service in relation to the amount of monitoring by the agencies that the exemption would require"); Bill Schmidheiser, Note, ERISA's Prohibited Transaction Restrictions: Policies and Problems, 4 J. Corp. L. 377, 405 (1979) (citing Exhibit B for the proposition that administratively feasible "means feasible for the Departments to administer, given the Departments' resources and the nature of the transaction sought to be exempted").

[218] ACLI Brief in Support of Motion for Summary Judgment (ECF No. 49 at 7).

Plaintiffs confuse issue exhaustion and administrative remedies under an existing statute with waiver principles arising from a notice and comment process. ACLI cites *Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996), arguing that typical waiver principles do not apply to pre-enforcement attacks on regulations restricting speech. Actually, *Weaver* did not hold that First Amendment objections under the Declaratory Judgment Act are immune to waiver before enforcement. *Weaver* concerned failure to exhaust administrative remedies under the Civil Service Reform Act ("CSRA"). It held that the CSRA's exhaustion requirements generally apply to constitutional claims. *Id*. at 1433. However, in reversing the trial court, the D.C. Circuit made an exception to the general rule, because in *Weaver* there was no administrative process available for plaintiff to exhaust. *Id*. at 1433–34. This reading is confirmed by courts that have interpreted *Weaver* to mean "that exhaustion is required for constitutional claims for equitable relief under the CSRA when an administrative process is available." *Ramirez v. U.S. Customs & Border Protection*, 709 F. Supp. 2d 74, 83 (D.D.C. 2010). Thus, even if *Weaver* applied here, Plaintiffs have not explained why a nearly six-year process of rulemaking, including two notice and comment periods, did not constitute an administrative process that had to be utilized to preserve the claim.

In the Court's view, however, *Weaver* does not affect an analysis of the regulations promulgated by the DOL under ERISA. A statute requiring administrative exhaustion before a claim is brought in federal court plainly differs from a waiver of a challenge to an agency's rulemaking.[219] While only Congress can insert an administrative exhaustion requirement into a statute, and sometimes does so as a jurisdictional matter, agencies oversee the notice and

---

[219] Plaintiffs' citation to *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592 (5th Cir. 2007), is likewise misplaced. *Dawson* held that administrative exhaustion is not a jurisdictional requirement under 7 U.S.C. § 6912(e), but it dismissed the case with prejudice because plaintiff failed to exhaust all administrative appeal procedures. The holding is not relevant here.

comment rulemaking process for regulations. Courts have formed a distinction between statutory administrative exhaustion and rulemaking waiver jurisprudence. *See Universal Health Serv., Inc. v. Thompson*, 363 F.3d 1013, 1020 (9th Cir. 2004) (notice and comment waiver "only forecloses arguments that may be raised on judicial review; it is not an exhaustion of remedies rule that forecloses judicial review"); *see also Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) (plaintiff relied upon a case that "addresses exhaustion of administrative remedies, not waiver of claims, and is thus wholly inapposite").

With respect to an agency's notice and comment rulemaking process, the Fifth Circuit has held:

> [t]his court will not consider questions of law which were neither presented to nor passed on by the agency…challenges to [agency] action are waived by the failure to raise the objections during the notice and comment period…[F]or the federal courts to review a petitioner's claims in the first instance would usurp the agency's function and deprive the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action…[T]herefore, only in exceptional circumstances should a court review for the first time on appeal a particular challenge to the [agency's] approval of [an agency decision] not raised during the agency proceedings.

*BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 828–29 (5th Cir. 2003) (internal quotations omitted); *see also Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991) ("Absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.").[220] Plaintiffs present no reason why exceptional circumstances exist here. A constitutional challenge is not *per se* exceptional nor is it immune to

---

[220] The Ninth and Sixth Circuits have held an argument was waived when a party failed to raise the issue during the notice and comment period. *See Mich. Dept. of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.7 (6th Cir. 2000) ("Petitioners failed to raise [Regulatory Flexibility Act] issues during the comment period and thus have waived them for purposes of appellate review."); *see also Universal Health Serv., Inc. v. Thompson*, 363 F.3d 1013, 1019–20 (9th Cir. 2004) (holding "Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review," and that the holding was "consistent with the decisions of every other circuit to have addressed the issue of waiver in notice-and-comment rulemaking")

waiver. To the contrary, constitutional challenges have been deemed waived when the objection was not made to the agency. *Nebraska v. EPA*, 331 F.3d 995, 997–98 (D.C. Cir. 2003). In *Nebraska*, petitioners argued a final regulation violated the Commerce Clause and the Tenth Amendment, but neither issue was raised during the notice and comment period. The D.C. Circuit reasoned that a finding of waiver was appropriate, because the agency could have formulated a rule to address petitioners' concerns, "gather[ed] evidence to evaluate their claims, or interpret[ed] the Act in light of their position." *Id.* at 998.

This rationale is directly applicable to the DOL's rules, as this Court's review of the First Amendment claim would "usurp the agency's function and deprive the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *BCCA Appeal*, 355 F.3d at 828–29.

At oral argument, Plaintiffs argued waiver was inapplicable, because a person's rights would be violated if he did not participate in a rulemaking process. [221] This is precisely what the Plaintiffs in *Thompson* argued:

> [s]uch a rule would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated.

363 F.3d at 1020. The Ninth Circuit refuted that argument, and its reasoning is directly on point:

> These Plaintiffs were on notice that the [] rulemaking was relevant to them. The annual choice of outlier thresholds had direct impact on the potential cost exposure of hospitals in the Medicare acute inpatient program. Clearly the annual ratemaking was a significant concern to the entire healthcare industry, and particularly for hospitals—like the Plaintiffs here—that participated in the Medicare program. The size of the administrative record itself shows the interest taken by the industry in the comment process. The fact that this was an annual ratemaking process rather than *ad hoc* agency action counters any notion that the Plaintiffs were blindsided by the parameter choice. In fact, several comments in the record addressed the

---

[221] Tr. Oral Arg. (ECF No. 126 at 45).

accuracy of the [Secretary's] forecasting. None of the comments, however, raised
the current arguments advanced by the Plaintiffs.

*Id.* at 1021. The Court finds the Ninth Circuit's reasoning in *Thompson* persuasive. The Plaintiffs

in this case have waived their First Amendment arguments, because they were well aware that

the rulemaking process was relevant to them, it could have a direct impact on their industry, and

the size of the administrative record shows the interest of the industry. Plaintiffs were not

blindsided.

Finally, the argument that several commenters raised the substance of the First

Amendment during the notice and comment period, thus not waiving it, is contradicted by the

record; the citations Plaintiffs present neither name a First Amendment claim nor mention First

Amendment principles.[222]

> b.   Plaintiffs Bring a Facial Challenge

Even if Plaintiffs' First Amendment challenge were not waived, the DOL's rules do not

violate the First Amendment. The parties dispute whether Plaintiffs' pre-enforcement First

Amendment claim under the Declaratory Judgment Act is a facial challenge or an as-applied

challenge. The Court concludes it is a facial challenge, for three reasons. First, the rules have not

been implemented. *See Bowen v. Kendrick*, 487 U.S. 589, 601 (1988) ("Only a facial challenge

could have been considered, as the Act had not been implemented."). Second, this conclusion

follows Supreme Court precedent for pre-enforcement First Amendment claims under the

Declaratory Judgment Act. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (acknowledging

that a pre-enforcement First Amendment claim under the Declaratory Judgment Act was a facial

challenge). Third, Plaintiffs do not argue their particular speech is protected from an otherwise

---

[222] *See* Cmt. 621 ACLI (July 21, 2015) (ECF No. 115 at AR 39737–39).

valid law. Instead, Plaintiffs seek "vacatur of the Rule as a whole."[223] Plaintiffs, therefore, must "establish that no set of circumstances exists under which [the regulations] would be valid, or that the [regulations] lack[] any plainly legitimate sweep." *United States v. Richards*, 755 F.3d 269, 273 (5th Cir. 2014).

### c.   The Rules Regulate Professional Conduct, Not Commercial Speech

The Court finds the rules regulate professional conduct, not commercial speech, and therefore any incidental effect on speech does not violate the First Amendment. Under the professional speech doctrine, the government may regulate a professional-client relationship, as a "professional's speech is incidental to the conduct of the profession," and the First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Hines v. Alldredge*, 783 F.3d 197, 201–02 (5th Cir. 2015).

The Fifth Circuit recently addressed when the professional speech doctrine applies in *Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016).[224] In *Serafine*, the Texas State Board of Examiners of Psychologists attempted to stop the plaintiff from using the term "psychologist" on her campaign website. The Fifth Circuit stated that regulating "the practice of a profession, even though that regulation may have an incidental impact on speech, does not violate the Constitution." *Id*. at 359 (citing *Hines* 783 F.3d at 201). The professional speech doctrine applies to a professionals' direct, personalized communication with clients. *Id*. However, it does not apply if "the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted." *Id*. (citing *Lowe v. S.E.C.* 472 U.S. 181, 232 (1985)).

---

[223] ACLI Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 107 at 4).
[224] The Fourth Circuit also recently did the same. *See Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016).

The professional speech doctrine is "confined to occupational-related speech made to individual clients." *Id.* at 360.[225]

Here, the DOL's rules only regulate personalized investment advice to a paying client, and thus would have an incidental effect on speech, if any. For example, the Fiduciary Rule frames the definition of recommendation to include advice "based on the particular investment needs of the advice recipient" and "advice to a specific advice recipient or recipients regarding the advisability of a particular investment or management decision."[226] The rules also expressly state that general communications to the public, which could constitute commercial speech, are not regulated. In particular, the definition of "recommendation" *excludes*

> general communications that a reasonable person would not view as an investment recommendation, including general circulation newsletters, commentary in publicly broadcast talk shows, remarks and presentations in widely attended speeches and conferences, research or news reports prepared for general distribution, general marketing materials, general market data, including data on market performance, market indices, or trading volumes, price quotes, performance reports, or prospectuses.[227]

Plaintiffs argue the professional speech doctrine is inapplicable because the rules are not targeted at conduct, but instead directly regulate speech that proposes commercial transactions, and have more than an incidental burden on speech. Plaintiffs acknowledge that annuity salespeople help consumers assess whether an annuity is a good choice, and that the sales are made on a personalized basis. There is no dispute that the DOL's rules regulate personalized advice in a private setting to a paying client.[228] The rules do not regulate the content of any speech, require investment advisers to deliver any particular message, or restrict what can be said once a

---

[225] The Fifth Circuit held the professional speech doctrine did not apply to Serafine because the speech on her campaign website did not provide advice to any particular client, but communicated with voters at large.

[226] 29 C.F.R. § 2510.3-21(a)(1)(2)(i)-(iii) (2016).

[227] *Id.* at (b)(2)(iii).

[228] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,976 (regulating "specific investment recommendations…i.e., recommending that the investor purchase specific assets or follow very specific investment strategies").

fiduciary relationship is established. *See Hines*, 783 F.3d at 201. The new rules, therefore,

regulate professional conduct with, at most, an incidental burden on speech, and do not run afoul

of the First Amendment.

Plaintiffs also contend the professional speech doctrine is inapposite because it has never

commanded a majority of the Supreme Court.[229] Although the professional speech doctrine was

first embraced by Justice White in his concurrence in *Lowe v. S.E.C.*, the Fifth Circuit has often

cited it with approval.[230] It articulated when the professional speech doctrine applies in *Serafine*,

citing the concurrence in *Lowe*. The Court concludes it should follow *Serafine* and *Hines* here.

Plaintiffs argue the DOL's rules infringe on their right to commercial expression in

personal solicitations, and therefore violate the First Amendment. *Edenfield v. Fane*, 507 U.S.

761 (1993). In *Edenfield*, an accountant challenged a Florida law prohibiting personal

solicitations to obtain new clients. The Supreme Court held the law banning solicitations violated

the First Amendment in an as-applied challenge. In *Edenfield*, the Court struck down a blanket

ban on personal solicitation, as opposed to a rule regulating the practice of a profession in the

context of individualized advice. *Edenfield* first noted "this case comes to us testing the

solicitation, nothing more." *Id*. at 765. Specifically, the accountant "obtained business clients by

making unsolicited telephone calls to their executives and arranging meetings to explain his

services and expertise…this direct, personal, uninvited solicitation" was banned by Florida law.

*Id*. at 763. The DOL's rules not only do not ban personal solicitation, they do not regulate

personal solicitation. Nothing prevents an agent selling FIAs or variable annuities from picking

---

[229] The Fourth, Ninth, and Eleventh Circuits have embraced the professional speech doctrine, and the Fifth Circuit's decisions in *Serafine* and *Hines* embrace the doctrine as well.
[230] *Serafine*, 810 F.3d at 359 (5th Cir. 2016); *Hines*, 783 F.3d 197, 201 (5th Cir. 2015).

up the phone to arrange a meeting to explain the agent's services or expertise. This is confirmed

by the language of the Fiduciary Rule, which states

> one would not become a fiduciary merely by providing information on standard financial and investment concepts…All of this is non-fiduciary education as long as the adviser doesn't cross the line to recommending a specific investment or investment strategy…without acting as a fiduciary, firms and advisers can provide information and materials on hypothetical asset allocations as long as they are based on generally accepted investment theories, explain the assumptions on which they are based, and don't cross the line to making specific investment recommendations or referring to specific products…without acting as a fiduciary, firms and advisers can provide a variety of…materials that enable workers to estimate future retirement needs and to assess the impact of different investment allocations on retirement income, as long as the adviser meets conditions similar to those described for asset allocation models. These interactive materials can even consider the impact of specific investments, as long as the specific investments are specified by the investor, rather than the firm/adviser.[231]

Next, Plaintiffs argue the rules are content-based and incompatible with the Supreme

Court's holding in *Sorrell*.  In *Sorrell*, a Vermont law was held to violate the First Amendment

because it prohibited certain healthcare entities from "disclosing or otherwise allowing

prescriber-identifying information to be used for marketing." 564 U.S. at 563.  *Sorrell* held the

law was content-based, because it allowed disclosure or sale of the information for academic and

research purposes, but prohibited the information for marketing. The Vermont law was

characterized as designed to "diminish the effectiveness of [manufacturer] marketing," and was

held unconstitutional. *Id*. at 565.

The DOL's rules do not regulate the content of speech. Instead, they require individuals

who qualify as fiduciaries under ERISA to conduct themselves according to fiduciary standards.

Plaintiffs claim the new rules create liabilities for receipt of commission-based compensation

based on the content of speech.[232] But the rules do not regulate the content of the message; they

---

[231] *Final Fiduciary Definition*, 81 Fed. Reg. at 20,976.
[232] ACLI Brief in Support of Motion for Summary Judgment (ECF No. 49 at 12).

regulate the conduct of receiving a commission in the presence of a conflict of interest. Rules that regulate a course of conduct do not violate the First Amendment "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).

The new rules must also be viewed in the context of ERISA's prohibited transaction rule, in which Congress deemed certain transactions so fraught with conflicts that it banned them. As early as 1977, the DOL determined that, without an exemption, commission-based compensation would trigger the prohibited transaction rules.[233] The DOL's new rules regulate conduct related to these transactions, to ensure consumers do not receive conflicted or misleading advice.

Plaintiffs argue the rules make two specific content-based distinctions. First, they claim the Fiduciary Rule regulates speech with a particular subject matter, including investment advice or recommendations to purchase retirement products. If this were content-based regulation, then ERISA's plain language, including the statute's fiduciary definition, various prohibited transaction exemptions since 1974, and numerous securities laws would all trigger heightened scrutiny. As other courts have held, that position is untenable.[234] Second, Plaintiffs claim BICE and PTE 84-24 discriminate among recommendations according to content-based criteria. The exemptions do not disfavor particular messages about retirement products. The exemptions regulate fiduciaries' conduct and aim to protect consumers from the commercial harms of conflicts of interest and misleading advice. These concepts are articulated throughout BICE and the new PTE 84-24, which require fiduciaries to comply with impartial *conduct* standards, and

---

[233] *PTE 77-9*, 42 Fed. Reg. at 32,395.
[234] *See Ohralik*, 436 U.S. at 456 (citing communications that are regulated without offending the First Amendment, including exchange of information about securities and exchange of price and production information among competitors); *see also SEC v. Wall Street Publ'g. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible-and that result has long since been rejected.").

"include obligations to *act* in the customer's [b]est [i]nterest, avoid misleading statements, and receive no more than reasonable compensation."[235]

At worst, the only speech the rules even arguably regulate is misleading advice. Plaintiffs and their members may speak freely, so long as they recommend products that are in a consumer's best interest. If an investment adviser recommends a product merely because the product makes the most money for the adviser or financial institution, despite the product not being in the investor's best interest, such advice is not appropriate for the investor and would be misleading. Thus, even if Plaintiffs' First Amendment claim were analyzed as a regulation of commercial speech, the rules would withstand First Amendment scrutiny because they only seek to regulate misleading advice and statements. For commercial speech to warrant First Amendment protection, the speech must "not be misleading," because the government may regulate communication that is "more likely to deceive the public than to inform it." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563, 567 (1980). Therefore, Plaintiffs cannot establish that there are "no set of circumstances exists under which [the regulations] would be valid," which is required for a successful facial challenge. *Richards*, 755 F.3d at 273. The rules are valid because they regulate conduct, not speech, and any incidentally affected speech is subject to regulation because it is deemed misleading.

Finally, Plaintiffs argue the rules "effectively ban[] commercial sales speech" because "all recommendations to retirement savers must be made in a fiduciary capacity or not at all."[236] This claim is not related to the First Amendment, because requirements for a person acting as a fiduciary is not a restriction on speech. It arises from the DOL's authority to define who is a

---

[235] *Final PTE 84-24*, 81 Fed. Reg. at 21,094; *Final BICE*, 81 Fed. Reg. at 21,026 (emphasis added).
[236] ACLI Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 107 at 8).

"fiduciary" and what constitutes a "recommendation" under ERISA and the Code, and the Court

has analyzed those issues above.

### G.  The Exemptions' Contractual Provisions Do Not Violate the FAA

The FAA provides that a written provision in any contract that "settle[s] by arbitration a

controversy thereafter arising out of such contract…shall be valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract."[237] BICE

and PTE 84-24 require financial institutions receiving exemptions under them to preserve an

investor's right to bring or participate in a class action. Plaintiffs argue this provision violates the

FAA because it conditions the enforceability of arbitration agreements on the particular terms

and conditions of the contracts required by each exemption. Plaintiffs' argument is without

merit, as the exemptions' contract requirements do not render arbitration agreements between a

financial institution and investor invalid, revocable, or unenforceable.[238] Institutions and advisers

may invoke and enforce arbitration agreements, including terms that waive or qualify the right to

bring a class action or any representative action; such contracts remain enforceable, but do not

"meet the conditions for relief from the prohibited transaction provisions of ERISA and the

Code."[239] The exemptions, therefore, do not violate the FAA's primary purpose, which is to

"ensure that private arbitration agreements are enforced according to their terms." *AT&T*

*Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This conclusion is also supported by the

FINRA Customer Code, which since 1992 has allowed individual arbitration but disallowed

class action prohibitions.[240]

---

[237] 9 U.S.C. § 2.
[238] *Final BICE*, 81 Fed. Reg. at 21,044.
[239] *Id.*
[240] *See Dep't of Enforcement v. Charles Schwab & Co.* (FINRA Bd. of Governors Apr. 24, 2014), *available at* https://www.finra.org/sites/default/files/NACDecision/p496824.pdf (ruling Rule 12204 does not violate the FAA).

The DOL determined the protections associated with class litigation "ensure adherence to the impartial conduct standards and other anti-conflict provisions of the exemptions," finding the provisions satisfied the three exemption requirements under ERISA and the Code.[241] The requirement fits within the DOL's authority to grant "conditional or unconditional" exemptions, and do not violate the FAA.

Plaintiffs brought to the Court's attention a recent district court decision which held a regulation promulgated by the Center for Medicare and Medicaid Service likely violated the FAA. *Am. Health Care Ass'n v. Burwell*, 3:16-CV-00233, 2016 WL 6585295 (N.D. Miss. Nov. 7, 2016). There, the agency's regulation threatened to withhold federal funding to disincentive nursing homes from entering into new arbitration agreements. The court found the provisions likely violated the FAA, for two reasons. First, nursing homes are so dependent upon Medicare and Medicaid funding that the regulation was a de facto ban on pre-dispute nursing home arbitration contracts. Second, citing *CompuCredit Corp v. Greenwood*, 132 S. Ct. 665, 670 (2012), the court held that in the absence of a congressional command to the contrary, the FAA "bars not only a rule prohibiting enforcement of existing agreements, but also a rule prohibiting new arbitration agreements." *Am. Health Care*, 2016 WL 6585295, at *5 (quotations omitted).

*American Health Care* is distinguishable from the DOL's rules. The DOL's rules do not implicate the power and potentially coercive nature of the spending clause, which was the central reason for concluding the agency had instituted a de facto ban in *American Health Care*. The conditions of BICE and PTE 84-24 do not constitute a de facto ban; any arbitration provision without the class action provision would remain valid, irrevocable, and enforceable, but the financial institution or adviser would be unable to qualify for an exemption from an otherwise

---

[241] *Id.* at 21,021.

prohibited transaction. Plaintiffs are not being coerced into relying on a particular exemption, as there are several plausible options and alternatives for the industry, including adjusting compensation models or innovating practices.  Further, although the standard of review articulated in *CompuCredit* is inapplicable here, the DOL does have a strong and specific congressional command, as ERISA and the Code expressly authorize the DOL to grant conditional or unconditional exemptions from otherwise prohibited transactions.

The "FAA's pro-arbitration policy goals do not require [the DOL] to relinquish its statutory authority." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  The relevant text of ERISA and the FAA "do not authorize the courts to balance the competing policies of [ERISA] and the FAA or to second-guess [the DOL's] judgment concerning which of the [exemptions] authorized by law that it shall seek in any given case…to hold otherwise would…undermine [the DOL's] independent statutory responsibility." *Id*. at 288, 297. The DOL has properly used its exemptive authority under ERISA for BICE and PTE 84-24, and its new rules do not violate the FAA.

## IV.  Conclusion

For the reasons stated above, Plaintiffs' Motions for Summary Judgment are **DENIED**, and Defendants' Motion for Summary Judgment is **GRANTED**.

**SO ORDERED**.

February 8, 2017.


**BARBARA M. G. LYNN**
**CHIEF JUDGE**